UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

FILED  JUN 15 2017

**CLERK**

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

JUN 15 2017 [ORAL ARGUMENT NOT SCHEDULED]

RECEIVED

No. **17-1156**

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

### IN RE KHALID SHAIKH MOHAMMAD,
*Petitioner*

---

On Petition for a Writ of Mandamus and Prohibition to Order
Recusal of Judge Scott L. Silliman from Serving in Petitioner's Case in the
United States Court of Military Commission Review

---

## PETITION FOR A WRIT OF MANDAMUS AND PROHIBITION

David Z. Nevin
  (admitted to the Bar of Idaho)
Nevin, Benjamin, McKay
& Bartlett LLP
303 W. Bannock
Boise, ID 83702
Tel: (208) 343-1000
Email: dnevin@nbmlaw.com

Gary D. Sowards
  (admitted to the Bar of California)
McBreen & Senior
1900 Avenue of the Stars
11th Floor
Los Angeles, CA 90067
Tel: (310) 552-5300
Email: gsowards@mcbreensenior.com

Derek A. Poteet
Major, U.S. Marine Corps
U.S. Department of Defense
Military Commissions Defense
  Organization
1620 Defense Pentagon
Washington, D.C. 20301
Tel: (703) 695-5293
Email: derek.poteet@osd.mil

Rita J. Radostitz
  (admitted to the Bar of Texas)
U.S. Department of Defense
Military Commissions Defense
  Organization
1620 Defense Pentagon
Washington, D.C. 20301
Tel: (703) 571-0723
Email: rita.radostitz@osd.mil

*Counsel for Petitioner*

ORIGINAL

## CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES

### I.    PARTIES AND AMICI APPEARING BELOW

The parties who appeared before the United States Court of Military Commission Review were:

1. Khalid Shaikh Mohammad, Appellee

2. Walid Muhammad Salih Mubarek bin 'Attash, Appellee

3. Ramzi bin al Shibh, Appellee

4. Ali Abdul-Aziz Ali, AKA Ammar al Baluchi, Appellee

5. Mustafa Ahmed Adam al Hawsawi, Appellee

6. United States of America, Appellant

### II.    PARTIES AND AMICI APPEARING IN THIS COURT

1. Khalid Shaikh Mohammad, Petitioner

2. The Honorable Scott L. Silliman, Respondent

3. United States of America, Respondent

4. Walid Muhammad Salih Mubarek bin 'Attash, Respondent

5. Ramzi bin al Shibh, Respondent

6. Ali Abdul-Aziz Ali, AKA Ammar al Baluchi, Respondent

7. Mustafa Ahmed Adam al Hawsawi, Respondent

### III.    RULINGS UNDER REVIEW

This case involves a petition for a writ of mandamus and prohibition to order the recusal of the Hon. Scott L. Silliman from serving as a judge in Petitioner's

i

case below and his disqualification from taking any part in the case to include assigning other judges to it. In particular, it seeks review of the Order and Opinion dated June 6, 2017 by Acting Chief Judge Silliman in the United States Court of Military Commission Review denying Petitioner's Motion for Recusal and/or Disqualification of Judge Silliman (Appendix at A1).

## IV.    RELATED CASES

This case has not previously been filed with this Court or any other court.

Dated: June 15, 2017

By: _____

*Counsel for Petitioner*

ii

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iv

GLOSSARY OF TERMS ................................................................... v

JURISDICTION................................................................................ 1

RELIEF SOUGHT ........................................................................... 1

ISSUE PRESENTED ........................................................................ 2

STATEMENT OF FACTS ................................................................. 2

    A.  Background of Interlocutory Appeal ........................................... 2

    B.  The Hon. Scott L. Silliman and Public Comments Relating to
        Mr. Mohammad's Case ............................................................ 3

REASONS FOR GRANTING THE WRIT........................................... 11

    I.   Writs of mandamus or prohibition are appropriate vehicles to remedy
        actual or apparent judicial bias. .............................................. 11

    II.  Judge Silliman's actual or apparent bias requires his disqualification. ... 13

    III.  Judge Silliman's statements prior to taking the bench are squarely
         relevant to his claim of bias and are not "cured" by his oath of office. ... 15

    IV.  Judge Silliman's rationalizations for his individual statements are
         not credible and, moreover, do not remove the taint of apparent bias
         that his statements, taken together or separately, reflect. ........................ 19

    V.  Judge Silliman's assignment of himself to this specific case further
        exacerbates the appearance of bias. ......................................... 23

CONCLUSION ............................................................................... 25

CERTIFICATE OF SERVICE ............................................................ 26

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT................. 28

STATUTES, REGULATIONS AND RULES

APPENDIX

# TABLE OF AUTHORITIES

*Authorities upon which Petitioner chiefly relies are marked with an asterisk.

## United States Constitution

U.S. Const. amend. V................................................................10

U.S. Const. amend. VIII.............................................................10

## Cases

*Aetna Life Ins. Co. v. Lavoie*, 475 U. S. 813 (1986).........................14

*Berger v. United States*, 255 U.S. 22 (1921) ...............................12

\* *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868 (2009)...............14, 16

*Cheney v. United States Dist. Court*, 542 U.S. 367 (2004) ..............12

*Cobell v. Norton*, 334 F.3d 1128 (D.C. Cir. 2003) .....................12, 13

*Glassroth v. Moore*, 335 F.3d 1282 (11th Cir. Ala. July 1, 2003) .........18

*Hamdan v. Rumsfeld*, 548 U.S. 557 (2006) .................................6

\* *In re al-Nashiri*, 791 F.3d 71 (D.C. Cir. 2015).................1, 11, 12

\* *In re Khadr*, 823 F.3d 92 (D.C. Cir. 2016) ......................1, 13

*In re Sch. Asbestos Litig.*, 977 F.2d 764 (3d Cir. 1992) ...............12

*In re United States*, 666 F.2d 690 (1st Cir. 1981).......................12

*Int'l Refugee Assistance Project v. Trump*, No. 17-1351, 2017 U.S. App.
      LEXIS 9109 (4th Cir. Md. May 25, 2017) ........................17, 18

*Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847 (1988) ..........12

*McCreary County v. ACLU*, 545 U.S. 844 (2005)......................17, 18

*Tripp v. Executive Office of the President*, 196 F.R.D. 201 (D.D. 2000)..........24

*Tumey v. Ohio*, 273 U.S. 510 (1927) ....................................14

\* *Williams v. Pennsylvania*, 579 U.S. ___, 136 S. Ct. 1899 (2016).........13, 15, 16

**Statutes**

10 U.S.C. § 948j ................................................................20

10 U.S.C. § 950g ................................................................1

28 U.S.C. § 455 ................................................................10

28 U.S.C. § 1651 ................................................................1, 11

**Regulations & Manuals**

Code of Judicial Conduct for United States Judges...........................................10, 22

Rule 25, CMCR Rules of Practice (2016) ................................................10

Rule for Military Commissions 902, Manual for Military Commissions,
    Part II (2016)................................................................10

**Other Authorities**

Jonathan Swift, *Polite Conversation* 174 (Chiswick Press ed., 1892))............17, 18

## GLOSSARY OF TERMS

CMCR  ................................... United States Court of Military Commission Review

UCMJ  .................................................Uniform Code of Military Justice

# JURISDICTION

This Court has exclusive supervisory jurisdiction over the United States Court of Military Commission Review ("CMCR") pursuant to 10 U.S.C. § 950g. This Court has jurisdiction to issue all writs necessary and appropriate in aid of that jurisdiction pursuant to 28 U.S.C. § 1651. This Court has held that mandamus is available to review certain CMCR interlocutory matters, which include "the existence of actual or apparent bias" by the judge. *In re al-Nashiri*, 791 F.3d 71, 76 (D.C. Cir. 2015); *see also In re Khadr*, 823 F.3d 92, 97 n.2 (D.C. Cir. 2016).

# RELIEF SOUGHT

Petitioner asks this Court to issue a writ of mandamus directing the Hon. Scott L. Silliman to recuse himself from serving as a judge on the CMCR in an appeal brought by the United States seeking review of a ruling of a military commission; and requests a writ of prohibition barring him from taking any part in the case, to include assigning judges to the case. Judge Silliman has a long history of public comment directly related to this case, including about Petitioner, which shows that he either has an actual bias against Petitioner and the other appellees, or he has voluntarily created the appearance of a lack of impartiality which disqualifies him from serving as a judge in the case.

## ISSUE PRESENTED

Whether a judge who has made numerous public statements about a petitioner's case indicating bias and pre-judgment, including stating that the petitioner is guilty and discussing his likely method of execution, is disqualified from serving as a judge in the petitioner's case.

## STATEMENT OF FACTS

### A. Background of Interlocutory Appeal.

Petitioner, Khalid Shaikh Mohammad ("Mr. Mohammad"), is one of five co-defendants in a joint capital military commission currently ongoing at Guantanamo Bay, Cuba, on charges of planning and bringing about the attacks of September 11, 2001. Mr. Mohammad was arrested in Rawalpindi, Pakistan, on March 1, 2003, detained *incommunicado,* and tortured for some 3½ years in overseas detention facilities, known as "black sites," which were operated by the United States Central Intelligence Agency. Mr. Mohammad was transferred to Naval Station Guantanamo Bay, Cuba in September of 2006. He was not permitted access to counsel from the time of his arrest until early 2008.

Capital charges against Mr. Mohammad and four co-defendants were referred to a military commission at Guantanamo Bay on May 9, 2008. In January 2009, then-President Obama announced his decision to close the detention facility

2

at Guantanamo Bay and the military commission system in operation there.  The

pending capital charges against Mr. Mohammad were dismissed without prejudice

in 2010. Then-Attorney General Eric Holder announced his intention to transfer

Mr. Mohammad and his co-defendants for prosecution in the United States District

Court for the Southern District of New York. President Obama thereafter reversed

course again and decided to initiate a second military commission prosecution

against Mr. Mohammad.

In May 2012, Mr. Mohammad and the four co-defendants were arraigned

again, on eight charges, six of which are capital.  On April 7, 2017, the military

commission granted a motion filed by co-defendant Mr. al Baluchi, joined by Mr.

Mohammad, and dismissed the only two non-capital charges as to all five

defendants on the ground that prosecution of these charges was barred by

applicable statutes of limitation.

The government filed an interlocutory appeal of the dismissal to the CMCR.

### B.  The Hon. Scott L. Silliman and Public Comments Relating to Mr. Mohammad's Case.

The Hon. Scott L. Silliman is a judge of the CMCR, having been appointed

by President Obama on November 10, 2011, and confirmed by the United States

Senate on June 21, 2012.[1]  According to the Office of Military Commissions

---

[1] Duke Law School Faculty biography, publicly available at
https://law.duke.edu/fac/silliman/ (last accessed June 9, 2017).

3

website he was sworn as an Appellate Military Judge on September 12, 2012, and sworn as the Deputy Chief Judge on March 11, 2014. App. at A186. Before taking the bench, Judge Silliman was on the faculty of Duke University School of Law and, before that, was a career Air Force judge advocate. His court biography from the Office of Military Commissions website also notes that he "continues to be widely sought throughout the country as a guest lecturer on these areas of the law, [national security law, military law, and the law of armed conflict] and is a frequent commentator on CNN, National Public Radio, and other national radio and television news programs." App. at A30.

This Petition refers to several excerpted quotations of Judge Silliman. Petitioner has used the most pertinent examples in selecting the portions of quotations for this Petition, and Mr. Mohammad encourages review of the entire context, whether at the publicly-available sources cited, or in the Appendix.

On September 12, 2001, Judge Silliman chose to publicly address students at Duke University School of Law, and stated, inter alia, "there is a rage in me, and I suspect within you, that needs to be vented…" in reference to the attacks of September 11, 2001.[2] He subsequently urged that there be restraint in venting that rage. This was part of a one hour and six minute open forum with law students and

---

[2] *Prof. Scott Silliman talks to Duke Law students about the 9-11 attacks on September 12, 2001*, uploaded on September 7, 2011, video file publicly available at https://www.youtube.com/watch?v=-UcwEa5g1r0 (last accessed June 9, 2017).

one other faculty member.  While the other faculty member provided a few remarks and some students asked questions, the majority of the more than one hour video is the remarks of then-Prof. Silliman.[3]

On November 28, 2001, Judge Silliman appeared as a witness and testified before the Senate Committee on the Judiciary about legally significant details of facts and law directly at issue in Mr. Mohammad's case, and stated:  "I maintain that shortly before 9 o'clock in the morning on Tuesday, September 11th, we were not in a state of armed conflict and we did not enter into a state of armed conflict until some time thereafter, certainly on or after the 7th of October."  App. A32, at A39.

In September 2002, in view of the first anniversary of the events at issue in this case, Judge Silliman opined publicly that the United States' treatment of many captives taken in the previous year violates provisions of the Geneva Convention as well as U.S. domestic law.  App. at A47.

In a 2004 law review article addressing jurisdiction of military commissions post-9/11, Judge Silliman opined specifically on Article 36 and Article 21 of the Uniform Code of Military Justice ("UCMJ"), provisions which are at issue in the

---

[3] *An Open Forum to Discuss the World Trade Center Disaster, Professors Scott Silliman and Christopher Schroeder answered questions related to the possible responses this country might make to this act of terrorism, September 12, 2001*, uploaded on April 17, 2017, video file publicly available at https://www.youtube.com/watch?v=ghCeDEmyda4 (last accessed June 14, 2017).

5

government's pending appeal before Judge Silliman. App. at A53. Then-Prof.
Silliman's view of Presidential power, executive orders, and military commissions
was rejected by the Supreme Court in *Hamdan v. Rumsfeld*, 548 U.S. 557 (2006).

On July 19, 2006, Judge Silliman testified again as a witness before the
Senate, this time at the Committee on Armed Services. His testimony on this
occasion directly related to provisions which are at issue in the government's
pending appeal before the CMCR, opining at length on how to deviate in military
commissions from the uniformity requirement of Article 36: "All this is easily
accomplished in a military commission system under the UCMJ by justifying, via
Article 36(b) of the Code, the need to deviate from the MRE [Military Rules of
Evidence] procedures." App. A68, at A119.

On February 12, 2008, Judge Silliman was quoted in the Los Angeles Times
discussing the guilt of Mr. Mohammad and his co-defendants, saying "The fact is
that we're going to have a military commission for those the United States
believes, and most of the world acknowledges, to be ring leaders of the 9/11
attacks…." App. at A130.

In a law review article published in 2009, Judge Silliman cited Mr.
Mohammad by name in stating his opinion that significant resources would be
needed to prosecute Mr. Mohammad in the United States due to the risk of
targeting by terrorist cells, specifically expressing concern for the safety of the

courtroom hearing Mr. Mohammad's case: "For example, when dealing with very high profile cases such as Khalid Sheikh Mohammed (sic), it is not inconceivable that terrorist cells operating within the U.S. would target the courtroom and prisoner detention facility where he would be kept during trial proceedings." In this article, then-Professor Silliman is once again taking a position advocating the assertion of military commission jurisdiction over Mr. Mohammad and an attendant deprivation of important fair trial rights. App. A134, at A138-A139, A142.

On August 18, 2009, Judge Silliman appeared on C-SPAN's Washington Journal with Susan Davis, and again asserted that bringing Guantanamo detainees to the United States for trial was a more "dangerous option" in light of the possibility that a "radicalized" group might stage an attack or protest."[4]

On November 30, 2009, Judge Silliman returned to discussing Mr. Mohammad by name (this time by using his familiar initials), and publicly endeavored to forecast Mr. Mohammad's trial strategy: "I think it's likely KSM will want to use the trial as a forum for himself and to put the government on trial. I will be very surprised if he pleads guilty … We should expect a long, convoluted trial full of difficulties for the government." App. at A145.

---

[4] Susan Davis, *Washington Journal*, C-SPAN (Aug. 18, 2009), video publicly available at https://www.c-span.org/video/?288435-4/guantanamo-bay-detainee-facility, (last accessed June 9, 2017).

On November 8, 2010, Judge Silliman was quoted in the media identifying Mr. Mohammad by name, and expressing his opinion that he and his four co-defendants are guilty: "We've got the major conspirators in the 9/11 attacks still at Guantanamo Bay – Khalid Sheikh Mohammed[sic] and four others[.]" App. A148, at A149.

On April 5, 2011, Judge Silliman was quoted in a news report discussing the manner in which Mr. Mohammad "will be" executed. He said, referring to Mr. Mohammad and to lethal injection executions carried out in the United States by the military, "I'm assuming the same pattern will be followed, except for the location." App. at A152.

On September 12, 2012, Judge Silliman was sworn as a CMCR Judge, exactly eleven years after beginning his practice of commenting publicly on this case.[5] Six months later, Judge Silliman introduced Brigadier General Mark Martins at the Duke Law School annual conference on Law, Ethics and National Security. BG Martins is the Chief Prosecutor for military commissions and also has detailed himself to be Trial Counsel in Mr. Mohammad's military commission case.

---

[5] App. at A187: "Judges, U.S. Court of Military Commissions Review" indicating that Judge Silliman was "Sworn as USCMCR Judge: September 12, 2012; Sworn as Deputy Chief Judge: Mar. 11, 2014" despite the requirement in the Regulation for Trial by Military Commission at 25-2.d. that the Chief Judge and Deputy Chief Judge be designated "from among those individuals nominated by the Judge Advocates General and from among others qualified to serve as appellate military judges," which requirement appears not to be satisfied by Judge Silliman.

While introducing BG Martins, Judge Silliman stated "General Martins, when he sends out his official bio sketch whenever he speaks, is a minimalist, and I don't intend to let him get away with it this time."  While going through a lengthy glowing introduction which was not limited to reading a paper but included personal reflections and anecdotes, Judge Silliman pointed out approvingly, "One of our colleagues, close colleagues, Bobby Chesney, professor of law at University of Texas, I think said it well. He said if in 2001, after 9/11, if we had had the 2009 Military Commissions Act, and if we had had General Martins as the chief prosecutor, much of the dialogue back and forth arguing about military commissions probably would have been minimized. And I think that's a very fair statement."[6]

---

[6] Duke University Law School; Law, Ethics and National Security (LENS) Conference 2013, *Hon. Scott Silliman, LENS Executive Director Emeritus, introducing BG Mark Martins*; March 1, 2013, video publicly available at https://law.duke.edu/video/lens-conference-2013-brig-gen-mark-martins-jagc-chief-prosecutor-military-commissions/ (last accessed June 9, 2017).  (Judge Silliman here was approvingly referencing Prof. Robert Chesney's statement, "If in 2001 we'd had the 2009 Military Commissions Act and Mark Martins in charge of the prosecution, from the get-go there would have been significant focus on the legitimacy of the system, rather than on the more draconian-looking, multiyear process we got. I'm sure some would still be critical, but it would not have become the cause célèbre it continues to be." As quoted in *"Meet the man who would save Guantanamo,"* by Terry Carter, ABA Journal, March 1, 2013, App. at A156.

9

On February 3, 2016, utilizing the title "Acting Chief Judge," Judge Silliman promulgated revised Rules of Practice for the CMCR.[7]  On April 25, 2017, again utilizing the title "Deputy Chief Judge," Judge Silliman assigned himself and two other judges to serve as the panel in the government's interlocutory appeal in Mr. Mohammad's case.  App. at A184.

On May 9, 2017, Mr. Mohammad filed a motion in the CMCR for recusal and/or disqualification of Judge Silliman for actual and apparent bias, based on the long history of public comments described above.  App. at A16.  Mr. Mohammad's motion in the CMCR for recusal and/or disqualification of Judge Silliman was based on CMCR Rule of Practice 25; Rule for Military Commissions 902; 28 U.S. Code § 455; the Code of Judicial Conduct for United States Judges as adopted by the Judicial Conference of the United States; and the Fifth and Eighth Amendments to the U.S. Constitution.

On June 6, 2017, again utilizing the title "Acting Chief Judge,"[8] Judge Silliman issued an Opinion and Order ("Order") finding he was unbiased and

---

[7] February 3, 2016 revised Rules of Practice for the United States Court of Military Commission Review, publicly available at http://www.mc.mil/Portals/0/pdfs/CMCR%20Rules%20of%20Practice%20(Feb% 203%202016).pdf, last accessed June 9, 2017.

[8] On May 25, 2017, Secretary of Defense James Mattis appointed LTC Paulette Burton to be Chief Judge of the CMCR, according to the court biography of Chief Judge Paulette V. Burton, available online at http://www.mc.mil/Portals/0/pdfs/Burton%20Chief%20Judge%20Bio.pdf (last

denying the motion for his recusal.  App. A1 at A15.  The Order is discussed in greater detail below.

## REASONS FOR GRANTING THE WRIT

I.    **Writs of mandamus or prohibition are appropriate vehicles to remedy actual or apparent judicial bias.**

This Court has jurisdiction pursuant to the All Writs Act, 28 U.S.C. § 1651(a), to issue "all writs necessary or appropriate in aid of [our] jurisdiction[]." *In re Al-Nashiri*, 791 F.3d 71, 75 (2015).  In addition, because the 2009 MCA gives this Court exclusive jurisdiction to determine the validity of a final judgment of a military commission, it has jurisdiction to "issue a writ of mandamus now to protect the exercise of our appellate jurisdiction later." *Id.* at 76.

Mr. Mohammad seeks the protection of a writ of mandamus to prevent the irreparable harm of having his case decided by a biased judge. In seeking that relief, he meets all the relevant conditions this Court has identified as governing mandamus to the CMCR in military commission cases.

---

accessed June 9, 2017).  This filled the nearly two year long absence of a Chief Judge on CMCR.  The website provides no explanation for Judge Silliman continuing to act as "Acting Chief Judge" after Judge Burton's appointment as Chief Judge.

In *Al-Nashiri*, addressing the availability of mandamus relief against actions

of the CMCR, this Court held that the "traditional prerequisites for mandamus

relief" are:

> First, the party seeking issuance of the writ must have no other
> adequate means to attain the relief he desires … Second, the petitioner
> must satisfy the burden of showing that his right to issuance of the
> writ is clear and indisputable. Third, even if the first two prerequisites
> have been met, the issuing court, in the exercise of its discretion, must
> be satisfied that the writ is appropriate under the circumstances.
> *Cheney v. United States Dist. Court*, 542 U.S. 367, 380-81 (2004)
> (citations, brackets and quotation marks omitted).

*Al-Nashiri*, 791 F.3d at 78.

As this Court further explained, actual or apparent judicial bias is a

paradigmatic example of a situation presenting the absence of "other adequate

means" to obtain relief:

> [w]ith actual bias, ordinary appellate review is insufficient because it
> is too difficult to detect all of the ways that bias can influence a
> proceeding. *See Cobell* [*v. Norton*, 334 F.3d 1128 (D.C. Cir. 2003)] at
> 1139. ("[I]f prejudice exist[ed], it has worked its evil and a judgment
> of it in a reviewing tribunal is precarious. It goes there fortified by
> presumptions, and nothing can be more elusive of estimate or decision
> than a disposition of a mind in which there is a personal ingredient."
> (*quoting Berger v. United States*, 255 U.S. 22, 36 (1921)). With
> apparent bias, ordinary appellate review fails to restore "public
> confidence in the integrity of the judicial process," *Liljeberg v. Health
> Services Acquisition Corp.*, 486 U.S. 847, 860, (1988) -- confidence
> that is irreparably dampened once "a case is allowed to proceed before
> a judge who appears to be tainted." *In re Sch. Asbestos Litig.*, 977
> F.2d 764, 776 (3d Cir. 1992); accord *In re United States*, 666 F.2d
> 690, 694 (1st Cir. 1981).

*Al-Nashiri*, 791 F.3d at 79. *Cobell*, in turn, observed that "[a]lthough this court does not seem to have ruled upon the propriety of seeking the recusal of a judicial officer by petition for a writ of mandamus, every circuit to have addressed the issue has found it proper." *Cobell*, 334 F.3d at 1139. Recently, in the *Khadr* case, this Court confirmed that "mandamus is appropriate when an interlocutory order would cause an 'irreparable' injury that would otherwise 'go unredressed'" such as "'the existence of actual or apparent bias' by the judge." *In re Khadr*, 823 F.3d 92, 97 n.2 (D.C. Cir. 2016).

Mandamus is therefore appropriate here to address the existence of the actual or apparent bias of Judge Silliman.

## II.    Judge Silliman's actual or apparent bias requires his disqualification.

Just last year, in *Williams v. Pennsylvania*, 136 S. Ct. 1899 (2016), the Supreme Court specifically considered the question presented here: when does actual or apparent bias of a judge sitting on an appeals court render that judge incapable of judging a capital case. In deciding that question, the Court reaffirmed that judicial bias is evaluated based on "an objective standard that, in the usual case, avoids having to determine whether actual bias is present. The Court asks not whether a judge harbors an actual, subjective bias, but instead whether, as an objective matter, 'the average judge in his position is 'likely' to be neutral, or

13

whether there is an unconstitutional 'potential for bias.'" *Williams*, 136 S. Ct. at 1905 (quoting *Caperton v. A. T. Massey Coal Co.,* 556 U.S. 868, 881 (2009)). That standard asks not whether the Judge is biased but whether based upon the facts and circumstances surrounding the judge's elevation to office as well as their conduct while on the bench, there is a "possible temptation" for the judge "not to hold the balance nice, clear and true." *Aetna Life Ins. Co. v. Lavoie*, 475 U. S. 813, 822 (1986); *Tumey v. Ohio*, 273 U.S. 510, 532 (1927).

Judge Silliman's bias in this case is both actual and apparent. Judge Silliman has formed and expressed publicly his opinion that Mr. Mohammad is guilty of the charges contained in the very case over which he now presides. Judge Silliman has testified before Congress, commented in the media and elsewhere, and published articles that address the precise legal issues in the government's present appeal. He has publicly commented on how he believes Mr. Mohammad's defense will be conducted and suggested that these defense strategies would be illegitimate. He has even formed, and publicly expressed, opinions regarding how Mr. Mohammad will be *executed* after what Judge Silliman presumably has concluded is Mr. Mohammad's inevitable conviction and death sentence. Judge Silliman has publicly suggested that Mr. Mohammad has and maintains links to "terrorist cells operating within the U.S. [who] would target the courtroom," indicating a belief –

14

if nothing else – that Judge Silliman is fearful for his own safety as he considers Mr. Mohammad's case.  App. at A134.

In short, Judge Silliman neither is nor appears to a reasonable observer to be unbiased respecting either Mr. Mohammad or the very legal issue the government now seeks to have Judge Silliman decide in its favor.  And, Judge Silliman's Order of June 6, 2017 denying the motion to recuse or disqualify, only further emphasizes his own biases.

### III.    Judge Silliman's statements prior to taking the bench are squarely relevant to his claim of bias and are not "cured" by his oath of office.

In its response to the motion for recusal in the CMCR, counsel for the prosecution sought to emphasize that most of Judge Silliman's comments were made before he took the bench.  Recusal App. at 12. As an initial matter, there is no legal basis for this distinction.  In fact, both of the Supreme Court's most recent cases on judicial recusal relate to the judge's activities *prior to* ascending to the bench as the basis for questioning their ability to hear cases involving particular parties. In fact, Judge Silliman's case combines the animating concerns that separately warranted recusal in those cases.

In *Williams*, a judge was alleged to have had prior administrative involvement in supervising the preparation of a defendant's case for trial.  136 S. Ct. 1899.  That, in turn, led the Court to hold that a disinterested observer could

15

reasonably conclude that the judge would have at least some professional interest in seeing the fruits of the prosecution affirmed. *Id.* And in *Caperton*, a judge had a close association with a coal company prior to ascending to the bench, including receiving substantial campaign contributions in the course of his judicial election. 556 U.S. 868. Again, the Court concluded that a disinterested observer could reasonably conclude that the judge would have at least some predisposition to view that coal company's claims favorably, if only to make good on the implicit promise that his favorable view of the company that helped him ascend to a judicial office would shape the law. *Id.*

In Judge Silliman's case, the Court is presented with an Article I judge who voluntarily entered the public controversy over the use of military commissions, who sought to build his public profile as an advocate for the Executive Branch's side of that controversy in the media and his academic work, who testified before Congress on the very technical legal issues now before him, and who repeatedly endorsed and perpetuated the Executive Branch's narrative of Mr. Mohammad's culpability and continuing dangerousness. Given that record, it is perfectly reasonable for a disinterested observer to conclude not only that Judge Silliman will feel compelled to adhere to his publicly expressed views, but also that he will want to see more than a decade of his public advocacy bear fruit, or even feel compelled to make good on the implicit promise to the very Executive Branch that

16

appointed him that his private views about the legal issues and defendant now before him will become the law of the land.

Judge Silliman, for his part, accepted the prosecution's argument dismissing the relevance of his public statements and activities prior to his appointment to the bench. *See* Order at A1 (referring to writings, statements, congressional testimony, and media appearances "all of which predate my being sworn in as a judge" on the CMCR); Order at A2 (asserting that eleven of the twelve instances cited by Mr. Mohammad occurred before "I was sworn in as a judge of this court"); Order at A5 (twelfth allegation is "the only one which followed my being sworn in as a judge of this court"); Order at A12 ("[t]he first 11 allegations relate to my public statements before I became a USCMCR judge"; "[t]he twelfth and last allegation … is the only one cited after I was sworn in as a judge of this court"). Notably, however, his acceptance of the government's false distinction was supported by no case authority. There is nothing talismanic, not least in the public's reasonable perception of that public official, about an official's taking the oath of office. "Just as the reasonable observer's 'world is not made brand new every morning,'" neither this Court, nor the public evaluating the fairness and integrity of the military commissions process is "able to awake without the vivid memory of these statements. We cannot shut our eyes to such evidence when it stares us in the face, for 'there's none so blind as they that won't see.'" *International Refugee*

17

*Assistance Project v. Trump*, 2017 WL 2273306 at *22 (4th Cir. 2017) (*quoting*

*McCreary County v. ACLU of Ky.*, 545 U.S. 844, 866 (2005) & Jonathan Swift,

Polite Conversation 174 (Chiswick Press ed., 1892)). Likewise in *Glassroth v.*

*Moore*, 335 F.3d 1282 (11th Cir. 2003), the Court was not blind to the fact that a

judge had touted himself as "The Ten Commandments Judge" during his judicial

election when addressing the question of whether the same judge was acting in

good faith when he erected a monument to the Ten Commandments on court

property.

　　The statements at issue here referred specifically to Judge Silliman's

personal response to the events which underlie the charges against Mr.

Mohammad, to Mr. Mohammad's factual guilt or innocence, his trial strategy, and

even the method by which he "will be" executed, and to detailed interpretations of

the law which govern the complex questions at issue in this very appeal. And to

cloud his neutrality even further, Judge Silliman is in a position to now decide

these very issues, not because of random judicial selection, but because he

*assigned himself* to hear this case.

　　Judge Silliman may not have been running for the position of CMCR judge

when his statements were made, at least not in the same sense in which a

traditionally elected official campaigns for office. But a disinterested observer

18

could reasonably conclude that his repeated public statements at least contributed in part to his appointment.

IV.    **Judge Silliman's rationalizations for his individual statements are not credible and, moreover, do not remove the taint of apparent bias that his statements, taken together or separately, reflect.**

1.    *"Rage" in the period before Mr Mohammad was arrested.*  Judge Silliman argues that his comment to Duke students regarding the need for venting his rage does not show bias because "at that time, the identity and the nationality of the perpetrators was unknown," and as a result "I could not have made, nor did I make, any reference to, or comment about, the Appellee."  Order at A7-A8.  The most troubling aspect of this explanation is its assumption that "the identity and nationality of the perpetrators" is no longer "unknown," a view inconsistent with the presumption of innocence.  The explanation is, in any event, a *non sequitur* since Judge Silliman makes no effort to explain why learning who has committed the offense – assuming that it has in fact been learned – would diminish his "rage."

Judge Silliman asserts that his comments "lasted only ten minutes, [and] were quite general in nature[.]"  Order at A7  Instead, his comments at that forum added up to more than forty minutes and contained multiple references to Osama

bin Laden, his description of the "sophistication" of the attack, and his confident speculation about details of the attack.[9]

2.     *Comments on the law at issue in the present appeal.*  Judge Silliman's testimony before the United States Senate and his scholarly discussions of UCMJ Articles 21 and 36 are especially relevant because they are at the heart of the pending CMCR appeal.  In particular, Judge Silliman has advocated that military commissions may avoid the more stringent procedural requirements of the UCMJ (Art. 36 of the UCMJ notwithstanding) by the "easy" expedient of a finding of impracticability by the President. [10]

3.     *Likelihood of disruption by terror groups.*  Judge Silliman explains that his remarks regarding the possibility of terrorist attacks during military commission proceedings were made only to suggest that protecting the courthouse

---

[9] *An Open Forum to Discuss the World Trade Center Disaster, Professors Scott Silliman and Christopher Schroeder answered questions related to the possible responses this country might make to this act of terrorism, September 12, 2001*, uploaded on April 17, 2017, video file publicly available at https://www.youtube.com/watch?v=ghCeDEmyda4 (last accessed June 14, 2017).
[10]  To the extent that Judge Silliman is, as his biography claims, a leading figure in the law of armed conflict, his very public expression of his opinion regarding hostilities in this case, during his testimony before Congress, makes him a potential witness.  This potential in itself, even apart from the provisions of 10 U.S.C. 948j ("[n]o person is eligible to act as military judge in a case of a military commission under this chapter if such person is the accuser or a witness or has acted as investigator or counsel in the same case[.]") suggests he should not serve as an appellate judge in the case.

20

at Guantanamo Bay would require fewer resources than protecting a courthouse in the continental United States. Order at A10. Regardless of the accuracy of this statement,[11] it has at least two damaging impacts. *First*, it implies that the defendants actually are, in fact, guilty. Otherwise terrorist groups would have no interest in disrupting their trials. *Second*, it tends to prejudice the pool of members, who will themselves be required to hear the case dispassionately and might instead be fearful for their own safety. The fact that no less an authority than the Deputy Chief Judge of the appellate court which supervises the military commissions has stated that attacks by terrorist groups on the proceedings themselves are *likely* will necessarily color the members' perception of the task before them as well as the accused.

Furthermore, the "context" of these comments that Judge Silliman has used to inoculate them reveals an even more troubling source of bias. By the time of his statements in 2009, Judge Silliman was actively contributing to the criticism of the

---

[11] In fact, evidence is to the contrary. *See* Human Rights First, Issue brief: January 2017 available at http://www.humanrightsfirst.org/sites/default/files/cost-of-guantanamo-brief.pdf (last accessed June 11, 2017) ("Indeed, it's come to be called 'the most expensive prison on earth.' Meanwhile, operating the Guantanamo military commissions, which have proven highly inefficient, is also much more expensive than conducting terrorism cases in federal courts." Quoting Carol Rosenberg, "Guantanamo: The Most Expensive Prison on Earth," The Miami Herald, Nov. 8, 2011, available at http://www.miamiherald.com/news/nation-world/world/americas/guantanamo/article1938974.html (last accessed June 11, 2017)).

Obama administration's decision to bring Mr. Mohammad and others to trial in federal court in New York. And those efforts succeeded. The Attorney General reversed his decision to rely on the regular court process and returned Mr. Mohammad's case to the less robust procedural protections of the military commissions.

Judge Silliman's repeated public remarks suggest that he is invested in the handling of Mr. Mohammad's case in a military commission setting. Indeed, the record fairly suggests that Judge Silliman intentionally enhanced his professional reputation and profile, and to quote his profile published on the CMCR website, "*continues to be* widely sought throughout the country as a guest lecturer on these areas of the law, and is a frequent commentator on CNN, National Public Radio, and other national radio and television news programs." (emphasis added.) His public comments regarding the 9/11 case are frequent to a degree that is unique among legal commentators and which are wholly inappropriate for an impartial judge presiding over such a high-profile capital case.

To be sure, the Code of Judicial Conduct for United States Judges provides that it is not judicial misconduct for a judge to make public comments on certain matters. But it also makes clear that after a point, such comments may require disqualification from hearing certain cases. Particularly in a case like Mr.

Mohammad's, which has drawn such intense public interest, the line has been crossed.

4.    *Extensive praise for the Chief Prosecutor.*  Judge Silliman's effusive praise of the Chief Prosecutor in the very case he now has assigned himself to hear, reveals an inappropriate favoritism for counsel for one of the parties, made at a time *after* the judge had taken the bench.  Judge Silliman's explanation that his remarks were not really about the prosecutor, but rather about the 2009 Military Commissions Act, Order at A12-A13, is belied by any fair review of the remarks in context.  The entire introduction is focused on the Chief Prosecutor, with only a passing reference to the statute, followed by yet another glowing mention of the Chief Prosecutor.

While a warm introduction of a prosecutor by a sitting judge might not in and of itself rise to a level requiring recusal, in this case, Judge Silliman's remarks went beyond the ordinary pleasantries of an introduction and essentially asserted his belief that the country would be better off if the Chief Prosecutor had been in charge earlier in the proceedings.  That level of apparent bias requires recusal.

## V.    Judge Silliman's assignment of himself to this specific case further exacerbates the appearance of bias.

Taken on their own, Judge Silliman's comments warrant recusal even in light of his efforts to explain them away. But his long record of inappropriate

comments is made irredeemable by the fact that Judge Silliman *assigned himself* to the panel to hear this case.

Unlike the rules in many courts requiring random assignment of judges, the CMCR rules provide for the Chief Judge to appoint individual judges to form appellate panels. This break from the standard practice is not simply a formality or the consequence of the CMCR's light docket. The purpose of random assignment procedures is "to ensure greater public confidence in the integrity of the judicial process.  The rule guarantees fair and equal distribution of cases to all judges, avoids public perception or appearance of favoritism in assignments, and reduces opportunities for judge shopping." *Tripp v. Executive Office of the President*, 196 F.R.D. 201 (D.D.C. 2000).  In the absence of random assignment, there is, of course, a greater likelihood that a reasonable observer will perceive bias arising from the assignment of a particular panel.  Taken together with Judge Silliman's extensive public comments, including repeatedly expressing the opinion that Mr. Mohammad is guilty and will be executed, his self-assignment to this case only further diminishes "the public's confidence in the integrity of the judicial process." *Id.*[12]

---

[12]  This sense of institutional bias is reinforced by the fact that the CMCR's website has links to copies of four of the government's filings, and to a single court order (in which Judge Silliman assigned himself and two other judges to the panel) – with no reference whatsoever to any of the Appellee briefs or motions, despite

## CONCLUSION

For the reasons provided above, this Court should grant the writ of mandamus and prohibition to order the recusal of the Hon. Scott L. Silliman from serving as a judge in Mr. Mohammad's case below and his disqualification from taking any part in the case to include assigning other judges to it.

Respectfully submitted,

//s//
DAVID Z. NEVIN
Learned Counsel

//s//
GARY D. SOWARDS
Defense Counsel

//s//
DEREK A. POTEET
Major, U.S. Marine Corps
Defense Counsel

//s//
RITA RADOSTITZ
Defense Counsel

*Counsel for Mr. Mohammad*

---

the fact that some were filed *prior* to those filed by the government. There is no reference on the website to Mr. Mohammad's motion to recuse Judge Silliman. App. at A188.

25

## CERTIFICATE OF SERVICE

I hereby certify that on June 15, 2017, copies of the foregoing Petition for a

Writ of Mandamus and Prohibition to the United States Court of Military

Commission Review were served by hand delivery and electronic Mail to:

1.  The Hon. Scott L. Silliman
    c/o Mr. Mark Harvey, Clerk,
    United States Court of Military Commission Review
    One Liberty Center
    875 N. Randolph Street, Suite 8000
    Arlington, VA 22203-1995
    harveym@osdgc.osd.mil

2.  Mr. Michael O'Sullivan
    Appellate Counsel for the United States
    c/o Office of the Chief Prosecutor
    Office of Military Commissions
    1610 Defense Pentagon
    Washington, D.C. 20301-1610
    michael.j.osullivan14.civ@mail.mil

3.  Major Matthew Seeger, U.S. Army
    Military Commissions Defense Organization
    1620 Defense Pentagon
    Washington, D.C. 20301-1620
    matthew.seeger@osd.mil

4.  Mr. James G. Connell, III
    Connell Law, L.L.C.
    P.O. Box 141
    Cabin John, MD 20818-0141
    O (703) 588-0407
    jconnell@connell-law.com
    james.connell2@osd.mil

5.  Ms. Alaina Wichner
    Military Commissions Defense Organization

26

1620 Defense Pentagon
Washington, D.C. 20301-1620
alaina.wichner@osd.mil

6. Mr. Walter Ruiz
   Military Commissions Defense Organization
   1620 Defense Pentagon
   Washington, D.C. 20301-1620
   walter.ruiz@osd.mil

Derek A. Poteet
Major, U.S. Marine Corps
Defense Counsel
*Counsel for Petitioner*

27

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**

In accordance with the requirements of Fed. R. App. P. 21(d), this document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this Petition was composed using Microsoft Word 2013 in 14-point Times New Roman font, a proportionally spaced font.  The word count is 6,653 words, excluding cover page; table of contents; tables of authorities; statutes, regulations and rules; certificates of counsel; signature blocks and the appendix.

_____
Derek A. Poteet
Major, U.S. Marine Corps
Defense Counsel
*Counsel for Petitioner*

28

## Statutes, Regulations and Rules

**10 U.S.C. § 948j (excerpt)**

(a) Detail of Military Judge.  A military judge shall be detailed to each military commission under this chapter. The Secretary of Defense shall prescribe regulations providing for the manner in which military judges are so detailed to military commissions. The military judge shall preside over each military commission to which such military judge has been detailed.

...

(c) Ineligibility of Certain Individuals.  No person is eligible to act as military judge in a case of a military commission under this chapter if such person is the accuser or a witness or has acted as investigator or a counsel in the same case.

**10 U.S.C. § 950g (excerpt)**

(a) Exclusive Appellate Jurisdiction.  Except as provided in subsection (b), the United States Court of Appeals for the District of Columbia Circuit shall have exclusive jurisdiction to determine the validity of a final judgment rendered by a military commission (as approved by the convening authority and, where applicable, as affirmed or set aside as incorrect in law by the United States Court of Military Commission Review) under this chapter.

(b) Exhaustion of Other Appeals.  The United States Court of Appeals for the District of Columbia Circuit may not review a final judgment described in subsection (a) until all other appeals under this chapter have been waived or exhausted.

**28 U.S.C. § 455 (excerpt)**

(a) Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

(b) He shall also disqualify himself in the following circumstances:

(1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;

(2) Where in private practice he served as lawyer in the matter in controversy, or a lawyer with whom he previously practiced law served during such association as a lawyer concerning the matter, or the judge or such lawyer has been a material witness concerning it;

(3) Where he has served in governmental employment and in such capacity participated as counsel, adviser or material witness concerning the proceeding or expressed an opinion concerning the merits of the particular case in controversy;

...

(d) For the purposes of this section the following words or phrases shall have the meaning indicated:

(1) "proceeding" includes pretrial, trial, appellate review, or other stages of litigation;

...

## 28 U.S.C. § 1651 (excerpt)

The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law.

## Regulations & Rules

**Code of Judicial Conduct for United States Judges (excerpts)**
**CANON 2**
Canon 2: A Judge Should Avoid Impropriety and the Appearance of Impropriety in all Activities

(A) *Respect for Law*. A judge should respect and comply with the law and should act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.

(B) *Outside Influence*. A judge should not allow family, social, political, financial, or other relationships to influence judicial conduct or judgment. A judge should neither lend the prestige of the judicial office to advance the private interests of the judge or others nor convey or permit others to convey the impression that they are in a special position to influence the judge. A judge should not testify voluntarily as a character witness.

**CANON 3**
Canon 3: A Judge Should Perform the Duties of the Office Fairly, Impartially and Diligently

The duties of judicial office take precedence over all other activities. In performing the duties prescribed by law, the judge should adhere to the following standards:

(A) *Adjudicative Responsibilities*.

(1) A judge should be faithful to, and maintain professional competence in, the law and should not be swayed by partisan interests, public clamor, or fear of criticism.

(2) A judge should hear and decide matters assigned, unless disqualified, and should maintain order and decorum in all judicial proceedings.

(3) A judge should be patient, dignified, respectful, and courteous to litigants, jurors, witnesses, lawyers, and others with whom the judge deals in an official capacity. A judge should require similar conduct of those subject to the judge's control, including lawyers to the extent consistent with their role in the adversary process.

(4) A judge should accord to every person who has a legal interest in a proceeding, and that person's lawyer, the full right to be heard according to law. Except as set out below, a judge should not initiate, permit, or consider ex parte communications or consider other communications concerning a pending or impending matter that are made outside the presence of the parties or their lawyers. If a judge receives an unauthorized ex parte communication bearing on the substance of a matter, the judge should promptly notify the parties of the subject matter of the communication and allow the parties an opportunity to respond, if requested. A judge may:

    (a) initiate, permit, or consider ex parte communications as authorized by law;

 ...

(6) A judge should not make public comment on the merits of a matter pending or impending in any court. A judge should require similar restraint by court personnel subject to the judge's direction and control. The prohibition on public comment on the merits does not extend to public statements made in the course of the judge's official duties, to explanations of court procedures, or to scholarly presentations made for purposes of legal education.

...

(C) *Disqualification.*

(1) A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances in which:

    (a) the judge has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;

    (b) the judge served as a lawyer in the matter in controversy, or a lawyer with whom the judge previously practiced law served during such association as a lawyer concerning the matter, or the judge or lawyer has been a material witness;

...

    (d) the judge or the judge's spouse, or a person related to either within the third degree of relationship, or the spouse of such a person is:

       (i) a party to the proceeding, or an officer, director, or trustee of a party;

       (ii) acting as a lawyer in the proceeding;

       (iii) known by the judge to have an interest that could be substantially affected by the outcome of the proceeding; or

(iv) to the judge's knowledge likely to be a material witness in the proceeding;

(e) the judge has served in governmental employment and in that capacity participated as a judge (in a previous judicial position), counsel, advisor, or material witness concerning the proceeding or has expressed an opinion concerning the merits of the particular case in controversy.

## CANON 4 (Excerpt)

Canon 4: A Judge May Engage in Extrajudicial Activities that are Consistent with the Obligations of Judicial Office

A judge may engage in extrajudicial activities, including law-related pursuits and civic, charitable, educational, religious, social, financial, fiduciary, and governmental activities, and may speak, write, lecture, and teach on both law-related and nonlegal subjects. However, a judge should not participate in extrajudicial activities that detract from the dignity of the judge's office, interfere with the performance of the judge's official duties, reflect adversely on the judge's impartiality, lead to frequent disqualification, or violate the limitations set forth below.

(A) *Law-related Activities*.

(1) *Speaking, Writing, and Teaching*. A judge may speak, write, lecture, teach, and participate in other activities concerning the law, the legal system, and the administration of justice

(2) *Consultation*. A judge may consult with or appear at a public hearing before an executive or legislative body or official:

(a) on matters concerning the law, the legal system, or the administration of justice;

(b) to the extent that it would generally be perceived that a judge's judicial experience provides special expertise in the area; or

(c) when the judge is acting pro se in a matter involving the judge or the judge's interest.

## Rule 25, CMCR Rules of Practice (2016)

RULE 25. RECUSAL OR DISQUALIFICATION OF JUDGES

(a) Grounds. Judges may recuse themselves under any circumstances considered sufficient to require such action. Judges must disqualify themselves under circumstances set forth in 28 U.S.C. § 455, R.M.C. 902, or in accordance with Canon 3C, Code of Conduct for United States Judges as adopted by the Judicial Conference of the United States. U.S. Courts website, Code of Conduct for United States Judges webpage, http://www.uscourts.gov/judges- judgeships/code-conduct-united-states-judges. For purposes of R.M.C. 902, the same

disqualification standards which apply to military judges shall also apply to civilian judges appointed under 10 U.S.C. § 950f.

(b) Procedure. A motion to disqualify a judge shall be referred to that judge for a final decision. If an initiating judge is recused or disqualified, that judge will notify the clerk of court, who will arrange for assignment of a substitute judge.

## Rule for Military Commissions 902, Manual for Military Commissions, Part II (2016) (Excerpt):

Rule 902. Disqualification of military judge

(a) In general. Except as provided in section (e) of this rule, a military judge shall disqualify himself or herself in any proceeding in which that military judge's impartiality might reasonably be questioned.

(b) Specific grounds. A military judge shall also disqualify himself or herself in the following circumstances:

(1) Where the military judge has a personal bias or prejudice concerning a party or personal knowledge of disputed evidentiary facts concerning the proceeding. ...

(3) Where the military judge has been or will be a witness in the same case, is the accuser, has forwarded charges in the case with a personal recommendations as to disposition, or, except in the performance of duties as military judge in a previous trial of the same or a related case, has expressed an opinion concerning the guilt or innocence of the accused. ...

(c) Definitions. For the purposes of this rule the following words or phrases shall have the meaning indicated—

(1) "Proceeding" includes pre-trial, trial, post-trial, appellate review, or other stages of litigation.

(2) The "degree of relationship" is calculated according to the civil law system.

(d) Procedure.

(1) The military judge shall, upon motion of any party or sua sponte, decide whether the military judge is disqualified.

(2) Each party shall be permitted to question the military judge and to present evidence regarding a possible ground for disqualification before the military judge decides the matter.

# APPENDIX

*U.S. v. Mohammad et. al.*, Case No. 17-002, Opinion and Order on Motion to Recuse or Disqualify Judge Silliman (CMCR, J. Silliman, Jun 6, 2017) .......... A1

*U.S. v. Mohammad et. al.*, Case No. 17-002, Motion to Recuse or Disqualify Judge Silliman (Appellee Mohammad, 9 May, 2017) ........................................ A16

*U.S. v. Mohammad et. al.*, Case No. 17-002, Appendix Vol 1. to Appellee Mohammad Motion to Recuse Judge Silliman (Appellee Mohammad, 9 May, 2017) ................................................................................................ A27

- Tab 1. Honorable Scott L. Silliman USCMCR Biography ............................ A29

- Tab 2. Testimony of Prof. Silliman before the U.S. Senate Committee on the Judiciary; *Department of Justice Oversight: Preserving Our Freedoms While Defending Against Terrorism,* Nov. 28, 2001 (S. Hrg. 107-704) ........ A31

- Tab 3. Keith Lawrence, *September 11: A Campus Reflects*, Duke News, September 2002 ...................................................................................... A47

- Tab 4. Scott L. Silliman, *On Military Commissions*, 36 Case W. Res. J. Int'l. 529 (2004) ...................................................................................... A53

- Tab 5. Testimony of Prof. Scott L. Silliman before the U.S. Senate Committee on Armed Services; *Military Commissions in Light of the Supreme Court Decision in Hamdan v. Rumsfeld*, July 19, 2006 (S. Hrg. 109-881) ................................................................................................ A67

- Tab 6. Los Angeles Times Staff Writer, *9/11 Suspects May Face Death Penalty*, L.A. Times, Feb. 12, 2008 ............................................................ A129

- Tab 7. Scott L. Silliman, *Prosecuting Alleged Terrorists by Military Commission: A Prudent Option*, 42 Case W. Res. J. Int'l L. 289 (2009) ..... A133

- Tab 8. David G. Savage, *Death penalty in 9/11 trials may be difficult*, L.A. Times, November 30, 2009 ................................................. A144

- Tab 9. Eleanor Hall, *Gitmo detainee acquitted of 284 charges, guilty of one*, The World Today (November 18, 2010) ............................. A147

- Tab 10. Mark Benjamin, *Gitmo Trial May Mean Obama Will Sign Off on KSM's Death,* Time, April 5, 2011 ......................................... A151

- Tab 11. Terry Carter, *Meet the man who would save Guantanamo*, ABA Journal, March 1, 2013 ..................................................... A155

*U.S. v. Mohammad et. al.*, Case No. 17-002, Response to Motion to Recuse or Disqualify Judge Silliman (Appellant, May 15, 2017) ................... A165

*U.S. v. Mohammad et. al.*, Case No. 17-002, Reply to Response to Motion to Recuse or Disqualify Judge Silliman (Appellee Mohammad, May 12, 2017) ....................................................................... A177

*U.S. v. Mohammad et. al.*, Case No. 17-002, Panel Designation Order (CMCR, April 25, 2017)............................................................ A184

USCMCR Judges, Military Commissions website (www.mc.mil, June 9, 2017)........................................................................... A186

*U.S. v. Mohammad et. al.*, Case No. 17-002, Public Docket (www.mc.mil, June 12, 2017)......................................................................... A187

USCMCR History, Military Commissions website (www.mc.mil, June 9, 2017)........................................................................... A188



**UNITED STATES**
**COURT OF MILITARY COMMISSION REVIEW**

| | | |
|---|---|---|
| United States, | ) | ORDER |
|     Appellant | ) | |
| | ) | APPELLEE MR. |
| v. | ) | MOHAMMAD'S |
| | ) | MOTION FOR RECUSAL |
| Khalid Shaikh Mohammad | ) | AND/OR |
| | ) | DISQUALIFICATION OF |
| Walid Muhammad Salih | ) | JUDGE SILLIMAN |
|     Mubarek Bin 'Attash | ) | |
| | ) | |
| Ramzi Bin al Shibh | ) | |
| | ) | |
| Ali Abdul-Aziz Ali AKA | ) | |
|     Ammar al Baluchi, and | ) | |
| | ) | |
| Mustafa Ahmed Adam al | ) | |
|     Hawsawi, | ) | USCMCR Case No. 17-002 |
| | ) | |
|     Appellees | ) | June 6, 2017 |

**OPINION AND ORDER**

Opinion filed by SILLIMAN, *Judge*.

On May 9, 2017, Appellee Mohammad moved that I recuse or disqualify myself from sitting as a judge or taking part in any proceeding, including assigning a panel of judges, with regard to the Appellant's interlocutory appeal currently before this court. Appellee Motion 1. The motion is predicated upon Appellee's assertion that through my writings, my statements at Duke Law School, my congressional testimony in 2001 and 2006, and my media appearances, all of which predate my being sworn in as a judge on the United States Court of Military Commission Review (USCMCR), show "an actual bias and prejudice against Mr. Mohammad in particular, and suggest a bias against the other defendants in the case as well." Appellee Mohammad Motion 9. To further support his assertion, Appellee cites one additional instance which occurred after I became a judge on this court—my introduction of Brigadier

General Mark Martins, the Chief Prosecutor for Military Commissions, who was a keynote speaker at a 2013 Law, Ethics and National Security Conference held at Duke Law School.  Appellee Mohammad Motion 5, 8.  Appellee argues that my recusal or disqualification is required pursuant to our court's Rules of Practice; Rule for Military Commissions (R.M.C.) 902; the statute on recusal and disqualification of federal judicial officers, 28 U.S.C. § 455; the Code of Conduct for United States Judges as adopted by the Judicial Conference of the United States; and  the Fifth and Eighth Amendments of the United States Constitution.  *Id.*  All co-Appellees joined Appellee Mohammad in this motion.  Appellee Mohammad Motion 2.  On May 15, 2017, Appellant opposed the motion for recusal and/or disqualification.  Appellant Response Brief 1.  On May 22, 2017, Appellee Mohammad filed a reply to Appellant's response.  After careful consideration of the facts and applicable law, I do not recuse or disqualify myself from sitting as a judge in these proceedings, and the motion is denied.

**The Allegations**

Appellee sets forth eleven instances which occurred prior to September 12, 2012 when I was sworn in as a judge of this court; and one instance after that date, through which he alleges that my writings, my comments as a Professor of the Practice of Law at Duke Law School, the two occasions when I testified before the United States Senate, and my comments to the media were done in a manner that is incompatible with being a judge who must act impartially.  Appellee Mohammad Motion 1, 2-5.  The allegations are set forth seriatim.

(1) In this first allegation, Appellee states that "Then-Professor Silliman chose to publicly address students at Duke University School of Law on September 12, 2001, Judge Silliman said 'there is a rage in me, and I suspect within you, that needs to be vented . . .' in reference to the attacks of September 11, 2001."[1]

(2) Appellee cites to my testimony before the United States Senate in 2001:

On November 28, 2001, then-Professor Silliman testified as a witness before the Senate Committee on the Judiciary regarding facts and law directly at issue in this case and stated: "I maintain that shortly before 9 o'clock in the morning on Tuesday, September 11th, we were not in a

---

[1] Appellee Mohammad Motion 2 (citing Recusal App. Vol. 2, Tab 1 (*Prof. Silliman addressing students at Duke University School of Law* (Sept. 12, 2001), https://www.youtube.com/watch?v=-UcwEa5g1r0)).

A2

state of armed conflict and we did not enter into a state of armed conflict until some time thereafter, certainly on or after the 7th of October.[2]

(3) Appellee cites a Duke News article of September 11, 2002, in which I was quoted:

> In 2002, in view of the first anniversary of the events at issue in this case, then-Prof. Silliman opined publicly that the United States' treatment of many captives taken in the last year violates provisions of the Geneva Convention as well as U.S. domestic law.[3]

(4) Appellee cites Scott L. Silliman, *On Military Commissions*, 36 Case W. Res. J. Intl. L. 529 (2004), one of my law review articles, and states that "In a law review article in 2004 addressing military commission jurisdiction post 9/11, then-Prof. Silliman opined specifically on Article 36, UCMJ, which is central to the instant appeal, and also on Article 21, UCMJ." [4]

(5) Appellee cites to my testimony before the Senate Armed Services Committee on July 19, 2006:

> On July 19, 2006, then-Professor Silliman testified as a witness before the Senate Committee on Armed Services, again on matters directly relevant to this case, [and] opin(ed) at length on deviations in military commission[s] from the uniformity requirement of Article 36: "All this is easily accomplished in a military commission system under the UCMJ by justifying, via Article 36(b) of the Code, the need to deviate from the MRE procedures."[5]

(6) Appellee refers to an interview I had with the Los Angeles Times, "On February 12, 2008, Judge Silliman was quoted in the Los Angeles Times as saying 'The fact is that we're going to have a military commission for those the

---

[2] Appellee Mohammad Motion 2 (citing Recusal App. Vol. 1, Tab 2 (Testimony of Prof. Scott L. Silliman, Sen. Jud. Comm., *Department of Justice Oversight: Preserving Our Freedoms While Defending Against Terrorism*, Sen. Hrg. 107-704 (Nov. 28, 2001).

[3] Appellee Mohammad Motion 2-3 (citing Recusal App. Vol. 1, Tab 3 (Keith Lawrence, (Sept. 2002), *September 11: A campus reflects*, Duke News)).

[4] Appellee Mohammad Motion 3 (citing Recusal App. Vol. 1, Tab 4 (Scott L. Silliman, *On Military Commissions*, 36 Case W. Res. J. Intl. L. 529 (2004)).

[5] Appellee Mohammad Motion 3 (citing Recusal App. Vol. 1, Tab 5 (Testimony of Prof. Scott L. Silliman, Sen. Armed Services Comm., *Military Commissions in Light of the Supreme Court Decision in Hamdan v. Rumsfeld*, Sen. Hrg. 109-881 (July 19, 2006).

3

A3

United States believes, and most of the world acknowledges, to be ring leaders of the 9/11 attacks . . .'."[6]

(7) Appellee cites to Scott L. Silliman, *Prosecuting Alleged Terrorists by Military Commission: A Prudent Option*, 42 Case W. Res. J. Intl. L. 289, 291-293 (2009), yet another of my law review articles, and asserts:

> [T]hen-Prof. Silliman opined on the significant resources required for security to prosecute someone like Mr. Mohammad in the United States due to the risk of targeting by terrorist cells, specifically expressing concern for the safety of the courtroom hearing Mr. Mohammad's case: "For example, when dealing with very high profile cases such as Khalid Sheikh Mohammed, it is not inconceivable that terrorist cells operating within the U.S. would target the courtroom and prisoner detention facility where he would be kept during trial proceedings."[7]

(8) Appellee references a 2009 C-SPAN interview and says: "On August 18, 2009, then-Professor Silliman appeared on C-SPAN's Washington Journal with Susan Davis, and asserted that bringing Guantanamo detainees to the United States for trial was a more 'dangerous option' in light of the possibility that a 'radicalized' group might stage an attack or protest."[8]

(9) Appellee cites to another media interview:

> On 30 November 2009, Judge Silliman told the Los Angeles Times, "I think it's likely KSM will want to use the trial as a forum for himself and to put the government on trial. I will be very surprised if he pleads guilty . . . . We should expect a long, convoluted trial full of difficulties for the government."[9]

(10) Appellee refers to yet another media interview: "On November [1]8, 2010, then-Prof. Silliman was quoted in the media stating an opinion on the guilt or innocence of the Appellees in this case: 'We've got the major

---

[6] Appellee Mohammad Motion 3 (citing Recusal App. Vol. 1, Tab. 6 (Los Angeles Times Staff Writer, *9/11 Suspects May Face Death Penalty*, L.A. Times (Feb. 12, 2008))).

[7] Appellee Mohammad Motion 3-4 (citing Recusal App. Vol. 1, Tab 7 (Scott L. Silliman, *Prosecuting Alleged Terrorists by Military Commission: A Prudent Option*, 42 Case W. Res. J. Intl. L. 289, 291-293 (2009)).

[8] Appellee Mohammad Motion 4 (citing Recusal App. Vol. 2, Tab 2 (Susan Davis, *Washington Journal*, C-SPAN (Aug. 18, 2009)).

[9] Appellee Mohammad Motion 4 (citing Recusal App. Vol. 1, Tab 8 (David G. Savage, *Death penalty in 9/11 trials may be difficult*, L.A. Times (Nov. 30, 2009).

conspirators in the 9/11 attacks still at Guantanamo Bay – Khalid Sheikh Mohammed and four others . . . '"[10]

(11) Appellee cites a final media interview in Time Magazine's on-line forum: "On April 5, 2011, then-Prof. Silliman was quoted discussing the manner in which Mr. Mohammad 'will be' executed. He said, referencing lethal injection executions carried out by the military in the United States, 'I'm assuming the same pattern will be followed, except for the location.'"[11]

(12) In the twelfth and last allegation, and the only one which followed my being sworn in as a judge of this court, Appellee cites my comments while introducing Brigadier General Mark Martins, the Chief Prosecutor for Military Commissions, who was a keynote speaker at a 2013 Center on Law, Ethics and National Security conference held at Duke Law School:

> "One of our colleagues, close colleagues, Bobby Chesney, professor of law at University of Texas, I think said it well.  He said if in 2001, after 9/11, if we had had the 2009 Military Commissions Act, and if we had had General Martins as the chief prosecutor, much of the dialogue back and forth arguing about military commissions probably would have been minimized.  And I think that's a very fair statement."[12]

**The Applicable Law**

The parties agree that the terms for recusal or disqualification are set forth in Rule 25 of the Rules of Practice of the USCMCR (Feb. 3, 2016). Appellee Mohammad Motion 6; Appellant Response Brief 2.  Rule 25 provides:

> (a) **Grounds**. Judges may recuse themselves under any circumstances considered sufficient to require such action. Judges must disqualify themselves under circumstances set forth in 28 U.S.C. § 455, R.M.C. 902, or in accordance with Cannon 3C, Code of Conduct for United States Judges as adopted by the Judicial Conference of the United States . . . . For purposes of R.M.C. 902, the same disqualification standards which apply to military judges shall also apply to civilian judges appointed under 10 U.S.C. § 950f.

---

[10] Appellee Mohammad Motion 4 (citing Recusal App. Vol. 1, Tab 9 (Eleanor Hall, *Gitmo detainee acquitted of 284 charges, guilty of one*, The World Today (Nov. 18, 2010)).

[11] Appellee Motion 4-5 (citing Recusal App. Vol. 1, Tab 10 (Mark Benjamin, *Gitmo Trial May Mean Obama Will Sign Off on KSM's Death*, Time (Apr. 5, 2011)).

[12] Appellee Mohammad Motion 5 (citing Recusal App. Vol. 1, Tab 11 (Duke University Law School; Law, Ethics and National Security (LENS) Conference 2013, Hon. Scott Silliman, LENS Executive Director Emeritus, introducing BG Mark Martins; Mar. 1, 2013); Vol. 2, Tab 3)).

A5

(b) **Procedure**. A motion to disqualify a judge shall be referred to that judge for a final decision. If an initiating judge is recused or disqualified, that judge will notify the clerk of court, who will arrange for assignment of a substitute judge.

Appellee argues that 28 U.S.C. §§ 455(a), 455(b)(1), or 455(b)(3), were violated by my public statements. Appellee Mohammed Motion 7. Those three subsections provide:

(a) Any justice, judge, or magistrate judge . . . of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

(b) He shall also disqualify himself in the following circumstances:

(1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;

\* \* \*

(3) Where he has served in governmental employment and in such capacity participated as counsel, adviser or material witness concerning the proceeding or expressed an opinion concerning the merits of the particular case in controversy.

Rule for Military Commissions 902 provides, in part:

(a) *In general*. Except as provided in section (e) of this rule, a military judge shall disqualify himself or herself in any proceeding in which that military judge's impartiality might reasonably be questioned.

(b) *Specific grounds*. A military judge shall also disqualify himself or herself in the following circumstances:

(1) Where the military judge has a personal bias or prejudice concerning a party or personal knowledge of disputed evidentiary facts concerning the proceeding.

Appellee cites and quotes the Code of Conduct for U.S. Judges, Commentary for Canon 2A[13] to support his disqualification argument. The Commentary for Canon 2A states, "Canon 2A. An appearance of impropriety occurs when reasonable minds, with knowledge of all the relevant circumstances disclosed by a reasonable inquiry, would conclude that the judge's honesty,

---

[13] The *Guide to Judiciary Policy* (rev. Mar. 20, 2014) contains the Code of Judicial Conduct for U.S. Judges and Commentary for the various canons. U.S. Courts website, http://www.uscourts.gov/judges-judgeships/code-conduct-united-states-judges.

6

A6

integrity, impartiality, temperament, or fitness to serve as a judge is impaired. . . ." Appellee Mohammad Motion 7-8.

Appellee also cites and quotes Canon 3(C)(1)(e):

(1) A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances in which: . . . (e) the judge has served in governmental employment and in that capacity participated as a judge (in a previous judicial position), counsel, advisor, or material witness concerning the proceeding or has expressed an opinion concerning the merits of the particular case in controversy.

Appellee Mohammad Motion 7 (quoting Canon 3(C)(1)(e)).

Canon 3(A)(6) states, "The prohibition on public comment on the merits does not extend to public statements made in the course of the judge's official duties, to explanations of court procedures, or to scholarly presentations made for purposes of legal education." Canon 3(C)(3)(d) states, "(d) "proceeding" includes pretrial, trial, appellate review, or other stages of litigation."

A "recusal inquiry" under 28 U.S.C. § 455 must be "made from the perspective of a reasonable observer who is informed of all the surrounding facts and circumstances."[14]

**Discussion**

It is important to put the twelve instances cited by Appellee in the full context in which they were either spoken or written, and I now do so in the order in which they were listed in Appellee's motion.

As to the first allegation cited, my comments to the students at Duke Law School on September 12, 2001, the day following the terrorist attack on the World Trade Center and the Pentagon, were done at the request of the Dean of the Law School who asked me and one of my colleagues to try to allay the fears and anxieties of our student body, many of whom were foreign students from Arab countries. My comments, which lasted only 10 minutes, were quite general in nature and addressed, among other things, the legal issues regarding the possible use of force against whoever was responsible for the attack. At that

---

[14] *Cheney v. United States*, 541 U.S. 913, 924 (2004) (quoting from *Microsoft Corp. v. United States*, 530 U.S. 1301, 1302 (2000) (Rehnquist, C.J.) and citing *Liteky v. United States*, 510 U.S. 540 (1994)). *See also S.E.C. v. Loving Spirit Foundation Inc.*, 392 F.3d 486, 493 (D.C. Cir. 2004)( "Section 455(a) permits a litigant to seek recusal of a judge 'in any proceeding in which his impartiality might reasonably be questioned.' In assessing section 455(a) motions, this circuit applies an 'objective' standard: Recusal is required when 'a reasonable and informed observer would question the judge's impartiality.' *United States v. Microsoft Corp.*, 253 F.3d 34, 114 (D.C. Cir. 2001) (en banc) (per curiam).").

time, the identity and the nationality of the perpetrators was unknown so I could not have made, nor did I make, any reference to, or comment about, the Appellee. With regard to the one comment about "rage", it was clearly a reference to the emotion welling up within all United States citizens following such a horrendous attack occurring within our country. It clearly reflects no bias against the Appellees since he was completely unknown to me at that time.

As to the second allegation, my November 28, 2001 testimony before the United States Senate Judiciary Committee, in looking at both my oral comments before the Committee, as well as my submitted written statement, it is clear that I was referring to the required legal predicate for the application of the President Bush's Military Order of November 13, 2001 regarding the use of military commissions; i.e. that violations of the law of war--the *jus in bello*--do not occur within a vacuum; they must by definition occur within the context of a recognized state of armed conflict. I went on to opine my belief at that time that at shortly before 9:00 am on the morning of September 11, 2001, we were not in a state of armed conflict and we did not enter into such a state until sometime thereafter. The state of armed conflict is not before our court, and in the event that the issue of the timing of the initiation of armed conflict should be before the USCMCR, I have an open mind and expect that determination to be based on the law and evidence of record. As with my comments to the Duke Law Student Body two months earlier, nothing I said before the Senate Judiciary Committee reflects any bias against Appellees or any reason why I could not act impartially as an appellate judge in these proceedings.

With regard to the third allegation, my comments in a September 11, 2002, Duke News article, following the quoted section in Appellee's motion, I went on to say in the article:

> Among the most troubling cases are those of Yaser Hamdi and Jose Padilla, two U.S. citizens who have been detained for months without benefit of counsel and without any specific charges lodged against them . . . . Further, he said, the United States, although claiming to be a nation under the rule of law, is seemingly not satisfying its commitments under international law. "I am troubled by our continued refusal to adhere to the Geneva Convention."[15]

From what I said, I was clearly worried about American citizens being detained in the United States without being afforded Constitutional protections, as well as the failure to comply with Common Article 3 of the Geneva Conventions with regard to those non-U.S. persons held in detention by the United States abroad. My expression of concern about the U.S. Government's conduct does not show bias against Appellees.

---

[15] Note 3, *supra*, Vol. 1, Tab 3 at 3-5.

In the fourth allegation, an excerpt from my 2004 article *On Military Commissions* in the Case Western Reserve Journal of International Law, I was discussing the historical roots of Article 21 and said:

> What is clear from General Crowder's testimony is that Article 15 of the Articles of War (and its successor, Article 21 of the Uniform Code of Military Justice) was not meant to constitute any grant of authority from Congress to the President with regard to military commissions. Rather, it was meant only to ensure that military commissions, predicated not upon a specific statutory grant but rather upon historical usage under the President's Commander-in-Chief authority, were not divested of their jurisdiction because of the creation of a new court-martial system which would have overlapping jurisdictional coverage.
>
> *   *   *
>
> Since Congress has not attempted to legislate with regard to military commissions following President Bush's Military Order, and since the only applicable statute (Article 21 of the Uniform Code of Military Justice) simply *recognizes* the previously existing jurisdiction of military commissions under common law, President Bush, as Commander-in-Chief, has clear authority to authorize the use of commissions, as he did on November 13, 2001.

Silliman, 36 Case W. Res. J. Intl. L. at 535-36 (internal citation omitted; emphasis in original).

With regard to Article 36 of the Uniform Code of Military Justice, I said in the article:

> The third statutory reference, Article 36 of the Uniform Code of Military Justice, is simply a general delegation of authority to the President to prescribe trial procedures, including modes of proof, for courts-martial, military commissions, and other military tribunals and states that he should, "so far as he considers practicable, apply the principles of law and rules of evidence" generally used in criminal cases in federal district courts. Rather than citing this provision as empowering him to authorize military commissions, the President clearly intended it to refer to his decision that use of those principles of law and rules of evidence was *not* practicable, "given the danger to the safety of the United States and the nature of international terrorism."

*Id.* at 533 (internal citation omitted; emphasis in original).

Appellee does not explain how my comments in this article are incorrect on the status of the law in 2004, or in any event, how those statements show bias 12 years later in the current proceeding. In referencing both codal provisions, I

9

A9

was discussing President's Bush's claimed statutory authority in his November 13, 2001 Military Order to convene military commissions and to direct use of certain procedures that were inconsistent with the Uniform Code of Military Justice, and not the application of either provision to any particular case before this court.

As to the fifth allegation, my 2006 testimony before the Senate Armed Services Committee, my statement is obviously true and accurate, made in the context of the Congressional debate over how the 2006 Military Commissions Act should be enacted, and what provisions should be included. There was clearly no reference to any particular trial, especially the one at bar.

With regard to the sixth allegation, my interview in the February 12, 2008 Los Angeles Times, my full quote was "The fact is that we're going to have a military commission for those the United States believes, and most of the world acknowledges, to be ring leaders of the 9/11 attacks . . . . That should not be delayed simply because we're in an election year."[16] The writer of the article went on to say:

> Silliman conceded there are probably political considerations to the timing of the charges but said he doubted the trial would get underway before the election. Military defense attorneys will make challenges on their clients' behalf and demand access to classified evidence and faraway witnesses, which would probably delay the process, Silliman said.[17]

The context for the article was the charging of the Appellee and four others with alleged crimes under the 2006 Military Commissions Act. My statement was accurate and unbiased since charges would not have been brought unless there was some evidence supporting them, and the question posed to me was as to the timing of any forthcoming trial, not whether there would be a conviction.

As to the seventh allegation, an excerpt from my 2009 Case Western Reserve Journal of International Law article, Appellee omitted the immediate preceding sentence to what he quoted. That sentence was "Ensuring court security and guaranteeing the safety of witnesses and jurors would also require significant additional resources." 42 Case W. Res. J. Intl. L. at 292. In an article weighing the two possible forums for trials of alleged terrorists, trial in federal district court and trial by military commission, I was using Appellee's possible trial in federal court to be illustrative of security concerns, which would not be applicable in a military commission trial held at Guantánamo Bay. There was certainly no comment, or even an implication, on what the outcome of a trial in either forum should be or would be.

---

[16] Note 6, *supra*, Vol. 1, Tab 6 at 2.

[17] *Id.*

As to the eighth allegation, my comments in a 2009 C-SPAN interview, those comments were with regard to the benefits and/or risks in prosecuting alleged terrorists in either federal district court or in a military commission. They were not, nor were they intended to be, comments upon the guilt or innocence of anyone. Those comments do not show bias against Appellees.

In reference to the ninth allegation, my comments in a 2009 Los Angeles 8Times interview, Appellee once again failed to cite the preceding sentence in the article, which reads "Earlier this year, Mohammed said at a Guantanamo hearing that he wished to plead guilty. But Duke University law professor Scott Silliman said the government should not count on him and his four alleged co-conspirators to plead guilty now."[18] Thus, I was commenting on the Appellee's own statement, at that time, that he wished to plead guilty to the charges before the military commission. I suggested that he might not, and in fact he did not plead guilty. My comments reflect no bias or pre-judgment of his guilt or innocence.

In the tenth allegation, Appellee cites to my interview with Eleanor Hall from The World Today. The context of this interview was the trial in federal district court of Ahmed Ghailani in 2010 and the interviewer asked me if the Ghailani trial was an indication that President Obama would use federal district court trials for those at Guantánamo Bay. I replied

> . . . I think that the Obama administration is also signal[ing] that it also wants to use the military commission system. We've got the major conspirators in the 9/11 attacks still at Guantanamo Bay - Khalid Sheikh Mohammed and four others - and no decision has been made yet as to whether they will be prosecuted by a military commission or trial in the Federal Courts.[19]

Obviously, the entire interview was focused on the Ghailani case and the choice of prosecutorial options available to the Obama administration, and not whether those yet to be tried in one forum or the other were guilty or innocent.

With regard to the eleventh allegation, my comments in the April 5, 2011 on-line Time Magazine forum, as with previous allegations of bias, it is important to put the above cited quotation in context. The article states:

> Attorney General Eric Holder's announcement Monday that Khalid Shaikh Mohammed and four other *alleged* 9/11 plotters will be tried in military commissions rather than civilian courts means that KSM *might* face lethal injection at Guantanamo, and the President *might* have to personally sign off on his death . . . . That law is silent on the method of execution, but lethal injection is the military's official execution method. And while the

---

[18] Note 9, *supra*, Recusal App. Vol. 1, Tab 8 at 1.

[19] *Id.* at 2.

A11

Army's death row is at Fort Leavenworth in Kansas, experts in military law suspect KSM's lethal injection would probably be carried out at GTMO. "I'm assuming the same pattern will be followed, except for the location," says Scott Silliman of Duke Law School.[20]

When looked at in the full context of the article, i.e. what method of execution would probably be used for an accused approved by the President for the death penalty following a conviction by military commission and exhaustion of all appeals, what I said was merely responsive to the interviewer's prior comments and not in any way prejudging the guilt or innocence of the Appellee. *See* Army Reg. 190-55, *U.S. Army Corrections System: Procedures for Military Executions* (July 23, 2010), ¶ 3-1a ("Military executions will be by lethal injection."). I recognized then, of course, that the U.S. military has not executed anyone for violations of the law of war in more than five decades and my prediction about the method of execution may not be accurate because my only knowledge about this issue was from the Army regulation.

The first 11 allegations relate to my public statements before I became a USCMCR judge. Appellee emphasizes two cases, *Williams v. Pennsylvania*, 579 U.S. ___, 136 S. Ct. 1899 (2016) and *Caperton v. A. T. Massey Coal Co.*, 556 U. S. 868 (2009), as precedential support for my recusal. Appellee Mohammad Reply 2-3. In *Williams*, the prosecutor was subsequently an appellate judge on Williams' case. The Supreme Court found this to be an intolerable situation stating, "The due process guarantee that 'no man can be a judge in his own case' would have little substance if it did not disqualify a former prosecutor from sitting in judgment of a prosecution in which he or she had made a critical decision." *Williams*, 136 S. Ct. at 1905 (citation omitted). I was not a prosecutor in Appellees case; I have never worked in the Office of Military Commissions; and I did not make any decisions regarding their cases. In *Caperton*, a person running for election to be an appellate judge received campaign contributions of $3,000,000 from an employee of Massey Coal, which dwarfed the contributions received by any other judicial candidate, and the Court held the judge was disqualified from acting in a case involving Massey Coal. *Caperton*, 556 U. S. at 878-79, 884-85, 887-88. (holding "On these extreme facts the probability of actual bias rises to an unconstitutional level."). I was appointed to my position, and I did not receive any campaign contributions. The *Williams* and *Caperton* decisions do not support my recusal.

The twelfth and last allegation, my introductory comments for Brigadier General Martins at the Law, Ethics and National Security Conference in 2013, is the only one cited after I was sworn in as a judge of this court. In 2013, I was the Executive Director of the Center on Law, Ethics and National Security and was therefore the host for the conference at the Duke Law School. In introducing General Martins as the keynote speaker, I first read from his formal profile which his office had provided, and I went on to use the words of

---

[20] Note 10, *supra*, Recusal App. Vol. 1, Tab 10 at 1 (emphasis added).

University of Texas law professor Bobby Chesney to describe what could have been if, in 2001, Brigadier General Martins had become the first chief prosecutor and, more importantly, Congress had enacted a statutory military commission system rather than one created solely by presidential authority. Professor Chesney referred to the statute first, and Brigadier General Martins second in his comments, indicating which he believed more important.

One has only to look to the debates and the case law up to the passage of the 2006 Military Commissions Act to see the truth in what Professor Chesney said. The military commission process was delayed after a U.S. District Court issued a stay on November 8, 2014, *see Hamdan v. Rumsfeld*, 344 F. Supp. 2d 152 (D.D.C. 2004), followed by stays issued by the Appointing Authority.[21] The military commission process was further delayed after the Supreme Court decision in *Hamdan v. Rumsfeld*, 548 U.S. 557, 635 (2006) because that decision made it necessary for the Congress to enact legislation and for the Secretary of Defense to issue the Manual for Military Commissions and Regulation for Military Commissions. Appellee cites to no precedent where a judge made brief complimentary introductory remarks about a government official and then recused himself from acting in cases involving that government official. Accordingly, my introductory comments on that occasion, citing to Professor Chesney, in no way indicated any bias against the Appellees, towards the prosecution or Brigadier General Martins, or any inability to sit impartially as a judge in the proceedings now pending before our court. Having a favorable view of a prosecutor or a defense counsel without more is not a basis for disqualification. *United States v. Bosch*, 951 F.2d 1546 (9th Cir. 1991).

Even though the Code of Conduct for United States Judges did not directly apply to my activities prior to September 12, 2012 when I was sworn in as a judge of this Court, Canon 4 of the Code does relate to the permissibility of my participation in the 2013 conference. Canon 4 of the Code of Conduct for United States Judges states, in part:

> A judge may engage in extrajudicial activities, including law-related pursuits and civic, charitable, educational, religious, social, financial, fiduciary, and governmental activities, and may speak, write, lecture, and teach on both law-related and nonlegal subjects. However, a judge should not participate in extrajudicial activities that detract from the dignity of the judge's office, interfere with the performance of the judge's official duties, reflect adversely on the judge's impartiality, lead to frequent disqualification, or violate the limitations set forth below.
>
> (A) *Law-related Activities*.

---

[21] *See* Office of Military Commissions website, USCMCR History page, *History of USCMCR*, http://www.mc.mil/ABOUTUS/USCMCR History.aspx.

(1) *Speaking, Writing, and Teaching.* A judge may speak, write, lecture, teach, and participate in other activities concerning the law, the legal system, and the administration of justice;

(2) *Consultation.* A judge may consult with or appear at a public hearing before an executive or legislative body or official:

(a) on matters concerning the law, the legal system, or the administration of justice;

\* \* \*

(3) *Organizations.* A judge may participate in and serve as a member, officer, director, trustee, or nonlegal advisor of a nonprofit organization devoted to the law, the legal system, or the administration of justice and may assist such an organization in the management and investment of funds. A judge may make recommendations to public and private fund-granting agencies about projects and programs concerning the law, the legal system, and the administration of justice.

The commentary to Canon 4 recognizes the importance of practitioners educating the public about legal matters. My efforts over the years to educate the public enhanced the confidence of the public in legal procedures. The debate over legal procedures helped Congress and the public determine how to handle the alleged violations of the law of war. Canon 4 states:

[A] judge is in a unique position to contribute to the law, the legal system, and the administration of justice, including revising substantive and procedural law and improving criminal and juvenile justice. To the extent that the judge's time permits and impartiality is not compromised, the judge is encouraged to do so . . . ."

Canon 4, cmt. As the Judicial Council of the Ninth Circuit explained:

Engaging in such law-related activities -- including speeches that comment on current events and legal developments -- is permitted not only because judges are citizens, but because they are particularly knowledgeable on such topics. Their speech may thus enhance the public discourse and lead to a more informed citizenry.

*In re Complaint of Judicial Misconduct,* 632 F.3d 1289, 1289 (9th Cir. Jud. Council 2011); *see id.* (holding that a judge's speeches about "the direction of immigration law and a campaign finance controversy" did not violate the Code of Conduct or constitute misconduct). In *In re Charges of Judicial Misconduct,* 769 F.3d 762 (D.C. Cir. 2014) the Court of Appeals for the District of Columbia noted:

14

A14

[T]he Code of Conduct encourages judges to "speak, write, lecture, and teach on both law-related and nonlegal subjects," Canon 4, and "to contribute to . . . revising substantive and procedural law and improving criminal and juvenile justice," Canon 4, cmt. This authorization extends to commenting on "substantive legal issues." Comm. on Codes of Conduct, Advisory Op. No. 93, at 3 (2009). As Advisory Opinion 93 states: "The evolution and exposition of the law is at the core of a judge's role. Judges, therefore have the ability to make a unique contribution to academic activities such as teaching and scholarly writing, which similarly serve to advance the law." *Id.*

*Id.* at 785.

In testing each of the 12 allegations of bias and lack of impartiality cited in the Appellee's motion against the standards set forth in Rule 25 of our court's rules, 28 U.S.C. § 455, Rule for Military Commissions 902, and Canons 3C and 4 of the Code of Conduct for United States Judges, those allegations are baseless.

**Conclusion**

Appellee argues that "Judge Silliman's statements and writings show an actual bias and prejudice against Mr. Mohammad in particular, and suggest a bias against the other defendants in this case as well." Appellee Mohammad Motion 9. To the contrary, as indicated in my responses to each of the twelve allegations of bias or partiality, *supra*, neither my statements nor my writings reflect any bias toward Appellee Mohammad or any of his co-defendants. When tested against *Cheney*'s objective informed reasonable observer standard, there is no evidence of actual or even apparent prejudice in anything I said or wrote. Accordingly, none of the twelve allegations of bias or prejudice against the Appellee have been proven, and recusal pursuant to Rule 25 of our Rules of Practice is not appropriate or required.

Based upon the foregoing, I decline to recuse or disqualify myself from the case at bar. Therefore, it is hereby

**ORDERED** that Appellee Mohammad's motion that I recuse or disqualify myself is DENIED.

Scott Silliman
Acting Chief Judge
U.S. Court of Military Commission Review

15

A15

UNITED STATES OF AMERICA

                                        *Appellant,*

          v.

KHALID SHAIKH MOHAMMAD,

WALID MUHAMMAD SALIH MUBAREK
BIN 'ATTASH,

RAMZI BINALSHIBH,

ALI ABDUL-AZIZ ALI,
          AKA AMMAR AL BALUCHI,

          And

MUSTAFA AHMED ADAM AL
HAWSAWI

                                        *Appellees.*

IN THE UNITED STATES COURT OF
MILITARY COMMISSION REVIEW

**APPELLEE MR. MOHAMMAD'S
MOTION FOR RECUSAL AND/OR
DISQUALIFICATION OF JUDGE
SILLIMAN**

USCMCR Case No. 17-002

Arraigned at Guantanamo Bay, Cuba
          on May 5, 2012

Before a Military Commission
          convened by Vice Admiral
          (ret.) Bruce E. MacDonald,
          USN

Presiding Military Judge
Colonel James L. Pohl, USA

DATE:  9 May 2017

## TO THE HONORABLE, THE JUDGES OF
## THE UNITED STATES COURT OF MILITARY COMMISSION REVIEW

Khalid Shaikh Mohammad, by and through counsel, respectfully moves for the recusal

and/or disqualification of the Hon. Scott L. Silliman from sitting as a judge in this case and

taking part in the proceedings in any way, to include assigning a panel of judges.  Judge Silliman

has opined frequently and publicly on this case[1] in a manner that is incompatible with being a

judge who must act impartially.  Many of these public comments reflect a negative view of the

Appellees and Mr. Mohammad specifically, and although some statements could arguably be

seen as helpful to positions taken by counsel for Mr. Mohammad, together they nonetheless

---

[1] The Honorable Scott L. Silliman Biography, available at
http://www.mc.mil/Portals/0/pdfs/Professor%20Scott%20Silliman%20Bio%20(Oct%207,%202014).pdf (last
accessed May 8, 2017) (Judge Silliman "is a frequent commentator on CNN, National Public Radio, and other
national radio and television news programs."); Appendix In Support of Appellee Mr. Mohammad's Motion For
Recusal and/or Disqualification of Hon. Scott L. Silliman ("Recusal Appendix") Vol. 1, Tab 1.

A16

indicate that Judge Silliman has drawn and publicly presented many conclusions -- before hearing this case -- which are directly relevant to this proceeding and which call into question his serving as a judge in this case.  Recusal and/or disqualification of Judge Silliman is required by many authorities including the Rules of Practice for this Court; Rule for Military Commissions 902; the statute on recusal and disqualification of federal judicial officers, 28 U.S. Code § 455; the Code of Conduct for United States Judges as adopted by the Judicial Conference of the United States, and by the Fifth and Eighth Amendments of the United States Constitution.

## FACTS

1.   Then-Professor Silliman chose to publicly address students at Duke University School of Law on September 12, 2001, Judge Silliman said "there is a rage in me, and I suspect within you, that needs to be vented…" in reference to the attacks of September 11, 2001.[2]

2.   On November 28, 2001, then-Professor Silliman testified as a witness before the Senate Committee on the Judiciary regarding facts and law directly at issue in this case and stated:  "I maintain that shortly before 9 o'clock in the morning on Tuesday, September 11th, we were not in a state of armed conflict and we did not enter into a state of armed conflict until some time thereafter, certainly on or after the 7th of October."[3]

3.   In 2002, in view of the first anniversary of the events at issue in this case, then-Prof. Silliman opined publicly that the United States' treatment of many captives taken in the last year

---

[2] *Prof. Silliman addressing students at Duke University School of Law on September 12, 2001*, uploaded on September 7, 2011, available at https://www.youtube.com/watch?v=-UcwEa5g1r0 (last accessed May 8, 2017); Recusal Appendix Vol 2, Tab 1, video file on DVD incorporated into Recusal Appendix.

[3] Testimony of Prof. Scott L. Silliman before the U.S. Senate Committee on the Judiciary, *Department of Justice Oversight:  Preserving Our Freedoms While Defending Against Terrorism*, Nov. 28, 2001 (S. Hrg. 107-704), available at: https://www.gpo.gov/fdsys/pkg/CHRG-107shrg81998/html/CHRG-107shrg81998.htm (last accessed May 8, 2017); Recusal Appendix Vol 1, Tab 2.

violates provisions of the Geneva Convention as well as U.S. domestic law.[4]

    4.  In a law review article in 2004 addressing military commission jurisdiction post 9/11, then-Prof. Silliman opined specifically on Article 36, UCMJ, which is central to the instant appeal, and also on Article 21, UCMJ.[5]

    5.  On July 19, 2006, then-Professor Silliman testified as a witness before the Senate Committee on Armed Services, again on matters directly relevant to this case, opinion at length on deviations in military commission from the uniformity requirement of Article 36: "All this is easily accomplished in a military commission system under the UCMJ by justifying, via Article 36(b) of the Code, the need to deviate from the MRE procedures."[6]

    6.  On February 12, 2008, Judge Silliman was quoted in the Los Angeles Times as saying "The fact is that we're going to have a military commission for those the United States believes, and most of the world acknowledges, to be ring leaders of the 9/11 attacks…"[7]

    7.  In a law review article published in 2009, then-Prof. Silliman opined on the significant resources required for security to prosecute someone like Mr. Mohammad in the United States due to the risk of targeting by terrorist cells, specifically expressing concern for the safety of the courtroom hearing Mr. Mohammad's case: "For example, when dealing with very high profile

---

[4] Keith Lawrence, September 2002, *September 11: A campus reflects*, Duke News, available at https://today.duke.edu/showcase/mmedia/features/911site/campus_remembers.html (last accessed May 8, 2017); Recusal Appendix Vol 1, Tab 3.

[5] Scott L. Silliman, *On Military Commissions*, 36 Case W. Res. J. Int'l L. 529 (2004), available at http://scholarlycommons.law.case.edu/cgi/viewcontent.cgi?article=1412&context=jil (last accessed May 8, 2017); Recusal Appendix Vol 1, Tab 4.

[6] Testimony of Prof. Scott L. Silliman before the U.S. Senate Committee on Armed Services; *Military Commissions in Light of the Supreme Court Decision in Hamdan v. Rumsfeld*, July 19, 2006 (S. Hrg. 109-881); available at: https://www.gpo.gov/fdsys/pkg/CHRG-109shrg35144/html/CHRG-109shrg35144.htm (last accessed May 8, 2017); Recusal Appendix Vol 1, Tab 5.

[7] Los Angeles Times Staff Writer, *9/11 Suspects May Face Death Penalty*, L.A. Times, Feb. 12, 2008, available at http://articles.latimes.com/2008/feb/12/nation/la-na-gitmo12feb12 (last accessed May 8, 2017); Recusal Appendix Vol 1, Tab 6.

cases such as Khalid Sheikh Mohammed, it is not inconceivable that terrorist cells operating within the U.S. would target the courtroom and prisoner detention facility where he would be kept during trial proceedings."[8]

8.   On August 18, 2009, then-Professor Silliman appeared on C-SPAN's *Washington Journal* with Susan Davis, and asserted that bringing Guantanamo detainees to the United States for trial was a more "dangerous option" in light of the possibility that a "radicalized" group might stage an attack or protest.[9]

9.   On 30 November 2009, Judge Silliman told the Los Angeles Times, "I think it's likely KSM will want to use the trial as a forum for himself and to put the government on trial.  I will be very surprised if he pleads guilty… We should expect a long, convoluted trial full of difficulties for the government."[10]

10. On November 8, 2010, then-Prof. Silliman was quoted in the media stating an opinion on the guilt or innocence of the Appellees in this case: "We've got the major conspirators in the 9/11 attacks still at Guantanamo Bay – Khalid Sheikh Mohammed and four others…"[11]

11. On April 5, 2011, then-Prof. Silliman was quoted discussing the manner in which Mr. Mohammad "will be" executed.  He said, referencing lethal injection executions carried out by the

---

[8] Scott L. Silliman, *Prosecuting Alleged Terrorists by Military Commission: A Prudent Option*, 42 Case W. Res. J. Int'l L. 289, 291-293 (2009), available at http://scholarlycommons.law.case.edu/cgi/viewcontent.cgi?article=1222&context=jil (last accessed May 8, 2017); Recusal Appendix Vol 1, Tab 7.

[9] Susan Davis, *Washington Journal*, C-SPAN (Aug. 18, 2009), available at https://www.c-span.org/video/?288435-4/guantanamo-bay-detainee-facility, (last accessed May 8, 2017); Recusal Appendix Vol 2, Tab 2.

[10] David G. Savage, *Death penalty in 9/11 trials may be difficult*, L.A. Times, November 30, 2009, available at http://articles.latimes.com/2009/nov/30/nation/la-na-terror-trials30-2009nov30/2 (last accessed May 8, 2017); Recusal Appendix Vol 1, Tab 8.

[11] Eleanor Hall, *Gitmo detainee acquitted of 284 charges, guilty of one*, The World Today (November 18, 2010), available at http://www.abc.net.au/worldtoday/content/2010/s3070013.htm  (last accessed May 8, 2017), Recusal Appendix Vol 1, Tab 9.

military in the United States, "I'm assuming the same pattern will be followed, except for the location."[12]

12.  On March 1, 2013, Judge Silliman introduced Brigadier General Mark Martins at the Duke Law School annual conference on Law, Ethics and National Security (LENS).  BG Martins is the Chief Prosecutor for Military Commissions.  Judge Silliman pointed out approvingly, "One of our colleagues, close colleagues, Bobby Chesney, professor of law at University of Texas, I think said it well. He said if in 2001, after 9/11, if we had had the 2009 Military Commissions Act, and if we had had General Martins as the chief prosecutor, much of the dialogue back and forth arguing about military commissions probably would have been minimized. And I think that's a very fair statement."[13]

13.  On September 12, 2012,[14] exactly eleven years after making his first of many public comments and opinions on this case, Judge Silliman was sworn as a United States Court of Military Commissions Review Judge.

14.  On April 25, 2017, the Clerk of this Court issued a Panel Designation assigning Judge

---

[12] Mark Benjamin, *Gitmo Trial May Mean Obama Will Sign Off on KSM's Death*, Time, April 5, 2011, available at http://swampland.time.com/2011/04/05/gitmo-trial-may-mean-obama-will-sign-off-on-ksms-death/ (last accessed May 8, 2017); Recusal Appendix Vol 1, Tab 10.

[13] Duke University Law School; Law, Ethics and National Security (LENS) Conference 2013, *Hon. Scott Silliman, LENS Executive Director Emeritus, introducing BG Mark Martins*; March 1, 2013, available at https://law.duke.edu/video/lens-conference-2013-brig-gen-mark-martins-jagc-chief-prosecutor-military-commissions/ (last accessed May 8, 2017); Recusal Appendix Vol 2, Tab 3 video file on DVD incorporated into Recusal Appendix.  (Judge Silliman approvingly referencing Robert Chesney's statement, "If in 2001 we'd had the 2009 Military Commissions Act and Mark Martins in charge of the prosecution, from the get-go there would have been significant focus on the legitimacy of the system, rather than on the more draconian-looking, multiyear process we got. I'm sure some would still be critical, but it would not have become the cause célèbre it continues to be." As quoted in "*Meet the man who would save Guantanamo*," by Terry Carter, ABA Journal, March 1, 2013, available at http://www.abajournal.com/magazine/article/the_man_who_would_save_guantanamo  (last accessed May 8, 2017)), Recusal Appendix, Vol 1, Tab 11.

[14] Honorable Scott L. Silliman Biography, available at http://www.mc.mil/Portals/0/pdfs/Professor%20Scott%20Silliman%20Bio%20(Oct%207,%202014).pdf (last accessed May 8, 2017), Recusal Appendix Vol. 1, Tab 1

Silliman to this case "[b]y order of the Deputy Chief Judge Scott L. Silliman . . . ."[15]

## LAW AND ARGUMENT

Judge Silliman's recusal and/or disqualification is compelled by the Rules of Practice of the U.S. Court of Military Commission Review.  As noted in the 2016 *In re Khadr* decision by the U.S. Court of Appeals for the D.C. Circuit, "Those rules are promulgated (and can be amended) by the Chief Judge of the U.S. Court of Military Commission Review, subject to approval by the Secretary of Defense."[16]

The Rules of Practice require judges of the U.S. Court of Military Commission Review to "disqualify themselves under circumstances set forth in 28 U.S.C. § 455, R.M.C. 902, or in accordance with Canon 3C, Code of Conduct for United States Judges as adopted by the Judicial Conference of the United States."  U.S. Court of Military Commission Review Rules of Practice Rule 25(a).  The D.C. Circuit in *Khadr* noted, "In turn, all of those referenced provisions obligate a judge to 'disqualify' himself or herself in, among other circumstances, any 'proceeding' in which his or her 'impartiality might reasonably be questioned.'"[17]

Rule 902 of the Rules for Military Commissions (R.M.C.) governs the disqualification of a military judge from a given proceeding.  Rule of Practice 25(a) provides that "For purposes of R.M.C. 902, the same disqualification standards which apply to military judges shall also apply to civilian judges appointed under 10 U.S.C. § 950f."[18]

---

[15] BRIEFING SCHEDULE AND PANEL DESIGNATION, *United States v. Mohammad, et al.*, USCMCR (Case No. 17-002) (April 25, 2017).

[16] *In re Khadr*, 823 F.3d 92, 97 (D.C. Cir. 2016) (citing Manual for Military Commissions, R.M.C. 1201(b)(6) (2012).

[17] *Id.*

[18] Rules of Practice for the United States Court of Military Commission Review, Feb. 3, 2016; available at http://www.mc.mil/Portals/0/pdfs/CMCR%20Rules%20of%20Practice%20(Feb%203%202016).pdf (promulgated

Generally, pursuant to R.M.C. 902(a), "…a military judge shall disqualify himself or herself in any proceeding in which that military judge's impartiality might reasonably be questioned."  R.M.C. 902(b) provides additional specific grounds for disqualification of a military judge.  For example, R.M.C. 902(b)(1) mandates disqualification "[w]here the military judge has a personal bias or prejudice concerning a party or personal knowledge of disputed evidentiary facts concerning the proceeding."  Additionally, R.M.C. 902(b)(3) calls for disqualification of the military judge when the judge, "except in the performance of duties as military judge in a previous trial of the same or a related case, has expressed an opinion concerning the guilt or innocence of the accused."

Federal law regarding judicial disqualification generally mandates disqualification of a judge in the same circumstances as the Rules for Military Commissions.  Pursuant to 28 U.S.C. § 455(a), "Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned."  The judge will also be disqualified where "he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding" or where "he has served in governmental employment and in such capacity participated as counsel, adviser or material witness concerning the proceeding or expressed an opinion concerning the merits of the particular case in controversy."  28 U.S.C. § 455(b).

Volume 2 of the Guide to Judiciary Policy is also illustrative.  Canon 2A of Volume 2 states "[a] judge should respect and comply with the law and should act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary."  According to the commentary for Canon 2A, "an appearance of impropriety occurs when reasonable minds,

---

by Judge Silliman as "Acting Chief Judge").

with knowledge of all the relevant circumstances disclosed by a reasonable inquiry, would conclude that the judge's honesty, integrity, impartiality, temperament, or fitness to serve as judge is impaired." Canon 3C provides that a judge "shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances in which…the judge has a personal bias or prejudice concerning a party" or "the judge has served in governmental employment and in that capacity participated as a judge…counsel, advisor, or material witness concerning the proceeding or has expressed an opinion concerning the merits of the particular case in controversy."

The Hon. Judge Silliman's prior public statements plainly demonstrate an opinion that Mr. Mohammad is guilty of the charges referred against him, and therefore necessitate Judge Silliman's recusal and/or disqualification from the present proceeding. Judge Silliman has testified as a witness before Congress on matters directly relevant to this proceeding, and has elsewhere publicly expressed his conclusions on contested matters directly at issue in this appeal, in advance of hearing this case. Prior to his appointment to USCMCR, Judge Silliman has said that he anticipates Mr. Mohammad will use the military commission as a forum for himself and to put the United States government on trial. He has said that he doubts Mr. Mohammad will plead guilty, presumably because he believes that Mr. Mohammad will lose an opportunity to criticize the government. He has spoken about Mr. Mohammad's potential execution by the United States government as if it were an inevitable outcome. As a judge of this Court, he has spoken glowingly about Brigadier General Martins, the Chief Prosecutor for Military Commissions and Trial Counsel in the instant case, and also about the Military Commissions Act of 2009. He has publicly described Mr. Mohammad as a "major conspirator" of the September

8

A23

11, 2001 attacks. He has expressed, in writing, his concern over moving Mr. Mohammad to the United States because of his fears of attacks by terrorist cells in the United States.

Judge Silliman's statements and writings show an actual bias and prejudice against Mr. Mohammad in particular, and suggest a bias against the other defendants in this case as well. He has previously expressed public concern for the safety of courtrooms in which Mr. Mohammad's case is heard, which reasonably is perceived as casting doubt on his impartiality in deciding whether to grant oral argument in this death penalty case.

Both R.C.M. 902 and 28 U.S.C. § 455 mandate that a judge recuse himself if in these circumstances, as do the Canons of the Code of Conduct for United States Judges. Even if the Court believes that Judge Silliman's statements do not demonstrate an actual bias or prejudice, he still must be disqualified because his statements give the impression to any reasonable observer that he is not impartial. His recusal or disqualification for even the appearance of bias is especially necessary in a capital case.

The Fifth Amendment prohibits the deprivation of a person's life, liberty or property interest without due process of law. Mr. Mohammad is facing trial for capital charges; the penalty of death is qualitatively different than a sentence of imprisonment, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case, and this need affects every procedure at trial. See Simmons v. South Carolina, 512 U.S. 154, (172) (1994) (Souter, J., concurring). Due process of law and the heightened need for reliability required by the Fifth and Eighth Amendments to the U.S. Constitution require Judge Silliman's recusal or disqualification from this proceeding.

## CONCLUSION

Judge Silliman has made statements plainly demonstrating that he has concluded

9

A24

already, in advance of trial, that Mr. Mohammad and the other Appellees are guilty of the charges referred against them to Military Commission, and has made other public comment that is incompatible with service as a judge on this case. Basic principles of fairness as well as R.C.M. 902, 28 U.S.C. § 455, and the Fifth and Eighth Amendments require that he recuse himself from sitting as judge for this proceeding. His statements show that he either has an actual bias against Mr. Mohammad and the other Appellees or he has given the appearance of a lack of impartiality. Either way, the law states that he is disqualified from sitting as one of the impartial judges in this case and requires recusal. Further, he should be disqualified from taking part in this case in any capacity, to include assigning a panel of judges.

Respectfully submitted,

//s//
DAVID Z. NEVIN
Learned Counsel

//s//
GARY D. SOWARDS
Defense Counsel

//s//
DEREK A. POTEET
Maj, USMC
Defense Counsel

//s//
RITA RADOSTITZ
Defense Counsel

*Counsel for Mr. Mohammad*

10

A25

## <u>CERTIFICATE OF SERVICE</u>

I certify that a copy of the foregoing was sent by electronic mail to the Clerk of Court and to counsel for all parties on May 9, 2017; along with Appendix Volume 1 in support of this motion, and Appendix Volume 2 Table of Contents. The complete Volume 2 of the Appendix including the DVD containing video matter incorporated therein was previously hand-delivered to the Clerk and to opposing counsel on May 8, 2017.


//s//
DAVID Z. NEVIN
Learned Counsel

A26

| | |
|---|---|
| UNITED STATES OF AMERICA | ) IN THE UNITED STATES COURT OF |
| | ) MILITARY COMMISSION REVIEW |
| *Appellant*, | ) |
| | ) |
| v. | ) **APPENDIX IN SUPPORT OF** |
| | ) **APPELLEE MR. MOHAMMAD'S** |
| KHALID SHAIKH MOHAMMAD, | ) **MOTION FOR RECUSAL AND/OR** |
| | ) **DISQUALIFICATION OF JUDGE** |
| WALID MUHAMMAD SALIH MUBAREK | ) **SILLIMAN** |
| BIN 'ATTASH, | ) |
| | ) |
| RAMZI BINALSHIBH, | ) USCMCR Case No. 17-002 |
| | ) |
| ALI ABDUL-AZIZ ALI, | ) |
|     AKA AMMAR AL BALUCHI, | ) |
| | ) DATE: May 9, 2017 |
| And | ) |
| | ) |
| MUSTAFA AHMED ADAM AL HAWSAWI | ) |
| | ) |
| *Appellees*. | ) |

**TO THE HONORABLE, THE JUDGES OF**
**THE UNITED STATES COURT OF MILITARY COMMISSION REVIEW**

**APPENDIX**

**TABLE OF CONTENTS TO SUPPORTING DOCUMENTS**

# VOLUME 1

    <u>Item</u>

Tab 1    The Honorable Scott L. Silliman Biography, available at
http://www.mc.mil/Portals/0/pdfs/Professor%20Scott%20Silliman%20Bio%20(Oct
%207,%202014).pdf (last accessed May 8, 2017)

Tab 2    Testimony of Prof. Scott L. Silliman before the U.S. Senate Committee on the
Judiciary; *Department of Justice Oversight: Preserving Our Freedoms While
Defending Against Terrorism*, Nov. 28, 2001 (S. Hrg. 107-704); available at:
https://www.gpo.gov/fdsys/pkg/CHRG-107shrg81998/html/CHRG-
107shrg81998.htm (last accessed May 8, 2017)

Tab 3    Keith Lawrence, *September 11: A Campus Reflects*, Duke News, September 2002;
available at
https://today.duke.edu/showcase/mmedia/features/911site/campus_remembers.html.
(last accessed May 8, 2017)

A27

Tab 4     Scott L. Silliman, *On Military Commissions*, 36 Case W. Res. J. Int'l L. 529 (2004); available at http://scholarlycommons.law.case.edu/cgi/viewcontent.cgi?article=1412&context=jil (last accessed May 8, 2017)

Tab 5     Testimony of Prof. Scott L. Silliman before the U.S. Senate Committee on Armed Services; *Military Commissions in Light of the Supreme Court Decision in Hamdan v. Rumsfeld*, July 19, 2006 (S. Hrg. 109-881); available at: https://www.gpo.gov/fdsys/pkg/CHRG-109shrg35144/html/CHRG-109shrg35144.htm (last accessed May 8, 2017)

Tab 6     Los Angeles Times Staff Writer, *9/11 Suspects May Face Death Penalty*, L.A. Times, Feb. 12, 2008; available at http://articles.latimes.com/2008/feb/12/nation/la-na-gitmo12feb12 (last accessed May 8, 2017)

Tab 7     Scott L. Silliman, *Prosecuting Alleged Terrorists by Military Commission: A Prudent Option*, 42 Case W. Res. J. Int'l L. 289 (2009); available at http://scholarlycommons.law.case.edu/cgi/viewcontent.cgi?article=1222&context=jil (last accessed May 8, 2017)

Tab 8     David G. Savage, *Death penalty in 9/11 trials may be difficult*, L.A. Times, November 30, 2009; available at http://articles.latimes.com/2009/nov/30/nation/la-na-terror-trials30-2009nov30/2 (last accessed May 8, 2017)

Tab 9     Eleanor Hall, *Gitmo detainee acquitted of 284 charges, guilty of one*, The World Today (November 18, 2010); available at http://www.abc.net.au/worldtoday/content/2010/s3070013.htm  (last accessed May 8, 2017)

Tab 10    Mark Benjamin, *Gitmo Trial May Mean Obama Will Sign Off on KSM's Death*, Time, April 5, 2011; available at http://swampland.time.com/2011/04/05/gitmo-trial-may-mean-obama-will-sign-off-on-ksms-death/ (last accessed May 8, 2017)

Tab 11    Terry Carter, *Meet the man who would save Guantanamo*, ABA Journal, March 1, 2013; available at http://www.abajournal.com/magazine/article/the_man_who_would_save_guantanamo (last accessed May 8, 2017)

A28

# TAB 1

**Professor Scott Silliman, Duke Law School**

Scott L. Silliman was sworn in as an appellate judge on the U.S. Court of Military Commission Review on September 12, 2012.  After teaching at Duke Law School for 21 years, he is now a Professor Emeritus of the Practice of Law at Duke.  Besides teaching at the law school, he served as Executive Director of Duke's Center on Law, Ethics and National Security from its inception in 1993 until July of 2011, and now serves as its Director Emeritus.  Professor Silliman participated in a four-year Air Force ROTC program during his undergraduate days at the University of North Carolina and was called to active duty as an Air Force judge advocate in November of 1968. During his military career, he held a variety of leadership positions, including staff judge advocate at two large installations and three major Air Force commands. On August 31, 1993, after nearly 25 years of service, he retired from the Air Force in the grade of colonel to assume his position on the faculty at Duke.  Professor Silliman's areas of expertise include national security law, military law, and the law of armed conflict.  He continues to be widely sought throughout the country as a guest lecturer on these areas of the law, and is a frequent commentator on CNN, National Public Radio, and other national radio and television news programs.  He received his B.A. in Philosophy in 1965 and his J.D. in 1968 from the University of North Carolina at Chapel Hill.

A30

# TAB 2

A31

5/8/2017          - DEPARTMENT OF JUSTICE OVERSIGHT: PRESERVING OUR FREEDOMS WHILE DEFENDING AGAINST TERRORISM

[Senate Hearing 107-704]
[From the U.S. Government Printing Office]

S. Hrg. 107-704

DEPARTMENT OF JUSTICE OVERSIGHT: PRESERVING OUR FREEDOMS WHILE
DEFENDING AGAINST TERRORISM
=======================================================================

HEARINGS

before the

COMMITTEE ON THE JUDICIARY
UNITED STATES SENATE

ONE HUNDRED SEVENTH CONGRESS

FIRST SESSION

_____

NOVEMBER 28, DECEMBER 4, AND DECEMBER 6, 2001

_____

Serial No. J-107-50

_____

Printed for the use of the Committee on the Judiciary

U.S. GOVERNMENT PRINTING OFFICE
81-998                    WASHINGTON : 2002
_____
For Sale by the Superintendent of Documents, U.S. Government Printing Office
Internet: bookstore.gpo.gov  Phone: toll free (866) 512-1800; (202) 512-1800
Fax: (202) 512-2250 Mail: Stop SSOP, Washington, DC 20402-0001

COMMITTEE ON THE JUDICIARY

PATRICK J. LEAHY, Vermont, Chairman
| | |
|---|---|
| EDWARD M. KENNEDY, Massachusetts | ORRIN G. HATCH, Utah |
| JOSEPH R. BIDEN, Jr., Delaware | STROM THURMOND, South Carolina |
| HERBERT KOHL, Wisconsin | CHARLES E. GRASSLEY, Iowa |
| DIANNE FEINSTEIN, California | ARLEN SPECTER, Pennsylvania |
| RUSSELL D. FEINGOLD, Wisconsin | JON KYL, Arizona |
| CHARLES E. SCHUMER, New York | MIKE DeWINE, Ohio |

6

A32

RICHARD J. DURBIN, Illinois          JEFF SESSIONS, Alabama
MARIA CANTWELL, Washington          SAM BROWNBACK, Kansas
JOHN EDWARDS, North Carolina          MITCH McCONNELL, Kentucky
          Bruce A. Cohen, Majority Chief Counsel and Staff Director
                    Sharon Prost, Minority Chief Counsel
                    Makan Delrahim, Minority Staff Director

C O N T E N T S

----------

WEDNESDAY, NOVEMBER 28, 2001
STATEMENTS OF COMMITTEE MEMBERS

Durbin, Hon. Richard J., a U.S. Senator from the State of
    Illinois...................................................... 37
Feingold, Hon. Russell D., a U.S. Senator from the State of
    Wisconsin.................................................... 29
Feinstein, Hon. Dianne, a U.S. Senator from the State of
    California................................................... 44
Grassley, Hon. Charles E., a U.S. Senator from the State of Iowa. 58
Hatch, Hon. Orrin G., a U.S. Senator from the State of Utah...... 4
Kennedy, Hon. Edward M., a U.S. Senator from the State of
    Massachusetts................................................ 20
Kyl, Hon. Jon, a U.S. Senator from the State of Arizona.......... 41
Leahy, Hon. Patrick J., a U.S. Senator from the State of Vermont. 1
Sessions, Hon. Jeff, a U.S. Senator from the State of Alabama.... 34
Specter, Hon. Arlen, a U.S. Senator from the State of
    Pennsylvania................................................. 25
Thurmond, Hon. Strom, a U.S. Senator from the State of South
    Carolina..................................................... 59

WITNESSES

Barr, William P., former Attorney General of the United States... 60
Bell, Griffin B., Senior Partner, King and Spalding, and former
    Attorney General of the United States, Washington, D.C........ 74
Chertoff, Michael, Assistant Attorney General, Criminal Division,
    Department of Justice, Washington, D.C....................... 8
Heymann, Philip B., James Barr Ames Professor of Law, Harvard Law
    School, and former Attorney General of the United States....... 68
Katyal, Neal, Visiting Professor, Yale Law School, and Professor
    of Law, Georgetown University, Washington, D.C................ 93
Martin, Kate, Director, Center for National Security Studies,
    Washington, D.C.............................................. 85
Silliman, Scott L., Executive Director, Center on Law, Ethics and
    National Security, Duke University School of Law, Durham, North
    Carolina..................................................... 79

A33

TUESDAY, DECEMBER 4, 2001 (MORNING SESSION)
STATEMENTS OF COMMITTEE MEMBERS

Feingold, Hon. Russell D., a U.S. Senator from the State of
  Wisconsin........................................................   133
Feinstein, Hon. Dianne, a U.S. Senator from the State of
  California.......................................................   134
Hatch, Hon. Orrin G., a U.S. Senator from the State of Utah......   123
Leahy, Hon. Patrick J., a U.S. Senator from the State of Vermont.   154
Schumer, Hon. Charles E., a U.S. Senator from the State of New
  York............................................................   121
Sessions, Hon. Jeff, a U.S. Senator from the State of Alabama....   127
Thurmond, Hon. Strom, a U.S. Senator from the State of South
  Carolina........................................................   154

WITNESSES

Lynch, Timothy, Director, Project on Criminal Justice, Cato
  Institute, Washington, D.C......................................   184
Nardotti, Michael J., Jr., Major General (Retired), former Army
  Judge Advocate General, and Partner, Patton Boggs LLP,
  Washington, D.C.................................................   172
Prosper, Hon. Pierre-Richard, Ambassador-at-Large for War Crimes
  Issues, Department of State, Washington, D.C...................   135
Sunstein, Cass R., Karl N. Llewellyn Distinguished Service
  Professor of Jurisprudence, Law School and Department of
  Political Science, University of Chicago, Chicago, Illinois....   178
Terwilliger, George J., III, former Deputy Attorney General, and
  Partner, White and Case, Washington, D.C......................   156
Tribe, Laurence H., Tyler Professor of Constitutional Law,
  Harvard Law School, Cambridge, Massachusetts..................   159

TUESDAY, DECEMBER 4, 2001 (AFTERNOON SESSION)
STATEMENTS OF COMMITTEE MEMBERS

Feingold, Hon. Russell D., a U.S. Senator from the State of
  Wisconsin........................................................   199
Hatch, Hon. Orrin G., a U.S. Senator from the State of Utah......   208
Kennedy, Hon. Edward M., a U.S. Senator from the State of
  Massachusetts...................................................   295
Sessions, Jeff, a U.S. Senator from the State of Alabama.........   279
Thurmond, Hon. Strom, a U.S. Senator from the State of South
  Carolina........................................................   294

WITNESSES

Al-Maqtari, Ali, New Haven, Connecticut..........................   212
Boyle, Michael J., Attorney, New Haven, Connecticut, on behalf of
  the American Immigration Lawyers Association...................   218
Dinh, Viet D., Assistant Attorney General, Office of Legal
  Policy, Department of Justice, Washington, D.C.................   203
Emerson, Steven, Executive Director, Investigative Project,
  Washington, D.C.................................................   241
Goldstein, Gerald H., Esq., Goldstein, Goldstein, and Hilley, San
  Antonio, Texas on behalf of the National Association of
  Criminal Defense Lawyers.......................................   229
Strossen, Nadine, President, American Civil Liberties Union, New
  York, New York.................................................   262
Toensing, Victoria, diGenova and Toensing, LLP, and former Deputy
  Assistant Attorney General, Criminal Division, Department of
  Justice, Washington, D.C.......................................   225

THURSDAY, DECEMBER 6, 2001
STATEMENTS OF COMMITTEE MEMBERS

A34

DeWine, Hon. Mike, a U.S. Senator from the State of Ohio......... 345
Edwards, Hon. John, a U.S. Senator from the State of North
   Carolina....................................................... 360
Feinstein, Hon. Dianne, a U.S. Senator from the State of
   California..................................................... 334
Grassley, Hon. Charles E., a U.S. Senator from the State of Iowa. 329
Hatch, Hon. Orrin G., a U.S. Senator from the State of Utah...... 302
Kennedy, Hon. Edward M., a U.S. Senator from the State of
   Massachusetts.................................................. 325
Kyl, Hon. Jon, a U.S. Senator from the State of Arizona.......... 338
Leahy, Hon. Patrick J., a U.S. Senator from the State of Vermont. 297
McConnell, Hon. Mitch, a U.S. Senator from the State of Kentucky. 355
Schumer, Hon. Charles E., a U.S. Senator from the State of New
   York.......................................................... 347
Thurmond, Hon. Strom, a U.S. Senator from the State of South
   Carolina...................................................... 317

WITNESS

Ashcroft, Hon. John, Attorney General of the United States,
   Washington, D.C............................................... 309

------

SUBMISSIONS FOR THE RECORD

Addicott, Jeffrey F., Visiting Professor of Law, St. Mary's
   University School of Law, San Antonio, Texas, letter.......... 365
American Civil Liberties Union, Washington, D.C.:
      November 28, 2001, statement............................... 365
      Timothy H. Edgar, Legislative Counsel, December 4, 2001,
         statement............................................... 370
American College of Trial Lawyers, Irvine, California, letter and
   statement..................................................... 380
American Council of Chief Defenders, Washington, D.C., statement
   and attachment................................................ 381
American Federation of Labor and Congress of Industrial
   Organizations, Washington, D.C., Executive Council, article.... 383
American Immigration Lawyers Association, Washington, D.C.,
   statement..................................................... 384
Amnesty International USA, New York, New York:
      November 28, 2001, news release............................ 385
      December 4, 2001, statement............................... 386
      William F. Schulz, Executive Director, statement.......... 399
      September 11 detainees, sample information.................. 400
Angel, Cecil, Detroit Free Press, December 3, 2001, article...... 402
Arab American Institute Foundation, Washington, D.C., report..... 402
Ayub, Ali, Arlington, Virginia, December 3, 2001, letter......... 421
Bar Association of San Francisco, San Francisco, California,
   letter........................................................ 422
Baxley, Bill, Attorney, Baxley, Dillard, Dauphin & McKnight,
   Birmingham, Alabama, letter................................... 423
Brownback, Hon. Sam, a U.S. Senator from the State of Kansas and
   Hon. Ron Wyden, a U.S. Senator from the State of Oregon,
   November 2, 2001, ``Dear Colleague'' letter................... 424
Clark, Kathleen, Professor of Law, Washington University, St.
   Louis, Missouri, statement.................................... 424
Federalist Society, Washington, D.C., paper..................... 427
Feiertag, Terry Yale, Attorney, Mandel, Lipton and Stevenson
   Limited, Chicago, Illinois, letter............................ 441
Gittins, Charles W., Lieutenant Colonel, U.S. Marine Corps
   Reserve, statement............................................ 443
Glaberson, William, New York Times, December 2, 2001, article.... 445
Hamud, Randall B., Attorney, San Diego, California, November 29,
   2001, letter and attachment................................... 446
Hatch, Hon. Orrin G., a U.S. Senator from the State of Utah, USA

A35

Today, December 6, 2001, article.............................. 450
Heritage Foundation, Washington, D.C., November 5, 2001,
    memorandum....................................... 451
Human Rights Committee, Charles D. Siegal, Chair, Los Angeles,
    California, December 3, 2001, letter........................... 460
Human Rights Watch, Washington, D.C.:
        statement...................................... 466
        Kenneth Roth, Executive Director, November 15, 2001, letter.. 468
Kmiec, Douglas W., Dean and St. Thomas More Professor of Law, The
    Catholic University of America School of Law, Washington, D.C.,
    letter.......................................... 470
Koh, Harold Hongju, New York Times, November 23, 2001, article... 475
Law professors and lawyers, joint letter......................... 476
Lewis, Anthony, New York Times:
        November 30, 2001, article................................ 545
        December 4, 2001, article................................. 546
McGee, Jim, Washington Post, November 28, 2001, article.......... 547
Miller, Hon. Zell, a U.S. Senator from the State of Georgia,
    December 5, 2001, press release.............................. 549
National District Attorneys Association, Kevin P. Meenan,
    President, Alexandria, Virginia, letter...................... 549
Newsday, November 25, 2001, editorial............................ 550
New York Times:
        November 10, 2001, editorial.............................. 552
        November 16, 2001, editorial.............................. 553
        December 2, 2001, editorial............................... 554
Orenstein, James, New York Times, December 6, 2001, article...... 556
Parkway Christian Fellowship, Allan M. Spencer, Jr., Birmingham,
    Alabama, letter.............................................. 557
People For the American Way, Ralph G. Neas, President,
    Washington, D.C., statement.................................. 557
Safire, William, New York Times:
        November 15, 2001, article................................ 559
        December 6, 2001, article................................. 560
St. Louis Post-Dispatch:
        November 12, 2001, editorial.............................. 561
        November 27, 2001, editorial.............................. 562
Scheffer, David J., Senior Fellow, U.S. Institute of Peace,
    Washington, D.C., statement and report....................... 563
Schulz, William F., Amnesty International USA; Kenneth Roth,
    Human Rights Watch; Gay McDougall, International Human Rights
    Law Group; Catherine Fitzpatrick, International League for
    Human Rights; Michael Posner, Lawyers Committee for Human
    Rights; Lynn Thomas, Minnesota Advocates for Human Rights; Len
    Rubenstein, Physicians for Human Rights; and Todd Howland,
    Robert F. Kennedy Memorial Center for Human Rights, joint
    letter....................................................... 581
Schwartz, Herman, Professor of Law, American University,
    Washington, D.C., statement.................................. 582
Slaughter, Anne-Marie, Professor of Law, Harvard Law School,
    Cambridge, Massachusetts:
        New York Times, November 17, 2001, article................ 584
        and William Burke-White, December 3, 2001, statement......... 585
Wall Street Journal, December 4, 2001, editorial................. 586
Washington Post, November 16, 2001, editorial.................... 587
Wedgwood, Ruth, Wall Street Journal, December 3, 2001, article... 588
Wilgoren, Jodi, New York Times, December 4, 2001, article........ 590
York, Byron, National Review, December 3, 2001, article......... 591
                        ------

ALPHABETICAL LIST OF WITNESSES

Al-Maqtari, Ali, New Haven, Connecticut......................... 212
Ashcroft, Hon. John, Attorney General of the United States....... 309
Barr, William P., former Attorney General of the United States... 60

A36

Bell, Griffin B., Senior Partner, King and Spalding, and former
    Attorney General of the United States, Washington, D.C.........    74
Boyle, Michael J., Attorney, New Haven, Connecticut, on behalf of
    the American Immigration Lawyers Association...................   218
Chertoff, Michael, Assistant Attorney General, Criminal Division,
    Department of Justice, Washington, D.C........................     8
Dinh, Viet D., Assistant Attorney General, Office of Legal
    Policy, Department of Justice, Washington, D.C................   203
Emerson, Steven, Executive Director, Investigative Project,
    Washington, D.C..............................................   241
Goldstein, Gerald H., Esq., Goldstein, Goldstein, and Hilley, San
    Antonio, Texas on behalf of the National Association of
    Criminal Defense Lawyers......................................   229
Heymann, Philip B., James Barr Ames Professor of Law, Harvard Law
    School, and former Attorney General of the United States.......    68
Katyal, Neal, Visiting Professor, Yale Law School, and Professor
    of Law, Georgetown University, Washington, D.C.................    93
Lynch, Timothy, Director, Project on Criminal Justice, Cato
    Institute, Washington, D.C.....................................   184
Martin, Kate, Director, Center for National Security Studies,
    Washington, D.C................................................    85
Nardotti, Michael J., Jr., Major General (Retired), former Army
    Judge Advocate General, and Partner, Patton Boggs LLP,
    Washington, D.C................................................   172
Prosper, Hon. Pierre-Richard, Ambassador-at-Large for War Crimes
    Issues, Department of State, Washington, D.C...................   135
Silliman, Scott L., Executive Director, Center on Law, Ethics and
    National Security, Duke University School of Law, Durham, North
    Carolina.......................................................    79
Strossen, Nadine, President, American Civil Liberties Union, New
    York, New York.................................................   262
Sunstein, Cass R., Karl N. Llewellyn Distinguished Service
    Professor of Jurisprudence, Law School and Department of
    Political Science, University of Chicago, Chicago, Illinois....   178
Terwilliger, George J., III, former Deputy Attorney General, and
    Partner, White and Case, Washington, D.C......................   156
Toensing, Victoria, diGenova and Toensing, LLP, and former Deputy
    Assistant Attorney General, Criminal Division, Department of
    Justice, Washington, D.C.......................................   225
Tribe, Laurence H., Tyler Professor of Constitutional Law,
    Harvard Law School, Cambridge, Massachusetts..................   159

DEPARTMENT OF JUSTICE OVERSIGHT: PRESERVING OUR FREEDOMS WHILE
DEFENDING AGAINST TERRORISM

----------

A37

WEDNESDAY, NOVEMBER 28, 2001

United States Senate,
Committee on the Judiciary,
Washington, D.C.

The Committee met, pursuant to notice, at 9:05 a.m., in
Room SD-226, Dirksen Senate Office Building, Hon. Patrick J.
Leahy, Chairman of the Committee, presiding.
Present: Senators Leahy, Kennedy, Kohl, Feinstein,
Feingold, Schumer, Durbin, Hatch, Grassley, Specter, Kyl,
DeWine, Sessions, and McConnell.

OPENING STATEMENT OF HON. PATRICK J. LEAHY, A U.S. SENATOR FROM
THE STATE OF VERMONT

    Chairman Leahy. Good morning. This is one of a series of
hearings this Committee is holding on the Department of
Justice's response to the September 11th attacks and on
implementation of the anti-terrorism legislation, the USA
PATRIOT Act.
    I know I speak for those on both sides of the aisle in
beginning this hearing by commending the hardworking men and
women of the agencies of the Department of Justice and also our
State and local officers for their dedicated law enforcement
efforts. We have seen it across this country, and, of course,
we have seen it especially in the affected areas of the
terrorist attacks.
    Now, at the time Congress worked on the anti-terrorism
bill, many observed how important congressional oversight would
be in the aftermath. And to fulfill our constitutional
oversight obligation, Senator Hatch and I invited Attorney
General Ashcroft to appear before the Committee today, but he
asked to have his appearance put off until next week so that he
could spend time with the U.S. Attorneys who are in town today
and tomorrow. And on Monday, I learned that the Department was
asking that Mr. Chertoff appear as our first witness at this
hearing.
    I have accommodated both requests by the Attorney General.
I look forward to his appearance before the Committee next week
on December 6th. In the meantime, our oversight hearing today
and additional hearings next Tuesday should help build a useful
record on several significant issues.
    We are all committed to bringing to justice those involved
in the September 11 attacks and to preventing future acts of
terrorism. As we showed in our passage of anti-terrorism
legislation, Congress can act promptly to equip the executive
branch with the appropriate tools to achieve these goals. The
administration requested many new powers, and after adding
important civil liberty protections, we empowered the Justice
Department with new and more advanced ways to track terrorists.
    We passed the bill in record time and with an
extraordinarily level of cooperation between Democrats and
Republicans, the House and the Senate, and the White House and
Congress. The separate but complementary roles of these
branches of Government, working together and sharing a unity of
purpose, made that bill a better law than either could have
made through a unilateral initiative.
    In the wake of that achievement, the administration has
departed from that example to launch a lengthening list of
unilateral actions, and that is disappointing because we had
worked together to get the original legislation. Rather than
respect the checks and balances that make up our constitutional
framework, the executive branch has chosen to cut out judicial
review in monitoring attorney-client communications and to cut

A38

With due deference to this important Committee carrying out your oversight function and your legislative function, I suggest that it would be well to adjourn this hearing pending receipt of such orders and regulations by the Secretary of Defense, as are contemplated by Section 4(b) and (c) of the President's Order as well as the meaning of the provision in Section 4(a) of punishment ``in accordance with the penalties provided under applicable law.''

Chairman Leahy. Thank you, General Bell. I appreciate your being here, and you bring back memories of my early days in this Committee where I think my seat was probably so far back that you never even noticed me because I was probably behind you. I didn't care much for the seniority system back then. Now that I have studied it 25 years, I like it a lot better.
    Professor?

STATEMENT OF SCOTT L. SILLIMAN, EXECUTIVE DIRECTOR, CENTER ON LAW, ETHICS AND NATIONAL SECURITY, DUKE UNIVERSITY SCHOOL OF LAW

Mr. Silliman. Mr. Chairman, Senator Hatch, Senator Specter, the President's order cites as one of its legal predicates Article 21 of the Uniform Code of Military Justice. That provision, I submit, creates no new authority in the President as to military commissions. It merely acknowledges that in establishing the jurisdiction for courts-martial, Congress did not deprive these commissions, another type of legal tribunal, of concurrent jurisdiction with respect to offenses which, by statute or by the law of war, may be tried by these commissions.
    As to statutory offenses, Congress clearly has the authority under Article I, section 8, clause 10, to define and punish offenses against the law of nations, of which the law of war is a subset. But it has done so only in a very restricted manner, notably, in the War Crimes Act of 1996, none of whose provisions are applicable to what we are dealing with in this instance. So we must, therefore, look to the law of war for the predicate authority for military commissions.
    Customary international law recognizes the right of a military commander to use military commissions to prosecute offenses against the law of war, offenses which, by definition, must take place within the context of a recognized state of armed conflict. I maintain that shortly before 9 o'clock in the morning on Tuesday, September 11th, we were not in a state of armed conflict and we did not enter into a state of armed conflict until some time thereafter, certainly on or after the 7th of October.
    Some argue that the events of that horrendous Tuesday demand a reappraisal of customary international law concepts regarding the distinction between state and non-state actors and that, irrespective of whether the attacks were carried out by one, 19, or a greater number of terrorist non-state actors, that they should nonetheless be considered acts of war. I cannot agree in that. The answer lies in legislation rather than an instantaneous sweeping aside of traditional customary law concepts.
    Articles 18 and 21 of the Uniform Code of Military Justice could be amended to allow for the use of military commissions or even courts-martial to try offenses, not just against the law of war but against the law of nations, and could include the broader category of offenses such as we are dealing with on September 11th.
    A word about the much cited case of Quirin involving the eight German saboteurs. Although the Supreme Court did sanction the use of a military commission in that instance, it did so in

the clear context of a formally declared war, saboteurs entering this country surreptitiously and illegally at a time frame only 7 months after the attack on Pearl Harbor, where the vulnerability of this country was shockingly realized. That realization of vulnerability also gave birth to the infamous internment camps for Japanese Americans sanctioned by the Supreme Court in the Korematsu case. The Korematsu case is a precedent, Mr. Chairman, that I suggest few would want to bring forward. I suggest that Quirin, like Korematsu, can be extended too far beyond its context.

I, therefore, see a weakness in the legal predicate for using military commissions to prosecute offenses occurring on September 11th, and I believe that that weakness could result in a finding that such commissions would not have jurisdiction over those offenses, the September 11th offenses.

I also have policy concerns, Mr. Chairman. I acknowledge the convenience and perhaps the prudence of commissions sitting overseas for terrorists captured incident to combat in Afghanistan and the Supreme Court opinions can be read as precluding judicial review in those cases. That is the Eisentrager case. But as to military commissions sitting in this country prosecuting resident aliens, I see not only an adverse impact upon our international credibility, but also a potential tarnishing of a proud heritage of 50 years of military justice under the Uniform Code of Military Justice.

Senators Kennedy and Kohl have both mentioned the Berenson case, 1996, in Peru. I would suggest that there appears to be little difference between the lack of protections afforded her in Peru and the minimal due process standards set out in the President's order.

We should expect a reproach from the international community for hypocrisy since we continually tout ourselves as a nation under the rule of law. I believe such a criticism could result in a fracturing of the disparate coalition that has been forged to wage a long-term campaign against terrorism worldwide, a campaign which must necessarily go farther than just the use of military force.

Secondly, many in this country do not accurately perceive the distinction between courts-martial under the Uniform Code of Military Justice and military commissions to be empaneled under the President's order. On Sunday's televised news program ``Face the Nation,'' former Deputy Attorney General George Terwilliger stated that ``there is a fundamental misconception that somehow a military court cannot be just. Our own soldiers and airmen are subject to military justice on a regular basis. The military can provide fair trials.''

That implies, Mr. Chairman, that military commissions will generally follow the same rules of procedure and modes of proof of courts-martial. As this Committee knows, that is not the case. Regrettably, this confusion is widespread, and I have a great concern that in pursuing the use of military commissions, especially in this country, this blurred distinction could sully the image of military justice under the code, a very fair and impartial system of which we have always been proud.

I look forward to answering any questions you might have, Mr. Chairman.

[The prepared statement of Mr. Silliman follows:]

Scott L. Silliman, Executive Director, Center on Law, Ethics, and National Security, Duke University School of Law

Mr. Chairman, Senator Hatch and members of the Committee. My name is Scott L. Silliman and I am the Executive Director of the Center on Law, Ethics and National Security at the Duke University School of Law. I am also a senior lecturing fellow at Duke and hold appointments as an

adjunct professor of law at Wake Forest University, the University of North Carolina, and North Carolina Central University. My research and teaching focuses primarily in the field of national security law. Prior to joining the law faculty at Duke University in 1993, I spent 25 years as a uniformed attorney in the United States Air Force Judge Advocate General's Department. During Operations Desert Shield and Desert Storm, I served as the senior Air Force attorney for Tactical Air Command, the major command providing the majority of the Air Force's war-fighting assets to General Schwarzkopf's Central Command.

I thank you for the invitation to discuss with the Committee some of my concerns with respect to the inherent tension which exists in successfully defending against terrorism while at the same time preserving our freedoms. In the event that members of al-Qaeda are captured or surrender incident to the military campaign in Afghanistan, or if individuals suspected of complicity in the attacks of September 11th are arrested in this country or elsewhere, there are several prosecutorial options available to the government. These are (1) trial in the federal district courts, as was done with regard to those responsible for the initial attack upon the World Trade Center in 1993 and upon our embassies in Kenya and Tanzania in 1998; (2) trial in the courts of any other country, under the principle of universal jurisdiction; (3) trial before some type of an international tribunal, either one currently in being or one to be established in the future; or (4) trial by military commission or other military tribunal established by the President in his capacity as Commander-in-Chief. None of these approaches is optimal; all have problems and limitations associated with their use. The President, however, has indicated his intent to pursue the use of military commissions and, accordingly, my comments will be restricted to the military order issued on November 13th which authorizes the detention, treatment and trial of certain non-citizens in the war against terrorism. In particular, I will discuss what I consider to be a weakness in the Administration's argument regarding the President's legal predicate for authorizing the use of military commissions with respect to the terrorist attacks on September 11th, a weakness which I believe needs to be remedied by the Congress through legislation. I will then discuss my policy concerns as to the overall breadth of the current order and how I believe it could adversely impact our international credibility as a nation under the rule of law.

    Authority of the President to Authorize Military Commissions

    The military order of November 13th lists three statutory provisions which, in addition to the President's constitutional powers, are cited as authority for the order. These are the Authorization for Use of Military Force Joint Resolution, signed by the President on September 18, 2001, and Articles 21 and 36 of the Uniform Code of Military Justice. As to the Joint Resolution, the key operative language is contained in Section 2(a) which authorizes the President ``to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on Sept 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations or persons.'' Section 2(b) declares that Congress, through this resolution, is satisfying its own requirements under the War Powers Resolution of 1973 regarding the need for a specific statutory authorization approving the use of our armed forces in this regard. There can be no doubt that the Joint Resolution is meant to buttress and affirm the President's right as commander-in-chief to use force in self-defense against a continuing threat, either from a state or a non-state actor. This inherent right of self-defense, clearly recognized in customary international law and codified (but not supplanted) by Article 51 of the United Nations Charter, was reiterated in United Nations Security Council resolutions 1368 of September 12th (Security Council Res. 1368, UN Doc. SC/7143) and 1373

of September 28th (Security Council Res. 1373, UN Doc. SC/
7158), both of which referred directly to the attacks of September
11th. It should be noted, however, that although there are frequent
references in the text of the Joint Resolution to ``terrorist acts''
and ``acts of international terrorism'', nowhere in the resolution, or
in the presidential signing statement, is there any mention or
characterization of the attacks of September 11th as acts of
war. They are clearly denoted as terrorist acts.

  Under the Constitution, Congress was granted authority to make
rules for the government of the land and naval forces (Article I,
Section 8, Clause 14). It did so most recently through enactment of the
Uniform Code of Military Justice (UCMJ), 10 U.S.C. Sec. Sec. 801 et
seq., in 1950. Article 21 of the Code, cited in the President's
military order, mentions military commissions but does so only in
acknowledging that the Code's creation of jurisdiction in courts-
martial to try persons subject to the UCMJ, does ``not deprive military
commissions...of concurrent jurisdiction with respect to offenders or
offenses that by statute or by the law of war may be tried by military
commissions, provost courts, or other military tribunals'' (10 U.S.C.
Sec. 821). A corresponding provision in Article 18 of the UCMJ,
although not cited in the military order, provides that ``(G)eneral
courts-martial also have jurisdiction to try any person who by the law
of war is subject to trial by a military tribunal and may adjudge any
punishment permitted by the law of war'' (10 U.S.C. Sec. 818). Articles
18 and 21 can only be read as reflective of Congress' intent, by
enacting statutory authority for trials by courts-martial and providing
for the concurrent jurisdiction of courts-martial with military
commissions, not to divest the latter of the jurisdiction that they
have by ``statute or by the Law of War''. The other provision of the
UCMJ specifically cited in the military order is Article 36, 10 U.S.C.
Sec. 836, which is a general delegation of authority to the President
to prescribe trial procedures, including modes of proof, for courts-
martial, military commissions, and other military tribunals. This
provision states that the President shall, ``so far as he considers
practicable, apply the principles of law and the rules of evidence'' as
generally used in criminal cases in federal district courts (10 U.S.C.
Sec. 836). In the military order, the President makes a specific
finding that using those rules would not be practicable in light of the
``danger to the safety of the United States and the nature of
international terrorism'' (Section 1(f), Military Order of November 13,
2001). This provision, therefore, has relevance only to the rules for
the conducting of military commissions, rather than to the authority
for establishing them.

  Has Congress legislated as to war crimes, other than in the UCMJ?
Although the Constitution grants Congress authority to define and
punish offenses against the law of nations (Article I, Section 8,
Clause 10), it has done so only in a very limited manner through the
War Crimes Act of 1996 (18 U.S.C. Sec. 2441). That statute makes
punishable any grave breach or violation of common Article 3 of the
Geneva Conventions, any violation of certain articles of Hague
Convention IV of 1907, or a violation of the Protocol on Prohibitions
or Restrictions on the Use of Mines, Booby-Traps and Other Devices,
when either the perpetrator or the victim is a member of the United
States armed forces or a national of the United States. None of these
treaty provisions, violations of which are proscribed under the Act,
appear to be applicable with regard to the terrorist attacks.
Therefore, since the only relevant statutory references to military
commissions are contained in the UCMJ, and those only recognize
jurisdiction with respect to offenses proscribed by statute (of which
none apply here) or the law of war, a subset of international law, it
is the law of war to which we must now turn.

  Customary international law clearly recognizes the authority of a
military commander to use military tribunals to prosecute offenses
against the jus in bello occurring during an armed conflict. The jus in

A42

bello, regulating how war should be conducted, differs from the jus ad bellum, which governs when the use of force is permissible by one state against another. Our history is replete with instances of military tribunals being used to deal with violations of the jus in bello in times of armed conflict, with the trials of General Yamashita and the German saboteurs during World War II being the most recent examples.

My concern with regard to the legal predicate for the application of the President's military order is that violations of the law of war--the jus in bello--do not occur within a vacuum; they must by definition occur within the context of a recognized state of armed conflict. I maintain that at shortly before 9:00 am on the morning of September 11th, we were not in a state of armed conflict and we did not enter into such a state until sometime thereafter. Therefore, with regard to the attacks of September 11th, the principal event prompting our armed response in self-defense against Osama bin Laden and the al-Qaeda organization in Afghanistan, these are clearly acts of terrorism in violation of international law, but not necessarily violations of the law of war. If my premise is correct, then it presents an impediment to using military commissions for the trial of those charged with or complicit in those particular attacks, as distinguished from charges relating to later events. Some may argue that the events of September 11th demand a reappraisal of existing customary international law concepts with regard to the distinction between state and non-state actors and that, irrespective of whether the attacks were carried out by one, nineteen, or a greater number of terrorist non-state actors, these attacks should be considered, at the instant they occurred, as nothing short of an act of war. I am unwilling to concur in that argument and, as will be discussed later, I believe the answer to this problem lies in legislation rather than in an instantaneous sweeping aside of longstanding principles of customary law.

In many of the Administration's pronouncements in support of the military order of November 13th, the Supreme Court opinion in Ex Parte Quirin, 317 US 1 (1942), is mentioned. I submit that Ex Parte Quirin, the case involving the eight German saboteurs who, in 1942, landed on our shores in Florida and Long Island with intent to do damage to our defense facilities, bears closer scrutiny than it has been given by military commission proponents. The Supreme Court sanctioned the use of a military commission to try the saboteurs, but did so in the context where there was a formal declaration of war by Congress and the individual saboteurs had entered this country surreptitiously. Even though one of them, Haupt, claimed to be an American citizen by virtue of the naturalization of his parents while he was still a minor, the Court determined that such citizenship did ``not relieve him from the consequences of a belligerency which is unlawful because in violation of the law of war'' (Ex Parte Quirin, 317 U.S. 317, 37 (1942)). Throughout Chief Justice Stone's opinion, there are references to the power of the President as Commander-in-Chief in time of war. Ten years later, Justice Robert Jackson, in his concurring opinion in the Steel Seizure Case, would develop his oft-quoted analysis of presidential powers in relation to those of Congress and determine that the President's authority is at a maximum when he acts pursuant to an express or implied authorization of Congress (Youngstown Sheet & Tube Co. v. Sawyer, 343 US 579, 592 (1952)). The Congressional declaration of war against Germany was just such a mandate for President Roosevelt, especially bearing in mind that the eight saboteurs breached our shores just seven months after the attack on Pearl Harbor where the vulnerability of this country to attack was shockingly realized. That realization of vulnerability also gave birth to the infamous internment camps for Japanese Americans which were established during this very same period and which were sanctioned by the Supreme Court in Korematsu v. United States, 323 US 214 (1944), an opinion which virtually no one claims has continued precedential value. Thus, I suggest that to draw authority from Ex Parte Quirin for the military order of November 13th is to take the case out of the context of the very

A43

specific circumstances in which it was decided, a declared war and a Supreme Court desiring to maximize the President's authority to act to defend our shores against an attack from state actors. No such context exists now, no matter how much we proclaim the ``acts of war'' of September 11th and try to make terrorists into state actors.

   In conclusion of the first part of my statement, dealing with what I consider a weakness in the argument for the President's legal authority to use military commissions to prosecute terrorists for offenses against the war of war occurring on September 11th, I submit that this weakness can be remedied, certainly as to future acts of terrorism which do not reach to the level of being offenses against the law of war. If Congress were to enlarge the scope of Articles 18 and 21 of the Uniform Code of Military Justice by either changing the words ``law of war'' to ``law of nations'', thereby incorporating acts such as those of September 11th, or by inserting additional language setting forth specifically denoted acts of terrorism, such an amendment would empower military commissions (Article 21) and courts-martial (Article 18) to prosecute acts of terrorism outside the context of a recognized state of armed conflict. As to the use of courts-martial, however, this would necessitate pretrial, trial and post-trial procedures, including modes of proof, as prescribed in the Manual for Courts-Martial, Exec. Order 12960, 63 Fed. Reg. 30065 (June 2, 1998), unless the President, acting under the Congressional delegation of Article 36 of the Code, were to modify those procedures, as he has done in the November 13th military order.

   Policy Concerns Regarding the Use of Military Commissions
   Mr. Chairman, my comments to this point have reflected a specific legal concern regarding the Constitutional predicate for the President to authorize the use of military commissions. I would now like to share with the Committee my more general policy concerns regarding the choice of military commissions as against other prosecutorial forums. I should say at the outset that my area of greatest concern is with respect to military commissions sitting in the United States and prosecuting resident aliens who entered this country legally and whose only offense might be that they are, or were at some time in the past, members of al-Qaeda. I acknowledge the convenience and possible prudence of commissions sitting in overseas areas, especially in a theater of military operations, for the prosecution of those members of al-Qaeda who are captured incident to combat in Afghanistan, and I think an argument could certainly be made that the Supreme Court's opinion in Johnson v. Eisentrager, 339 U.S. 763 (1950) would preclude judicial review by the Article III courts over such commissions held overseas. The concept of military commissions sitting in this country is another matter.

   The administration has evidenced frustration with what it perceives to be restrictions and limitations that seemingly hinder prosecutors in attempting to bring terrorists to trial in our federal district courts. Mention has been made of the rules governing disclosure which would compel release of sensitive intelligence information. The lengthy trials of those convicted of the 1993 bombing of the World Trade Center and the 1998 attacks upon our embassies in Africa are cited as examples of the inability of the federal district courts to adequately cope with trials of terrorists. Further, it is argued that a criminal justice system which incorporates rehabilitation and reincorporation into society as part of the sentencing process is ill-suited to deal with those whose zealous religious beliefs idealize martyrdom. I suggest that these arguments are not necessarily persuasive. Congress has provided tools for prosecutors to deal with classified information in criminal trials, notably the Classified Information Procedures Act, 18 U.S.C. App Sec. 1 et seq. (1980), and the two prior successful convictions of al-Qaeda terrorists are indicative that it can be done, no matter how problematic for prosecutors the trials may be.

   As to the option of using international tribunals, I concede that

A44

no existing tribunal has jurisdiction over the terrorists. Neither the ad hoc tribunal for the former Yugoslavia, nor the one for Rwanda, could prosecute terrorists without the United Nations Security Council having to make specific amendments to either of their respective charters. The International Criminal Court, a UN sponsored treaty-based tribunal, is not yet in existence and, even if a sufficient number of states were able to quickly ratify the Rome Treaty, that tribunal has only prospective jurisdiction. Lastly, although the United Nations Security Council could create yet another ad hoc tribunal for the specific purpose of dealing with terrorist acts, any such attempt would surely founder because of the inability of the international community to agree upon a definition of ``terrorism''--a flaw that greatly restricts the feasibility of using any international tribunal for this purpose. Thus, international tribunals do not provide us with a current, viable forum for prosecuting terrorists.

The third option, trials by other countries under the jurisdictional principle of universality, is not well-suited to the United States for policy reasons. I agree with critics of this option that America needs to be directly or at least indirectly involved in the prosecution because the attack upon our people and our facilities occurred within our country and we clearly have the greatest interest in prosecuting those responsible for or complicit in the attacks. Further, the opportunity for capital punishment, and its arguable deterrence value, is greatly diminished when other sovereigns conduct the prosecutions within their own countries. This potential choice of forum is the least practical.

Acknowledging that none of the prosecutorial forums is optimal, but that the two most feasible are trials in our federal district courts and trials by military commission, the President clearly signaled his intent on November 13th to use the latter. I suggest that this choice may entail costs which outweigh the benefits, notably with regard to commissions sitting in this country. I believe we should be cognizant of a potential adverse impact upon our international credibility, as well as a tarnishing of the image of 50 years of military Justice under the UCMJ.

It was but five years ago that the United States roundly condemned the conviction by a military tribunal in Peru of New York native Lori Berenson on charges of terrorism. Through official channels, we requested that she be retried in a civilian court because of the lack of due process afforded her in the tribunal. Our cries of unfairness were echoed by United Nations officials who openly criticized Peru's anti-terrorism military courts. There seems little difference in the measure of due process afforded Berenson in Peru and what is called for under the President's military order, and I believe this opens us to a charge of hypocrisy from the international community. The force of this criticism could be lessened if those who advise the Secretary of Defense counsel him to ensure a high level of due process in the regulations establishing the commissions, but the charge laid against us can never be totally ameliorated. Consequently, I believe our use of military commissions may result in a fracturing of the large and disparate coalition which has been put together to wage the long-term campaign against terrorism worldwide, a campaign which must necessarily involve far more than the use of military force. As to my second point, my sense is that the American people do not accurately perceive the distinction between courts-martial under the military justice system and military commissions which could be empaneled under the President's order. I have heard it said on radio talk shows that if military commissions are good enough for our servicemen and servicewomen, then they are certainly good enough for terrorists. Even former Deputy Attorney General George Terwilliger, on this past Sunday's news program Face the Nation, said that ``there is a fundamental misconception that somehow a military court cannot be just. Our own soldiers and airmen are subject to military justice on a regular basis. The military can provide fair trials.'' This suggests to me that a segment of the American people, having perhaps become acquainted with military justice

through the portrayal of courts-martial on television or in the movies, believe that military commissions will generally follow the same rules of procedure and modes of proof. This Committee knows that is not so. There is a marked contrast in the protections afforded our service personnel under the military justice system, and the lack of due process in military commissions. To illustrate, there is a guarantee of judicial review under the former; that is specifically denied under the latter. Although courts-martial may, under certain circumstances be closed to the public, the evidentiary rules and burden of proof required for conviction are virtually identical to those in our federal district courts; that is not the case in military commissions. In other words, the two systems have little in common, and this must be made clear as the debate on the propriety of using military commissions continues.

In the final analysis, the decision is one for the President to make, and he has already indicated the probable path he intends to pursue. I believe, however, that hearings such as are being conducted by this Committee will allow for a broad and balanced airing of views on this issue, not only to hopefully better inform the Members in both chambers, but also to give the Administration the benefit of additional voices in the debate. This should, and must, be done before the first terrorist is brought to trial.

Mr. Chairman, Senator Hatch and members of the Committee, thank you again for inviting me to share my concerns with you. I look forward to answering any questions you might have.

Chairman Leahy. Thank you very much, Professor. I appreciate that, and I also appreciate very much you making that very needed distinction between these tribunals and our well-established--you were a colonel in the military, and you know the well-established rules of military tribunals.

Ms. Martin, thank you very much, and, again, I appreciate you spending so much time here with us today. Please go ahead and testify.

STATEMENT OF KATE MARTIN, DIRECTOR, CENTER FOR NATIONAL
            SECURITY STUDIES, WASHINGTON, D.C.

Ms. Martin. Thank you, Mr. Chairman, and I thank the Committee for the opportunity to appear today, and I particularly want to thank the chairman for convening this extraordinarily important series of oversight hearings.

The Government's efforts to identify the perpetrators of the terrible attacks on September 11th and to prevent future attacks before they occur could not be more crucial. But we have become increasingly concerned that, instead of conducting a focused and effective law enforcement investigation, the Government has turned instead to a number of radical and overly broad measures that threaten basic rights without in turn providing any increased security.

While some have cast the terrible situation we find ourselves in today as one in which we must decide what liberties we are willing to sacrifice for an increased measure of safety, I do not believe that is an accurate or helpful analysis. Before asking what trade-offs are constitutional, we must ask what we gain in security by restricting our civil liberties.

The common thread in the Justice Department's recent actions in detaining individuals, providing for eavesdropping, and the President's order on military commissions is the secrecy and lack of public and congressional participation in adopting those measures. It is only by forcing the Government to articulate why and how particular restrictions on our liberties will contribute to security that we can have any guarantee that the steps being taken will, in fact, be

A46

# TAB 3

Sept. 11: A Campus Reflects                    https://today.duke.edu/showcase/mmedia/features/911site/campus_reme...

# DUKE ›› News & Communications

Search Duke 

**9/11 Home Page**
**Calendar of Events**
**Previous Events**
**9/11 Experts List**
**Duke News Service**
**Alumni Memorials**
**Duke Home**





## SEPTEMBER 11: A CAMPUS REFLECTS



First-year students Paula Lehman, left, and Cortney Cooper
Photo by Duke Photography

### An Emotional Anniversary
Memorials bring back old feelings

First-year students Paula Lehman and Cortney Cooper stood on the edge of the lawn below the Duke Chapel steps, their eyes brimming with tears, as the university's Sept. 11 memorial service ended.

More than 500 students, faculty, staff and campus visitors gathered to hear President Nannerl O. Keohane and others honor the victims of last year's attacks and to celebrate America's resilience. Lehman and Cooper came for one additional reason -- to pay homage to their hometown, New York City.

"I was looking for something to take us back home," said Lehman, who was a senior with Cooper at the Spence School, a private girls' school in Manhattan, when the two World Trade Center towers collapsed. "I spent the last year trying to push those memories away. I thought I needed to spend the day thinking about it."

Wednesday was a day of reflection across campus. A solemn tone was struck early, as a single chime rang out on six different occasions, each corresponding to the moment that the four planes crashed and the World Trade Center towers collapsed.

Throughout the day, groups small and large gathered to hear physicians and policy analysts, religion experts and legal scholars, try to make sense of the painful events of the last year.

Trees were planted and prayers were said in memory of the six Duke alumni killed in the attacks. In Duke Hospital, staff, patients and visitors posted their thoughts at three writing stations.

And in classes, such as Charles-Philippe David's political science course, "War and Peace After 9-11," students debated what has changed in the world during the past year. Not much, senior Reuben Manning told classmates. "There have been planes hijacked before, and there will be planes hijacked in the future," he said. "It's not necessarily that the nature of terrorism has changed; it's just the stage is bigger."

Other students said they felt much had changed, from the restrictions imposed on travel to Americans' new sense of vulnerability.

Back on the chapel steps, Antonio Arce, a doctoral student in Latin American politics, said he felt emotionally drained by the one-year anniversary. "After all the stories came out of people's lives and who they lost and all the tragedies that took place in the buildings, today actually brought more tears than when it happened."

### Spotlight



Campus Voices: Members of Duke community reflect on the meaning of the 9/11 anniversary.



A portfolio of images from the DUMA Exhibit "Missing: Documenting the Spontaneous Memorials of 9/11"



In a recent interview with Dialogue, Cathryn Cotten discusses how universities have had to change their visa administration.

### Audio & Video

🔊 Audio from Duke's Karla Holloway on "Talk of the Nation," on National Public Radio. September 11, 2002 Listen.

🔊 Audio from Professor Ebrahim Moosa on "The Connection," on National Public Radio. September 10, 2002 Listen.

Information for Broadcast Media

Lina Adilah, a librarian at Perkins Library, voiced a note of optimism: "I think people are more united than before and there is more tolerance for other cultures. You just feel people are kinder, you can see it in their eyes. They want to help, rather than just walking on by."

Listed below is a snapshot of Wednesday's activities around campus:

**Memorial service outside Duke Chapel**
Flanked by uniformed Duke and Durham police officers, Durham firefighters and student ROTC members, President Keohane asked those gathered to be inspired by the many acts of heroism shown over the last year.

"On this occasion of national remembrance, we relive last year's grief, patriotic pride and anger - but with a difference. We stir up our most painful emotions not in order to lay the ghosts of the men and women who died, but to let their spirits rouse us, the living, to further efforts by whose light we can create and sustain a better world where terrorism can find no foothold - a world where innocence need not be sacrificed on the altar of national ego or religious fundamentalism.

"We have had enough and more than enough of fire, hatred, blood, the anti-hero; enough of chaos," she said. "On this solemn day, may we recognize that the spirit of heroism did not die with our heroes."

Other speakers included Chief Otis Cooper of the Durham Fire Department, interim Chief Steve Chalmers of the Durham Police Department, Duke Police Chief Clarence Birkhead and Joshua Jean-Baptiste, president of Duke Student Government.

"The tragedy of Sept. 11 changed the world as we know it," Jean-Baptiste told the crowd. "The safety and innocence many of us felt here in our Gothic Wonderland may never return."

**Divinity School**
On Tuesday, divinity professors discussed what would be an appropriate response from a Christian community to the Sept. 11 attacks.

The church was right to offer healing in the days and weeks following the "unspeakable horror," said William C. Turner, Jr., associate professor of the practice of homiletics. But it is now time for the church to say that the people who died on airplanes, in the Pentagon and in World Trade Center offices "are not heroes. They are victims of a sinful world," as are thousands of other people who die each day from war, starvation and disease, he said.

William H. Willimon, professor of Christian ministry and dean of Duke Chapel, said Americans sought comfort in the wrong places after the attacks. "We reached out and grabbed a flag instead of a cross," he said. "We sought our consolation in Bette Midler and Rudy Giulliani" instead of the scripture.

Emmanuel Katongole, a visiting faculty member from Uganda, said he worries that the new foreign policy paradigm that pits the United States against terrorism may lead Americans to ignore the plight of the Third World. Katongole said terrorism should not be downplayed, but noted it is only one of many threats. "Environmental degradation and the silent death of millions" are equally important, he said.

On Wednesday morning, Professor Stanley Hauerwas, speaking in York Chapel, said Sept. 11 is "a day we struggle to forget, even though forgetting seems an act of betrayal to those who died. In an apocalyptic time, the rulers of nations can learn from religion that God has abolished

A49

war. God was not rendered powerless by the events of Sept. 11."
Hauerwas, the Gilbert T. Rowe Professor of Theological Ethics, added,
"The alternative to terror, both terrible and wonderful � is us."

**Duke Hospital**
For 10 days in February, Dr. Eric Christopher, clinical associate professor
in Duke's departments of internal medicine and psychiatry, helped the
American Red Cross provide health care to Ground Zero workers. On
Wednesday, he shared his observations with medical residents, students
and attending physicians at the hospital.

"Trauma creates disempowerment and disconnection," Christopher said.
"On a mass scale and with travel and communication lines severed,
people in Manhattan were left with few escape routes from the city and
an inability to connect with others." Re-establishing a sense of safety
and reconnecting with others - perhaps a therapist or another survivor -
is paramount when helping people cope with the loss of life.
Re-establishing relationships helps people reconnect and can ultimately
lead to healing, he said.

**Political Science**
After holding a memorial for Sept. 11 victim Peter Ortale, a Duke
alumnus who majored in political science, faculty members Peter Feaver,
Robert Keohane and Bruce Jentleson examined "The Impact of 9/11 on
America's Role in the World." The professors seemed to agree on four
points:

- The military action immediately after Sept. 11 appears to have
  been well-conceived, well-directed and effective in achieving its
  immediate goals of destroying the terrorist infrastructure in
  Afghanistan and driving its leaders underground.
- The mission now is no longer as clear, and the enemy is not well
  defined.
- Regardless of what is to be done, no "military-only" approach will
  be successful.
- The toughest piece of the puzzle will be creating and maintaining
  an international alliance for whatever activities are undertaken.

**Law School**
While many commemorated Sept. 11 by looking back, Duke law
professors used the occasion to discuss some of the complicated legal
issues still confronting the United States.

Associate Professor Michael Byers said the U.S. clearly had the force of
international law behind it during the fighting in Afghanistan, but the
same probably cannot be said for an invasion of Iraq.

If Iraq refuses to allow comprehensive weapons inspections, Byers
added, the U.S. should seek support in the United Nations' Security
Council before undertaking military action. "To go it alone would
fragment that support."

Professor Madeline Morris noted the political nature of terrorism creates
a unique tension that complicates efforts to prosecute terrorists -- efforts
that even now are playing out across the globe.

"The contours of national and international authority over law
enforcement in the field of terrorism is an issue that is going to develop
in important ways in the near future," Morris said. "The new permanent
International Criminal Court -- which is coming into existence even as we
speak -- is planning to take up the question of whether its jurisdiction
should be extended to encompass crimes of terrorism."

Professor Scott Silliman, executive director of the Law School's Center on Law, Ethics and National Security, said the United States' treatment of many captives taken in the last year violates provisions of the Geneva Convention as well as U.S. domestic law. Among the most troubling cases are those of Yaser Hamdi and Jose Padilla, two U.S. citizens who have been detained for months without benefit of counsel and without any specific charges lodged against them.

Further, he said, the United States, although claiming to be a nation under the rule of law, is seemingly not satisfying its commitments under international law. "I am troubled by our continued refusal to adhere to the Geneva Convention," Silliman said.

**Sanford Institute of Public Policy**
The day's events concluded with an evening symposium to examine the policy implications of Sept. 11. Sanford Institute Director Bruce Jentleson neatly summed up the panel's two fundamental points: First, "we face very serious problems and very serious threats. There can be no illusions," he said.

But there is also a tremendous amount of creative thinking among ethicists, scientists, policymakers and others. "This is a challenge for us on the panel and for your generation," Jentleson told the audience of nearly 200 people. "We have met many challenges before and we will do so again."

Bruce Kuniholm, professor of public policy studies and history, said since Sept. 11, there is an increased sense of vulnerability, not just for the U.S. but for the world. "The attack made clear that it was not just the United States with its superpower status and its open society, but the whole interdependent international community that faces a threat," said Kuniholm, who served on the State Department's policy planning staff during the Carter administration with responsibilities for the Persian Gulf and Southwest Asia.

He urged the Bush administration to outline a broader vision of international interests and to provide a "transnational vision" of how to protect those interests, including "addressing the political and economic realities that create support for terror."

For the medical research community, the Sept. 11 attacks have had a galvanizing effect, said Professor of Medicine Barton Haynes, who also directs the Duke Human Vaccine Institute. "There has been a sharp focusing of the research community on research on biodefense and emerging infections, as well as on ethical and logical issues." The anthrax attacks that followed also "produced an immediate wake-up call to the biomedical research community," he said.

Haynes echoed other panelists in emphasizing the post-Sept. 11 realization "that we live in a global community, and that the health and welfare of citizens in developing countries distant from the U.S. is critical to our own well-being in the U.S."

Silliman, a retired Air Force colonel and military attorney, also appeared on the evening panel, and he encouraged lawmakers to consider long-term, international consequences of any legal actions. "My concern as we craft legal tools in the War on Terrorism is that we are shaping international law that will not be for us alone to use," he said.

The fifth panelist, Professor Maureen Quilligan, chair of the English Department, noted that the word "terrorism" originated in 18th-century France, during the French Revolution's "Reign of Terror." "The term is meant to terrorize the population with fear," she said. "The best thing we

A51

Sept. 11: A Campus Reflects                                    https://today.duke.edu/showcase/mmedia/features/911site/campus_reme...

can do to end the war on terrorism is to give up our terrible fear. The only thing we truly have to fear is our own terror."

This article, written by Keith Lawrence, is based on reports by Blake Dickinson, Jon Goldstein, Sally Hicks, Tracey Koepke, Kathy Neal, Jerry Oster, David Reid, Cabell Smith and Sherry Williamson.

A52

# TAB 4



**Case Western Reserve Journal of International Law**

Volume 36 | Issue 2

2004

# On Military Commissions

Scott L. Silliman

Follow this and additional works at: http://scholarlycommons.law.case.edu/jil

 Part of the International Law Commons

Recommended Citation

Scott L. S ll man  *On Military Commissions*  36 Case W. Res. J. Int'l L. 529 (2004)
Ava lable at: http://scholarlycommons.law.case.edu/j l/vol36/ ss2/20

Th s A c e sb oug  o you o  ee a d ope access by  e S ude  Jou  a s a Case Wes e  Rese ve U  ve s y Sc oo o Law Sc o a y Co   o s.
I  as bee  accep ed o   c us o  Case Wes e  Rese ve Jou  a o I e  a o a Law by a  au  o zed ad     s a o o Case Wes e  Rese ve
U  ve s y Sc oo o Law Sc o a y Co   o s.

A54

ON MILITARY COMMISSIONS

*Scott L. Silliman*[†]

*I. Introduction*

    With pretrial hearings for several detainees underway at Guantanamo Bay, and the prospect for full trials before military commissions[1] starting either late this year or early in 2005, this little-understood option for prosecuting terrorists has become the focus of intense debate within this country and abroad, even becoming an election year issue for the presidential contenders.[2]    Many have suggested that the military commission procedures should have grafted in more of the due process protections afforded in courts-martial under the Uniform Code of Military Justice,[3] the criminal justice system created by Congress to govern the conduct of our own service men and women,[4] even though the commissions will be used only for non-resident aliens.  Others question whether the

---

[†] A.B. 1965, J.D. 1968, University of North Carolina.  After serving for 25 years as a uniformed judge advocate in the United States Air Force, Professor Silliman retired in the grade of colonel in 1993 and joined the faculty at Duke University School of Law where he is a Professor of the Practice of Law as well as Executive Director of Duke's Center on Law, Ethics and National Security.

[1] Although many commentators have referred to the proceedings at Guantanamo Bay as military "tribunals", the more correct term is military "commissions" since military tribunals encompass not only commissions, but also courts-martial, provost courts, and courts of inquiry.  See 10 U.S.C. § 821 (2004).

[2] Senator Kerry has indicated that he would "scrap the military commissions created by President Bush to try suspected al Qaeda and Taliban fighters detained at Guantanamo Bay, Cuba, and would instead establish a new system modeled on military courts-martial."  Glenn Kessler, *Kerry Would Drop Detainee Commissions*, WASH. POST, Sept. 1, 2004, at A07.

[3] *See* 10 U.S.C.S. §§ 801-946 (2004).

[4] *See, e.g.*, American Bar Association Resolution 8C, contained in The Summary of Action Taken by the House of Delegates of the American Bar Association, Karen J. Mathis, Chair, Presiding, Philadelphia, Pennsylvania, February 4-5, 2002; and AMERICAN BAR ASSOCIATION TASK FORCE ON TERRORISM AND THE LAW, Report and Recommendations on Military Commissions (hereinafter ABA Task Force); January 4, 2002 *available at* http://abanet.org/leadership/military.pdf.  Regrettably, some, even our highest officials, tend to confuse military commissions and courts-martial.  White House Counsel Alberto Gonzalez was the featured speaker at an ABA-sponsored luncheon in Washington DC on November 30, 2001.  When asked by a member of the press how he would respond to allegations regarding the unfairness of the military commissions, he responded that there was a rich 50 year history of military justice which should disprove that allegation.  Military justice is, of course, the statutory system of justice under the Uniform Code of Military Justice and quite distinct from the presidentially created military commission system.

529

530              CASE W. RES. J. INT'L L.          [Vol. 36:529

proceedings at Guantanamo Bay should comply, even minimally, with constitutional requirements, and most commentators have assailed the lack of any type of *judicial* review of military commission convictions.[5]

But what are these military commissions, and from where do they derive their authority? This brief note is intended only as a primer on the current military commission system for those not familiar with it, highlighting some of the key issues at the center of the debate.

*II. Early Commissions*

This country has a rich historical tradition of trying by military commission those accused of violations of the law of war when the civil courts are either not open or considered not suitable.[6] One of the first was the trial of Major John Andre, Adjutant-General to the British Army, in 1780 on a charge that he had crossed the battle lines to meet with Benedict Arnold and had been captured in disguise and while using an assumed name.[7] Many others were conducted during the Revolutionary War period, as well as during the Mexican and Civil Wars.[8] Two of the most recent, and perhaps of greatest relevance to an analysis of the Guantanamo Bay commissions, were conducted during World War II. In the first, after the declaration of war between the United States and Germany, eight Nazi saboteurs disembarked from two German submarines at Amagansett Beach on Long Island and at Ponte Vedra Beach in Florida, respectively, and proceeded to bury their uniforms and don civilian attire.[9] They thereafter set about to sabotage war industries and war facilities in this country, but were quickly captured and prosecuted by a military commission convened by President Roosevelt and held in Washington DC.[10] All eight were

---

[5] Convictions by military commissions are reviewed by a Review Panel consisting of three military officers (including civilians specially appointed as military officers for that purpose), one of which must have experience as a judge. The Review Panel is empowered to forward the case to the Secretary of Defense with a recommendation as to disposition or to return the case to the Appointing Authority (the official who appoints the commission) for further proceedings, provided that a majority of the Review Panel has formed a definite and firm conviction that a material error of law occurred. DEP'T OF DEF. MILITARY COMMISSION ORDER NO. 1, para. 6(H)(4), Mar. 21, 2002, *available at* http://www.defenselink.mil/news/commissions.htm (last visited Mar. 1, 2005).

[6] LOUIS FISHER, PRESIDENTIAL WAR POWER 205 (2d ed. 2004).

[7] Ex Parte Quirin, 317 U.S. 1, 41 n. 14 (1942).

[8] See *id.* at 32 n. 10.

[9] *Id.* at 21.

[10] LOUIS FISHER, NAZI SABOTEURS ON TRIAL 25, 35, & 50 (2003).

30

A56

convicted, and six of the eight were electrocuted only five days after being sentenced to death by the commission.[11]

The Supreme Court, in the context of reviewing the district court's denial of petitions for habeas corpus, issued a carefully limited ruling affirming the government's power to detain and try the saboteurs by military commission under the circumstances presented.[12]  In the second, after the surrender of Germany but before the surrender of Japan, twenty-one German nationals were convicted by a military commission sitting in China of violating the laws of war by collecting and furnishing to the Japanese armed forces intelligence concerning American forces and their movements.[13]  They were sentenced to prison terms and relocated to occupied Germany to serve them.[14]  The Supreme Court, again in the context of a district court denial of petitions for habeas corpus, held that enemy aliens, who at no relevant time and in no stage of their captivity had been within our territorial jurisdiction, had no constitutional right to access our courts.[15]  The Court also reiterated that a military commission is a lawful tribunal to adjudge enemy offenses against the laws of war.[16]

The military commissions which gave rise to both the *Quirin* and *Eisentrager* cases, as well as the one used to prosecute General Yamashita, the Commanding General of the Imperial Japanese Army in the Philippines,[17] were *war courts*, one of three types of military commissions.[18]  The other two types of commissions are *martial law courts*, such as those used during the Civil War in *Ex parte Milligan*[19] and in World War II in *Duncan v. Kahanamoku*;[20] and *occupation courts*, such as the one

---

[11] *Id.* at 79.

[12] "We have no occasion now to define with meticulous care the ultimate boundaries of the jurisdiction of military tribunals to try persons according to the law of war.  It is enough that petitioners here, upon the conceded facts, were plainly within those boundaries, and were held in good faith for trial by military commission, charged with being enemies who, with the purpose of destroying war materials and utilities, entered or after entry remained in our territory without uniform—an offense against the law of war.  We hold only that those particular acts constitute an offense against the law of war which the Constitution authorizes to be tried by military commission". *Quirin*, 317 U.S. at 45-46.

[13] Johnson v. Eisentrager, 339 U.S. 763, 766 (1950).

[14] *Id.*

[15] *Id.* at 777-778.

[16] *See generally id.* at 785.

[17] In Re Yamashita, 327 U.S. 1, 5 (1946).

[18] Maj. Timothy C. MacDonnell, *Military Commissions and Courts-Martial: A Brief Discussion of the Constitutional and Jurisdictional Distinctions Between the Two Courts*, ARMY LAW., Mar. 2002, at 19, 37.

[19] 71 U.S. 2 (4 Wall.) (1866).

[20] 327 U.S. 304, 307 (1946).

used in *Madsen v. Kinsella*[21] for the trial of an American dependent wife charged with murdering her husband in occupied Germany in violation of the German criminal code. The military commissions currently being used at Guantanamo Bay are of the first type, *war courts*.

### III. Who Can Authorize Military Commissions: The President or Congress?

One of the principal points of contention immediately following the promulgation of President Bush's Military Order of November 13, 2001 authorizing military commissions[22] was whether he had the authority, without specific congressional approval, to do so.[23] I believe he did, and that it flowed directly from his constitutional authority as Commander-in-Chief.[24] It is significant that the Military Order was styled exactly as such-a *military* order-rather than the much more commonly used title *executive* order. Further, the first paragraph of the order clearly emphasizes the President's authority as Commander in Chief of the Armed Forces, as against the later references to supporting statutes.[25] As to the statutory references cited,[26] only one of the three could arguably be construed as even suggesting a congressional grant of authority to the President to authorize commissions, but a closer analysis renders that claim dubious.

In the Authorization for Use of Military Force Joint Resolution of September 18, 2001, the first law cited, the key operative language is

---

[21] 343 U.S. 341, 343 (1952).

[22] Military Order, Detention, Treatment, and Trial of Certain Non-Citizens in the War Against Terrorism, 66 Fed. Reg. 57,833 (2001) (hereinafter Military Order).

[23] *See, e.g., Department Of Justice Oversight: Preserving Our Freedoms While Defending Against Terrorism: Before the Senate Comm. On the Judiciary* 107th Cong. 107-74 (2001) (statements of Scott Silliman, Executive Director, Center on Law, Ethics, and National Security, Duke University School of Law and Neal Katyal, Visiting Professor Yale Law School, Professor of Law, Georgetown University); Curtis A. Bradley & Jack L. Goldsmith, *The Constitutional Validity of Military Commissions*, 5 GREEN BAG 3 249 (2002).

[24] *See* U.S. Const. art II, § 2, cl. 1. Colonel Winthrop's respected commentary gives support to this argument: "The commission is simply an instrumentality for the more efficient execution of the war powers vested in Congress and the power vested in the President as Commander-in-Chief in war. In some instances...Congress has specifically recognized the military commission as a proper war-court, and in terms provided for the trial thereby of certain offences. In general, however, it has left it to the President, and the military commanders representing him, to employ the commission, as occasion may require, for the investigation and punishment of violations of the laws of war and other offenses not cognizable by court-martial." WILLIAM WINTHROP, MILITARY LAW AND PRECEDENTS, 831 (2d ed., 1920).

[25] Military Order, *supra.*, note 22.

[26] *See generally* Authorization for Use of Military Force, Pub. L. No. 107-40, 115 Stat. 224 (2001); 10 U.S.C.S. § 821 (2004); 10 U.S.C.S. § 836 (2004).

32

A58

contained in Section 2(a) which clearly authorizes the President to use force,[27] but does not go so far as to empower him to conduct military commissions to prosecute those captured.[28] The third statutory reference, Article 36 of the Uniform Code of Military Justice, is simply a general delegation of authority to the President to prescribe trial procedures, including modes of proof, for courts-martial, military commissions, and other military tribunals and states that he should, "so far as he considers practicable, apply the principles of law and rules of evidence" generally used in criminal cases in federal districtcourts.[29] Rather than citing this provision as empowering him to authorize military commissions, the President clearly intended it to refer to his decision that use of those principles of law and rules of evidence was *not* practicable "given the danger to the safety of the United States and the nature of international terrorism."[30] The second cited law, Article 21 of the Uniform Code of Military Justice,[31] is the one which has drawn the most attention with regard to the President's authorization of military commissions.

Under the Constitution, Congress was granted authority to make rules for the government of the land and naval forces[32] and it did so most recently through enactment of the Uniform Code of Military Justice,[33] of which

---

[27] "That the President is authorized to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on Sept 11, 2001, or harbored such organizations or persons, in order to prevent future acts of international terrorism against the United States by such nations, organizations or persons." 107 Pub. L. 40, 115 Stat. 224, at 2(a).

[28] In the Supreme Court decision regarding a petition for habeas corpus filed on behalf of Yaser Hamdi, an American citizen designated by the President as an "enemy combatant" and held without charges or access to counsel for over two years at a naval brig in Charleston, South Carolina, five justices (O'Connor, Rehnquist, Kennedy and Breyer for the majority, Souter and Ginsburg concurring, and Scalia, Stevens, and Thomas in dissent) believed that the Resolution was sufficient to satisfy the requirements of the non-detention statute, 18 U.S.C. § 4001(a), for purposes of legitimizing Hamdi's detention under the circumstances, but even in so holding the Court ruled that he had the right to challenge that detention before a "neutral decisionmaker". Since Hamdi, as an American citizen, was outside the parameters of the Military Order, the Court obviously did not address the issue of whether the Resolution could be construed to authorize anything other than detention. Hamdi v. Rumsfeld, 124 S. Ct. 2633, 2639-2640, 2678 (2004).

[29] 10 U.S.C.S. § 836 (2004).

[30] Military Order, *supra* note 22, at § 1(f).

[31] 10 U.S.C.S. § 821 (2004).

[32] U.S. CONST. art I, § 8, cl. 14. This clause is distinctly different in purpose from article I, § 8, clause 10 which gives Congress the authority to define and punish offenses against the law of nations, of which the law of war is a subset. *See* note 42, *infra*, and accompanying text.

[33] *See* 10 U.S.C.S. §§ 801-946 (2004).

33

534          CASE W. RES. J. INT'L L.          [Vol. 36:529

Article 21 is a part. That section of the military code, entitled "Jurisdiction of courts-martial not exclusive," states:

> "The provisions of this chapter [ ]conferring jurisdiction upon courts-martial do not deprive military commissions, provost courts, or other military tribunals of concurrent jurisdiction with respect to offenders and offenses that by statute or by the law of war may be tried by military commissions, provost courts, or other military tribunals."[34]

This section is virtually identical in wording to its predecessor, Article 15 of the Articles of War,[35] which, when newly enacted in 1916, was the subject of hearings in the Senate Subcommittee on Military Affairs. The testimony of Army Brigadier General Crowder, then Judge Advocate General of the Army, before the subcommittee is instructive:

> "**General Crowder:** Article 15 is new. We have included in article 2 as subject to military law a number of persons who are also subject to trial by military commission. A military commission is our common-law war court. It has no statutory existence, though it is *recognized* by statute law. As long as the articles embraced them in the designation "persons subject to military law," and provided that they might be tried by court-martial, I was afraid that, having made a special provision for their trial by court-martial, it might be held that the provision operated to exclude trials by military commission and other war courts; so this new article was introduced . . . It just saves to these war courts the jurisdiction they now have and makes it a concurrent jurisdiction with courts-martial, so that the military commander in the field in time of war will be at liberty to employ either form of court that happens to be convenient . . . Yet, as I have said, these war courts never have been formally authorized by statute.
>
> **Senator Colt.** They grew out of usage and necessity?
>
> **Gen. Crowder.** Out of usage and necessity. I thought it was just as well, as inquiries would arise, to put this information in the record." (Emphasis added).[36]

---

[34] 10 U.S.C. § 821 (2005).

[35] "Art 15. NOT EXCLUSIVE. - The provisions of these articles conferring jurisdiction upon courts-martial shall not be construed as depriving military commissions, provost courts, or other military tribunals of concurrent jurisdiction in respect of offenders or offenses that by statute or by the law of war may be triable by such military commissions, provost courts, or other military tribunals." Articles of War, ch. 418, 39 Stat. 650, 653 (1916).

[36] *Preparedness for National Defense: Hearing Before the Senate Committee on Military Affairs*, 1916 Leg., 64th Cong. 64-1 (1916) (Testimony of Brigadier General Enoch H. Crowder, United States Army, Judge Advocate General of the Army, Feb. 7, 1916).

A60

What is clear from General Crowder's testimony is that Article 15 of the Articles of War (and its successor, Article 21 of the Uniform Code of Military Justice) was not meant to constitute any grant of authority from Congress to the President with regard to military commissions. Rather, it was meant only to ensure that military commissions, predicated not upon a specific statutory grant but rather upon historical usage under the President's Commander-in-Chief authority, were not divested of their jurisdiction because of the creation of a new court-martial system which would have overlapping jurisdictional coverage. The word "recognized" is key to an accurate understanding because it implies only acknowledgment, not establishment. Interestingly, the wording from Chief Justice Stone's opinion in *Quirin* is similar[37] in discussing the legal predicate for President Roosevelt's executive order authorizing a military commission for the Nazi saboteurs.

It is worth remembering that Roosevelt's executive order was issued incident to a congressionally declared war in which the president's authority as Commander-in-Chief was at its maximum,[38] and therefore the Court's discussion of presidential power as supported by congressional mandate vis-a-vis military commissions must be considered more broadly than just with reference to Article 15 of the Articles of War.[39] Further, *Quirin* specifically left open the question of whether the President alone had authority to authorize military commissions, quite apart from any act of Congress,[40] but the Supreme Court later answered that in the affirmative in *Madsen v. Kinsella*[41] in the context of its discussion of the legality of an occupation court in Germany.

---

[37] "But the Articles also *recognize* the 'military commission' appointed by military command as an appropriate tribunal for the trial and punishment of offenses against the law of war not ordinarily tried by court martial." (Emphasis added). *Quirin*, 317 U.S. at 41.

[38] *Cf.* Justice Jackson's first category in his discussion of the balance of presidential powers in the Steel Seizure case; Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 635 (1952).

[39] "The Constitution thus invests the President, as Commander in Chief, with the power to wage war which Congress has declared, and to carry into effect all laws passed by Congress for the conduct of the war and for the government and regulation of the Armed Forces, and all the laws defining and punishing offenses against the law of nations, including those which pertain to the conduct of war". *Quirin*, 317 U.S. at 26.

[40] "It is unnecessary for present purposes to determine to what extent the President as Commander in Chief has constitutional power to create military commissions without the support of Congressional legislation." *Id.*, at 29.

[41] "In the absence of attempts by Congress to limit the President's power, it appears that, as Commander-in-Chief of the Army and Navy of the United States, he may, in time of war, establish and prescribe the jurisdiction and procedure of military commissions, and of tribunals in the nature of such commissions, in territory occupied by Armed Forces of the United States." *Madsen*, 343 U.S. 341, 348.

A61

536          CASE W. RES. J. INT'L L.          [Vol. 36:529

Since Congress has not attempted to legislate with regard to military commissions following President Bush's Military Order,[42] and since the only applicable statute (Article 21 of the Uniform Code of Military Justice) simply *recognizes* the previously existing jurisdiction of military commissions under common law, President Bush, as Commander-in-Chief, has clear authority to authorize the use of commissions, as he did on November 13, 2001.

### IV. Procedures for Military Commissions At Guantanamo Bay

The Military Order, standing alone, reflects a paucity of due process, whether measured by domestic or international law standards;[43] but some four months later, perhaps in response to widespread criticism, the Secretary of Defense promulgated a much more detailed set of procedures which included many of the protections afforded in the Uniform Code of Military Justice.[44] Significant differences still exist, though, between those used in military commissions and those used in courts-martial, notably the

---

[42] Although article I, § 8, clause 10 of the Constitution authorizes Congress to define and punish piracies and felonies committed on the high seas, and offenses against the law of nations, it has done so with regard to the latter in a very limited manner, most notably in the War Crimes Act of 1996, 18 U.S.CS. § 2441, which makes punishable in our federal courts violations of a number of international treaties wherever the perpetrator or the victim is a member of our armed forces or a national of the United States. Congress has clearly not used this clause, which would be the more appropriate grant of authority, to legislate in the area of military commissions.

[43] Harold Hongju Koh, *The Case Against Military Commissions*, 96 AM. J. INT'L L. 337, 338 n.7 & 9 (2002). The Order provides only for (a) a full and fair trial, with the military commission sitting as triers of both fact and law; (b) admission of evidence that would have probative value to a reasonable person; (c) procedures for safeguarding classified information; (d) provision for the designation of prosecution and defense attorneys; (e) conviction and sentencing upon the concurrence of only two-thirds of the commission members; and (f) administrative review and final decision by either the President or, if designated, by the Secretary of Defense. Military Order, *supra* note 22, § 4(c)(2-8).

[44] *See* DEP'T OF DEF. MILITARY COMMISSION ORDER NO. 1, Mar. 21, 2002, *supra* note 5, at § 5A-5P. This order added, among other things, provision for the accused to be furnished a copy of the charges in advance of trial; a presumption of innocence until proven guilty; a "beyond a reasonable doubt" standard for findings of guilt; detailing of a defense counsel before and throughout the trial; a requirement for the prosecution to make evidence available to the defense which is either exculpatory or which it intends to introduce at trial; formal acknowledgment that the accused is not required to testify during trial and that no adverse inference can be drawn from the decision not to testify; the right of the accused to testify in his own defense, if he so elects; the right of the accused to obtain witnesses and present evidence; the right to an interpreter; the right of the accused to be present at trial, unless he engages in disruptive behavior (but his defense counsel may not be excluded); the right to make a statement and submit evidence before sentencing; a public trial, unless it must be closed because of classified evidence; and a provision against double jeopardy.

2004]                ON MILITARY COMMISSIONS                537

fact that a civilian defense attorney representing an accused before a commission must be a United States citizen;[45] there is no "judge" for the military commission, only a legal officer who serves as part of the panel as the "presiding officer" and who has limited independent duties;[46] and there is no provision for judicial review of military commissions.[47] Finally, a series of nine Military Commission Instructions[48] gives more precise definition and detail to the procedural rules set out in Military Commission Order No. 1. Also, the Secretary of Defense has appointed those responsible for administering the military commission system,[49] and the panel members of the military commission itself have been selected.[50]

---

[45] *Compare* DEP'T OF DEF. MILITARY COMMISSION ORDER NO. 1, *id*, at § 4(C)(3) *with* MANUAL FOR COURTS-MARTIAL, R.C.M. § 502(d)(3) (2002) *available at* http://www.usapa.army.mil/pdfiles/mcm2002.pdf [hereinafter MANUAL]. It is possible that foreign attorneys, properly credentialed in their own countries, might be allowed to participate as "consultants" to the defense team, but MILITARY COMMISSION ORDER NO. 1 would appear to preclude a non-U.S. citizen from actually participating in an active defense role at the trial.

[46] *Compare* DEP'T OF DEF. MILITARY COMMISSION ORDER NO. 1, *id*, at § 4(A)(1) *with* MANUAL, *supra* note 45 at R.C.M. § 801.

[47] *Compare* DEP'T OF DEF. MILITARY COMMISSION ORDER NO. 1, *id*, at § 6H(4-6) *with* MANUAL, *supra* note 45 at R.C.M. § 1203-1205.

[48] DEP'T OF DEF. MILITARY COMMISSION INSTRUCTION NO. 1, MILITARY COMMISSION INSTRUCTIONS, (Apr. 30, 2003); DEP'T OF DEF. MILITARY COMMISSION INSTRUCTION NO. 2, CRIMES AND ELEMENTS FOR TRIALS BY MILITARY COMMISSION (Apr. 30, 2003); DEP'T OF DEF. MILITARY COMMISSION INSTRUCTION NO. 3, RESPONSIBILITIES OF THE CHIEF PROSECUTOR, DEPUTY CHIEF PROSECUTOR, PROSECUTOR, AND ASSISTANT PROSECUTORS, (Apr. 15, 2004); DEP'T OF DEF. MILITARY COMMISSION INSTRUCTION NO. 4, RESPONSIBILITIES OF THE CHIEF DEFENSE COUNSEL, DEPUTY CHIEF DEFENSE COUNSEL, DETAILED DEFENSE COUNSEL, AND CIVILIAN DEFENSE COUNSEL, (Apr. 15, 2004); DEP'T OF DEF. MILITARY COMMISSION INSTRUCTION NO. 5, QUALIFICATION OF CIVILIAN DEFENSE COUNSEL, (Apr. 30, 2003); DEP'T OF DEF. MILITARY COMMISSION INSTRUCTION NO. 6, REPORTING RELATIONSHIPS FOR MILITARY COMMISSION PERSONNEL, (Apr. 15, 2004); DEP'T OF DEF. MILITARY COMMISSION INSTRUCTION NO. 7, SENTENCING, (Apr. 30, 2003); DEP'T OF DEF. MILITARY COMMISSION INSTRUCTION NO. 8, ADMINISTRATIVE PROCEDURES, (Apr. 30, 2003); and DEP'T OF DEF. MILITARY COMMISSION INSTRUCTION NO. 9, REVIEW OF MILITARY COMMISSION PROCEEDINGS, (Dec. 26, 2003); *all available at* http://www.defenselink.mil/news/commissions.html.

[49] Retired Army Maj. General John D. Altenburg, Jr., a former Assistant Judge Advocate General of the United States Army, has replaced Deputy Secretary of Defense Wolfowitz as the Appointing Authority; Retired Air Force Brig. Gen. Thomas L. Hemingway was recalled to active duty and is the Deputy Appointing Authority as well as Legal Advisor to the Appointing Authority; Army Col. Robert L. Swann has replaced Army Col. Fred Borch as the Chief Prosecutor; Air Force Col. Will A. Gunn is the Chief Defense Counsel; and former Attorney General Griffin B. Bell, former Secretary of Transportation William T. Coleman, Jr., Chief Justice Frank J. Williams of the Rhode Island Supreme Court, and former Judge of the Court of Common Pleas (Bucks County, Pennsylvania) Edward G. Biester, Jr., have all been named as review panel members for military commissions. *See* DEP'T OF DEF.,

37

A63

*V. Judicial Review of Commission Proceedings: A Door Left Partially Open*

As previously noted, one of the most criticized aspects of the military commission system is the lack of any provision for *judicial* review of convictions.[51] That was expressly prohibited by the terms of the Military Order,[52] and although such language might be construed as an attempt to suspend the Writ of Habeas Corpus, it could not have that effect in light of clear Supreme Court precedent.[53] Short of that, the Bush administration has relied heavily upon the Supreme Court's 1950 decision in *Eisentrager*[54] to argue that there should be no judicial review of the activities at Guantanamo Bay, be it detention or trial by military commission, because the Constitution affords no access to our courts to the non-resident aliens held there. Nonetheless, the Court granted certiorari in the fall of 2003 in a case filed on behalf of two Australian and twelve Kuwaiti detainees whose petitions for habeas corpus had been denied.[55] Notwithstanding the very limited scope of the grant (to the jurisdictional issue only), it was assumed that the Court would necessarily have to look at the continued vitality of *Eisentrager* in a new context–the "War against Terrorism." It did not. The Court skirted the constitutional issue by finding a statutory basis for habeas review which, because of prior case law, did not exist in 1950. Further, it

MILITARY COMMISSION ORDER NOS. 4-6 (Jan.30, 2004, Mar. 15, 2004, Mar. 26, 2004); Briefing, Department of Defense Background Briefing. (Dec. 1, 2003) (Federal News Service).

[50] The Presiding Officer is retired Army Col. Peter E. Brownbeck, a former Army judge advocate recalled to active duty for this purpose, with the other panel members being Marine Col. Jack Sparks, Jr., Marine Col. R. Thomas Bright, Air Force Lt. Col. Timothy Toomey, and Air Force Col. Christopher Bogdan. Toni Locy, *Guantanamo Hearings Start Today*, USA TODAY, Aug. 24, 2004, at 4A.

[51] *See supra* note 5 and accompanying text.

[52] "With respect to any individual subject to this order – (1) military tribunals shall have exclusive jurisdiction with respect to offenses by the individual; and (2) the individual shall not be privileged to seek any remedy or maintain any proceeding, directly or indirectly, or to have such remedy or proceeding sought on the individual's behalf, in (i) any court of the United States, or any State thereof, (ii) any court of any foreign nation, or (iii) any international tribunal". DEP'T OF DEF. MILITARY COMMISSION ORDER NO. 1, *supra* note 22, at § 7(b).

[53] ABA TASK FORCE, *supra* note 4, at 11 (citing *Madsen v. Kinsella, Application of Yamashita* and *Ex Parte Quirin*).

[54] *Eisentrager*, 339 U.S. at 775-79, 790-91.

[55] Al Odah v. United States, 321 F.3d 1134 (D.C. Cir. 2003), *cert. granted sub nom*; Rasul v. Bush, 540 U.S. 1003 (2003), granting on the limited question: "[w]hether United States courts lack jurisdiction to consider challenges to the legality of the detention of foreign nationals captured abroad in connection with hostilities and incarcerated at the Guantanamo Bay Naval Bay, Cuba."

left for later resolution the nature and scope of habeas proceedings in the lower courts.[56]  Interestingly, in *Rasul*, an amicus brief filed by a number of the military attorneys assigned to defend the detainees before military commissions urged the court, in what was clearly only a detention issue case, not to adopt a blanket approach which would preclude a case-by-case review for those facing commissions.[57]   The Court's ruling on purely statutory grounds left that option open, and a lower court decision last fall provides a tantalizing hint of the direction the courts may follow.[58]

Salim Ahmed Hamdan, who was facing trial by military commission on charges of conspiracy to commit several war crimes, filed a writ of habeas corpus challenging the commission's lawfulness.  On November 8th, Judge James Robertson of the United States District Court for the District of Columbia ruled that Hamdan's trial could not proceed because the government had failed to comply with the Third Geneva Convention in making the determination that Hamdan was *not* a prisoner of war and that, since the mechanism under the Convention was not employed, Hamdan was presumed to be a prisoner of war and could only be prosecuted by a military court-martial (the same type of criminal trial forum used for our own servicemen and service women).[59]

The government appealed Judge Robertson's decision to the Court of Appeals and Hamdan petitioned the Supreme Court for a writ of certiorari before judgment, which the Court denied.[60]   Until the DC Circuit Court of Appeals rules on the government's appeal, the military commissions have been paused; but regardless of what the Circuit Court does in *Hamdan*, his case, or perhaps one to follow, should ultimately reach the Supreme Court.  Will the Court, perhaps against the backdrop of the ongoing national and international debate over the perceived unfairness of the commissions, take

---

[56] Rasul v. Bush, 124 S. Ct. 2686, 2698 (2004).  So far, two judges in the District of Columbia Circuit, where all the cases coming out of Guantanamo Bay have been consolidated, have issued conflicting rulings regarding what rights the detainees have.   In Khalid v. Bush, 2005 WL 100924 (D.C.C.), decided on January 19, 2005, Judge Leon granted the government's motion to dismiss the claims of seven detainees because no viable legal theory existed by which he could issue a writ of habeas corpus.  On the other hand, in *In re* Guantanamo Detainee Cases, 2005 WL 195356 (D.C.C.), decided on January 31, 2005, Judge Green ruled that the detainees in the cases referred to her had stated valid claims under the Fifth Amendment and that at least some of them had stated valid claims under the Third Geneva Convention.

[57] Brief of the Military Attorneys Assigned to the Defense in the Office of Military Commissions as Amicus Curiae in Support of Neither Party at 4-5, Rasul v. Bush, 124 S. Ct. 2686 (2004) (No. 03-343).

[58] Hamdan v. Rumsfeld, 344 F. Supp 2d 152 (D.C. Cir. 2004), *petition for cert before judgment to the United States Court of Appeals for the District of Columbia Circuit denied*, 125 S. Ct. 972 (U.S. Jan. 18, 2005).

[59] *Hamdan*, 344 F. Supp 2d at 165.

[60] *Id.*

540          CASE W. RES. J. INT'L L.          [Vol. 36:529

the opportunity to revisit the *constitutional* underpinnings of *Eisentrager* in the context of a commission conviction? If it does, whatever the ruling, it will have a major impact upon the Administration's strategy for prosecuting terrorists outside our borders.

## VI. Conclusion

Quite apart from criticisms of the charter documents already discussed, the military commission proceedings, before they were halted by Judge Robertson, had clearly gotten off to a rocky start, with acknowledged errors in translation and challenges being made to several of the commission panel members, including the presiding officer himself.[61] With these trials almost four years in the making, and with the imperative to prove to the world that we know what we are doing and that the proceedings will be fair, these initial missteps are, taken in best light, unfortunate. If the courts allow them to proceed, the commissions will hopefully run more smoothly and be more widely accepted by the international community. In the final analysis, though, only history can judge whether we acted prudently in using them and whether they properly achieved their purpose. That is a verdict we must await.

---

[61] Toni Locy, *Tribunal Struggles with First Hearings*, USA TODAY, Aug. 30, 2004, at 12A; *Translation Problems at GTMO Trials*, UNITED PRESS INT'L, Aug. 26, 2004; Toni Locy, *U.S. Tribunal Could Lose Members*, USA TODAY, Sept. 15, 2004, at 5A.

A66

# TAB 5

[Senate Hearing 109-881]
[From the U.S. Government Printing Office]

S. Hrg. 109-881

MILITARY COMMISSIONS IN LIGHT OF THE SUPREME COURT DECISION IN HAMDAN
V. RUMSFELD

=======================================================================

HEARINGS

before the

COMMITTEE ON ARMED SERVICES
UNITED STATES SENATE

ONE HUNDRED NINTH CONGRESS

SECOND SESSION

_____

JULY 13, 19; AUGUST 2, 2006

_____

Printed for the use of the Committee on Armed Services

U.S. GOVERNMENT PRINTING OFFICE
35-144 PDF                WASHINGTON DC:  2008
--------------------------------------------------------------------
For Sale by the Superintendent of Documents, U.S. Government Printing Office
Internet: bookstore.gpo.gov  Phone: toll free (866) 512-1800; (202) 512◆091800
Fax: (202) 512◆092104 Mail: Stop IDCC, Washington, DC 20402◆090001

COMMITTEE ON ARMED SERVICES

JOHN WARNER, Virginia, Chairman

JOHN McCAIN, Arizona                CARL LEVIN, Michigan
JAMES M. INHOFE, Oklahoma           EDWARD M. KENNEDY, Massachusetts
PAT ROBERTS, Kansas                 ROBERT C. BYRD, West Virginia
JEFF SESSIONS, Alabama              JOSEPH I. LIEBERMAN, Connecticut
SUSAN M. COLLINS, Maine             JACK REED, Rhode Island
JOHN ENSIGN, Nevada                 DANIEL K. AKAKA, Hawaii
JAMES M. TALENT, Missouri           BILL NELSON, Florida
SAXBY CHAMBLISS, Georgia            E. BENJAMIN NELSON, Nebraska
LINDSEY O. GRAHAM, South Carolina   MARK DAYTON, Minnesota
ELIZABETH DOLE, North Carolina      EVAN BAYH, Indiana
JOHN CORNYN, Texas                  HILLARY RODHAM CLINTON, New York
JOHN THUNE, South Dakota

Charles S. Abell, Staff Director

Richard D. DeBobes, Democratic Staff Director

A68

(ii)

# C O N T E N T S

---

CHRONOLOGICAL LIST OF WITNESSES

Military Commissions in Light of the Supreme Court Decision in Hamdan
v. Rumsfeld

july 13, 2006

Page

Black, MG Scott C., USA, The Judge Advocate General of the Army..    7
McPherson, RADM James E., USN, Judge Advocate General of the Navy    8
Rives, Maj. Gen. Jack L., USAF, The Judge Advocate General of the
    AirForce...................................................    8
Sandkulher, Brig. Gen. Kevin M., USMC, Staff Judge Advocate to
    the Commandantof the Marine Corps.............................    8
Romig, MG Thomas J., USA (Ret.), Former Judge Advocate General of
    theArmy.......................................................    8
Hutson, RADM John D., USN (Ret.), Former Judge Advocate General
    ofthe Navy....................................................    9

Continue to Receive Testimony on Military Commissions in Light of
theSupreme Court Decision in Hamdan v. Rumsfeld

july 19, 2006

Massimino, Elisa C., Director, Washington Office, Human Rights
    First........................................................    104
Bierman, Katherine Newell, Counterterrorism Counsel, U.S.
    Program,Human Rights Watch...................................    122
Fidell, Eugene R., President, National Institute of Military
    Justice......................................................    133
Mernin, Michael, Chair, Committee on Military Affairs and
    Justice, TheAssociation of the Bar of the City of New York.....    164
Carafano, James J., Senior Research Fellow, The Heritage
    Foundation...................................................    213
Katyal, Neal K., Professor of Law, Georgetown University.........    231
Schlueter, David A., Hardy Professor of Law and Director of
    Advocacy Programs,St. Mary's University......................    249
Silliman, Scott L., Professor of the Practice of Law and
    Executive Director,Center on Law, Ethics, and National
    Security, Duke University.....................................    260

Continue to Receive Testimony on the Future of Military Commissions
inLight of the Supreme Court Decision in Hamdan v. Rumsfeld

august 2, 2006

Gonzales, Hon. Alberto R., Attorney General of the United States.    316
England, Hon. Gordon R., Deputy Secretary of Defense............    322

(iii)

MILITARY COMMISSIONS IN LIGHT OF THE SUPREME COURT DECISION IN HAMDAN

A69

V. RUMSFELD

----------

THURSDAY, JULY 13, 2006

U.S. Senate,
Committee on Armed Services,
Washington, DC.

The committee met, pursuant to notice, at 10:02 a.m. in room SH-216, Hart Senate Office Building, Senator John Warner (chairman) presiding.

Committee members present: Senators Warner, McCain, Inhofe, Roberts, Sessions, Collins, Talent, Chambliss, Graham, Cornyn, Thune, Levin, Kennedy, Byrd, Lieberman, Reed, Bill Nelson, E. Benjamin Nelson, Dayton, Bayh, and Clinton.

Committee staff members present: Charles S. Abell, staff director; and Leah C. Brewer, nominations and hearings clerk.

Majority staff members present: William M. Caniano, professional staff member; Regina A. Dubey, professional staff member; Ambrose R. Hock, professional staff member; Derek J. Maurer, professional staff member; David M. Morriss, counsel; and Scott W. Stucky, general counsel.

Minority staff members present: Richard D. DeBobes, Democratic staff director; Michael J. Kuiken, professional staff member; Peter K. Levine, minority counsel; William G.P. Monahan, minority counsel; and Michael J. Noblet, staff assistant.

Staff assistants present: Jessica L. Kingston, Benjamin L. Rubin, and Pendred K. Wilson.

Committee members' assistants present: Ann Loomis, assistant to Senator Warner; Pablo Chavez, Christopher J. Paul, and Richard H. Fontaine, Jr., assistants to Senator McCain; John A. Bonsell and Jeremy Shull, assistants to Senator Inhofe; Chris Arnold, assistant to Senator Roberts; Mackenzie M. Eaglen, assistant to Senator Collins; Clyde A. Taylor IV, assistant to Senator Chambliss; Matthew R. Rimkunas, assistant to Senator Graham; Russell J. Thomasson, assistant to Senator Cornyn; Stuart C. Mallory, assistant to Senator Thune; Mieke Y. Eoyang and Joseph Axelrad, assistants to Senator Kennedy; Christina Evans and Erik Raven, assistants to Senator Byrd; Frederick M. Downey, assistant to Senator Lieberman; Elizabeth King, assistant to Senator Reed; William K. Sutey, assistant to Senator Bill Nelson; Eric Pierce, assistant to Senator Ben Nelson; Luke Ballman, assistant to Senator Dayton; Todd Rosenblum, assistant to Senator Bayh; and Andrew Shapiro, assistant to Senator Clinton.

OPENING STATEMENT OF SENATOR JOHN WARNER, CHAIRMAN

Chairman Warner. Subsequent to the Supreme Court decision, I was approached by a number of people who inquired as to my opinion with regard to the gravity of this situation. I said, this piece of legislation which Congress is now tasked to provide could be one of the landmark pieces of legislation, certainly in the 28 years that I've been privileged to be in the United States Senate.

Given that we started a little late this morning--we had to do that to accommodate some of our colleagues on the Judiciary Committee--I will not, in an opening statement, try to go back over the history of how the administration, and, indeed, this country, have tried to deal with this very complex and, really, unprecedented situation regarding detainees. Most, if not all, have no real state allegiance, and were not in a state-

44

A70

with fundamental guarantees of due process.

notes

Proposed Article 5a explicitly codifies the historically recognized authority of the President to appoint military commissions. Subdivision (a) states the three types and functions of military commissions, recognized by the plurality in Hamdan. 126 S.Ct. at 2775-76 (citing authorities). Subdivision (b) authorizes the President to promulgate rules for military commissions. The baseline for such rules would be fundamental concepts of due process.

``Sec. 836. Art. 36. President May Prescribe Rules

(a) Pretrial, trial, and post-trial procedures, including modes of proof, for cases arising under this chapter triable in courts-martial, military commissions and other military tribunals, and procedures for courts of inquiry, may be prescribed by the President by regulations which shall, so far as he considers practicable, apply the principles of law and the rules of evidence generally recognized in the trial of criminal cases in the United States district courts, but which may not be contrary to or inconsistent with this chapter.
(b) To the extent practicable, the rules governing cases triable in courts-martial shall be uniform for all Armed Forces. All rules and regulations made under this article shall be uniform insofar as practicable.''

notes

The amendment to Rule 36(b) would make it clear that the uniformity requirement extends only to courts-martial procedures. It would thus create a clean slate for adopting military commission rules that more carefully address the balance between the function and purposes of military commissions, the basic due process rights of an accused, and preservation of national security.
Clarifying the uniformity requirement in Article 36(b) does not answer the question of what rules should be adopted for military commissions. But it does free the drafters of such rules from the strictures of the very detailed procedural and evidentiary codes now applied to courts-martial and yet still adopt rules that comport with basic due process.

Chairman Warner. I was waiting to hear what you told your Sunday school class. I don't mean to be impertinent, but it seems to me that it's the adherence to the rule of law that sets this Nation apart from those that chop off the heads.
Mr. Schlueter. Absolutely. Absolutely. I was asking them for their input. I didn't tell them exactly what I was going to say.
Chairman Warner. If you're given the opportunity, you can say that one of your fellow students suggested that as an answer.
Mr. Schlueter. I will. Thank you very much, Senator.
Chairman Warner. I found your testimony very enjoyable. I do hope I can spend a minute with you before we conclude our proceedings.
Now, we have Mr. Silliman, professor of the practice of law and Executive Director, Center on Law, Ethics, and National Security, Duke University
Thank you for joining us.

STATEMENT OF SCOTT L. SILLIMAN, PROFESSOR OF THE PRACTICE OF LAW AND EXECUTIVE DIRECTOR, CENTER ON LAW, ETHICS, AND NATIONAL SECURITY, DUKE UNIVERSITY

Mr. Silliman. Thank you, Mr. Chairman.

A71

I think we've heard the two extremes expressed already on this panel. I think Professor Katyal would have us use courts-martial, as they are currently existing, which would require absolutely no action on the part of Congress. The President could start them immediately. Professor Schlueter has suggested that the baseline really ought to be the President's military order and Military Commission Order Number 1. I'm going to provide a path between those two, Mr. Chairman.

But I think we need to absolutely understand what the Court did and what it did not do in Hamdan v. Rumsfeld. It did not deal with the constitutional power of the President to create military commissions. As a matter of fact, in a very lengthy portion of that opinion, Mr. Chairman, it acknowledged, but it did not affirm that it exists. What that case is all about is a statutory interpretation, much like the Court did in a case over 200 years ago called Little v. Barreme and in the Steel Seizure case. It said, when the President is acting as Commander in Chief under his Article 2, Section 2, powers, then he must stay within the constraints that Congress has imposed upon him, and, in this instance, those are in the UCMJ.

I might also say, Mr. Chairman, that I do not agree with many on the first panel that Common Article 3, as interpreted by the United States Supreme Court, extends, by that ruling, outside the context of military commissions. I am well aware of what Secretary England did within the DOD; and I would suggest that, as a matter of policy, that makes sense. It was not, in my opinion, Mr. Chairman, required, as a matter dictated by the Supreme Court. The Supreme Court carefully looked at Common Article 3, through the lens of Article 21. That's all it did. That's why it made no other reference to any other provision, but for the regularly constituted court. It didn't deal with humiliating treatment or anything of the like. So, we're dealing with a question of statutory interpretation, not constitutional interpretation.

I want to limit my comments to commissions.

There are basically three options, Mr. Chairman. One, as suggested, is to take the existing military commission rules and procedures, and merely give congressional sanction to them, basically putting everything back the way it was. Now, I think we should know that the original military order of November 13, 2001, was basically copied from President Roosevelt's order of 1942, and it had absolutely no participation from military lawyers. It was a matter of convenience to use that as a model, even to the extent that if you look at that order, in paragraph 7(b), it reads in effect ``to suspend the writ of habeas corpus,'' which the Supreme Court, in the Quirin case, struck down. So, I do not think that the Military Commission Order Number 1, which had to be constrained within the President's military order, could not change that. It should not be the base we ought to use.

Now, it is clear that if this Congress wanted to limit the application of Common Article 3, it could do so domestically. You have that right. Because a treaty and a statute, under Article 6 of the Constitution, are treated as the same, and the last trumps the earlier one. But I would suggest, Mr. Chairman, that to do that, to reinstitute a system of procedures that was criticized by the United States Supreme Court, and which do not meet commonly recognized international law standards, would be imprudent. So, I strongly suggest that's not what the Court should do.

Senator Levin. You mean Congress.

Mr. Silliman. I'm sorry. Congress. Thank you, Senator Levin.

A second option is to craft a completely new system of rules and procedures for military commissions using the

President's military commission order as the base, and building up by including those provisions, perhaps from the court-martial procedures, perhaps from the international tribunals, that, in the eyes of Congress, would be appropriate.

That approach, I'm sure, could cure most, if not all, of the defects raised by the Supreme Court in its opinion. It could create a more flexible standard for the admissibility of evidence, I think, which is a concern for many of the members of your committee. I do share the view, though, that however you build a standard for the admissibility of evidence, that it should not allow, under any circumstances, the introduction of evidence that was acquired through torture or coercive interrogation techniques that are outside either the DTA or the current version of the U.S. Army Interrogation Manual.

Now, that second option would be a better option, in my judgment, than reinstituting the current system, but I think there is a third option that is better, that requires no major legislation on the part of Congress, and that is to take the UCMJ as the baseline, and then to make adjustments from that to accommodate the needs of security and the concept that there are some provisions of the UCMJ which may not be applicable.

Now, I would remind you, Mr. Chairman, that there is already existing jurisdiction in the UCMJ, under Articles 18 and 21, for jurisdiction by military commissions. As the Supreme Court told us, that in those commissions, underneath the UCMJ—not outside of it, the way the President created it that the rules and procedures should be uniform with court-martial rules and procedures insofar as practicable. Yes, you could legislate, and legislatively reverse what the Supreme Court said. I don't think we need to do that, nor should we do that.

Granted, there are probably two articles, maybe one more, that would need to be amended by using military commissions under the UCMJ. One that's been mentioned, I think several of us agree Article 36 would have to be amended to allow for military commissions, rather than courts-martial. I also agree that there should be some kind of robust, substantial judicial review in the Court of Appeals for the Armed Forces. I agree with that. That could be done easily with a change to Article 66.

But you remember, sir, that this Congress, in 1951, made the decision that, although you have the constitutional authority to make rules governing the land and naval forces, that, in Article 36 and Article 56, with regard to maximum punishments, you did make the conscious decision to delegate to the President of the United States the authority to make those rules. It has worked well for 56 years.

So, I disagree with Mr. Dell'Orto that there are going to be 140 or 145 articles of the code that need to be changed. I totally disagree with that. At most, there would be three or four that would require congressional action.

The other rules of procedure that would be changed, if they need to be changed, are in the military rules of evidence and the rules for courts-martial, in the Manual for Courts-Martial. That's the President's executive order.

Yes, the NIMJ proposal, I think, generally is a good idea. I think there needs to be, Senator Levin, at least a notice requirement  I think that's very important so that Congress knows what the President determines to be impractical.

I do suggest one thing, that the invitation to the first panel was to solicit and to bring forward to this committee the ideas for these changes. I think that's the wrong group, simply because I spent 25 years as an Air Force lawyer, a prosecutor and defense counsel, but I've been out for 13 years, teaching law at Duke. What this committee needs to do is to solicit and

receive the comments of the Active-Duty lawyers. You had the
JAGs here last week, but even those two stars, those flag
officers, are not the ones that are practitioners. I'm talking
about the young captains and majors who know it far better than
any of us do, and it is their counsel that I think needs to be
heard.

Now, there is, perhaps, a risk that if that group were
convened and they could do it very quickly, Mr. Chairman, and
provided to the President, and perhaps provided to this
committee, their ideas on how to make those minor changes, that
the President might not agree with that group. That, we know,
happened 3 years ago, with regard to interrogation techniques.

I think, with the reporting requirement, or, Senator Levin,
perhaps something greater than that, that this body of
individuals who are the practitioners, who know it best, and
whose guidance I would look to, as far as those fine
refinements, can do it quickly to meet your timetable, but
they, far better than any of us, are the ones you should be
listening to.

So, Mr. Chairman, I would suggest that what this Congress
needs to do, as far as legislative change, is limited to a few
articles of the code. The vast changes to make the military
commission system, under the code, adaptable, so it provides
for captures on the battlefield, for evidence and chain of
custody, those can be done in the Manual for Courts-Martial,
under, perhaps, Article 18. You need not change the rest of the
provisions. It can be built into Article 18.

I do worry, sir, that in the perceived rush for legislative
action, that we take the risk of erring, because the system
that we build will not just be for Hamdan and perhaps 20 or 30
others, it will be a system that must be built for the future,
for future conflicts. So, let's not let the rush steer us away
from receiving the advice of those who know it best, and who
can provide you with that good advice and counsel.

Thank you, Mr. Chairman. I look forward to your questions.

[The prepared statement of Mr. Silliman follows:]

                    Prepared Statement by Scott L. Silliman

Mr. Chairman, Senator Levin, and members of the committee. My name
is Scott L. Silliman and I am a Professor of the Practice of Law at
Duke Law School and the Executive Director of Duke's Center on Law,
Ethics, and National Security. I also hold appointments as an adjunct
Associate Professor of Law at the University of North Carolina, and as
an Adjunct Professor of Law at North Carolina Central University. My
research and teaching focus primarily on national security law and
military justice. Prior to joining the law faculty at Duke University
in 1993, I spent 25 years as a uniformed attorney in the United States
Air Force Judge Advocate General's Department.

I thank you for the invitation to discuss with the committee my
views on the Supreme Court's opinion in Hamdan v. Rumsfeld \1\ and what
your legislative response should be to that ruling. As you take
testimony and deliberate on the type of statutory system which could be
adopted or crafted for prosecuting terrorists for violations of the law
of war, I submit that the task before you extends far beyond Hamdan and
the few others at Guantanamo Bay currently facing military commissions.
It is to fashion a system for prosecuting terrorists that will
withstand judicial scrutiny in our courts, meet commonly accepted
international legal standards, and be available for use in other non-
traditional armed conflicts in the future. As I will explain in greater
detail later, I believe such a system should be predicated upon the
Uniform Code of Military Justice (UCMJ) and its core elements of
procedural protection, with minor modifications made where deemed
appropriate. I will first briefly discuss military commissions in
general and the substance of the Supreme Court's ruling in Hamdan

before turning to what I believe are the legislative options currently under consideration.

------------------------------------------------------------------------
    \1\ Hamdan v. Rumsfeld, 126 S.Ct. 2749 (2006.)
------------------------------------------------------------------------

### military commissions generally

    Military commissions have been used to try those accused of violations of the law of war as far back as the Revolutionary War when Major John Andre, Adjutant-General to the British Army, was prosecuted in 1780 on a charge that he had crossed the battle lines to meet with Benedict Arnold and had been captured in disguise and while using an assumed name.\2\ Others were conducted during the Mexican and Civil Wars, and more recently during World War II.\3\ There are actually three different types of military commissions: martial law courts, occupation courts, and war courts.\4\ Martial law courts have been used when martial law is declared, such as during the Civil War \5\ and in Hawaii during World War II.\6\ An occupation court can be used when the United States is an occupying power, such as in post-war Germany when an American dependent wife was charged with murdering her military husband in violation of the German criminal code.\7\ Finally, war courts have been used to prosecute violations of the law of war during a period of recognized armed conflict, such as during World War II.\8\ The military commissions which were established by President Bush in his Military Order of November, 13, 2001,\9\ and which were envisioned for use at Guantanamo Bay were of this last type, war courts.

------------------------------------------------------------------------
    \2\ See generally Scott L. Silliman, On Military Commissions, 36 Case W. Res. J. Int'l L. 529 (2005); Louis Fisher, Military Tribunals and Presidential Power (Univ. of Kansas Press 2005).
    \3\Id.
    \4\ Major Timothy C. Macdonnell, Military Commissions and Courts-Martial: A Brief Discussion fo the Constitutional and Jurisdictional Distinctions Between the Two Courts, The Army Lawyer, March 2002, DA PAM 27-50-350, 19, 37.
    \5\ Ex parte Milligan, 71 U.S. (4 Wall.) 2 (1866).
    \6\ Duncan v. Kahanamoku, 327 U.S. 304 (1946).
    \7\ Madsen v. Kinsella, 343 U.S. 341 (1952).
    \8\ Ex parte Quirin 317 U.S. 1 (1942); Johnson v. Eisentrager, 339 U.S. 763 (1950).
    \9\ Military Order, Detention, Treatment,and Trial of Certain Non-Citizens in the War against Terrorism, 66 Fed. Reg. 57,833 (2001).
------------------------------------------------------------------------

### the court's opinion in hamdan v. rumsfeld

    The first issue facing the Court was jurisdictional could it still rule on Hamdan's case since the Government argued that the Detainee Treatment Act (DTA),\10\ enacted on December 30, 2005, ``stripped'' the Court of the power to hear Hamdan's petitions for habeas and mandamus, even though they had been filed in the district court over 2 years earlier and the Supreme Court had granted certiorari almost 2 months prior to the President signing the act into law. Using principles of statutory construction, the Court ruled that it retained jurisdiction.\11\

------------------------------------------------------------------------
    \10\ Pub. L. No. 109-148, 119 Stat. 2739 (2005), hereinafter DTA.
    \11\ Hamdan, supra note 1, at 2769.
------------------------------------------------------------------------

    On the merits, the Court initially probed the interplay between the powers of the President and those of Congress in time of war, raising, but not answering, a question left lingering from Milligan:

        ``Whether Chief Justice Chase was correct in suggesting that the President may constitutionally convene military commissions 'without the sanction of Congress' in cases of 'controlling

necessity' is a question this Court has not answered
definitively, and need not answer today.'' \12\

---

\12\ Id. at 2774.

The Court went on, however, to specifically reject the Government's
assertion that the President's authority to convene military
commissions flowed from statute, whether it be the Authorization for
the Use of Military Force (AUMF),\13\ the DTA, or the UCMJ.\14\ In one
sentence of singular significance, albeit buried in a footnote, the
Court clearly foreshadowed its principal holding:

---

\13\ Pub. L. 107-40, 115 Stat. 224 (2001).
\14\ ``The Government would have us dispense with the inquiry that
the Quirin Court undertook and find in either the AUMF or the DTA
specific, overriding authorization for the very commission that has
been convened to try Hamdan. Neither of these congressional Acts,
however, expands the President's authority to convene military
commissions.'' . . . .``Together, the UCMJ, the AUMF, and the DTA at
most acknowledge a general Presidential authority to convene military
commissions in circumstances where justified under the 'Constitution
and laws', including the law of war.'' (Id. at 2774, 2775).

        ``Whether or not the President has independent power, absent
    congressional authorization, to convene military commissions,
    he may not disregard limitations which that Congress has, in
    proper exercise of its own war powers, placed upon his powers.
    See Youngstown Sheet and Tube Co. v. Sawyer, 343 U.S. 579, 637
    (1952) (Jackson, J., concurring). The Government does not argue
    otherwise.''\15\

---

\15\ Id. n. 23.

The Court then discussed two statutory provisions which established
just those limitations, Articles 36(b) and 21 of the UCMJ, 10 U.S.C.
Sec. Sec. 836(b) and 821, respectively. The Court looked to the text of
Article 36(b),\16\ interpreting it to mean that procedures established
for military commissions must be uniform with those established in the
UCMJ for courts-martial unless such uniformity was not practicable.\17\
The Court ruled that the President's determination that such uniformity
was impracticable was insufficient to justify the variances from court-
martial procedures.\18\

---

\16\ ``All rules and regulations made under this article shall be
uniform insofar as practicable.'' 10 U.S.C. Sec. 836(b).
\17\ Hamdan, supra note 1, at 2790.
\18\ Id. at 2791.

---

With regard to Article 21,\19\ the Court ruled that Congress had
conditioned the President's use of military commissions on compliance
with the law of war, of which Common Article 3 of the Geneva
Conventions was a part and which dictated the use of a ``regularly
constituted court affording all the judicial guarantees which are
recognized as indispensable by civilized peoples.''\20\ Because the
accepted definition of a regularly constituted court includes ordinary
military courts (courts-martial) but excludes all special
tribunals,\21\ the President's military commissions were not in
compliance with Common Article 3 since he had demonstrated no practical
need for deviating from courts-martial practice.\22\

---

\19\ 10 U.S.C. Sec. 821.
\20\ Id. at 2796, citing the Geneva Conventions of 1949, 6 U.S.T.
at 3320 (Art 3(1)(d)).
\21\ Id.
\22\ Id. at 2797.

---

Put most simply, the Court's ruled that in unilaterally creating a system for military commissions, the President exceeded his authority by running afoul of statutory limitations imposed by the Congress, in this instance in the UCMJ.\23\ Since my testimony is limited to the Court's ruling with regard to military commissions under the President's Military Order, I will not address whether or to what extent the Court's inclusion of Common Article 3 as a part of the law of war impacts other applications of executive power in the War against al Qaeda.

---

\23\ In this regard, the Court's analysis in Hamdan is no different from that in earlier cases. Little v. Barreme, 6 U.S. (2 Cranch) 170 (1804) and Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579 (1952).

---

possible legislative options in response to the court's decision

One option being considered is to pass a law which which merely gives legislative sanction to the prior system for military commissions-putting everything back in place the way it was-notwithstanding the Court's determination that there must be compliance with Common Article 3. Because Article VI of the Constitution treats statutes and treaties alike as ``the Supreme Law of the Land,'' \24\ and a later enacted statute displaces an earlier one,\25\ I believe that, as a matter of domestic law, Congress could legislatively restrict the application of Common Article 3 with regard to military commissions. There is, however, no assurance that such a ``reblued'' military commission system would pass judicial muster and, at the very least, it would invite additional challenges in the courts and further years of uncertainty. More importantly, merely giving Congressional sanction to the minimal level of due process in a military commission system which was criticized as inadequate by the Supreme Court \26\ and which fails to satisfy commonly recognized international legal standards is, I believe, imprudent.

\24\ ``This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.'' U.S. Const. Art VI, cl. 2.
\25\ See Head Money Cases, 112 U.S. 580, 598-599 (1884).
\26\ A military commission system with a similar lax standard for the admissibility of evidence and little overall due process drew criticism from two justices of the Supreme Court in an earlier era. Although the Court upheld the constitutionality of the military commission which convicted Japanese General Tomoyuki Yamashita, Justices Rutledge and Murphy wrote scathing dissents about the lack of due process requirements in that commission. Yamashita v. Styler, 327 U.S. 1, 26-29, 44-45, 48-66 (1946).

---

A second option is for Congress to craft a statute authorizing a completely new military commission system, using the President's Military Order and Military Commission Order No. 1 \27\ as a base line and ``building up'' to a higher level of due process by adding in procedural protections from the UCMJ. Such a statute could which remedy most of the defects which the Court cited in its opinion, and yet still satisfy those who demand a more flexible standard for the admissibility of evidence. For example, less reliable testimony such as unsworn statements or hearsay is not allowed in our Federal and state courts, but could be admissible in military commissions if Congress made that the rule. Even under this more flexible standard, however, I strongly believe that statements of an accused or others acquired through coercive interrogation techniques should not be allowed into evidence under any circumstances. If the statute provided that a detainee would

A77

be present at all trial sessions, unless he became disruptive; if there
were provisions to ensure that classified national security information
was safeguarded; and if there was some provision for a more substantial
judicial review of a conviction, such as in the United States Court of
Appeals for the Armed Forces which deals with military justice issues,
such a system would, I think, satisfy the objections of most. In other
words, if virtually all the due process safeguards which currently
apply in courts-martial, save for a more flexible standard for the
admissibility of evidence, were grafted into a newly enacted military
commission system, that type of legislative response would be, I
suggest, a better option. I submit, though, that this option starts
from the wrong base line--the old system--and is unnecessary because an
already existing statute can readily be tailored to achieve a better
result.

-----------------------------------------------------------------------
    \27\ Department of Defense Military Commission Order No. 1, Mar.
21, 2002, available at http://www.defenselink.mil/news/legalrefs.htm
(last visited July 17, 2006).
-----------------------------------------------------------------------

    The third option, and the one I advocate, is to use the UCMJ \28\
as the base line, and then make whatever minor adjustments may be
necessary where certain provisions of the Code or the Manual for
Courts-Martial \29\ are deemed impracticable. The UCMJ is a fair and
well-proven system of law, created by Congress some 56 years ago partly
in response to the many criticisms of military justice actions during
World War II where there was little due process in courts-martial. It
is the military criminal code used to deal with misconduct committed by
members of our own Armed Forces, and the Supreme Court clearly implied
that it could appropriately and with judicial approval be used to
prosecute those at Guantanamo Bay. Further, and more importantly, the
Code already provides for jurisdiction to prosecute, either by courts-
martial or military commission, those who violate the law of war during
armed conflict,\30\ although I am unaware of any such trials being
conducted under this authority. If we were dealing with individuals who
were classified as prisoners of war, the Third Geneva Convention
requires that only a court-martial (or perhaps trial in Federal
criminal court) could be used to prosecute them; \31\ but those held at
Guantanamo Bay have not been so classified, so either system under the
UCMJ, courts-martial or military commission, is permitted. To use
courts-martial, the type of tribunal used for our own military
personnel, with its inherent procedural protections which meet and
sometimes exceed those in Federal criminal trials, is clearly not
appropriate.

-----------------------------------------------------------------------
    \28\ 10 U.S.C. Sec. 801 et seq. (2000 ed.).
    \29\ Manual for Courts-Martial, United States (2005 edition), Exec.
Order No. 13365, 69 Fed. Reg. 71333 ((2004) (hereinafter MCM).
    \30\ Article 18 reads, in part, ``General courts-martial also have
jurisdiction to try any person who by the law of war is subject to
trial by a military tribunal and may adjudge any punishment permitted
by the law of war.'' 10 U.S.C. Sec. 818. Article 21 reads ``The
provisions of this chapter conferring jurisdiction upon-courts-martial
do not deprive military commissions, provost courts, or other military
tribunals of concurrent jurisdiction with respect to offenders or
offenses that by statute or by the law of war may be tried by military
commissions, provost courts, or other military tribunals'' 10 U.S.C.
Sec. 821. Article 2(a)(12) extends personal jurisdiction to those non-
military, non U S  citizens at Guantanamo Bay  Subject to any treaty
or agreement to which the United States is or may be a party or to an
accepted rule of international law, persons within an area leased by or
otherwise reserved or acquired for the use of the United States which
is under the control of the Secretary concerned and which is outside
the United States and outside the Canal Zone, the commonwealth of
Puerto Rico, Guam, and the Virgin Islands.'' 10 U.S.C. Sec. 802(a)(12).
    \31\ Article 84 provides that ``A prisoner of war shall be tried

A78

only by a military court, unless the existing laws of the Detaining
Power expressly permit the civil courts to try a member of the armed
forces of the Detaining Power. . .''; and Article 102 states ``A
prisoner of war can be validly sentenced only if the sentence has been
pronounced by the same courts according to the same procedure as in the
case of members of the Armed Forces of the Detaining Power. . . .''
Geneva Convention Relative to the Treatment of Prisoners of War, arts
84, 102, July 12, 1949, 6 U.S.T. 3316, 75 U.N.T.S. 135.
--------------------------------------------------------------------

    The use of military commissions, as provided for under the Code, is
therefore the better prosecutorial forum. Even before the enactment of
the UCMJ in 1950, military commissions were recognized as an alternate
form of tribunal for use by commanders in the field when courts-martial
were deemed inconvenient or impracticable.\32\ However, Congress in the
UCMJ stipulated that the rules and regulations under the Code should be
``uniform insofar as practical'' \33\ and, no matter how that provision
was interpreted in the past, the Supreme Court in Hamdan said that it
meant that ``the rules set forth in the Manual for Courts-Martial must
apply to military commissions unless impracticable.'' \34\ The task,
then, is to identify those court-martial provisions which would clearly
be impracticable when prosecuting terrorists by military commission. I
suggest that those articles of the UCMJ which would not, in part or in
whole, be practicable in military commissions are few; the greater
number would be in the Manual for Courts-Martial, an executive order,
which requires action only by the President, perhaps with congressional
approval.
--------------------------------------------------------------------

    \32\ The legislative history of Article 15 of the Articles of War,
the predecessor of Article 21 of the UCMJ, is relevant in this regard.
Army Brigadier General Crowder, then Judge Advocate General of the
Army, testified before the Senate Subcommittee on Military Affairs on
February 7, 1916, as follows:

    ``General Crowder: Article 15 is new. We have included in Article 2
as subject to military law a number of persons who are also subject to
trial by military commission. A military commission is our common-law
war court. It has no statutory existence, though it is recognized by
statute law. As long as the articles embraced them in the designation
``persons subject to military law,'' and provided that they might be
tried by court-martial, I was afraid that, having made a special
provision for their trial by court-martial, it might be held that the
provision operated to exclude trials by military commission and other
war courts; so this new article was introduced. . . . It just saves to
these war courts the jurisdiction they now have and makes it a
concurrent jurisdiction with courts-martial, so that the military
commander in the field in time of war will be at liberty to employ
either form of court that happens to be convenient. . . . Yet, as I
have said, these war courts never have been formally authorized by
statute.'' (Emphasis added) Testimony of Brigadier General Enoch H.
Crowder, United States Army, Judge Advocate General of the Army, on
February 7, 1916, before the Subcommittee on Military Affairs, United
States Senate, Revision of the Articles of War, S. Rep. No. 130, 64th
Cong., 1st Sess. 40.
    \33\ UCMJ, Article 32(b), supra note 16.
    \34\ Hamdan, supra note 1, at 2791.
--------------------------------------------------------------------

    As to the UCMJ, I suggest that Article 31(b),\35\ requiring the
rendering of advice of rights to a person being interrogated who is
suspected of an offense, has no application in a military commission
procedure. Similarly, Article 32,\36\ requiring a pretrial
investigation prior to the convening of a general court-martial, would
be neither necessary nor appropriate. Finally, with regard to appellate
review of convictions of military commissions, Article 66 \37\ would
need to be amended by adding military commissions to the jurisdiction
of the service Courts of Criminal Appeals, and also adding a provision

for the President to designate which of the respective Courts of
Criminal Appeals would exercise jurisdiction over the commissions.
Since Article 67,\38\ regarding review by the Court of Appeals for the
Armed Forces, uses the term ``cases'', there appears to be need for any
amendment to that provision.
------------------------------------------------------------------------
    \35\ 10 U.S.C. Sec. 831(b).
    \36\ 10 U.S.C. Sec. 832.
    \37\ 10 U.S.C. Sec. 866.
    \38\ 10 U.S.C. Sec. 867.
------------------------------------------------------------------------

    Proposed amendments to the UCMJ sponsored by the National Institute
of Military Justice (NIMJ), which are on record with the committee and
which I specifically endorse, would effect the change to Article 66. As
to excluding Article 32 from military commission procedure, the NIMJ
proposal also contains a recommended amendment to Article 36 which
would grant the President the authority to prescribe procedures for
military commissions, applying the principles of law and the rules of
evidence prescribed for general courts-martial (with the exception of
Article 32) insofar as he considers them practicable, as long as those
procedures are not contrary to or inconsistent with international law.
The amendment also contains a reporting requirement to Congress
regarding the President's determination of impracticability. Finally,
the NIMJ proposal includes an amendment to Article 21 \39\ which would
provide specific statutory authorization for the President to establish
military commissions (and provost courts) in time or war or pursuant to
an authorization for the use of force, as long as the commissions are
consistent with international law, including the law of war. Since I
take the view that the President, when acting pursuant to his commander
in chief powers under Article II, Section 2, is constitutionally
empowered to establish military commissions unless constrained by
Congress,\40\ I do not believe this proposed amendment to Article 21 is
necessary, but it may be prudent as an additional, statutory grant of
authority for him to establish a commission system pursuant to the
Code.
------------------------------------------------------------------------
    \39\ UCMJ, Article 21, supra note 30.
    \40\ See Madsen v. Kinsella, supra note 7, at 348.
------------------------------------------------------------------------

    There are several provisions of the Manual for Courts-Martial which
would seemingly not be practical in military commission procedures,
but, as mentioned above, making changes to these provisions is within
the purview of the President but would also presumably be subject to
the reporting requirement of NIMJ's proposed amendment to Article 36.
The speedy trial rules governing courts-martial,\41\ as well as the
myriad rules governing the admissibility of evidence and the
application of the exclusionary rule,\42\ will need to be tailored to
meet the exigencies of captures and acquiring evidence in battlefield
environment while still maintaining a fundamental fairness to the
accused. The provisions which govern the admissibility of classified
and other sensitive government evidence (when requested by the accused)
\43\ which generally mirror the Classified Information Procedures Act,
\44\ would have to be amended to provide for the safeguarding and use
of classified and other sensitive government information to be
introduced by the government to prove the guilt of the accused, while
still ensuring measure of authenticity of that evidence. As to the many
changes to the military rules of evidence governing courts-martial
which might be required when applied to military commissions, a general
clause regarding exceptions could perhaps be added to M.R.E. 101 \45\
and, more especially, M.R.E. 1101 \46\ to effect that purpose.
------------------------------------------------------------------------
    \41\ MCM, supra note 29, at R.C.M. Sec. 707.
    \42\ See generally MCM, supra note 29, at M.R.E. 301-504.
    \43\ Id. at M.R.E. 505-506.
    \44\ 18 U.S.C. app. III Sec. Sec. 1-16 (1988).

A80

\45\ MCM, supra note 29, at M.R.E. 101.
\46\ Id. at M.R.E. 1101.

------------------------------------------------------------------------

Finally, although I have offered a few proposed changes to the rules and procedures for courts-martial which, to my mind, would make them more adaptable for use in military commissions, I strongly urge that a committee of judge advocates be formally convened to carefully study and make recommendations to the President as to what may, in their view, be required. They are the practitioners who know the Code and the Manual best. If this proposed military commission system under authority of the UCMJ is to provide an appropriate forum for prosecuting those we now detain, as well as those who commit violations of the law of war in future conflicts, we must ensure that perceived pressures to legislate quickly do not cause us to err and fail in our goal to establish a system which reflects our national values and which satisfies commonly accepted principles of international law.

Mr. Chairman, Senator Levin, and members of the committee, thank you again for inviting me to share my views with you. I look forward to answering any questions you might have.

Chairman Warner. Elaborate somewhat on how we reach out to this group. Are they structured in such a way?

Mr. Silliman. Mr. Chairman, I would recommend that you go back to the JAGs who were before you last week, and you solicit from them ideas coming from their trial practitioners. Every Service has a system of trial lawyers and defense lawyers that are in court virtually every day.

Chairman Warner. I'm familiar with that.

Mr. Silliman. Yes.

Chairman Warner. It's from that group.

Mr. Silliman. It is from that group that I think you need to hear. We can give you conceptual ideas on where changes should be made. Those are the ones who are actually in court. Also, Dwight Sullivan's defense lawyers for the military commission system. Charlie Swift, Lieutenant Commander Swift, who testified before in the Judiciary Committee, is one of those who would give you great advice and counsel on how these systems can be built to be fair and yet meet the exigencies of battlefield. I think again, not to change the charter that you created this morning, Mr. Chairman, it is vital that as you receive that type of information, which you need, that you not overlook those that can give you the best counsel, because they're doing it now. I'm not. They are.

Mr. Schlueter. Could I also respond to that, Senator? I don't know if you had intended to call former retired Major General John Altenberg, who is the appointing authority for the commissions, or any of the individuals who were otherwise involved in prosecuting the cases, but if you're analyzing the current rules concerning military commissions and how they had intended to apply them, it strikes me that they could provide helpful information.

One concern I'd have about just reaching out to the junior JAGs is, if they haven't had any hands-on experience with the commissions themselves, they can tell you firsthand how the courts-martial system works, but I would hope that, at this stage, we'd at least have some experience from those actually on the ground. One was quoted earlier, by one of the earlier panelists, who said that he wished that they tried court-martials to begin with. So, I'd recommend you consider those individuals, as well.

Chairman Warner. Did you wish to reply to that observation there?

Mr. Silliman. No. I'm well familiar with retired Major General John Altenberg, and I just think that because he is the appointing authority for the current commission system, it may

A81

be a little bit awkward for him to provide that type of advice. However, I think that when you look to the DOD, and the military commission system is a part of the DOD, that you allow the JAGs, who provide the lawyers for that system, to go within their own ranks and select the four, five, or six practitioners who know the system far better than any of us ever could. Then, to allow them to provide that type of listing of which military rule of evidence, which rule for court-martial, and, on the larger scale, which article of the UCMJ, might need to be amended. Again, my strong suggestion, Mr. Chairman, is as to the code itself, which requires action of Congress, the number of articles that need to be changed or amended are very few.

Mr. Katyal. On this question, I would add to Professor Schlueter, I think his advice is a good one. I'm a civilian defense counsel in the Office of Military Commissions. My opposite is a prosecutor, Stu Couch, who I think is a fantastic prosecutor and, I think, could illuminate for the committee or others on his team. It doesn't need to be General Altenberg, why they think the rule existing rules for court-martial aren't enough.

From my perspective, I think cases like Hamdan could be tried tomorrow in an court-martial. The ideas about hearsay, chain of custody, classified information, I think, can all be handled within the existing system. I think it would be very helpful to hear from the prosecutors in the commissions office as to why they disagree.

Chairman Warner. All right.

I would invite this gentleman, that you've designated, to visit with our counsel for a few minutes, at the conclusion of this hearing.

Senator Levin, I'm going to let you lead off the questions.

Senator Levin. If I understand your point, Professor, you believe there are so few changes that need to be made in the UCMJ, statutorily, they're the advice that they would give would not be as much statutory changes as to changes in the manual. Is that accurate?

Mr. Silliman. I think you would invite them to do both, Senator Levin.

Senator Levin. But if you're right, there would not be very many that they would be forwarding to us that require statutory changes, and most of their recommendations would be UCMJ changes. Am I reading you right?

Mr. Silliman. Yes, you are, Senator. The statement that Senator Cornyn used, that came from Mr. Dell'Orto, about 140 to 145 articles of the code that would need to be changed, I think, is, with all due respect, absurd. There aren't that many more articles in the code to begin with. What I'm suggesting is that there's confusion, as far as what requires congressional action and what requires a change by the President of the United States in the Executive order. I would, again, suggest that you not disturb that fundamental delegation of authority that was made in 1951 to the President, to allow him to craft those, with your knowledge, with notice to you, with some kind of cooperation, but I do not believe that it would be, in my judgment, appropriate for Congress to start to legislate what has previously been within the purview of the President, as far as rules and military rules of evidence.

Senator Levin. Now, if we do that, however, we're not going to be very different from what his current commissions are?

By the way, let me back up. I think what Senator Cornyn was saying is, it would take, according to the DOD; this was not his assessment, he said the DOD had indicated there would have to be 120 changes--did he say, in the code or in the manual?

Mr. Silliman. No, I didn't mean to say that's Senator

A82

Cornyn's comment.

Senator Levin. No. He's saying the code.

Mr. Silliman. But I think the reference was about 150 changes to the military rules of evidence, 170 to the rules for courts-martial, and I think the comment was 140-plus articles of the code would have to be changed. I think that's incorrect.

Senator Levin. We're going to get that list.

Mr. Silliman. Right.

Senator Levin. We would be happy to share that with you, and then you could comment specifically on it. But I'm just wondering whether or not, if we simply provide a notice requirement for the President, whether we're not going to find the President doing what he's done before, which is to get as close to the commission rules as he possibly can; whereas, I don't think that's the basic thrust of the Court.

Mr. Silliman. Senator, if, in fact, this list is done by the Active-Duty military lawyers.

Senator Levin. It can be done by the President.

Mr. Silliman. Well, no, but.

Senator Levin. The President's counsel.

Mr. Silliman. Input comes from the military lawyers.

Senator Levin. They tried it once.

Their input was not accepted, when it came to rules of detention.

Mr. Silliman. I think this Congress has reacted very strongly to the fact that the military lawyers were shut out. It was noted in several investigations.

Senator Levin. It may have been noted, but we didn't react very strongly, in my judgment.

Mr. Silliman. All I'm suggesting, Senator Levin, with all due respect is.

Senator Levin. Some members of it did, obviously. Some of us did. But I don't think Congress responded.

Mr. Silliman. I just worry, sir, as far as the long-term approach, that if we're looking to create a system that is not just for the 10, 20, or 30 that we're dealing with now, but that will be a system in place for years, that we not shift the balance so far that Congress itself must legislate these rules. Again, the fundamental delegation, from the Constitution through the UCMJ, is to the President. Now, if the President has disregarded it in the past, then I think steps should be taken to ensure that there be some notice, some requirement there. I do not recommend that Congress take on the responsibility of legislating this system.

Senator Levin. My final request would be then to all three of you would be to give us your starting point, whatever it is, and the changes that you believe are either desirable from that starting point. That usually would be if you start from the UCMJ, I would think or required my hunch would be, that verb would be appropriate if your starting point is the commission order. But whether my verb is correct or not, the changes that you would urge upon the committee, from whatever starting point you choose and if you choose no starting point, whatever-- however you want to recommend and I know the chairman's very much inclined to get advice from wherever sources we can, but I would surely agree that we should ask the JAGs to have some of their people, who are in the middle of the cauldron, to give us their practical experience on what specific actions we ought to take legislatively. Also, what changes they would recommend in the manual in order to accommodate what, I guess, has been called practicality or necessity or common sense. Obviously, there are some commonsense differences here between the way we are going to handle these criminal trials and the way we would handle criminal trials of people who are charged with crimes who are wearing our military uniform, just based on the

A83

circumstances and without going into too many details, what is,
I think, obvious.

    Mr. Silliman. In my prepared statement, Senator Levin, I do
give you those thoughts.

    Senator Levin. Are those examples or is that comprehensive?

    Mr. Silliman. That is one of those ambiguous words, I
guess, Senator Levin.

    Senator Levin. No, I mean, is that intended to be a full
listing of the changes that you would recommend?

    Mr. Silliman. No, it is my suggestion, Senator, but I also
do say, at the end of my prepared statement, that I do very
strongly recommend that you go to the those Active-Duty JAGs.

    Senator Levin. No, I didn't mean that. I was talking about
you, yourself, in terms of any specific recommendations.

    Mr. Silliman. I do refer to Article 36(b), 31(b), and also
any specific series of rules for court-martial and military
rules of evidence that I think may be considered impracticable,
as far as military commissions. Yes, I do.

    Senator Levin. We would welcome any additional specifics
from you and from our other panel members, a list of specifics
that you would recommend to us, because we're going to have to
do this, one way or another, and we want to do it right. The
chairman, obviously, wants to proceed in a thoughtful way, and
that's what he's doing. He's doing it with the support of all
the members of the committee, whether we agree with the final
outcome or not. The process which we are using here is one
which we intend to be as thoughtful and as thorough as we
possibly can make it under these circumstances that we face.

    Thank you all.

    Chairman Warner. Yes. I join with Senator Levin on that.
He's talking about where we would start. Do give us some idea
of where you want to end up, though. It's one thing to give us
a starting place, but we want to make sure we have your views
as to where we should end up on this thing.

    The situation we're in we're at war, as a Nation. I know
this institution, I think I say with a sense of humility, as
well as anybody, and I know what has to be done.

    My press secretary came up and turned on the mike; it's
like the President the other day at the Big 8, he had his mike
on at the wrong time. Now mine was off at the wrong time.
[Laughter.]

    I'll start all over again.

    I join with Senator Levin, as you looking at your starting
places, make sure we know where you'd like to see it end up.

    But, gentlemen, we're at war. We cannot leave this thing
dangling in this situation. The Nation was somewhat taken aback
at the far reach of the Supreme Court on this matter. I just
know for a fact how this institution works. If we don't get
this thing done in this Congress, mind you we convene with the
new members getting to sign up for pay the first week in
January, and then we go home for 3 weeks. So, that's all we
achieve in January. Then, February, we're trying to form into
our committees and our leadership. I'm not here to fault
Congress; it's just the way this institution works. I do not
think we can leave this situation dangling out here without
some legislative solution. So, we're going to do our best, and
we're fortunate to have folks like yourselves who are willing
to step up and help us. I thank you.

    Mr. Silliman. Mr. Chairman?

    Chairman Warner. Yes.

    Mr. Silliman. One thing, in following what you said. In
light of the time, I think it's important that this committee
also have a precise focus. The Supreme Court did not strike
down interrogation practices of the United States. The Supreme
Court did not strike down any other application of presidential

executive power in the war on terrorism. It dealt specifically
and precisely with military commissions. There have been a lot
of questions and comments from the committee with regard to
concerns about interrogation techniques, quite apart from
whether evidence is admissible. I think you can't solve all of
that now. If your goal is to respond directly to the Supreme
Court opinion and to put back in place some system for
prosecution, I think that can be done, but it must be done to
the extent that you can do it apart from those other concerns.

   Senator Levin. Mr. Chairman, if I can comment on that.
   Chairman Warner. Sure.
   Senator Levin. I just fully agree with that, and I tried,
in my opening statement, to carve that out, because there's
been so much misunderstanding, including in the media, about
what we are dealing with. We're not dealing with detention and
how long people can be detained. It is a fascinating,
complicated question. If this is a long war, if it's a war with
no known end, when do people ever have a prospect of leaving
detention? It's a tremendously important question. But we're
not dealing with that. We're not dealing with interrogation
techniques. Lord knows, we should do that, with a lot of
oversight. But that's not the question we're dealing with,
except as it might apply to admissibility of evidence in a
criminal trial. We're dealing with a criminal trial. We have to
do it right, but it's a very narrow group of people, maybe 10
or 20 or 30 people. But, as you all point out, we're
legislating for the future, it's not just for these 30 people.
We should recognize that it's not the hundreds that are there
that we're dealing with
   If I may say, Mr. Chairman, if we do take additional time
to do this--and I hope we don't need to--it's not as though
people are going to be released to the battlefield by our
delay. So, I hope we can do it this year. I'm with the
chairman. I support that effort. But it's not as though that if
we do delay, that they're going to have a right to a speedy
trial. There's no suggestion of that. It's also true, on the
other side of this, that whenever we adopt these rules, that
when these trials take place, that when they're acquitted, if
they are acquitted, they're not free. They are still in
detention. That's lost track of; as well, I'm afraid, by
members at times and by the media and by the public. It's a
very narrow issue that we have to grapple with, and we ought to
do it right. Hopefully, under our chairman's leadership, we can
do it this year.
   Chairman Warner. We thank you very much. Thank you, Senator
Levin. Again, we express appreciation of the entire Senate for
your participation today.
   The hearing is adjourned.
   [The prepared statement of William E. Eckhardt is also
included for the record:]

                Prepared Statement by William E. Eckhardt

                  military commissions post hamdan

   Members of the Senate Armed Services Committee: It is an honor and
a privilege to be able to express my views on how Congress should
proceed in light of the recent Hamdan decision. Unfortunately, such a
sensitive and important decision must be made under severe time
constraints and political pressure. Rules governing military
commissions are old and unrevised but must be retooled to apply in
frighteningly different and unimagined circumstances.
   Military legal problems are solved using two tools--history and
law. Any approach must be multidisciplined. A solution cannot be found
while wearing ``purely legal blinders.'' For example, the rule of law

on the battlefield is applied using rules of engagement which are composed of international law, domestic law, diplomatic constraints, political constraints, and technological constraints. These different factors have to be combined and harmonized to provide a workable procedure. The goal is to promote the rule of law, but many interdisciplinary factors--not just law--must be considered. In short, any military legal system must be practical and flexible.

Turning first to history. No--and I repeat--No country that has had a serious terrorism problem has been able to use its normal criminal law system. In societies pressed by the threat of terror, adjustments often are made for apprehensions, for detentions, for evidentiary rules, and for protection of the system (buildings, judges, juries). The most immediate problem before this committee deals with procedure--handling classified material and dealing with hearsay. The debate today on rules for military commissions, unfortunately, will be repeated--in all probability--for our civilian Federal rules of evidence. This is the first of several very serious civil liberty issues that we must face as a country in this new time of terror.

Legal problems in an age of terror should be handled with a two step approach. First: Does the government need the unusual ``power''? Has it justified its request? Second: If there is a demonstrated need for the procedure, change or power, its enactment should be balanced with steps to control the exercise of that power and with heightened review procedures to be certain that there is no abuse and that justice is done.

Turning to the issue at hand, this committee must decide how to constitute military commissions, must decide what evidentiary rules and review procedures are required, and must help clarify the United State Government's position on Geneva Convention Common Article 3.

### commission system

The United States needs a system to exercise judicial power outside the boundaries of the continental United States. Judicial power within the United States is reposed in our Civilian Article III court system. Historically, application of judicial power outside the continental United States has been done by military law with its twin components-- Courts-Martial and Military Commissions--under the authority of Article I. The Courts-Martial System is the gold standard because of its years of maturing under the auspices of the 1950 Uniform Code of Military Justice (UCMJ) and the 1983 Military Justice Act authorizing Supreme Court review of military justice. However, we are now paying the price for long ignoring the true ``military'' in military law. We are presently forced to concentrate on military commission law with its old rules and quaint customs.

We must not be distracted by the ``military'' label of these Commissions. They are ``military'' because the logical place to place this power is in the military code and because the military is the agent for exercising this Federal judicial power. Because they are ``military,'' they must not be perceived as second class or less than legitimate. Historically, after limited use in the Revolutionary War, General Winfield Scott used military commissions extensively in the Mexican War. Later, at the turn of the century in the Elihu Root era, the judicial power of the United States was exercised extra territorially on a broad scale by commissions and by territorial courts. Applied judicial power exercised under Article I must be both practical and flexible. That power must never veer from the Rule of Law but, at the same time, it must be applied with common-sense practical flexibility.

### commission procedures: evidentiary rules; safeguards

The immediate evidentiary problems appear to be how to treat hearsay and how to handle classified information. Following the method for handling legal problems in a time of terror noted previously, Congress needs to ascertain if these evidentiary rules are necessary. It appears to me that the need is self-evident that unique rules are

required. The next step is to determine safeguards in their application. In short a judge should be required to make certain factual findings that would be extensively reviewed for abuse of discretion. Basic due process would require that no evidence be admitted that a judge found to be ``unreliable.'' Certainly, no evidence that is the result of torture should be admitted. National security rulings should be tested rigorously by requiring strict review of fact finding on the part of the presiding judge.

Congress should pay special attention to the review process. When the government requires an extra ``iron fist'' there should always be appropriate ``checks and balances'' in the review procedures. The public must have confidence--both domestically and internationally-- that justice has been done.

### geneva convention common article 3

Congress must pay close attention to the Common Article 3 problem. The technical Geneva Convention Regime is in grave peril. The legal system rests on twin pillars: state restraint and reciprocity. Both pillars are missing in our age of terror. Yet the ideals and principles of the Geneva Convention are the very essence of the ethic of the profession of arms. That ethic is founded upon long respected just war tradition, ancient concepts of military chivalry, and commitment to the rule of law. The United States will follow Geneva Convention principles even if there is no technical requirement to do so. But if one side totally refuses to acknowledge or abide by time-honored rules designed to protect civilians, prevent unnecessary suffering, and safeguard property from unnecessary destruction, it may be unreasonable to expect strict, technical compliance by the other side.

Common Article 3 presents the problem of how to treat individuals captured on the battlefield who do not comply with the rules. Should individuals who do not follow the rules be entitled to the special and privileged status of prisoners of war? The United States Government for years--through numerous administrations--has taken the principled position that one must obey the rules before one is entitled to the privileged status of prisoner of war. Our European Allies have taken a different stance--largely for supposed humanitarian reasons. The Europeans believe that all persons detained should be treated as prisoners of war. The United States believes that such a position totally undermines the very basis for having a Geneva Convention system and discourages compliance with the rules of war. In this very public dispute, the United States is morally correct but its position has been a public relations disaster. However, everyone agrees, as the United States Government has repeatedly stressed, that detainees must be treated humanely.

Because of the controversy surrounding this issue, Congress needs to clarify and to give legitimacy to an authoritative position of the United States Government regarding the applicability of Common Article 3. I am concerned that there may be a difference in the standards of treatment of detainees required by the McCain Torture Legislation and by the ruling of the Supreme Court in Hamdan. Regardless of the technicalities here, confusion is the enemy. Our soldiers deserve and our Nation's honor requires clarity. Further, clarification would seem to be necessary to give complete legitimacy to future military commissions.

### conclusion

In conclusion, Congress is now called upon to address the true ``military'' in military law. It must visit an ancient concept of military commissions and give them vitality and legitimacy. Congress must debate for the first time a change in courtroom rules necessitated by terrorism. Importantly, it must clarify the status of Geneva Convention Common Article 3 at a time when the entire Geneva Convention Regime is in question.

A87

Yet, I am confident that Congress will provide a legitimate military law system--just as it did in the Military Justice Act of 1950. As with that historic Act, the modernized military commission system can become a respected model which will be admired and emulated.

[Questions for the record with answers supplied follow:]

Questions Submitted by Senator John Warner

appellate procedure

1. Senator Warner. Mr. Fidell, Mr. Katyal, Mr. Schlueter, and Mr. Silliman, in your opinion, does the appellate procedure set out in the Detainee Treatment Act (DTA) for final decisions of military commissions (i.e., a limited scope of review in the District of Columbia Circuit) comply with the requirements of Common Article 3 relating to ``judicial guarantees?''

Mr. Fidell. The authoritative commentary to Common Article 3 cautions (III Pictet at 40) that ``[a]ll civilized nations surround the administration of justice with safeguards aimed at eliminating the possibility of judicial errors.'' The DTA's limitations on the scope of appellate review needlessly raise a question as to whether the military commissions meet that standard. Even if the appellate review prescribed by the DTA satisfies Common Article 3's minimal requirement relating to ``judicial guarantees,'' it should be corrected because it is out of step with normal review of military criminal cases and because it vests appellate review in the wrong court.

The United States already has an expert military appellate court: the United States Court of Appeals for the Armed Forces (USCAAF) (previously known as the United States Court of Military Appeals). USCAAF has been in existence since 1951, and has decided thousands of cases. It has an excellent reputation and is an institution of which our country can be proud. There is no reason to shunt the appellate review of military commission cases into the United States Court of Appeals for the District of Columbia Circuit, a court whose involvement with military justice matters is confined to occasional Administrative Procedure Act cases and even rarer military habeas corpus cases.

The fact that the DC Circuit has ruled as it has (i.e., for the government) on Guantanamo-related habeas corpus cases is not a proper basis for making it responsible for direct review of military commission decisions. Doing so reflects a kind of legislative forum-shopping that does not contribute to public confidence in the administration of justice, despite the high regard in which the DC Circuit is widely and justifiably held.

Mr. Katyal. No. Section 1005(e) of the DTA, under the interpretation given to the Act by the government, turns the traditional concept of a fair trial on its head. It postpones constitutional review of trial procedures until after trial and conviction have occurred. The government has claimed that ``review after military justice verdicts is the norm, not before the verdict.'' But as the Supreme Court said in Hamdan, that principle derives from courts-martial--a battle-tested system with independence and a tradition. Here, when dealing with the civil courts, the tradition has always been to review military commissions upfront, as in Ex Parte Quirin (1942) and Hamdan itself.

The DTA system is problematic for four reasons. First, review is only granted automatically to those defendants who are imprisoned for longer than 10 years or who face the death penalty. - 1005(e)(3). Because many of the individuals currently detained are accused only of conspiracy, the DTA cuts off automatic review in most cases that could possibly be brought to trial. For these individuals, appellate review is granted only at the discretion of the court of appeals. Without an avenue for appeal before or during the trial, these prisoners would face a court with unfettered discretion.

Second, even in those cases where judicial review is possible, the

DTA creates the possibility of an unnecessarily long trial process. Under the DTA, the first trial must proceed to completion and result in a final decision. In the nearly 5 years since the tribunals were established, not a single trial has even commenced. Moreover, even if a trial were to proceed in full, its result would only be final upon the President's determination to that effect. See Commission Order No. 1 — 6(H)(6). In effect, the DTA puts judicial review at the mercy of prosecutors and the President. Then, after the final decision, after review in the DC Circuit Court of Appeals, and presumably after review in the Supreme Court, a decision overturning the verdict would result in yet another trial. Prosecutors would have to scramble to retry these defendants 8-10 years after their capture. Reducing the scope of judicial review to final decisions only subjects both the defendants and prosecutors to excessive delays, high costs, and a potentially interminable trial process. Basic standards of criminal procedure, as well as administrative efficiency, require that trial procedures, writ large, be constitutional the first time around.

    Third, the limited scope of review in the DC Circuit also threatens basic fair trial rights. As Justice Kennedy notes in his concurrence, ``provisions for review of legal issues after trial cannot correct for structural defects . . . that can cast doubt on the factfinding process and the presiding judge's exercise of discretion during trial.'' Hamdan v. Rumsfeld, 26 S.Ct. 2749, 2807 (2006) (Kennedy, J. concurring). Moreover, if the military trial system is struck down or modified by the courts after conviction, individuals would face retrial after having previewed their defense for the prosecution. The administration has already afforded itself a lopsided advantage in preparing evidence for the trials of suspected terrorists ,with limited rules for disclosure and review. A system where defects are remedied only by retrial exacerbates the asymmetry.

    Fourth, the DTA cuts out the most relevant military court--the USCAAF. In 1975, the Supreme Court in the Councilman decision looked to this court as providing a crucial degree of independence from the executive in the military justice system. It is a court that is the envy of the world, with specialized expertise in military matters. Given the fact that the administration is saying that the civilian justice system is not appropriate to try suspected terrorists, one would think that the existing military appellate court, the USCAAF, is far better suited to hear these cases than the civilian U.S. Court of Appeals for the District of Columbia Circuit. Decisions from this regular military appellate court may also be subject to more deference in the Supreme Court than the DC Circuit.

    Mr. Schlueter. I believe that the appellate procedure set out in the DTA, for final decisions by the DC Circuit Court, is sufficient to comply with Common Article 3. As I understand the general scope of Common Article 3, that provision provides the signatory states with some flexibility in the ways in which they provide basic due process to those who are tried in that state's courts. In this instance, the provision provides for ``civilian'' review of the decisions, and that in the minds of many in the public is a desirable procedure.

    Mr. Silliman. No, I don't think it does because it excludes from the nondiscretionary grant of review anyone convicted by a military commission who receives a sentence of less than 10 years; and Common Article 3 makes no distinction based upon quantum of sentence. Further, the scope of review is merely procedural (``whether the final decision was consistent with the standards and procedures specified in the military order . . .''). I'm not sure that I interpret the second clause (section 1005(e)(3)(D)(ii) as enlarging that limited scope (``to the extent the Constitution and laws of the United States are applicable, whether the use of such standards and procedures to reach the final decision is consistent with the Constitution and law of the United States'').

    2. Senator Warner. Mr. Fidell, Mr. Katyal, Mr. Schlueter, and Mr. Silliman, what changes in appellate procedure, if any, would you

recommend?

Mr. Fidell. National Institute of Military Justice (NIMJ) recommends that direct appellate review of military commissions be vested in the USCAAF, and that the contrary DTA provision be repealed. We also believe Congress can properly dispense with intermediate review by a Service Court of Criminal Appeals (CCA). However, USCAAF should have plenary review power akin to that exercised by the CCAs, so that it can review findings for proof beyond a reasonable doubt and sentences for appropriateness, as well as any legal issues that may be presented. There is certainly no need for a ``review panel'' or ``Court of Military Commission Review.''

Mr. Katyal. As I testified before the committee, the single most important decision Congress must make if they adopt military-commission legislation is to craft an ``anti-abstention provision.'' This would create an expedited review process, modeled on by the Bipartisan Campaign Finance Reform Act (McCain-Feingold), and would protect the rights of both sides in what is likely to be an unprecedented new trial system. Challenges would go first to a three-judge district court, with immediate certiorari in the Supreme Court. Federal courts must play their role at the outset in order to avoid the trauma to the Nation of potentially having convicted terrorists set free, and to protect the minimal trial rights of defendants consistent with constitutional and treaty-based obligations. See my prepared testimony at the July 19 hearing (hereinafter ``SASC Testimony'') at pp. 13-14.

Mr. Schlueter. I would not recommend any changes in the appellate procedure for reviewing convictions of those found guilty by military commission. I disagree with the view that those individuals should have their cases reviewed by the existing Service appellate courts (e.g., the Army Court of Criminal Appeals) and then the USCAAF. The appellate review in those courts can take several years. In fact the latter court recently adopted a series of rules to ensure that servicemembers receive timely appellate review of their courts-martial convictions. In a series of cases, the military courts have had to deal with post-trial delays spreading out over as much as 4 years.

In the case of appellate review of convictions by military commissions, it is critical that procedure be efficient and swift. If military courts were to have jurisdiction, if there were attempts to expedite those cases, and not those of American servicemembers, in effect the detainees would receive favored treatment.

Mr. Silliman. I would recommend that appeals from convictions by military commissions be heard in the USCAAF, rather than in the United States Court of Appeals for the District of Columbia. The USCAAF is an Article I court, created by Congress in 1950 as part of the Uniformed Code of Military Justice (UCMJ) to hear appeals of courts-martial from all the Services, and is well versed in military justice issues.

war crimes statue

3. Senator Warner. Mr. Katyal, Mr. Schlueter, and Mr. Silliman, in light of the Court's Common Article 3 holding, does Congress need to amend the War Crimes Statute (18. U.S.C. 2441) to ensure military interrogators are protected from criminal liability as they perform their duties?

Mr. Katyal. A statute that would grant immunity for violations of Common Article 3 would be a gross violation of our treaty obligations, as well as customary international law. Although Congress has the power to make such an amendment, it would come at great political cost and would not protect military interrogators from prosecution abroad. Under the principle of ``universality,'' courts abroad may exert jurisdiction over any defendant charged with war crimes that they are able to take into custody. In additional to foreign national courts, the founding charters of numerous international tribunals, including the International Criminal Court, expressly recognize violations of Common Article 3 as war crimes.

Before accepting any claim that the executive branch ``needs'' a

``fix'' to either the War Crimes Act or Common Article 3, Congress should understand what the executive's implementing rules are with respect to these laws. For example, the executive branch has the power under Article 2 of the Constitution to ``take care'' that the laws are faithfully executed--which means that it wields the prosecution power. I would imagine that this power would fairly include the ability to decline to prosecute any and all War Crimes Act violations in a given category of cases. If so, it is not clear what purpose, if any, would be served by legislating an exemption or clarification of the existing act. I believe that it is absolutely essential that Congress inquire as to whether the administration believes that its Article 2 prosecution power gives it the ability to decline to prosecute cases prior to government activity that might otherwise violate the statute. I also think it imperative that the committee ask the executive for any and all memoranda of understanding or other agreements, both formal and informal, between the Department of Justice (DOJ) and other Government agencies with respect to prosecution under the War Crimes Act and violations of the Geneva Conventions. If such documents or agreements exist, they will be the most useful materials in deciding whether any legislation in this area is necessary or appropriate.

    Mr. Schlueter. Although the Court in Hamdan indicated that Common Article 3 is binding law, it is difficult to say how the Court would interpret individual provisions in other cases. Nonetheless, it would seem prudent to enact legislation to protect servicemembers, to guard against an adverse future opinion from the Supreme Court.

    Mr. Silliman. No. First of all, there is a memorandum of understanding between the Departments of Justice and Defense whereby it is agreed that American soldiers are to be tried in military courts rather than Federal Court for any charges arising from their conduct in the field which constitutes an alleged violation of both the U.S. Code and the UCMJ. Any possible allegation of a violation of Common Article 3 would also surely constitute an allegation of misconduct under the UCMJ. Also, testimony before this committee by the Judge Advocates General (JAG) confirms that military personnel are trained to the standards set forth in Common Article 3. Thus, I see no reasons why 18 U.S.C. 2441 needs to be amended.

                           geneva conventions

    4. Senator Warner. Mr. Katyal, Mr. Schlueter, and Mr. Silliman, in your opinion, do the 1949 Geneva Conventions represent the present state of customary international law with respect to armed conflict?

    Mr. Katyal. Yes. Both Congress and the Supreme Court, most recently in Hamdi v. Rumsfeld, have recognized the Geneva Conventions as a codification of the law of war. See 18 U.S.C. − 2441(c)(1) (2003) (defining violations of the law of war as breaches of the Hague or Geneva Conventions); Hamdi v. Rumsfeld, 124 S. Ct. 2633, 2641 (2004). Congress also considers Common Article 3 an essential element of the law of war, as reflected in the War Crimes Act.

    Mr. Schlueter. I do not have sufficient experience or knowledge in this area--international law--to be able to give you an informed answer.

    Mr. Silliman. Yes, they do.

    5. Senator Warner. Mr. Katyal, Mr. Schlueter, and Mr. Silliman, has additional Protocol I of 1977, which the United States refused to ratify, become part of customary international law?

    Mr. Katyal. Yes. The United States Government has adhered to the view that Protocol I constitutes customary international law. See, e.g., Brief of Retired Generals and Admirals in Support of Petitioner, Hamdan v. Rumsfeld, at 20. In Hamdan, the plurality stated that the term ``regularly constituted court'' must be understood to incorporate at a minimum the trial protections recognized by customary international law as embodied in Article 75 of Protocol I. See 126 S.Ct. at 2797. Several court decisions have held that violations of

A91

Protocol I are violations of Common Article 3. See Kadic v. Karadzic, 70 F.3d 232, 242-43 (2d Cir. 1995); Mehinovic v. Vuckovic, 198 F. Supp. 2d 1322, 1351 (N.D. Ga. 2002).

Mr. Schlueter. I do not have sufficient experience or knowledge in this area--international law--to be able to give you an informed answer.

Mr. Silliman. Many of the provisions of additional Protocol I are acknowledged by the State Department as customary international law, even though the United States has not ratified that Protocol. For example, Article 75, which gives us a clarification of what the ``judicial guarantees'' are referred to in Common Article 3, is customary international law.

### classified information

6. Senator Warner. Mr. Fidell, Mr. Katyal, Mr. Schlueter, and Mr. Silliman, the present military commission rules allow the appointing authority of the presiding officer of a commission to exclude the accused and his civilian counsel from access to evidence during proceeding that these officials decide to close to protect classified information or for other named reasons. In your opinion, can a process that passes constitutional and statutory muster be constructed without giving the accused and counsel possessing the necessary clearances access to such material in some form?

Mr. Fidell. NIMJ does not believe any person can properly be convicted of a criminal offense based on evidence that is not made available to the accused and his or her attorney. The current arrangement for classified information in courts-martial--Military Rule of Evidence 505--has been put to the test in numerous cases over the years. That procedure--under which the ``members'' of the court-martial never have access to information to which the accused is not also privy--is workable. There is no basis for applying a different approach in military commissions.

Mr. Katyal. The court-martial process provides a clear model of how such a system would--and does--operate. If the accused at any stage of a military trial seeks classified information, the government may ask for an in camera (closed) proceeding to discuss the use of the information in trial. Mil. R. Evid. 505(i). During this session, the military judge hears arguments from both sides on whether disclosure ``reasonably could be expected'' to harm national security prior to the accused or his lawyer being made privy to the classified information. Only ``relevant and necessary'' classified information to the prosecution's or accused's case can be made available. Mil. Rule Evid. 505(i).

Moreover, the military rules of evidence provide alternatives to disclosure of classified information, which include: redaction of the classified information; substitution of an unclassified description or summary of the classified information; substitution of a statement admitting the relevant facts the classified information would tend to prove; or full withholding of disclosure. Mil. R. Evid. 505(d),(g). Courts-martial also grant broad privileges for withholding information when it is ``detrimental to the public interest.'' Mil. R. Evid. 506(a). My testimony addresses these and similar issues at great length, see pp. 7-11.

The one thing that Federal courts have not accepted, as Senator Lindsey Graham has recently stated, is the exclusion of the defendant from his own criminal trial when he is not being disruptive. I was only able to find one example in American history when a defendant was excluded from a military commission in 1865, and that conviction was reversed by the JAG.

Mr. Schlueter. Yes, I am confident that we can construct a procedure for balancing the need for national security and access by counsel and the accused and at the same time pass constitutional muster. It is important to note that the Court in constructing a majority vote in Hamdan, did not specifically rule that the accused's

A92

lack of access to classified information was in itself
unconstitutional. It simply held that procedure, and others, appeared
to be inconsistent with the UCMJ and the Manual for Courts-Martial, and
that the President had not sufficiently explained the need for such
variations.

    Mr. Silliman. Provision could be made for protecting highly
classified national security information by preventing an accused from
having direct access to it, as long as he is afforded access to
unclassified summaries of that information if it is to be used against
him. His military defense counsel, however, assuming he had the
requisite security clearance, could not be denied access to the
classified information itself. The Manual for Courts-Martial, in
Military Rules of Evidence (MREs) 505 and 506, has provisions that
mirror the Classified Information Procedures Act with regard to the use
of classified information in a criminal trial, although these
provisions normally apply to an accused's request to introduce
classified information in his defense.

                            common article 3

    7. Senator Warner. Ms. Massimino, Ms. Newell Bierman, Mr. Fidell,
Mr. Mernin, Dr. Carafano, Mr. Katyal, Mr. Schlueter, and Mr. Silliman,
in your opinion, does the statuary prohibition on cruel, inhumane, and
degrading treatment or punishment enacted last year constitute
sufficient legal guidance to ensure compliance with Common Article 3?
    Ms. Massimino. No. The statutory prohibition on cruel, inhuman, or
degrading treatment contained in the DTA was a necessary corrective to
administration policies holding that: (1) the Geneva Conventions do not
govern U.S. conduct in the current conflict; (2) interrogation
techniques in violation of that standard and outside of the Army Field
Manual on Intelligence Interrogations are authorized; and (3) the
treaty obligation to refrain from cruel, inhuman, or degrading
treatment does not bind the United States when it acted against aliens
outside its territory. The DTA provides important legal guidance by
requiring that all U.S. personnel--military and civilian--comply with
the prohibition on cruel, inhuman, or degrading treatment, regardless
of the location or legal status of those in their custody.
    The DTA does not, however, purport to address the full range of
requirements set out in Common Article 3 of the Geneva Conventions.
Common Article 3 prohibits cruel treatment and torture, as well as
``outrages upon personal dignity, in particular humiliating and
degrading treatment.'' While the administration now argues that the
requirements of Common Article 3 are vague, that has not been the
position of the United States military, now or in the past. To the
contrary, the military has recognized and implemented its obligation to
comply with Common Article 3 for more than 50 years. After the Supreme
Court ruled in the Hamdan v. Rumsfeld case that the United States was
bound by the requirements of Common Article 3 in the current conflict,
Deputy Secretary of Defense Gordon England issued a directive restating
the obligation to comply with Common Article 3 and finding that DOD
policies and doctrine are all already in compliance with Common Article
3. No further legal guidance is necessary in order to ensure compliance
with Common Article 3.
    Ms. Newell Bierman. The DTA provided important legal guidance,
reaffirming the U.S.'s commitment to humane treatment and making clear
that the prohibition on cruel, inhuman, and degrading treatment governs
all U.S. officials and agents, including CIA and civilian contractors.
    The U.S. military has considered itself bound by the principles of
Common Article 3 in every conflict since the Geneva Conventions were
ratified in 1949. The Department of Defense (DOD) Directive issued on
July 7, 2006, by Gordon England restates DOD's obligation to comply
with Common Article 3 and makes clear that DOD policies, directives,
executive orders, and doctrine all already comply with the standards of
Common Article 3. As Major General Scott C. Black, JAG of the Army,
told the Senate Armed Service Committee the following week: ``[W]e've

A93

been training to [Common Article 3] and living to that standard since the beginning of our Army. We continue to do so.'' (7/13/06, SASC). The ranking JAGs of each of the other Armed Services agreed.

The U.S. military has never asked for guidance or complained about the vagueness of the humane treatment principles embodied in Common Article 3 in any of the conflicts it has fought over the past 50 years. The lack of clarity in the current conflict came about because the administration suggested that the Geneva Conventions, including Common Article 3, did not apply. Reaffirming a standard the military knows well--the humane treatment standards of Common Article 3--would restore the clarity that has been lost. Congress should also exercise oversight to ensure that abuses like those that occurred at Abu Ghraib do not happen again, ensure that all those responsible for promoting abusive practices are held fully accountable, and require that the humane treatment requirements embodied in Common Article 3 and the DTA are fully respected and applied by every U.S. agency in every operation around the world.

Mr. Fidell. The statutory prohibition on cruel, inhuman, and degrading treatment does not purport to address all of the requirements set forth in Common Article 3. Common Article 3 is no more vague than a number of punitive articles of the UCMJ that have been part of military law for decades and are generally recognized as providing fair notice of what conduct is proscribed. Examples include Article 88 (contemptuous words), 89 (disrespect), 91 (contemptuous or disrespectful language or deportment), 92(3) (dereliction of duty, including duty imposed by custom of the service), 93 (cruelty, oppression, or maltreatment), 133 (conduct unbecoming an officer and a gentleman), and 134 (conduct that is prejudicial to good order and discipline or service-discrediting). Additional guidance can be provided in the Manual for Courts-Martial, but if that is done, it should be made clear that no inference arises that the law was too unclear to permit prosecution for misconduct (violations of Common Article 3) that occurred before the additional guidance was promulgated. It should be noted that United States practice is not to charge war crimes as offenses under the law of war, but rather as violations of the pertinent substantive punitive article, such as Article 118, which forbids murder.

Mr. Mernin. No. The statutory prohibition on cruel, inhuman, and degrading treatment or punishment enacted last year, in its definitional section, articulates a more restricted definition of what treatment is prohibited than does Common Article 3. The baseline treatment standards of Common Article 3 have been incorporated in the training of U.S. Armed Forces for decades as a requirement of international law and the law of armed conflict, as a useful tool to inhibit sliding down a slippery slope of maltreatment, and as consistent with core military concepts of honor and reciprocity. While the New York City Bar Association (the ``Association'') praised, and continues to applaud, last year's statutory prohibitions set forth in the DTA, the act did not purport to incorporate or subsume the standards of Common Article 3. Moreover, the act's lack of an enforcement mechanism weakens its ability to contribute to or ensure compliance with Common Article 3. Finally, the Presidential signing statement which accompanied the act's becoming law, and reserved the right not to comply with the act in certain circumstances, also may undercut its effectiveness as ``sufficient legal guidance.''

Dr. Carafano. Statutes by themselves rarely provide sufficient legal guidance. The President and military commanders need to be responsible for establishing doctrine, military regulations, and enforcement of expected behavior and treaty compliance.

Mr. Katyal. Standing alone, the prohibition enacted by Congress last year, the ``McCain amendment,'' does not provide sufficient legal guidance. It has at its core a subjective test--the ``shocks the conscience'' standard for constitutional due process--that is vague and highly case specific. What gives that law practical content is the principle that its text must be read and enforced in a manner

consistent with our international obligations, as Acting Assistant Attorney General Stephen Bradbury acknowledged in his testimony. See http://judiciary.senate.gov/testimony.cfm?id=757&wit--id=5505. Its provisions must prohibit, therefore, all conduct that would be prohibited under Common Article 3. While soldiers and military officers are quite familiar with these international standards, the administration, for its part, has protested that they are unclear and appears to have pursued policies that violate the Geneva Conventions, even if they do not directly violate the McCain amendment's narrower prohibition. In this sense, then, the McCain amendment has not provided clear legal guidance on compliance with Common Article 3. Now that the Hamdan decision has clarified that Common Article 3 applies to all conflicts, government actors cannot hide behind the literal language of the McCain amendment to immunize actions that violate the treaty. The military has developed its own system of guidelines and procedures evincing a comprehension and acceptance of the Geneva Conventions. In fact, each JAG testified before this committee that our troops train to these standards and that the Hamdan decision imposes no new requirements upon them. There is no reason to think that, now aware that the article applies, other government actors could not do the same.

Mr. Schlueter. I do not have sufficient experience or knowledge in this area--international law--to be able to give you an informed answer.

Mr. Silliman. The prohibitions contained in the DTA are virtually identical to those in Common Article 3, except that where the statute refers to ``degrading treatment,'' the Convention's provision uses the enlarged phrase ``humiliating and degrading treatment.'' Both are similar in connotation and, if there is a difference, it is slight. Therefore, I think the statutory prohibition does generally provide sufficient legal guidance for our Armed Forces personnel. Remember that the JAGs, in their testimony before you, acknowledged that Common Article 3 is the standard to which we normally train our Service personnel. Thus, as the Army Field Manuals, such as the one on accepted interrogation techniques, give clarity to what is, and what is not, permissible without being ``cruel, inhuman, or degrading treatment or punishment'' and, by extension, ``humiliating'' treatment as well.

8. Senator Warner. Ms. Massimino, Ms. Newell Bierman, Mr. Fidell, Mr. Mernin, Dr. Carafano, Mr. Katyal, Mr. Schlueter, and Mr. Silliman, would compliance with that statute constitute compliance with Common Article 3?

Ms. Massimino. No. As noted in response to question 7, Common Article 3 encompasses a broader range of requirements than does the DTA. But even with respect to the common obligation to refrain from cruel treatment, the administration's interpretation of the DTA standard is such that the two standards cannot be equated. Common Article 3 has always been interpreted by the United States as imposing an absolute prohibition on inhumane treatment. Under the Common Article 3 standard, interrogation techniques such as prolonged stress positions, waterboarding, heat injury or hypothermia, the use of dogs to terrify, and other such conduct would clearly be prohibited, regardless of the facts or circumstances surrounding the particular interrogation.

In contrast, and despite the fact that Supreme Court jurisprudence holds that certain acts are inherently cruel, the administration has interpreted the DTA ``shocks the conscience'' standard as infinitely elastic. Under the administration's interpretation of this standard, conduct is permissible depending on the rationale for employing it. Thus, no technique would be absolutely prohibited if interrogators believed the information they sought was valuable enough to justify the abuse.

For this reason, compliance with the DTA--which the administration has interpreted as a relative standard--would not constitute compliance with the absolute requirements of Common Article 3.

A95

Ms. Newell Bierman. Unfortunately, no--not if that statute is given the interpretation put forth by the Bush administration, in various legal opinions. Common Article 3 has always been interpreted as imposing an absolute prohibition on all inhumane conduct, drawing a clear line between prohibited and permissible conduct. We believe that this is precisely what Congress intended to do when it passed the DTA--to forbid absolutely the kinds of abusive interrogation techniques we saw in Abu Ghraib.

The Bush administration, however, has interpreted the DTA as imposing a relative standard, creating a sliding scale of prohibited treatment. Applying a ``shocks the conscience'' test, the administration claims that what  shocks the conscience'' depends on the need. This means conduct that would--and should--be prohibited under an absolute bar on inhumane treatment, including techniques such as waterboarding, use of snarling dogs, and exposure to extreme hot and cold, might be allowed in certain situations if the interrogator or other official could explain a sufficiently important need. This appears to be the reason why the administration is asking Congress to interpret Common Article 3 by reference to the DTA.

Given the administration's interpretation of the DTA, if Congress were to agree to this proposal, it would be seen around the world as the U.S. taking a ``reservation'' to the Geneva Conventions--attempting to unilaterally redefine its terms and limit its protections. No country in the world has ever before formally renounced its humane treatment requirements under Common Article 3 or suggested that the absolute prohibition on inhumane treatment should be replaced with a sliding scale. Such a step would send a message that America's enemies would all-too willingly amplify and mimic: that the United States affirmatively seeks to limit the scope of the humane treatment requirements.

Mr. Fidell. No. As noted in response to question 7, the McCain amendment does not purport to address all of the requirements of Common Article 3.

Mr. Mernin. No. As set forth above, the statute is by its terms not referable to Common Article 3  A number of commentators have offered examples of the potential different treatment standards reflected in the two sources. Before a statutory departure from Common Article 3 is undertaken, it should first take into account the opinion of the JAG testimony concerning the U.S. Armed Forces' teaching, training, and application of the Geneva Conventions, including Article 3.

Dr. Carafano. Most likely, unless the statute or Common Article 3 are misconstrued as they were in the Hamdan decision.

Mr. Katyal. No. The McCain amendment's literal prohibition is significantly narrower than that of Common Article 3. The standard it applies is that of the Federal constitution's ban on cruel and unusual punishment. The test is whether the conduct ``shocks the conscience.'' As this standard has been applied, the reasons for the conduct are relevant to the determination of its legality. A finding of some particularly heightened security need, for example, could justify otherwise ``conscience-shocking'' treatment of prisoners.

By contrast, Common Article 3 also prohibits conduct constituting ``outrages upon personal dignity, in particular humiliating and degrading treatment.'' It does not require any physical harm and does not balance the severity of the conduct against its rationale.

It's easy to see where these two standards would diverge. Imagine the CIA has been ``water-boarding'' a suspected al Qaeda operative. Under the McCain amendment's standard, such a practice may well be legal. It might be justified by the exigency of the situation, by the rank of the prisoner, or by his access to information. Moreover, this conduct may not count as ``torture'' under other domestic statutes if it does not cause prolonged physical suffering. Under Common Article 3, however, such a practice may well qualify as the kind of ``outrage on personal dignity'' that is prohibited in all situations.

Compliance with the McCain amendment will only constitute compliance with Common Article 3 if the constitutional standard is

understood to be identical to that of the treaty.

To the extent any legislation that abrogates our Geneva Convention obligations is being contemplated, it deserves the most careful and informed attention by Congress, following the submission of enough intelligence information to make sure that such a step is absolutely necessary. It must take place only after a sober and careful analysis, and not be the product of a rush to legislate.

Mr. Schlueter. I do not have sufficient experience or knowledge in this area--international law--to be able to give you an informed answer.

Mr. Silliman. Yes, with regard to treatment of detainees, because I see little difference in scope of coverage between ``cruel treatment'' and ``humiliating and degrading treatment'', as used in Common Article 3; and ``cruel, inhuman, or degrading treatment or punishment'' in the DTA.

———

Questions Submitted by Senator John McCain

common article 3

9. Senator McCain. Ms. Massimino, Ms. Newell Bierman, Mr. Fidell, Mr. Mernin, Dr. Carafano, Mr. Katyal, Mr. Schlueter, and Mr. Silliman, the Supreme Court found that Geneva Common Article 3, which bars cruel and humiliating treatment, including outrages upon personal dignity, applies to al Qaeda. In response, some have argued that the terms included in Common Article 3 are vague and undefined in law of war doctrine. In Tuesday's Senate Judiciary Committee hearing, for example, the head of the DOJ's Office of Legal Counsel said that some of the terms are ``inherently vague.'' Is this your understanding?

Ms. Massimino. No. The terms in Common Article 3 are not inherently or otherwise vague. If the DOJ's Office of Legal Counsel finds the terms of Common Article 3 to be vague, perhaps they should talk to the military, to whom the meaning and requirements of Common Article 3 are clear As the senior serving JAGs recently testified, our Armed Forces have trained to Common Article 3 and can live within its requirements while effectively defending our Nation. The military has more than 50 years of experience training to and applying this standard. They have not complained of its vagueness; rather, they have always argued for the broadest interpretation of the standard, recognizing the importance to the safety of our own troops of preserving the integrity of Common Article 3. Moreover, as evidenced by Secretary England's July 6, 2006, directive, the DOD's understanding of Common Article 3 was not changed by the recent Hamdan decision.

Ms. Newell Bierman. As stated in the answer to question 7, the military has long understood, trained to, and applied the humane treatment requirements of Common Article 3, without ever raising concerns about its vagueness. The DOD Directive issued on July 7, 2006, by Gordon England restates DOD's obligation to comply with Common Article 3 and affirms that DOD policies, directives, executive orders, and doctrine all already comply with the standards of Common Article 3. The provisions of the Third and Fourth Geneva Conventions--including Common Article 3--are incorporated as required conduct for the armed services in Army Regulation 190-8, Enemy Prisoners of War, Retained Personnel, Civilian Internees and other Detainees, and similar regulations for other Services. As Major General Scott C. Black, JAG of the Army, told the Senate Armed Service Committee the following week:

[W]e've been training to [Common Article 3] and living to that standard since the beginning of our Army. We continue to do so.'' (7/13/06, SASC). The ranking JAGs of each of the other armed services agreed. As these military leaders make clear, the standards of Common Article 3 have long been deemed sufficiently clear for the military to mandate, teach, and apply. No more vague than other guiding principles, the standards of Common Article 3 have been given concrete meaning through usage over time.

5/9/2017      - MILITARY COMMISSIONS IN LIGHT OF THE SUPREME COURT DECISION IN HAMDAN V. RUMSFELD

Mr. Fidell. No. As indicated in response to question 7, some of the prohibitions of Common Article 3 are no more vague than a variety of existing punitive articles in the UCMJ that have withstood judicial scrutiny for many years.

Mr. Mernin. No. Common Article 3 has provided a useful framework for decades, and should not be discarded based upon a facile claim of vagueness. The cited testimony focused on the ban of ``outrages upon personal dignity, in particular humiliating and degrading treatment'' as inherently vague. The Association respectfully disagrees. Common Article 3 has been interpreted and followed by our Armed Forces for decades and to discard this well-regarded, clear legal standard--for the sake of expediency in establishing rules which will only apply to a handful of detainees--would be a grave mistake. By its terms, the subject provision accommodates the notion that there might be instances of ``humiliating and degrading treatment'' which do not rise to the level of ``outrages upon personal dignity.'' As an example, one can posit an instance of verbal ridicule that would constitute an instance of ``humiliating and degrading treatment.'' However, such an isolated event would not rise to the level of ``outrages upon personal dignity.'' Requiring a modicum of interpretation does not make a standard inherently vague.

Mr. Carafano. Yes. For example, the phrase contained in Common Article 3 that treatment of detailees should prohibit ``the passing of sentences and the carrying out of executions without previous judgment pronounced by a regularly constituted court, affording all the judicial guarantees which are recognized as indispensable by civilized peoples'' is vague. To comply with this section, it will require some due process, but what that due process should look like is hardly agreed upon by all ``civilized peoples,'' nor is it even agreed upon who constitutes the body of civilized peoples. Nine justices of our Supreme Court also disagreed sharply on what a ``regularly'' constituted court was. Some ambiguity was intended by the drafters, which is one reason Congress attempted to remove jurisdiction from the Federal courts, which tend to establish fixed meanings that are too inflexible.

Mr Katyal  The  vagueness'' of Common Article 3 has never, until now, impeded American military operations. It has never even been raised as an issue, even though American interrogators and soldiers have been subject to its requirements under the War Crimes Act since that law was passed almost 9 years ago. For decades the military has trained its soldiers to comply with a standard that goes well beyond what the Geneva Conventions, including Common Article 3, require. Further, the Government has itself asserted that the DOD has heretofore been in full compliance with the Geneva Conventions in its conduct of the global war on terror. By the administration's own admission, the military has always known how to comply--rendering their claim of vagueness nonsensical.

In reality, the vagueness argument is simply another step in an elaborate dance to protect non-complying parties from prosecution. If the United States wants to insulate such conduct, we should do so only after carefully assessing the costs to the international reputation of the United States and the impact of such a decision on our troops. Please also see my answer to question 8, above.

Mr. Schlueter. I do not have sufficient experience or knowledge in this area--international law--to be able to give you an informed answer.

Mr. Silliman. First of all, I do not read the Supreme Court's opinion in Hamdan v. Rumsfeld as ruling that our treatment of al Qaeda detainees, apart from our use of military commissions to prosecute them, must comply with Common Article 3. That was a clear implication flowing from the ruling, but the Court did not make that holding. That is an issue for another day. In that regard, I believe the memorandum issued by the Deputy Secretary of Defense on July 7 regarding application of Common Article 3 to those being held by DOD personnel is a good policy decision, but not one specifically mandated by the Court's ruling in Hamdan.

A98

Having said that, let me now address the substance of your question. I disagree with Mr. Bradbury's testimony in the Senate Judiciary Committee that the terms of Common Article 3 are ``inherently vague.'' As I said in response to a question from the Chairman, it has been acknowledged by the JAG that we train our Armed Forces to the Common Article 3 standard, and in our training manuals and other materials we distribute to our Service personnel, we give definition and clarity to the terms used in the article.

10. Senator McCain. Ms. Massimino, Ms. Newell Bierman, Mr. Fidell, Mr. Mernin, Dr. Carafano, Mr. Katyal, Mr. Schlueter, and Mr. Silliman, is there a body of opinion that defines Common Article 3?

Ms. Massimino. Yes. The provisions in Common Article 3 are defined by U.S. case law in relation to the Alien Tort Statute and the Torture Victims Protection Act, such as Kadic v. Karadzic, 70 F.3d. 232 (2d Cir. 1995). Common Article 3 is also defined by international commentaries, such as the International Committee of the Red Cross (ICRC), and a well-developed body of international case law from international tribunals to which administration witnesses have referred to as a source for guidance on procedure and rules. As I noted in my testimony, the International Criminal Tribunal for the Former Yugoslavia (ICTY), for example, has said that ``cruel treatment constitutes an intentional act or omission, that is, an act which, judged objectively, is deliberate and not accidental, which causes serious mental or physical suffering or injury or constitutes a serious attack on human dignity.'' Prosecutor v. Delalic, Case No. IT-96-21-T (Nov. 16, 1998) at para. 552. The ICTY similarly held that an outrage upon personal dignity is an act that causes ``serious humiliation or degradation to the victim,'' and requires humiliation to be ``so intense that the reasonable person would be outraged.'' Prosecutor v. Aleksovski, Case No. IT-95-14/1-T (June 25, 1999) at para. 56. According to that international tribunal, a perpetrator must have acted (or failed to act) deliberately and must have been able to perceive his suffering to be the ``foreseeable and reasonable consequences of his actions.'' Id. These formulations are very similar to the way in which offenses are defined under U.S. criminal law.

Ms. Newell Bierman. Yes. There is a well-defined body of law, based on U.S. legal opinions, ICRC commentary and jurisprudence from international criminal tribunals that defines the nature and scope of the obligations under Common Article 3. U.S. courts have interpreted Common Article 3 in the context of civil litigation brought against human rights abusers under the Alien Tort Claims Act. In Kadic v. Karadic, 70 3d 232 (2d Cir. 1995), for example, the Second Circuit applied the law of Common Article 3 to conclude that the ``offenses alleged by the appellants''--rape, torture, summary execution--``would violate the most fundamental norms of the law of war embodied in Common Article 3.'' Id. at 243. International criminal tribunals, and commentators, particularly the ICRC have also defined the scope of Common Article 3. The ICRC commentaries have defined the humane treatment standards of Common Article 3 as ``concern[ing] acts which world public opinion finds particularly revolting--acts which were committed frequently during World War II.'' The case law of the ICTY and the International Criminal Tribunal for Rwanda (ICTR) also provides useful guidance on the definition of a Common Article 3 crime. In examining offenses of either cruel treatment or outrages upon personal dignity, the tribunals have made clear that the humiliation suffered must be real and serious and must be so intense that the reasonable person would be outraged and have consistently limited individual criminal liability to serious violations of the humane treatment standards of Common Article 3. The statute for the International Criminal Court (ICC) in Article 82(c) defines war crimes as serious violations of Common Article 3, and the ICTY has said that serious violations of Common Article 3 are prosecutable as war crimes. Kunarac (Appeals Chamber), June 12, 2002, para. 68. The Court has also repeatedly set the standard that for a breach of IHL to be a war crime

the ``violation must be serious . . . it must constitute a breach of a rule protecting important values, and the breach must involve grave consequences for the victim.'' Tadic, (Appeals Chamber), Decision on the Defence Motion for Interlocutory Appeal on Jurisdiction, October 2, 1995.

Mr. Fidell. There is a substantial literature on Common Article 3, including instructional materials generated by the Armed Forces. In 1960 the ICRC published a definitive commentary on all of the Geneva Conventions, commonly known as ``Pictet,'' after its overall editor, Jean S. Pictet.

Mr. Mernin. Yes. The authoritative ICRC Commentary, edited by Jean S. Pictet, was published in 1958. In addition, a number of U.S. courts (see, e.g., Kadic v. Karadzic, 70 F.3d 232 (2d Cir. 1995), courts of other nations, and international criminal tribunals have rendered decisions concerning or applying Common Article 3. An accessible standard of what constitutes a violation of the article has developed in this body of case law.

Dr. Carafano. Not in any final way, nor should there be. In international relations, sovereign states must take responsibility for their own treaty interpretations.

Mr. Katyal. The requirements and purposes of Common Article 3 have been taken up by U.S. domestic courts in the context of civil litigation under the Alien Tort Statute and the Torture Victims Protection Act, international criminal tribunals, and commentators, particularly the ICRC. Most notably, the Second Circuit Court of Appeals applied the law of Common Article 3 in Kadic v. Karadzic, 70 F.3d.232 (2d Cir. 1995). The UCMJ, and interpretations of it, are also relevant to defining Common Article 3 because, as Hamdan reaffirms, the UCMJ codifies the laws of war. Moreover, the military's long tradition of training soldiers in the proper treatment of prisoners of war, and its longstanding regulations, should also be treated as a relevant source of interpretive guidance.

Mr. Schlueter. I do not have sufficient experience or knowledge in this area--international law--to be able to give you an informed answer.

Mr. Silliman. There is a body of opinion comprised of customary international law, treaties, other scholarly writings, and even military training manuals from the United States and other countries which clarifies what is required to fulfill the requirements of Common Article 3.

11. Senator McCain. Ms. Massimino, Ms. Newell Bierman, Mr. Fidell, Mr. Mernin, Dr. Carafano, Mr. Katyal, Mr. Schlueter, and Mr. Silliman, does the vagueness of these terms require a change in America's relationship to the Geneva Conventions?

Ms. Massimino. No. Our relationship to the Geneva Conventions need not and should not change. The U.S. military has abided by the Geneva Conventions since they were ratified in 1949 and has consistently-- until now--maintained that the standards of conduct required by the Conventions are clear. It would not be in the U.S. national interest to deviate from this position now. The United States has greater exposure militarily than any other nation, and thus has the greatest stake in reinforcing the reciprocal nature of the Geneva Conventions. Moreover, a change in America's relationship to the Geneva Conventions would be perceived around the world not only as a breach of our treaty obligations, but as a lack of support for human rights and the rule of law.

Ms. Newell Bierman. Absolutely not. The U.S. has endorsed, upheld, and promoted the humane treatment standards embodied in Geneva since it was ratified in 1949. As explained in the answers to questions 7 and 9, the U.S. military has long trained to and sought to apply these standards without any complaints about vagueness. Any attempt to redefine the United States' relationship with Geneva will undoubtedly be seen as the U.S. attempting to unilaterally redefine its terms and limit its protections. No country in the world has ever before formally

A100

renounced or sought to define away its humane treatment and fair trial obligations under Common Article 3. Such a step would send a message that America's enemies would all-too willingly amplify and mimic: that the United States affirmatively seeks to limit the scope of the humane treatment requirements. Carving out exceptions now would set a dangerous precedent, undermining humane treatment standards that protect U.S. soldiers if captured by the enemy in future conflicts.

Put another way, the costs of any change would be great and the benefits few to none. When Senator Graham asked the ranking JAGs of each of the armed services at the July 13 hearing before this committee, ``Can we win the war and still live within Common Article 3?,'' all answered with an unequivocal ``yes.'' Former JAG of the Navy, Rear Admiral John Hutson added: ``In fact, I'd turn it around. I don't think we can win the war unless we live within Common Article 3.'' (7/13, SASC Hearing).

Mr. Fidell. No. The Geneva Conventions were negotiated over 50 years ago and the War Crimes Act, which refers to Common Article 3, 18 U.S.C. - 2441(c)(3), was enacted 10 years ago. It's a little late to claim that Common Article 3 is too vague.

Mr. Mernin. No. As set forth above, the Association disagrees with the premise that the referenced terms are vague. The treatment standards of Common Article 3 have formed an integral part of our Nation's Armed Forces' overall training and application with respect to detention and interrogation for decades. To whittle away at these respected and tested norms, for the sake of expediency, would send the wrong message to our troops, our enemies, our allies, and to the world.

Dr. Carafano. No. The parties to the Convention intended some ambiguities and papered over others. That is true of most treaties, and we do not ``change our relationship'' to them.

Mr. Katyal. Not in the least. American officials and soldiers have long demonstrated both the capacity and the willingness to abide by the Geneva Conventions, without complaint of vagueness or insufficient guidance. Further, the military is not arguing that deviations from the Geneva Conventions are required in order to successfully prosecute the war on terror. Disrupting the existing balance of domestic statutes, international law and judicial glosses on these sources of law in any way that reduces or eliminates our obligations under the treaty would be a violation of international law to a degree unprecedented in America's history. The government would forfeit America's status as the world's leading proponent of human rights. By even contemplating such a dramatic--and unnecessary--change, the government is in uncharted territory.

Mr. Schlueter. I do not have sufficient experience or knowledge in this area--international law--to be able to give you an informed answer.

Mr. Silliman. Because I do not agree that the terms are ``inherently vague,'' I see no need to modify our longstanding acceptance to be bound by the provisions of the Geneva Conventions.

12. Senator McCain. Ms. Massimino, Ms. Newell Bierman, Mr. Fidell, Mr. Mernin, Dr. Carafano, Mr. Katyal, Mr. Schlueter, and Mr. Silliman, some have suggested that we put in statute that the prohibitions contained in Common Article 3 are identical to the prohibition against cruel, inhumane, and degrading treatment contained in last year's DTA. In that bill, we defined cruel, inhumane, and degrading treatment with reference to the 5th, 8th, and 14th amendments to the U.S. Constitution. Is this a good idea?

Ms. Massimino. No. See responses to questions 7 and 8. Because of the way the administration has interpreted the DTA standard, were Congress to put in statute that the prohibitions contained in Common Article 3 are identical to the DTA, the result would be a weakening of the Common Article 3 standard. Common Article 3 has always been interpreted by the United States as imposing an absolute prohibition on inhumane treatment of prisoners. Thus, under the Common Article 3 standard, subjecting prisoners to interrogation techniques such as

prolonged stress positions, waterboarding, heat injury or hypothermia, and other such conduct would clearly be prohibited, regardless of the facts or circumstances surrounding the particular interrogation. The United States has in the past prosecuted foreign enemies for subjecting our personnel to such acts.

In contrast, the administration has interpreted the DTA ``shocks the conscience'' standard to be ``flexible,'' so that abusive conduct may be permissible depending on the rationale for employing it. In Vice President Cheney's words, what shocks the conscience is ``really in the eye of the beholder.'' For this reason, legislating that compliance with the DTA constitutes compliance with the requirements of Common Article 3 would result in replacing an absolute standard with a relative one, thereby weakening the Geneva Conventions standard.

Ms. Newell Bierman. Absolutely not. As explained in the answer to question 8, Common Article 3 has always been interpreted as imposing an absolute prohibition on all inhumane conduct, drawing a clear line between prohibited and permissible conduct. The DTA, in comparison, has been interpreted by this administration as imposing a relative standard, a sliding scale of prohibited treatment. Applying a ``shocks the conscience'' test, the administration claims that what ``shocks the conscience'' depends on the need.

Some have suggested that defining the humane treatment standards of Common Article 3 in accordance with the DTA would add ``clarity'' to uncertain language in Common Article 3. But what is ``cruel, inhuman, and degrading'' is not inherently more ``clear'' than what is ``humiliating and degrading.'' In contrast, an absolute standard--which establishes definitive boundaries between prohibited and approved conduct--is certainly clearer and easier to teach and train to than a standard which varies according to the circumstances. In fact, as both Gordon England's July 7 memo--and the statements of the JAGs have made clear--the military has long been teaching and training to the Common Article 3 standards. The military has never concluded that the standard was too unclear to teach, train to, and apply.

Mr. Fidell. Reference to the 5th, 8th, and 14th Amendments was understandable in light of the United States position on the Convention Against Torture, but was not necessarily a good idea since the Geneva Conventions ought to have a common meaning among nations, rather than one that varies from country to country.

Mr. Mernin. No. The prohibitions are not identical, and the United States should not by such legislation water down or turn its back on its treaty obligations, nor by doing so encourage or credit another nation's unilateral effort to rewrite the meaning of Common Article 3's baseline safeguards. Nations need to be able to depend upon the uniform application of treaty provisions, or the provisions will over time lose their force.

Dr. Carafano. Yes, it is better than most other alternatives, but only insofar as the reference to these constitutional amendments pertains to the definition of cruel, inhumane, and degrading treatment, and not to establishment of any sort of constitutional rights for detainees.

Mr. Katyal. As I discussed above, the standard courts apply under those amendments is whether the conduct in question ``shocks the conscience.'' This constitutional test, while certainly more familiar to the courts than any new statutory language would have been, may not transfer so cleanly into the context of an international, largely secretive operation against high-level terrorists. First, the test is subjective--the reasons motivating the conduct are relevant to determining whether the conduct is constitutional. For example, punishment grossly disproportionate to the cause of deterring or punishing crime would violate the law. However, where the prisoner is a high-level member of al Qaeda, or has access to information, the ``shocks the conscience'' standard may well permit conduct that is categorically prohibited by Common Article 3. There is simply no precedent for evaluating our constitutional standard under these circumstances. Second, because it is so subjective and case-specific,

the standard in the DTA will put courts in a position of making policy judgments about acts conducted on the ground by military and intelligence personnel. While the flexibility of the DTA standard gives power to the courts to use their discretion, the balancing they will be forced to do makes more likely to abstain from judgment and allow violations of our international obligations to continue.

Third, because the executive has asserted that those detained abroad have no constitutional rights, including under the 5th, 8th, and 14th amendments, it is not clear that the language of the act protects detainees held outside of the United States at all.

Mr. Schlueter. Yes, I believe that using the Constitutional standards, as interpreted by the United States courts is a prudent course.

Mr. Silliman. The definition of ``cruel, inhuman, or degrading treatment or punishment'' in the DTA is obviously modeled after the Senate's definition in its formal ``understanding'' of the phrase ``cruel, inhuman, or degrading treatment of punishment'' as used in Article 16 of the 1984 Convention Against Torture. Even though Common Article 3 has a difference in wording (using the phrase ``humiliating and degrading treatment'' rather than simply ``degrading treatment'' as in the statute), because the difference in connotation is slight, I do not believe that reference to 5th, 8th, or 14th amendment standards would necessarily be inappropriate.

13. Senator McCain. Ms. Massimino, Ms. Newell Bierman, Mr. Fidell, Mr. Mernin, Dr. Carafano, Mr. Katyal, Mr. Schlueter, and Mr. Silliman, what are the implications of our redefining Common Article 3 in this way?

Ms. Massimino. See response to question 12. The implications of our redefining Common Article 3 by equating it with the DTA standard would be serious. First, it could result in implicitly authorizing for U.S. personnel acts which the rest of the world rightly views and would treat as war crimes. Second, it risks undermining the core Geneva Conventions standard of humane treatment on which our own personnel rely.

Forty-nine retired military leaders recently wrote a letter to this committee about the prospect of the United States redefining Common Article 3 in this way. In their view, ``were we to take this step, we would be viewed by the rest of the world as having formally renounced the clear strictures of the Geneva Conventions. Our enemies would be encouraged to interpret the Conventions in their own way as well, placing our troops in jeopardy in future conflicts. American moral authority in the war would be further damaged.''

Ms. Newell Bierman. See answers to questions 8 and 11.

Mr. Fidell. Adoption of a narrow reading of Common Article 3 has at least four intolerable consequences. First, it destroys any chance for a common, universal understanding of the meaning of these treaties. Second, to the extent that the definition does not address parts of Common Article 3, it leaves those provisions in limbo as a matter of United States law. Third, it potentially could serve as the basis for undeserved immunity on the part of United States military and civilian personnel who have previously violated Common Article 3. Finally, it would deprive our country of the right to object to abusive treatment of our personnel who fall into others' hands.

Mr. Mernin. As alluded to in response to question 12, such a redefinition would open the door for our enemies to mistreat American captives yet still claim, behind a curtain of deceptive logic, that their actions were consistent with their interpretation of Common Article 3. Moreover, JAG testimony to this Committee and the Judiciary Committee has made clear that there is neither a need, nor desire within the armed services, to depart from the Common Article 3 standards which have been taught, trained to, and applied for decades.

Dr. Carafano. If Congress chose to do so, the Court ought to uphold its action. The only consequence might be that our treaty partners argue we are not in compliance with our treaty obligations.

Mr. Katyal. First, it would immediately stop some extreme procedures--such as waterboarding. Even the CIA's Inspector General has evidently conceded that such procedures shock the conscience.

Distressingly, however, several large loopholes will persist under the DTA's standard. To the extent that the ``shocks the conscience'' test would still permit conduct that Common Article 3 would prohibit, such as the elimination of fair trial rights, the statute would violate the Geneva Conventions.

Mr. Schlueter. I do not have sufficient experience or knowledge in this area--international law--to be able to give you an informed answer.

Mr Silliman  This would provide a statutory definition as to what might constitute a violation of Common Article 3 for domestic purposes, but it would not bind either an international tribunal or the courts of other countries on how they might rule on what constitutes a violation of that article of the Conventions.

how congress should proceed

14. Senator McCain. Ms. Massimino, Ms. Newell Bierman, Mr. Fidell, Mr. Mernin, Dr. Carafano, Mr. Katyal, and Mr. Schlueter, in Mr. Silliman's prepared testimony, he stated his view that, as a matter of domestic law, Congress could restrict the application of Common Article 3, but that doing so might not pass judicial muster and would invite additional litigation and more years of legal uncertainty. Could you explain to us why the Supreme Court might not uphold such legislation as Professor Silliman suggests?

Ms. Massimino. Congress has the constitutional authority to pass a law that is in conflict with a treaty ratified by the United States. However, passage of a law restricting the application of Common Article 3 would be a serious breach of our international legal obligations and would likely be viewed by all other nations as a material breach of the Geneva Conventions as a whole. As such, the courts certainly could find it highly suspect, and indeed might overturn the law, particularly if there was any doubt about whether Congress intended to put the United States in breach of its international legal obligations.

Ms. Newell Bierman. When the United States affirmed and ratified the Geneva Conventions in 1949, it committed to applying the humane treatment and fair justice requirements of Common Article 3. Common Article 3 is part of customary international law. Kunarc (Appeals Chamber) June 12, 2002, para. 68. The legislative authorization of military commissions that fail to meet the fair justice requirements of Common Article 3 would put the United States out of compliance with its treaty obligations and would be illegal under a set of core customary international law norms.

Mr. Fidell. We agree that Congress could restrict the application of Common Article 3, but doing so would constitute a de facto repudiation of the Geneva Conventions, which would be wrong and seriously endanger United States personnel abroad. We defer to Professor Silliman as to whether the Supreme Court would sustain legislation that restricted the application of Common Article 3, especially if Congress's intent to do so was unmistakable.

Mr. Mernin. With respect to whether the Supreme Court would sustain such a legislative maneuver, the Court could well find that any material departure from the Common Article 3 treatment standards impermissibly violated the law of armed conflict. The Court stated: ``Common Article 3 then, is applicable here and, as indicated above, requires that Hamdan be tried by a `regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples'.'' Although legislation which attempted to restrict the application of Common Article 3 would be possible, any step which sought to roll back the explicit guarantees of Geneva, on the heels of the Hamdan decision and in the context of the message the DTA sought to convey, would constitute an ill-advised effort to circumvent the U.S. military's experience-driven policy and practice. In this and future conflicts, our troops are the ones most at

A104

risk of capture, and our detainee policies have always been premised, in significant part, on the encouragement of reciprocity in the treatment of our captured troops. We should never take steps which heighten the risk of maltreatment of our troops without any demonstrable benefit.

Dr. Carafano. If Congress chose to do so, the Court ought to uphold its action. The only consequence might be that our treaty partners argue we are not in compliance with our treaty obligations.

Mr. Katyal. As a matter of domestic law alone, Congress has the power to pass such a law--though at great political cost, with severe legal consequences. Nevertheless, such legislation would violate international law that binds the United States. Any limit on the application of Common Article 3 would be a material breach of one of the United States' most important and longstanding treaty obligations. As I discussed in my testimony at page 16, Common Article 3 is considered a ``Convention in miniature'' because of the fundamental principles it embodies. Violating it would be considered a material breach of the Geneva Conventions as a whole. Moreover, as I mentioned above, the 1949 Geneva Conventions codify existing customary international law. Any statute that permits the violation of Common Article 3 would be illegal under this set of core international legal norms.

Mr. Schlueter. The Supreme Court's general view is that in interpreting treaties and Federal legislation, the last in time will prevail--if there are any conflicts. Thus, if Congress were to enact legislation covering some of the same topics already covered in Common Article 3, Congress's last word on the topic would normally prevail. So it does not strike me that such legislation would necessarily be constitutionally suspect, or that even if it were, a majority of the court would strike down the Federal legislation.

15. Senator McCain. Ms. Massimino, Ms. Newell Bierman, Mr. Fidell, Mr. Mernin, Dr. Carafano, Mr. Katyal, and Mr. Schlueter, could you also give a more detailed explanation of how such legislation would create more litigation and legal uncertainty?

Ms. Massimino. Legislation that purports to restrict or redefine our obligations under Common Article 3 would certainly be challenged in the courts. To the extent that Congress establishes military commissions that infringe on the basic principles of fair justice described by the Supreme Court in Hamdan or authorizes conduct that would violate the Geneva Conventions, such challenges would have merit. In addition to legal challenges, however, legislation limiting the scope and meaning of Common Article 3 would create legal uncertainty, undermining the Pentagon's new rules on detainee treatment (which are grounded on the military's understanding of Common Article 3).

Ms. Newell Bierman. The President authorized the use of military commissions in March 2002. For the past 4 years, the military commissions--rather than accused terrorists--have been on trial, and appropriately so. In Hamdan, the Supreme Court laid out basic principles of fair justice, none of which are reflected in the military commission rules: the tribunal must be fair and impartial; the accused has the right to be present at trial and provided all of the evidence presented to the factfinder; the accused cannot be convicted on the basis of unreliable evidence that he has not been able to confront, such as evidence obtained through torture; and the accused is entitled to an independent appeal of any finding of guilt. If Congress were to authorize commissions that violated these basic fair trial standards, it would undoubtedly lead to another round of litigation, thus delaying even longer the time when the United States holds accountable those who have committed war crimes.

Mr. Fidell. Because the Supreme Court has not sought to answer questions not directly presented to it, in either Hamdan or Hamdi, a measure of uncertainty and additional litigation is inevitable. It might indeed have been preferable for the Court to have gone further in both of these decisions in providing a roadmap for Congress and the

executive branch. However, the Court's reluctance to do so is consonant with its essentially conservative view of the judicial function in a democracy. Accordingly, additional litigation (and uncertainty until the litigation comes to an end) is inevitable. NIMJ does not agree that the prospect of additional litigation is in itself a reason for or against legislation. So long as our Nation adheres to its commitment to the rule of law and our civilian courts are open, Congress must assume that efforts will be made to seek judicial review of claims that constitutional and other rights have been violated. It is to be hoped that the Federal courts would address such claims on an expedited basis, but if fear of litigation were permitted to trump important rights and access to the courts, it would be a sad day for our country. Moreover, the Supreme Court has long made clear that executive branch action is most likely to be sustained when it is clearly supported by congressional action. Legislation clarifying what the President can and cannot do may produce litigation, but actions of the President that find support in congressional legislation are most likely to be sustained.

Mr. Mernin. After Hamdan, any legislative response which restricts the application of Common Article 3 will invite further detainee litigation by detainees. First, whether Congress even has the ability to change the substantive law of war as to current detainees would be placed in issue. Second, the substantive arguments as to whether the newly legislated procedures satisfied our treaty obligations and constitutional standards, as set forth by the Hamdan court, would be at issue. Departing from the Common Article 3 standards would place an enormous burden on those we call upon to implement these policies, who would be compelled to maneuver in the grey area between the known Common Article 3 standards and the new legislative standards. Damage to the well-earned respect for the U.S. military legal system would be the worst result.

Dr. Carafano. There are many lawyers looking for ways to defend their clients and/or cause trouble for the administration. Congress should not concern itself if there is more litigation (there will be), but only if such future litigation has merit.

Mr. Katyal. If Congress were to authorize practices that violate international and domestic standards, it would run the risk of having the legislation invalidated. Those detained or interrogated by the United States would be able to raise legal claims based, first, on the violation of international law, and second, on the basis of American constitutional protections, whose violation might be inferred from the abandonment of these long-held standards for the treatment of prisoners. For example, imagine that Congress wrote a statute that said that the UCMJ does not incorporate Common Article 3, and therefore allows trials without the presence of the defendant or his counsel. We would see another round of litigation challenging, first, the denial of trial rights as a matter of our treaty obligations with or without an implementing statute; second, the legality of a statute that implicitly repealed the treaty obligation; and third, the constitutionality of the statute under the 5th amendment and other protections. Additionally, we could expect to see litigation in international tribunals and wrangling in the U.N. against the United States for rescinding a fundamental treaty obligation.

Mr. Schlueter. If, as noted in the answer to question 14, above, Congress decided to enact legislation covering the same topics as those covered in Common Article 3, I cannot agree that it would necessarily generate any litigation that would not otherwise be generated by those arguing that a violation has occurred under Common Article 3. Even then, only persons with standing, to allege violations of such legislation would be able to initiate such litigation.

16. Senator McCain. Ms. Massimino, Ms. Newell Bierman, Mr. Fidell, Mr. Mernin, Dr. Carafano, Mr. Katyal, Mr. Schlueter, and Mr. Silliman, in his prepared testimony, Mr. Schlueter states that ``it is appropriate for Congress to map out only broad policy guidelines for

implementing military commissions, and leave to the President and the DOD the task of more specifically setting out the procedures and rules to be used.'' Mr. Fidell from the NIMJ seems to agree with that approach. Could the panel address why Congress should set specifically the procedures and rules to be used for military commissions?

Ms. Massimino. As stated in my testimony, before it launches into deliberations about which procedures should govern in military commissions, Congress should satisfy itself that commissions of any kind--as opposed to regular courts martial--are necessary to try those suspected of war crimes. But if it concludes that the courts martial system is insufficient, Congress should be extremely skeptical of proposals that would delegate the task of setting procedures and rules exclusively to the executive branch. While there is nothing inherently wrong with Congress setting broad policy guidelines and delegating the authority to set detailed rules to the executive branch, in this instance such delegation would be unwise. The administration has twice set rules and procedures for military commission that have failed to satisfy basic fair trial standards. The proposal it has now asks Congress to approve is similarly deficient. We see in the administration's current legislative proposal what kinds of rules it would likely establish under such delegated authority: an accused would be denied the right to be present at trial and provided all of the evidence that was obtained by unlawful coercion. A trial system operating under such rules would likely not survive judicial scrutiny and would likely be viewed as illegitimate by the rest of the world.

Ms. Newell Bierman. There is nothing inherently wrong with legislation that sets policy guidelines and delegates decisionmaking regarding precise rules and procedures. But any delegation should be made to an independent body of experts, such as the current and former ranking JAGs, with the experience required to design rules that are both fair and lawful--and not to the President and DOD. The President and DOD have already proven far too willing to do away with basic fair trial standards to be entrusted with the responsibility of crafting commission rules and procedures. Twice, the administration crafted rules and procedures to govern military commissions--first in March 2002, and then again in August 2005. Neither system withstood Supreme Court scrutiny. Now, rather than adapting in response to the Supreme Court decision, the administration has circulated a draft proposal that incorporates many of the same deficiencies of the earlier systems that were identified by the Supreme Court. At this point, the administration should not be entrusted with the task of designing a system that is sufficiently fair to pass judicial scrutiny.

Mr. Fidell. The overall design of the UCMJ has long been for many details that might otherwise be enacted by Congress to be decided upon by the President instead. It would certainly be odd for Congress to go into more detail on procedures for trials of enemy combatants than it has for trials of our own personnel. As indicated in our prepared testimony and during the July 19, 2006 hearing, NIMJ believes that the President should have the power to depart, for military commissions, from a default model of general court-martial procedures, subject to substantial protections such as particularized statements of impracticability, reporting requirements, and meaningful judicial review. However, in light of the strong evidence of intransigence on the part of the executive branch in the weeks since the Supreme Court decided Hamdan, including claims of impracticability that are entirely lacking in substance, we have concluded that Congress should place some aspects of military commission procedure beyond the President's power-- i e , in those respects he should not be permitted to depart from general court-martial procedures based on a claim of impracticability. We are developing a further revision of our proposal to reflect this.

Mr. Mernin. The Association believes the suggestion that broad deference to the executive would now result in a satisfactory system is not supported by the public record. We applaud NIMJ's efforts and continue to study its revised proposal which uses as its starting point the UCMJ. The administration reportedly received and disregarded, or

A107

failed to credit, significant input as to methods to better structure the commissions. Accounts suggest that the experience and input of senior JAG officers was largely ignored in the commission rulemaking process. One would hope that the executive would now seek to establish commissions which satisfied the goals of security, credibility, and fairness. However, the evidence suggests that circumventing, rather than addressing, the substantive issues raised by the Hamdan decision may underlie the administration's efforts to respond.

Mr. Carafano. It should not do so; nor should it attempt to micromanage other aspects of military intelligence and prosecution of the war.

Mr. Katyal. As Justice Kennedy's concurrence reiterates, the President's actions are granted the highest degree of deference when they are consistent with, and authorized by, Congress. Giving the executive branch largely unfettered discretion in the fashioning of a new system creates a high risk that the President's actions will create procedures and standards far below what treaties require, what the Constitution requires, and what our existing laws require. Hamdan makes clear that a vague grant of authority, for example, the AUMF, which could theoretically authorize all sorts of executive actions, does not necessarily immunize all actions taken, allegedly, pursuant to it. Congressional authority insulates the President's actions from review only when it is specific, thoughtful, and the product of clear deliberation about the proper separation of power between the branches. If Congress were only to set out policy guidelines that are overbroad to the point of being meaningless, it would abdicate a critical role it plays in guaranteeing compliance with the Constitution and other laws. Moreover, Congress is fully capable of designing a fair, effective, and legal system for trying detainees on its own without deferring to the executive branch.

Indeed, the executive branch cannot be relied upon to craft an adequate military commission system on its own. The executive branch has already attempted to design and implement two military commission systems--the one adopted by Military Commission Order No. 1 of March 21, 2002, and the system of August 31, 2005. Neither withstood Supreme Court scrutiny. Despite the failings of the administration's commissions, executive branch officials initially asked Congress to simply ratify the August 31, 2005, commission system. The administration has since circulated a draft bill that is radically deficient in providing the necessary procedural protections to create a fair and reliable commission system. The administration's track record suggests that it is unwilling or unable to produce a commission system that would have the necessary fairness to produce reliable findings entitled to domestic and international legitimacy. Congress unquestionably has the constitutional authority to design any military commission system and should exercise such authority. Please also see my answer to question 18 below.

Mr. Schlueter. As noted in the question, in my view Congress should leave to the executive branch the task of drafting specific rules and procedures. That is the model that has been used for decades in dealing with military justice issues and is appropriate for any procedural issues dealing with military commissions. The reason for that approach is that both Congress and the Supreme Court have recognized that in the area of military criminal justice procedures, the executive possesses the necessary expertise to draft those rules. A similar approach is used to draft the rules of procedure for Federal courts. That is, under the Rules Enabling Act, the judicial branch is charged with promulgating drafts of amendments to the Federal rules; those rules are transmitted to the Supreme Court, which approves them and forwards them to Congress. Absent any action by Congress, the amendments become effective on December 1 of the year the Supreme Court approved them.

Given the controversial nature of any proposed rules for military commissions, a compromise might be to require that the executive report any such rules to Congress, which is charged under the Constitution with general oversight in this area.

5/9/2017                    - MILITARY COMMISSIONS IN LIGHT OF THE SUPREME COURT DECISION IN HAMDAN V. RUMSFELD

Mr. Silliman. I totally agree with the approach suggested by Mr. Schlueter and Mr. Fidell, and join them in recommending that Congress leave to the executive branch the crafting of the detailed rules of procedure for military commissions, rather than trying to legislate them. I believe that the case law supports the premise that the President, when acting as Commander in Chief, has the constitutional authority to establish military commissions as long as he stays within congressional constraints. The Supreme Court in Hamdan v. Rumsfeld implicitly reaffirmed this view. Further, those most knowledgeable of how to draw the balance between prosecuting terrorists and safeguarding national security interests are the practitioners of military law-- Active-Duty JAGs--who are in the executive branch. Therefore, Congress should legislate only where necessary; for example, where a provision of the UCMJ must be amended, and leave to the executive branch the discretion to establish more detailed rules and procedures in an executive order, such as the Manual for Courts-Martial.

17. Senator McCain. Ms. Massimino, Ms. Newell Bierman, Mr. Fidell, Dr. Carafano, Mr. Katyal, Mr. Schlueter, and Mr. Silliman, could each of you comment on Mr. Mernin's recommendation that Congress pass legislation appointing an expert panel with the mandate of advising Congress about the best way to establish a military commission system that would respond to the Supreme Court's decision in Hamdan?

Ms. Massimino. This is an interesting proposal. A body of experts-- perhaps comprised of former JAGs--who remain independent from the executive branch yet experienced in national security and military commissions would be well-suited to assess the various models and test the contentions made by the administration about the necessity for depriving detainees of certain fundamental procedural protections contained in the UCMJ and Manual for Courts Martial. Also, it is more likely that a design proposed by an independent panel of experts would be acceptable to the American public and deemed legitimate by the international community.

Ms. Newell Bierman. The process of creating a fair system of justice is complex and confusing, with interacting rules and procedures, and requires great care. The creation of an independent and expert panel to advise Congress is an excellent idea that would give any commissions established by Congress greater legitimacy. A body of experts would be able to dispel the myth that the UCMJ and Manual for Court Martial do not provide a workable system of justice to try those accused of war crimes.

Mr. Fidell. Expert panels such as those the New York City Bar Association have proposed can often play a useful role, but we believe such a panel in the present context would only put off some of the tough decisions Congress is going to have to make in the end anyway. The hearings Congress has already held have included many of the individuals and groups that would be involved in an expert panel. For these reasons, and given the indefensible delay that has already occurred since the first detainees arrived at Guantanamo Bay, we recommend against an expert panel.

Dr. Carafano. The executive and Congress have access to the expertise they need. To appoint a commission and wait for their findings would unnecessarily delay the effort to provide speedy due process.

Mr. Katyal. This is an extremely important and good idea--whether along the lines of Mr. Mernin's proposal or that of Senator Levin, who has advocated a Code Committee review under the UCMJ provision. An expert panel would be helpful for studying the problems involved in trying detainees by military commission and developing useful empirical evidence about the effectiveness and security of the different models available. Indeed, an expert panel would go a long way towards ending the myth making and posturing that has dominated this process from the start. The administration has offered no empirical evidence, for example, that courts-martial fail to protect both the government's interests and the constitutional and human rights of the defendants.

A109

Moreover, the administration's arguments that the hearsay and chain-of-custody evidentiary rules are burdensome are vastly overstated. See my testimony at pages 7-11. Given the tremendous delays in getting military commissions off the ground thus far, devoting time and research to designing a viable commission system will cause no cognizable injury to our national security. There have been no military commissions in the past half-century, let alone since September 11, and, as the chairman eloquently pointed out, the eyes of the world are watching us. Getting it wrong again is simply too dangerous. That bell cannot be unrung.

Mr. Schlueter. I do not agree with the underlying recommendation that an expert panel be created in order to address the issue of rules of procedure for military commissions. That would simply bog Congress down in political debates about what rules should or should not be adopted. As I note in my answer to question 17, above, the task of drafting the rules should be left to the executive.

Mr. Silliman. As I mentioned in my testimony, I believe the body of experts best suited to making such recommendations regarding military commissions are the Active-Duty JAGs, and they can easily and quickly be brought together for this purpose. That would not require legislation, only a willingness on the part of the executive department to convene such a ``grass roots'' panel and to share its findings openly with Congress so as to facilitate active and sincere joint participation in responding to the Court's decision.

attorney general gonzales's testimony on hamdan

18. Senator McCain. Ms. Massimino, Ms. Newell Bierman, Mr. Fidell, Mr. Mernin, Dr. Carafano, Mr. Katyal, Mr. Schlueter, and Mr. Silliman, in testimony before the Senate Judiciary Committee, Attorney General Gonzales stated that the existing military commissions that were struck down by Hamdan take into account the ``situational difficulties'' of the war on terrorism and ``thus provide a useful basis for Congress's consideration of modified procedures.'' Do you agree with the suggestion that the commissions should be the starting point for legislation?

Ms. Massimino. No. the military commissions struck down by the Supreme Court were so inherently flawed that they should be set aside in their entirety. Congress should start fresh in its consideration of whether military commissions are necessary, and, if it finds they are, what limited deviations from the courts-martial system are needed. There is no reason for Congress to take as the framework for its deliberations a system which completely failed to meet basic fair trial standards. Military commission prosecutors themselves have remarked that the military commissions were incapable of delivering a fair trial. As the Supreme Court found, they deprived defendants of the most basic rights, including the right of an accused to be present at trial and provided all of the evidence presented to the factfinder, and the right of the accused not to be convicted on the basis of unreliable evidence that was obtained through unlawful coercion. Furthermore, the military commissions system has been outperformed by the Federal court system. The Federal courts have prosecuted 261 terrorism cases since September 11 while the military commissions have not produced a single conviction. If Congress is looking for a successful model for terrorism prosecutions, perhaps it should also draw on the regular criminal justice system.

Ms. Newell Bierman. No. The commissions that the Attorney General continues to champion have failed to bring a single accused terrorist to justice in their 4 years of operation, even as the DOJ has reported having prosecuted over 260 terrorism cases in Federal court during the same time period. Moreover, the commissions' flaws are both structural and procedural--affecting the entire system--and cannot provide a useful starting point for legislation. Even the military commission's own prosecutors have complained that the commissions were unfair. The Appointing Authority convened the commission, brought the charges,

selected the panel determining guilt or innocence, oversaw the prosecutor and decided dispositive issues of law that arose in the middle of trial. This is the equivalent as the executive acting as judge, prosecutor, and jury. Moreover, as the Supreme Court concluded, the commissions denied the most basic fair trial rights to defendants, including the right to be present and to confront the evidence presented against them.

Mr. Fidell. We do not agree with the Attorney General's suggestion. We have a robust military justice system. It is not perfect--and we would be pleased to discuss with the committee areas in which it could be improved--but it is the obvious starting point, and the burden should be placed squarely on those who contend otherwise. Indeed, the disturbing court-martial cases that have arisen in Iraq and Afghanistan in recent months demonstrate the military justice model's ability to function in the most adverse circumstances and yet earn public confidence. That is more that can be said of the military commissions with which the executive branch has been fumbling for years in the complete safety of the Guantanamo Bay enclave.

Mr. Mernin. No. The existing commission procedures were drafted in a rush, modified without sufficient review, and never actually implemented. No trials resulted from the existing commissions. If there are trials to be conducted--rather than detentions dressed up under the guise of due process--then security, fairness, and our national values demand that a just, clear, and consistent trial system be implemented, without hiding behind facile and conclusory assertions of ``situational difficulties.''

Mr. Carafano. Yes and the ending point. As Justice Thomas stated in his dissent, the President's latitude in military and foreign affairs, especially when sanctioned by Congress in the form of an Authorization to Use Military Force, and in a more specific authorization, if necessary, is at its zenith.

Mr. Katyal. No. The flaws with the existing military commissions-- the flaws which contributed to their dismantling by the Supreme Court-- went to the core of the system itself and reeked of self-serving by the administration. The commissions were plagued by years-long delays in appointing counsel and even in charging the defendants. Further, the commissions denied even the most basic trial rights to defendants, including the right to be present at trial and the right to question and confront the evidence presented against them. Even the military commission's own prosecutors complained that the system was unfair to defendants and designed to guarantee convictions, not fair trials. The Appointing Authority, who convened the commissions and brought the charges, was also responsible for selecting the panel determining guilt or innocence and exerted control over the prosecutor. Domestically, this is the equivalent of a judge initiating the case, picking the charges, directing the prosecution, and selecting the jury. It is unclear where the Attorney General would have Congress ``start'' in this system, because its flaws are embedded within its very structure.

The starting point--and ending point--for any proposed authorizing legislation is the court-martial system established by the UCMJ. For reasons explored in my testimony, the court-martial system has many significant advantages over any system that could be crafted out of the existing commissions. Chief among these advantages is the tremendous respect that has been accorded to the UCMJ since the time that it was written. Countries throughout the world have emulated the U.S. court-martial system, and it continues to be a model of how to achieve justice when sensitive information and special parties are involved. The court-martial system is flexible, secure, and effective. Best of all, it already exists.

Mr. Schlueter. I wholeheartedly agree that the baseline for further consideration of military commission procedures should be the existing rules adopted in November. In promulgating those procedures, the drafters considered a wide range of issues and I believe, got most of it right. The fact that some tweaking is required does not justify rejecting all of the rules.

Mr. Silliman. I do not. The Supreme Court appropriately delineated the many legal deficiencies, both domestic and international, with regard to the President's commission system, and strongly implied that the UCMJ be at the core of any new system established in response to the Court's ruling. That Code, the UCMJ, should be the starting point.

19. Senator McCain. Ms. Massimino, Ms. Newell Bierman, Mr. Fidell, Mr. Mernin, Dr. Carafano, Mr. Katyal, Mr. Schlueter, and Mr. Silliman, why would someone suggest that the commissions and not the UCMJ should be the starting point for legislation?

Ms. Massimino. There is no good reason why someone would make this suggestion. As the Supreme Court made clear, the default system is the UCMJ. Those who advocate deviating from the UCMJ have the burden of demonstrating why it is impracticable to adhere to this system. There are numerous advantages to using the UCMJ as a stating point for legislation. Unlike the military commissions system, the UCMJ has been approved by the Supreme Court. Therefore, its use will not lead to another round of litigation challenging the legality of the system. Also, military judges, prosecutors, and defense counsel are well-versed in the UCMJ's procedures and, consequently, are better prepared to handle prosecutions under this system. As I noted in my testimony, one of the major deficiencies with the military commissions at Guantanamo was the lack of clarity as to what constituted ``commission law.'' The absence of time-tested and court-adjudicated rules and procedures resulted in continual delays, and much less predictability and stability. Moreover, the efficacy of the UCMJ system has been reaffirmed with the recent court-martial cases that arose in Iraq and Afghanistan. These cases, which have required the gathering of evidence from the operational settings, prove that the UCMJ is fully capable of taking into account the ``situational difficulties'' of the war on terrorism.

Ms. Newell Bierman. It is unclear why someone would suggest this. When Senator Graham asked the ranking JAGs of each of the armed services: ``We need to have military commissions as uniformed as possible with the UCMJ, because that's the root source of the law of military commissions. Is that correct?'' (7/13, SASC), all answered ``yes.'' Enacting legislation based on the military commissions--rather than the UCMJ--will undoubtedly lead to a whole new round of litigation. Military commissions rather than suspected terrorists remain on trial. The UCMJ, in contrast, is a tried and true system, approved by the Supreme Court, and created in response to concerns about the inadequacies of military commissions hastily put together during World War II. It provides the appropriate starting point for any congressional legislation.

Mr. Fidell. It is difficult to speculate as to why anyone would choose the wrong starting point, as the executive branch has elected to continue to do. If the reason is a desire to stack the deck and ensure convictions, that would be incompatible with our national values. If the reason is to maximize the power of the so-called unitary executive, the easy answer is that in this area Congress enjoys its own express grant of authority under Article I, § 8 of the Constitution.

Mr. Mernin. Someone acting on behalf of a prosecutor, given carte blanche, might follow an ill-advised tendency to create those procedures most likely to obtain convictions, in the belief that prosecutorial discretion would prevent abuse. That is not a recipe for due process, fairness, or honor.

Dr. Carafano. I do not know, given that it would be extremely unwise. I think it would be inappropriate to use UCMJ.

Mr. Katyal. From the prosecutor's perspective, if Congress gives you the ability to write all the rules for trial and the ability to define the offenses and pick the judges, you are likely to be elated. It's just like appointing the fox to guard the hen house. Trying prisoners captured in the global war on terror no doubt poses unique challenges. For these reasons, the administration tends to argue that it needs a unique court system to try those captured in such unique

86

A112

circumstances. Nevertheless, different circumstances alone do not justify deviating from a set of laws that has been flexible enough to meet the needs of the military during a period where the nature of war, and the nature of the military, have both changed rapidly. The UCMJ is unfamiliar to most civilian lawyers and has its own system of precedent and procedure that government lawyers would themselves have to learn. Of course, it's easy to see why the administration would rather start from scratch and build a system where it has written all the rules and picked the judges. The administration, however, has failed to articulate a compelling explanation for why such a deviation from the existing system is necessary or prudent. Indeed, as the administration has pointed out elsewhere, the DOJ has been remarkably successful in using the existing Article III courts to obtain terrorism convictions-- 261 between September 11, 2001 and June 22, 2006 by its own count.

Mr. Schlueter. As I note in my answer to question 18, the drafters of those rules considered a wide range of issues and had considerable input from both civilian and military sources. Granted, the DOD ultimately rejected some recommendations from the uniformed lawyers but that fact alone does not warrant complete rejection of the rules. Instead, the DOD should be given the option of amending those rules found wanting by the Court in Hamdan, or by explaining why the UCMJ procedures are not applicable to commissions.

Mr. Silliman. I believe the rationale for such a suggestion would be that the UCMJ is an unworkable system for prosecuting terrorists because it contains procedural protections which should not be afforded to those who mock and do not adhere to the rule of law. I do not agree with that rationale because I believe a military commission system under the auspices of the UCMJ is quite workable for such trials and has the added advantage of satisfying judicial muster and having a great measure of international credibility.

20. Senator McCain. Ms. Massimino, Ms. Newell Bierman, Mr. Fidell, Mr. Mernin, Dr. Carafano, Mr. Katyal, Mr. Schlueter, and Mr. Silliman, in testimony before the Senate Judiciary Committee, Attorney General Gonzales stated that ``no one can expect members of our military to read Miranda warnings to terrorists captured on the battlefield, or provide terrorists on the battlefield immediate access to counsel, or maintain a strict chain of custody for evidence. Nor should terrorist trials compromise sources and methods for gathering intelligence, or prohibit the admission of probative hearsay evidence.'' Mr. Gonzales suggests that each of these examples would happen if the UCMJ were used as the basis for detainee trials. Do you agree with Mr. Gonzales's assessment?

Ms. Massimino. No. The administration's concerns reveal a lack of understanding of the flexibility of the court martial system for dealing with these issues. First, in no situation does the UCMJ require combatants captured on the battlefield to be given either Miranda warnings or immediate access to counsel. These rights are only required if the detainees are interrogated for law enforcement purposes, not for intelligence gathering purposes. Second, the UCMJ has a low threshold for the authentication of evidence. Evidence may be authenticated either directly or circumstantially; a rigid chain-of-custody need not be established. Third, the UCMJ has an adequate procedure to address the administration's legitimate concerns about sources and methods; prosecutors can introduce summarized or redacted versions. Fourth, the UCMJ has a wide array of hearsay exceptions which allow the admission of reliable hearsay evidence.

Ms. Newell Bierman. As described in my testimony, these are all red herrings. First, the UCMJ does not require the military to read Miranda warnings or provide counsel to those captured on the battlefield. Under the UCMJ, Miranda warnings and access to counsel are only required when an individual is being interrogated for law enforcement purposes. They are not required when an individual is questioned for interrogation purposes, and certainly are not required to be given when capturing suspected terrorists on the battlefield. Second, the UCMJ and MCM,

A113

which contains the rules of evidence, do not require strict chain of custody for evidence to be introduced at trial. They do, however, require some sort of showing that the evidence is what it is purported to be--a standard that should apply in any trial that is fair. Third, the UCMJ and MCM protect against the disclosure of any evidence that would compromise intelligence gathering and give the government broad latitude to introduce substitute forms of classified evidence to protect intelligence sources and methods. Fourth, the UCMJ and MCM include 24 exceptions to the prohibition against hearsay, including a residual exception designed to allow in statements of any witness who is ``unavailable.'' These rules provide broad latitude to admit hearsay.

    Mr. Fidell. We do not agree with the Attorney General. Military justice jurisprudence already distinguishes between interrogations for law enforcement or disciplinary purposes and those for operational purposes. United States v. Loukas, 29 M.J. 385 (C.M.A. 1990); United States v. Smith, 56 M.J. 653 (A. Ct. Crim. App. 2001) (no warnings required where questions served to execute U.S. Disciplinary Barracks operational and security requirements); United States v. Moses, 45 M.J. 132 (C.A.A.F. 1996) (no warnings required during armed stand-off with suspect). Unwarned statements obtained in operational settings for security, intelligence, or other non-law-enforcement purposes would be admissible in evidence.

    The Attorney General's concern about compromising sources and methods is readily handled under M.R.E. 505.

    The admission of hearsay evidence would raise severe problems under the Confrontation Clause of the Sixth Amendment to the Constitution. Crawford v. Washington, 541 U.S. 36 (2004).

    Chain-of-custody issues have not proven problematic in the normal course of military justice even in cases arising from operational settings. There are, moreover, various alternative ways to authenticate ``real'' (i.e., tangible) evidence without having to rely on chain-of-custody evidence. For example, a seized weapon can be marked by the seizing soldier with a knife.

    Mr. Mernin. No. The Association believes that the Attorney General's examples misrepresent the prosecutorial realities and the UCMJ, and we do not support the extreme departure from fundamental guarantees of fairness which the administration endorses. With respect to the notion of Miranda warnings in the battlefield, there would be no such requirement. The military law version of Miranda warnings provided by Article 31(b) of the UCMJ are applicable only with respect to law enforcement interrogations. Similarly, we have no understanding that any right to counsel ever attaches on the battlefield. The UCMJ already provides for a variety of alternate methods of authentication of evidence, taking into account the same sorts of evidentiary issues to which the Attorney General alluded. In sum, the texts of the UCMJ and the Manual for Courts Martial dispel the Attorney General's assertions and contain necessary safeguards and exceptions to permit effective prosecution, providing necessary latitude to prosecutors while guaranteeing fundamental fairness.

    Mr. Carafano. Yes. The UCMJ is a traditional legal system that puts the protection of the right of the individual foremost, and then adds accommodations for national security and military necessity. That system is appropriate for U.S. citizen-soldiers who may err. Such a system is not appropriate for unlawful, enemy combatants who want to destroy us in the long war in which we are engaged. For example, Article 31(b) of the UCMJ requires informing servicemen suspected of a crime of their Miranda rights.

    Mr. Katyal. My testimony goes at length into each of these issues at pp. 8-10. To summarize:
Miranda Warnings
    Article 31(b) of the UCMJ does contain a Miranda-like requirement. But our Nation's highest military court has held that an interrogation for purposes of intelligence gathering was not subject to this requirement, and that evidence obtained without a 31(b) warning can be

A114

admitted into a court-martial proceeding. See United States v.
Lonetree, 35 M.J. 396 (C.M.A. 1992). Military appellate courts have
repeatedly held that Article 31(b) warnings are required only for ``a
law-enforcement or disciplinary investigation.'' See, e.g., United
States v. Loukas, 29 M.J. 385, 387 (C.M.A. 1990). The notion that
soldiers in the field would be required to give Article 31(b) warnings
to potential enemy combatants whom they encounter or detain is simply
not true.
Counsel
    I know of no responsible scholar or lawyer who seriously contends
that existing law requires ``provid[ing] terrorists on the battlefield
immediate access to counsel.'' Come to think of it, I do not know any
irresponsible ones who seriously advocate this position either.
Chain of Custody
    Military Rules of Evidence 901-903 deal with the admission of
documents--and these rules make introduction of evidence easy, not
difficult. The proponent of evidence can use various methods to
authenticate it and is not tied to any rigid step-by-step
authentication techniques. Stephen A. Saltzburg et al., Military Rules
of Evidence Manual 9-4 (5th ed. 2003). Military Rule of Evidence 901
requires only a showing of authenticity through either direct or
circumstantial evidence. Id. Under the identical Federal Rule 901(a),
``[t]here is no single way to authenticate evidence. In particular, the
direct testimony of a custodian or a percipient witness is not a sine
qua non to the authentication of a writing. Thus, a document's
appearance, contents, substance, internal patterns, or other
distinctive characteristics, taken in conjunction with circumstances,
can, in cumulation, even without direct testimony, provide sufficient
indicia of reliability to permit a finding that it is authentic.''
United States v. Holmquist, 36 F.3d 154, 167 (1st Cir. 1994) (citations
and internal quotation marks omitted), cert. denied, 514 U.S. 1084
(1995). Additionally, ``[m]ere breaks or gaps in the chain [of custody]
affect only the weight of the evidence, and not its admissibility.''
Saltzburg, supra, at 8-9; see also United States v. Hudson, 20M.J. 607
(A.F.C.M.R. 1985).
Hearsay
    The 800 series of the Military Rules of Evidence generally track
the Federal Rules of Evidence, though the military's business records
exception is far broader than the civilian rule, expressly allowing the
admission of such records as ``forensic laboratory reports'' and
``chain of custody documents.'' The hearsay rules, including the
residual hearsay exception in Military Rule of Evidence 807, are
actually quite flexible. They are designed to promote accuracy by
allowing in forms of hearsay that are reliable and excluding forms of
hearsay that are unreliable. These rules should be embraced, not
feared.
    Mr. Schlueter. He is correct, if one were to take the rules
governing courts-martial and apply them, without limitation, to
military commissions.
    Mr. Silliman. No, I do not. We must be careful to separate issues
regarding military operations from questions of the admissibility of
evidence in a judicial forum. For example, most of the individuals
captured in Afghanistan or Iraq, and thereafter detained at Guantanamo
Bay and elsewhere, are being held because they were determined to be
unlawful combatants, a status which denies them protection as prisoners
of war under the Third Geneva Convention. Simply being an unlawful
combatant is not, in and of itself, a violation of the law of war.
Violating the law of war requires some overt act contrary to that body
of law which was committed within the context of a recognized armed
conflict. Thus, with regard to the Article 31(b) requirement for an
advice of rights upon suspicion of an offense, that would seldom be
required upon initial capture. Further, that requirement has been
interpreted in military courts as applying only to those acting in an
official capacity (e.g. commanders, law enforcement personnel, CID,
etc.), rather than just anyone who might suspect that an offense was

A115

committed. Also, choices often have to be made as to whether it is more important to detain an individual for purposes of acquiring needed intelligence (where one does not worry about evidentiary standards and advice of rights because there is no intent to go to trial) or whether it is clear from the beginning that there will be a prosecution and that any statements taken must necessarily be under circumstances which comply with Article 31 so that they can be used against the accused. Since perhaps up to 95 percent of those we have detained at Guantanamo Bay will never be prosecuted, and they have been held solely for intelligence purposes, invoking Article 31(b) as a ``major problem,'' in my opinion, merely confuses the issue.

    As to chain of custody considerations, there have been many cases where members of our Armed Forces have been prosecuted by court-martial for crimes committed on or near the battlefield, and chain of custody issues have neither precluded sending the case to trial or, where the weight of the evidence supports it, a conviction. Even if there are breaks in the chain of custody of a piece of evidence to be offered at trial, those breaks only affect the weight of the evidence, not its admissibility.

    Finally, with regard to safeguarding classified information during trial proceedings or dealing with the admissibility of what some may consider less reliable evidence, such as hearsay, these ``problems'' are easily solved within a military commissions system under the UCMJ by making minor exceptions from regular court-martial procedures.

                    specific trial procedures

    21. Senator McCain. Ms. Massimino, Ms. Newell Bierman, Mr. Fidell, Mr. Mernin, Dr. Carafano, Mr. Katyal, Mr. Schlueter, and Mr. Silliman, in testimony last week before the Senate Judiciary Committee, Steven Bradbury from the DOJ stated that ``a good example to look to for an acceptable hearsay rule is the international criminal tribunals, for example, for the former Yugoslavia and for Rwanda, which regularly allow the use of hearsay evidence, as long as the evidence is probative and reliable in the determination of the factfinder, and as long as it is not outweighed by undue prejudice.'' Do you believe that this is an acceptable hearsay rule?

    Ms. Massimino. Mr. Bradbury did not accurately describe the hearsay rule adopted by the ICTY and ICTR in this statement. Rule 92 bis allows the admission of hearsay evidence only for nonmaterial facts. Unlike the hearsay rule proposed by the administration, the ICTY and ICTR do not allow admission of hearsay evidence that goes to prove a material fact. Furthermore, the ICTY and ICTR mandate that judges, individuals with legal training, decide whether hearsay evidence should be admitted. Conversely, the military commissions would empower individuals who lack legal training to make these often complex and nuanced decisions on hearsay evidence. Thus, the disparity in legal knowledge between the international judges and the military commissions' jurors makes the admission of hearsay--for the limited purpose of establishing nonmaterial facts--appropriate for the ICTY and ICTR but not for the military commissions.

    Ms. Newell Bierman. As explained in my testimony, on page 11, these rules cannot be considered in isolation. While the international tribunals allow the factfinder to admit any relevant evidence that he or she deems to have probative value, other rules protect against the use of unreliable evidence and the introduction of statements obtained through torture or coercion. Importantly, both the ICTY and ICTR contain an additional important protection, Rule 92 bis, which ensures that hearsay evidence can only be used as corroborating evidence, and cannot be used to establish the central facts of the case--acts or conduct of the accused that go to proof of the wrongdoing charged. Moreover, the ICC and ICTY both contain clear prohibitions on evidence that is obtained by a violation of internationally recognized human rights norms, such as a prohibition against evidence obtained through torture. These international tribunals are made up of legally trained

judges who have experience making fine distinctions on the reliability and value of different forms of evidence that a jury or even a panel of non-lawyer officers simply won't have.

In sum, the ICTY and ICTR hearsay rule would not be acceptable unless accompanied by other critical protections, including, at a minimum, a prohibition against evidence obtained through torture and cruel, inhuman, and degrading treatment; a prohibition on the use of hearsay evidence to establish the central facts of the case; and a meaningful opportunity to challenge a statement's reliability.

Mr. Fidell. Mr. Bradbury's assertion is misleading. Rule 92 bis (Proof of Facts other than by Oral Evidence) of the International Criminal Tribunals for the Former Yugoslavia and Rwanda limits the use of hearsay evidence to a statement ``which goes to proof of a matter other than the acts and conduct of the accused as charged in the indictment.''

Mr. Mernin. Mr. Bradbury's shorthand reference apparently seeks to raise the inference that hearsay was regularly used to prove a case against an accused in the cited international criminal tribunals. We understand him to refer, in particular, to the permitted use of written statements in lieu of live testimony. The suggestion is misleading. Rule 92 bis (bis is used for ``(a)'' or ``A'' in the text's numbering protocol) permits the introduction of written witness statements in certain circumstances, in lieu of live testimony. However, if such a statement concerns the acts or conduct of the accused, the witness is to be made available for live testimony; thus, the written statement alone is never admitted as evidence in chief. Moreover, it is always dangerous and difficult to cherry-pick rules from one set of procedures and attempt to overlay them onto another system. The issues raised are complex. If the committee desires, the Association would be able to make an expert on rules of evidence in the international criminal tribunals available for consultation.

Dr. Carafano. Yes, but it might be more generous than necessary, depending on how it is interpreted.

Mr. Katyal. As my testimony explains at pages 7-11, this is actually not an accurate statement of the hearsay rules used in the international criminal tribunals. Those who would rely on ICTY/ICTR evidence rules would do well to consider that the factfinders in those tribunals are all legally-trained individuals and judges who are used to certain standards of evidence, and know how to discount evidence that does not meet traditional indicia of reliability. The military commission, by contrast, consists of untrained, lay factfinders, all of whom may have differing assumptions about such matters. Rules of evidence are drafted, in part, to guide lay ``jurors'' and avoid evidence that might be inflammatory or probative in the minds of the untrained. In short, the hearsay standard adopted by the international criminal tribunals is acceptable for that court system, but not for military commissions to try detainees. As I understand it, the ICTY/ICTR can't adjudge death, whereas a military commission can, so there is reason to be even more cautious with respect to evidentiary rules for commissions than for international tribunals. Please also see my answer to question 22, below.

Mr. Schlueter. Although I am not familiar with the specific hearsay rules applied by the international criminal tribunals, that rule makes perfect sense. In our jurisprudence, we place a great deal of emphasis on the heasay rule, often citing English common law. However, in many countries, including England, the hearsay rule is essentially a requirement that the out of court statements be trustworthy, and relevant; the rule in those countries does not seem to carry the weight that we ascribe to it.

Mr. Silliman. I do not think it is readily adaptable to a military commission system. The more flexible hearsay rules under the ICTY or ICTR are part of an integral evidentiary system which has other safeguards to guarantee authenticity. Therefore, we must be exceedingly cautious in simply borrowing, out of context, an evidentiary rule from an international tribunal.

22. Senator McCain. Ms. Massimino, Ms. Newell Bierman, Mr. Fidell,
Mr. Mernin, Dr. Carafano, Mr. Katyal, Mr. Schlueter, and Mr. Silliman,
is this how the hearsay rule used by the international criminal
tribunals works?

Ms. Massimino. See answer to question 21.

Ms. Newell Bierman. See answer to question 21.

Mr. Fidell. Please see our response to question 21. Hearsay that
would otherwise be inadmissible under Crawford v. Washington, 541 U.S.
36 (2004), is admissible in the ICTY and ICTR only on matters other
than the accused's own acts and conduct. See Prosecutor v. Galic, No.
IT-98-29-AR73.2, at 1 (ICTY June 7, 2002) (ICTY Jud. Supp. No. 34).

Mr. Mernin. No. See response to question 21. In addition, while the
rules for admission of hearsay evidence are broader under the
international criminal tribunals, we understand that, for example, in
the Milosevic trial, the defense was provided access to every adverse
witness for cross-examination, whether that witness' initial testimony
offered was written or oral.

Dr. Carafano. I don't know.

Mr. Katyal. No. As I understand it, Assistant Attorney General
Bradbury did not mention that the rules of both ICTY and ICTR include
an important and major restriction to the rule allowing hearsay--to the
point of making a comparison virtually irrelevant for the current
military commissions debate. Under Rule 92 bis of both ICTY and ICTR
rules, the trial chamber may choose to admit ``a written statement in
lieu of oral testimony'' unless such a statement would prove ``acts and
conduct of the accused as charged in the indictment.'' The trial
chamber trying Slobodan Milosevic emphasized that ``regardless of how
repetitive [written statement] evidence is, it cannot be admitted if it
goes directly to the acts or conduct of the accused.'' Prosecutor v.
Milosevic, ICTY Case No. IT-02-54, P 8 (Mar. 21, 2002). If the
administration seriously wants to play by ICTY/ICTR rules, it should
play by all of them, and not hand pick a few divorced from context to
suit its purposes.

Mr. Schlueter. As I note in question 21, I am not familiar with the
specific hearsay rule applications in international criminal tribunals.

Mr. Silliman. The ``trier of fact'' in an international criminal
tribunal is a trial judge (rather than a panel of ``lay'' officers) who
is well-versed in the fine points of the law regarding the
admissibility of evidence. He or she therefore has sufficient legal
training so as to be able, in deliberating guilt or innocence, to give
the appropriate weight to evidence which, although it may be deemed
technically admissible under the more flexible rule, is nonetheless far
from reliable.

23. Senator McCain. Ms. Massimino, Ms. Newell Bierman, Mr. Fidell,
Mr. Mernin, Dr. Carafano, Mr. Katyal, Mr. Schlueter, and Mr. Silliman,
does the UCMJ and specifically Military Rule of Evidence 501,
adequately protect classified evidence? If not, what do we need to do
to enhance the protection of classified information in detainee trials?

Ms. Massimino. Military Rule of Evidence 505 adequately protects
classified evidence. Classified information whose disclosure is harmful
to national security can be presented in alternative forms, including a
redacted version or a summary of the information. This rule, which is
highly regarded by military judges, prosecutors, and defense counsel,
strikes an appropriate balance between the government's interest in
protecting against disclosure of information that is damaging to our
national security and the right of an accused to know and confront the
evidence used against him.

Ms. Newell Bierman. Yes. There is widespread agreement among
experienced practitioners, JAGs, and academics that the Military Rules
of Evidence provide strong protections against the disclosure of
classified evidence. If disclosure of classified evidence would harm
national security, the government is entitled to submit a wide array of
substitute forms of the same information, including a redacted version

of the classified information, a summary of the information, or even a summary of the facts that the evidence would tend to prove. The rules ensure that no classified evidence is provided to the accused if its disclosure would in any way harm national security.

Mr. Fidell. The question should refer to Rule 505, which adequately protects classified information and closely follows the Classified Information Procedures Act of 1980. No special provisions are needed to enhance Rule 505 for military commission cases. ``Graymail'' is much less of a concern in the military commission context than in other criminal cases because the government claims authority to continue to detain military commission accused who are acquitted.

Mr. Mernin. The Military Rules of Evidence, in particular Rule 505, provide adequate procedural safeguards for both prosecution and defense with respect to classified evidence. We have not been persuaded that any other procedure is necessitated, certainly not by conclusory claims of ``situational difficulties.'' The defense should have access to any evidence supporting the charges against the accused which is offered to the court, and civilian defense counsel with security clearances should have access to all evidence admitted against the accused and all potentially exculpatory evidence.

Dr. Carafano. No; we need to allow the President and future presidents to make such rules.

Mr. Katyal. Please see my answer to question 6, supra, and my testimony at p. 11. There is no need to break from these rules without strong empirical evidence demonstrating such a necessity.

Mr. Schlueter. Yes, in my opinion, those rules would adequately protect classified information. If the DOD were to show that they are not, I am sure that those rules could be modified to meet the exigencies of military commissions.

Mr. Silliman. The rules governing introduction of classified information into evidence are found in MREs 505 and 506 which basically mirror the provisions of the Classified Information Procedures Act. I consider them more than adequate to protect classified information when requested by the accused for use in his defense. As to safeguarding critical classified information to be used by the government in detainee trials on the question of guilt or innocence, while still ensuring some measure of authenticity and at least a minimal level of access by the accused, specific rules could be adopted by amending the MREs in the Manual for Courts-Martial so as to provide for this. Perhaps the use of unclassified summaries specifically approved by the military judge might be one option, but there may be others which could deal with this issue. All this is easily accomplished in a military commission system under the UCMJ by justifying, via Article 36(b) of the Code, the need to deviate from the MRE procedures.

24. Senator McCain. Ms. Massimino, Ms. Newell Bierman, Mr. Fidell, Mr. Mernin, Dr. Carafano, Mr. Katyal, Mr. Schlueter, and Mr. Silliman, in testimony before the Senate Judiciary Committee and the Senate Armed Services Committee last week, much was made of the potential problems posed by Article 31(b) of the UCMJ--which essentially sets up the military's Miranda rights--in the context of detainee trials. Is it the case that this article ties our hands with respect to intelligence gathering?

Ms. Massimino. No. See answer to question 20. The UCMJ does not require Miranda warnings when the interrogation is carried out for intelligence gathering purposes. They are only required for interrogations with law enforcement purposes.

Ms Newell Bierman No As stated in my testimony on pages 11 13 and in answer to question 20, Miranda warnings are not required when a detainee is being interrogated for intelligence purposes. They are only required when someone is being interrogated for law enforcement purposes. The claims that Article 31(b) would impose an obligation on troops to give Miranda warnings before they capture and question suspected terrorists on the battlefield is a straw man, put forth to mislead and confuse the committee.

A119

Mr. Fidell. No. Please refer to our response to question 20.

Mr. Mernin. No. See response to question 20.

Dr. Carafano. Yes, among other problems.

Mr. Katyal. Please see my answer to question 20, supra, as well as my testimony at pp. 8-9.

Mr. Schlueter. Yes, a requirement that military interrogators (or civilian employees working for the military) would have to give rights-warnings is not a frivolous concern or smoke screen. Under Article 31(b), all suspects being questioned must be advised of the offense, of the right to remain silent, and the fact that their statements may be used against them. Article 31 does not contain a counsel-rights component. But military case law and Military Rule of Evidence 305 also require Miranda-type counsel warnings if the suspect is in custody. More importantly, Military Rule of Evidence 304 contains an exclusionary rule that provides that unwarned statements may be excluded.

If authorities simply wish to gather information, but not introduce the statements into evidence, then arguably they can continue to gather information through interrogation.

Mr. Silliman. No, it does not. As discussed more fully in my answer to a previous question (question 20), the law does not require that every soldier on the battlefield give an Article 31(b) advice of rights warning upon initial capture. If one is simply trying to acquire intelligence, rather than gathering evidence for use in a later trial, then no advice of rights would be necessary.

25. Senator McCain. Ms. Massimino, Ms. Newell Bierman, Mr. Fidell, Mr. Mernin, Dr. Carafano, Mr. Katyal, Mr. Schlueter, and Mr. Silliman, if the military's Miranda rule is truly problematic, how should we fix it?

Ms. Massimino. The UCMJ's Miranda rule is not problematic and thus does not need fixing. Interrogators are not burdened by the Miranda rule since they need not provide detainees with Miranda warnings when interrogating for intelligence purposes. Furthermore, these statements are admissible in court so long as they were not obtained through the use of coercion, unlawful influence, or unlawful inducement.

Ms. Newell Bierman. The UCMJ Miranda rule is not problematic. It ensures that the accused are not coerced into incriminating themselves when being interrogated for law enforcement purposes, while leaving interrogators free to question detainees for intelligence purposes without issuing Miranda warnings. Moreover, any statements that are elicited during intelligence interrogations can still be admissible in court, even if no Miranda warnings have been given.

Mr. Fidell. Article 31 has not been a problem and does not need to be fixed. Any legislation Congress enacts should, however, make clear that the existing suppression rule in Article 31(d) for statements obtained ``through the use of coercion, unlawful influence, or unlawful inducement,'' currently applicable to courts-martial, also applies to military commissions.

Mr. Mernin. The Association does not have any understanding that UCMJ Article 31 is ``problematic'' and needs to be fixed. If it were, it would need to be fixed generally, and not merely with respect to detainees.

Dr. Carafano. Let the President set the rules.

Mr. Katyal. I would only ``fix'' any of the military's existing rules after the empirical evidence has demonstrated that they need fixing. On the other hand, statutory language codifying the case law exempting operational/intelligence questioning from the Article 31(b) rights warning requirement and the exclusionary rule for violating the rights warning requirement would do no harm--it would simplify codify the existing law.

Mr. Schlueter. One way to fix the Miranda issue is to create statutory exception (or in the Military Rules of Evidence, should a decision be made to apply the Rules of Evidence to military commissions) for certain trials or for those cases where it is

determined that the interrogation was for important national security information.

Mr. Silliman. Although I do not view Article 31(b) of the Code as problematic with regard to mere intelligence gathering, if there is concern that it might pose a problem as to gathering evidence for use in a later military commission, then the advice of rights requirement could be a provision which is deemed to be ``impracticable'' in the President's determination under Article 36(b) justifying deviations from normal court-martial procedures.

26. Senator McCain. Ms. Massimino, Ms. Newell Bierman, Mr. Fidell, Mr Mernin, Dr Carafano, Mr Katyal, Mr Schlueter, and Mr Silliman, at the House Armed Services Committee hearing on Hamdan, Mr. Bradbury of the Justice Department's Office of Legal Counsel said the administration wishes to maintain flexibility in introducing evidence coerced from detainees. Specifically, he said, ``We do not use as evidence in military commissions evidence that is determined to have been obtained through torture. But when you talk about coercion and statements obtained through coercive questioning, there's obviously a spectrum, a gradation of what some might consider pressuring or coercion short of torture, and I don't think you can make an absolute rule.'' Is Mr. Bradbury correct in his analysis of coercion and the need to introduce coerced evidence in detainee trials?

Ms. Massimino. He is not. As explained in my testimony on page 8, if there is any lesson we should have learned over the past 4 years, it is that obtaining information through the use of force, coercion, or intimidation, is unnecessary and counter-productive. To enforce legal prohibitions against torture and cruel treatment, we must draw a bright line against the introduction of any evidence obtained through unlawful coercion. Admitting evidence acquired from coercive interrogation is a de facto sanctioning of that coercive conduct and would seriously undermine the prohibitions on torture and other cruel, inhuman, or degrading treatment found in Common Article 3 and the DTA. If we want to uphold these standards, we should not undermine them by admitting into court the fruits of their violations.

Ms. Newell Bierman. As Major General Scott C. Black, JAG of the Army, told the Senate Judiciary Committee: ``I don't believe that a statement that is obtained under coercive, under torture, certainly, and under coercive measures should be admissible.'' (8/2, Senate Hearing). All of the other ranking JAGs agreed. This rule is particularly important given the administration's extremely narrow definition of torture, which does not even include waterboarding (a form of mock drowning). The government's proposed rule would allow the use of evidence obtained through a wide array of cruel and inhuman practices that don't meet the government's definition of torture--use of snarling dogs, naked pyramids of prisoners, prolonged exposure to extremes of heat and cold. Congress would be effectively sanctioning such practices, inviting their continued use. As Senator McCain stated in the August 2, 2006, hearing before this committee: ``I think that if you practice illegal, inhumane treatment and allow that to be admissible in court, that would be a radical departure from any practice [of] this Nation.''

Mr. Fidell. NIMJ sees no basis for distinguishing between courts-martial and military commissions from the standpoint of suppressing evidence obtained through coercion. We believe the Nation would be profoundly offended if one of our GIs or civilian personnel were put on trial elsewhere and evidence obtained through coercion were admissible. We must apply that same standard to ourselves. What constitutes coercion, of course, will have to be decided as a matter of law by the military judge in a military commission.

Where coercion has been applied, the resulting evidence (including fruits) would be inadmissible in a military commission trial, but could still be of value for intelligence purposes. At times, the executive branch may be put to difficult choices between the need for intelligence and the desire to invoke the criminal process.

Mr. Mernin. According to the U.S. Army's Field Manual on Intelligence Interrogation and its predecessors, coercion and threats of coercion are illegal, immoral, and of little or no practical value in interrogations. Our Armed Forces have long understood that coerced evidence is unreliable. Even assuming that isolated coerced information were to prove worthwhile in the intelligence-gathering context, to conclude that such information was sufficiently reliable so as to be introduced as evidence would be a departure from well-established law and practice, contrary to what years of experience have taught our Armed Forces, and contrary to our Nation's values. The Association believes that Senator McCain and the testifying JAGs are inarguably correct on this fundamental issue.

Dr. Carafano. Yes.

Mr. Katyal. As Senator McCain has stated, coerced confessions should be excluded. The Supreme Court has repeatedly recognized ``the probable unreliability of confessions that are obtained in a manner deemed coercive.'' Jackson v. Denno, 378 U.S. 368, 386 (1964). The Supreme Court recognized this concept most recently in an opinion written by Chief Justice Roberts. See Sanchez-Llamas v. Oregon, 126 S. Ct. 2669 (2006) (``We require exclusion of coerced confessions both because we disapprove of such coercion and because such confessions tend to be unreliable.'').

Article 31(d) of the UCMJ categorically excludes from courts-martial statements obtained by coercion. Article 31(a) of UCMJ extends this rule to compelling someone to answer questions. The commission version of Article 31(a), meanwhile, only speaks to testifying. When combined with the commission version of 31(b), which allows the admission of coerced statements, the result is that U.S. military members have an incentive to use coercion to gather information.

While it might be appropriate to include a definition of coerced statements in a statute applicable to commissions--a definition that does not appear in the UCMJ--coerced statements should be per se inadmissible.

Mr. Schlueter. I agree with Mr. Bradbury. That principle applies not only in military commissions but in both civilian and military law. The case law on this point is clear. Police may use trickery, deception, and even some mentally coercive means to obtain statements. The test is whether the suspect's will was overborne. The fact that a suspect is delusional or that interrogators appealed to a suspect's emotions or even religious beliefs are common and permissible tactics for law enforcement--as long as the accused's statements are voluntary.

Mr. Silliman. First, I do not agree with Mr. Bradbury regarding his inability to define coercion short of torture. Those techniques which were approved for use in Army Field Manual 34-52 were clearly consistent with international law and, in the experience of many Army interrogators, yielded credible information. As to the need to introduce evidence obtained by coercive measures, I question whether there is any guarantee that such evidence would even be truthful since it is widely accepted that people will say anything to stop pain; and I also believe that allowing coerced evidence into a trial runs contrary to our national values and would further erode our standing in the international community as a nation under the rule of law.

specific trial procedures

27. Senator McCain. Ms. Massimino, Ms. Newell Bierman, Mr. Fidell, Mr. Mernin, Dr. Carafano, Mr. Katyal, Mr. Schlueter, and Mr. Silliman, in a letter dated July 10, 2006, and addressed to Chairman John Warner of the Senate Armed Services Committee and Chairman Arlen Specter of the Senate Judiciary Committee, a group of retired JAGs state that we should ``bring accused terrorists to justice in military trials based on the UCMJ and MCM.'' The letter goes on to say that, in developing legislation to address the Hamdan ruling, ``it should start from the premise that the United States already has the best system of military justice in the world'' but that narrowly targeted amendments to the UCMJ to accommodate ``specific difficulties in gathering evidence

A122

during the time of war'' would be acceptable. If the current rules are not adequate, what changes need to be made to those rules?

Ms. Massimino. The current rules for trials based on the UCMJ and MCM are adequate. The court-martial system was designed to prosecute prisoners in exactly this type of setting and has a well-established track record. The burden is on those advocating for change to establish the necessity of substituted rules.

Ms. Newell Bierman. The claims that the UCMJ is not equipped to handle the difficulties of trying individuals captured during wartime are largely overstated. In fact, the UCMJ is designed explicitly to dispense military justice for conduct during armed conflict, including the prosecution of prisoners of war who commit abuses during times of war. Any changes to the UCMJ should be narrowly tailored, limited, and based on demonstrated necessity.

Mr. Fidell. Whether or not the United States has ``the best system of military justice in the world'' aspects of it would not, for example, pass muster under the European Convention on Human Rights-- that system is unarguably a dramatically better model from which to work than the dusted-off procedures President Roosevelt issued for the trial of the German saboteurs in 1942, to which the current generation of military commission rules have been traced. NIMJ is preparing a revised proposal that would set a due process ``floor,'' exempt military commissions from some parts of the UCMJ, and afford the President carefully cabined residual rulemaking authority to depart from the general court-martial norm.

Mr. Mernin. Fundamentally, the Association believes the rules for commissions should not depart materially from the UCMJ and Manual for Courts Martial. We believe that convening a panel of experts would guarantee that a thorough job of determining necessary circumscribed departures from the UCMJ would occur in a transparent and nonpartisan manner. This process would serve the twin goals of establishing a workable system to prosecute and punish our enemies who have committed breaches of the law of war, and establishing a system which reaffirms the United States' role as the world's pre-eminent advocate of the rule of law and justice. Moreover, it is also essential that the system crafted is worthy of the American men and women in uniform who will make it work, whether as prosecutors, defense counsel, or judges.

Dr. Carafano. They should more clearly and explicitly exempt military commissions that try illegal combatants.

Mr. Katyal. Again, I do not believe that the rules for military commissions should deviate from the UCMJ rules for courts-martial until there is empirical evidence to demonstrate that such deviations are necessary. Please also see my answers to questions 6, 16-20, and 23 above.

Mr. Schlueter. That is very difficult to say. As someone with over 30 years of experience with military justice, I firmly believe that the system is fair. But I am also struck by the fact that for the first time in 30 years, those organizations and individuals who once questioned and challenged its fairness, now find it not only acceptable, but desirable. I understand that the administration has proposed a large number of changes to the UCMJ to accommodate military commissions. That draft should be a good start.

Mr. Silliman. I wholeheartedly endorse the statements of the retired JAGs contained in their letter. A system for military commissions, based upon existing jurisdictional authority in Articles 18 and 21 of the UCMJ and employing most of the procedural protections afforded to our own service personnel under the UCMJ and the Manual for Courts-Martial, would not only be a proper prosecutorial forum for trying terrorists but would also be upheld in the courts and applauded by the global community. If exceptions from those procedural protections are to be taken, they would probably include a more flexible standard for the admissibility of evidence (but still prohibiting evidence acquired through torture or coercion); the elimination of a formal Article 32 pretrial investigation; a more streamlined appellate procedure, perhaps eliminating the need for an

A123

Article 66 review in a service court of criminal appeals prior to
review in the U.S. Court of Appeals for the Armed Forces; and perhaps
some modification to the threshold for giving advice of rights under
Article 31(b).

28. Senator McCain. Ms. Massimino, Ms. Newell Bierman, Mr. Fidell,
Mr. Mernin, Dr. Carafano, Mr. Katyal, Mr. Schlueter, and Mr. Silliman,
how, in your view, can Congress best fashion legislation that will
stand up to Supreme Court scrutiny?
    Ms. Massimino. The UCMJ and the Manual for Courts Martial already
stand up to Supreme Court scrutiny. As the Supreme Court ruling in
Hamdan requires, they provide a fair process in accordance with Common
Article 3. Attempting to satisfy the requirements of Common Article 3
with an improvised military commissions system is a tall order and one
that the administration has failed twice already to fill. Therefore,
Congress would be best served by sticking with the UCMJ and MCM.
However, to the extent that it deviates from the UCMJ and MCM, Congress
should maintain the court-martial system as the basis for the new
system and only substitute procedures when an imperative need is
demonstrated and the substitution is narrowly tailored to fit that
need.
    Ms. Newell Bierman. The Supreme Court laid out a way forward. The
UCMJ and MCM constitute a tried and true system and should serve as the
starting point for any legislation. Any deviations from the UCMJ and
MCM need to be narrowly tailored and carefully crafted to respond to an
identified need.
    Mr. Fidell. Our proposal, which is in the course of revision, would
be sustained by the Supreme Court. It would meet Common Article
3(1)(d)'s requirement for ``a regularly constituted court affording all
the judicial guarantees which are recognized as indispensable by
civilized peoples,'' would bar secret evidence and trials from which
the accused was excluded, and would take account of the uniformity
requirement currently found in Article 36(b) of the UCMJ.
    Mr. Mernin. Using the UCMJ as a starting point, and departing from
it only to address demonstrable    situational difficulties,'' would
likely be the best course to take in order to arrive at a workable
system which would survive judicial review.
    Dr. Carafano. Congress could fashion such legislation by explicitly
authorizing the procedures set forth in the President's Executive Order
of November 13, 2001 as it attempted to do in the DTA of 2005. The
Court's reason for striking down the use of military tribunals was that
the procedures were insufficiently authorized, including Congress's
attempt to divest Federal courts of jurisdiction over them.
    Mr. Katyal. In my view, it is vital that Congress first to do no
harm. No changes to the court-martial system should be made until there
is empirical evidence demonstrating that such deviations are required.
The administration's proposed legislation that was circulated by the
Washington Post 10 days ago, for example, would quickly be invalidated
by courts, and lead again to the terrible prospect of not having any
convictions of detainees in the wake of September 11.
    The court-martial system can meet the needs of the government while
protecting our national security interests and fulfilling our
constitutional and international obligations. Importantly, a court-
martial is a decidedly legal proceeding and there is already
substantial law on the books authorizing and governing them. The
Supreme Court has on countless occasions recognized and affirmed such
proceedings--most recently in the Hamdan opinion. Courts-martial
satisfy all the conditions for trials of detainees that the Hamdan
majority found the President's commissions lacking. They would
eliminate the problems of uniformity that the Supreme Court found so
problematic; they would provide assurances of independent proceedings
and review that the commissions sorely lack; and they would satisfy
Common Article 3's requirement of a ``regularly constituted court''--a
requirement that may be difficult, if impossible, to achieve by
patchwork legislation.

A124

Finally, any departures from the UCMJ must be coupled with an anti-abstention provision, along the lines of the McCain-Feingold campaign finance legislation. The system needs to be reviewed immediately, not years after the fact when convictions would have to be reversed and terrorist defendants potentially set free. Please also see my answer to question 2, above.

Mr. Schlueter. I do not see the decision in Hamdan as requiring a massive overhaul of either the UCMJ, MCM, or military commission rules. There was some indication that the commission rules might have been approved by the court, had the President complied with Article 36(b), UCMJ. As noted above, I think Congress should take a minimalist approach  enact legislation that explicitly grants authority to the President to convene military commissions and also remove the uniformity requirement from Article 36.

Mr. Silliman. If Congress accepts the premise that any system for military commissions should use the UCMJ as the core, excepting such court-martial procedures as are determined and justified to be impracticable, then there is no question in my mind that it will withstand judicial scrutiny. That would entail a minimal amount of legislative amendments to the Code itself; the rest of the changes would be made to the rules for courts-martial and military rules of evidence, integral parts of the Manual for Courts-Martial, an executive order promulgated by the President. Congress could maintain oversight of these changes to the MCM through an appropriate reporting requirement.

29. Senator McCain. Ms. Massimino, Ms. Newell Bierman, Mr. Fidell, Mr. Mernin, Dr. Carafano, Mr. Katyal, Mr. Schlueter, and Mr. Silliman, the Hamdan court appeared to be concerned about an accused and his civilian counsel being excluded from, and precluded from ever learning what evidence was presented during, any part of the military commission trial. How should this concern be addressed?

Ms. Massimino. A defendant must have the right to know the evidence being used against him, to respond to it, and to challenge its credibility or authenticity  Rule 505 of the MCM provides a method for the prosecution to use classified evidence without infringing on this right. See answer to question 23.

Ms. Newell Bierman. This concern is adequately dealt with in Rule 505 of the MCM, dealing with classified evidence. As explained in the answer to question 23, these rules allow for all kinds of substitute evidence to be provided in the place of classified evidence. But the bottom line rule still applies: Whatever substitute version of the evidence is shared with the accused is the same evidence that is presented to the factfinder. No one should be convicted on the basis of evidence that he was never provided and had no opportunity to contest.

Mr. Fidell. Any legislation should put military commissions on a solid statutory basis and make it clear that the accused and his or her counsel must (a) have access to all evidence that is presented to the triers of fact, and (b) be present at all sessions unless they voluntarily (or through misbehavior) waive that right. The latter right would be similar to the right applicable to courts-martial under Article 39(b) of the UCMJ.

Mr. Mernin. Such a situation should not be permitted. As I testified, the accused must ultimately have access to any evidence supporting the charges against him which is offered to the court, and civilian defense counsel with security clearances should have access to all evidence admitted against the accused and all potentially exculpatory evidence. UCMJ evidentiary rules accommodate these fundamental standards.

Dr. Carafano. With regard to illegal combatants, the administration's rules provide adequate protections, and more than international law ever required. Congress should simply authorize them.

Mr. Katyal. The accused must be entitled to be present during all proceedings and the accused must be entitled to see all of the evidence that the members see. As former Rear Admiral Hutson pointed out,

denying the accused this most basic of rights results in telling him, basically, ``We know you're guilty. We can't tell you why, but there's somebody that says you're guilty.'' Denying this right to the accused, especially in light of the Hamdan majority's mandate, would be extremely dangerous, unjust, and unwise. As Senator Graham stated in the August 2 hearing:

> ``So the question may become for our Nation, if the only way we can try this terrorist is disclose classified information and we can't share it with the accused, I would argue don't do the trial. Just keep him. Because it could come back to haunt us. I have been in hundreds of military trials. I can assure you the situation where that's the only evidence to prosecute somebody is one in a million. We need not define ourselves by the one in a million.''

   Mr. Schlueter. The issue of access by the accused and his attorney to all proceedings is difficult. But it is one that has addressed the courts in the past anytime national security information was involved in the trial. Those rules should be applied to military commissions as well. The procedural aspects of Military Rules of Evidence 505 and 506 are good starting points for drafting such rules.
   Mr. Silliman. This concern only applies, I believe, to an accused being removed from his own trial when classified and other extremely sensitive national security information is being offered into evidence. As discussed in my answer to a previous question (question 23), Military Rules of Evidence 505 and 506 could be amended to provide for safeguarding critical national security information to be used by the government in detainee trials on the question of guilt or innocence, while still ensuring some measure of authenticity and at least a minimal level of access by the accused. Such a provision would then obviate the need to remove the accused from trial proceedings except when he is disruptive.

   30. Senator McCain. Ms. Massimino, Ms. Newell Bierman, Mr. Fidell, Mr. Mernin, Dr. Carafano, Mr. Katyal, Mr. Schlueter, and Mr. Silliman, Dr. Carafano suggested in his testimony that to win the war of ideas in the war on terrorism Congress should essentially ratify the military commissions that have been overturned by the Supreme Court. I would suggest that there are some here who believe that the exact opposite is true: That to win the war of ideas we need to put in place a system that is based on the UCMJ and that respects Common Article 3, and that only that way will we show the world that we are truly different from our enemy in this war. Would the panel care to comment?
   Ms. Massimino. How we treat suspected terrorists--including how we try them--speaks volumes about who we are as a nation, and our confidence in the institutions and values that set us apart. The hallmark of the rule of law as applied by civilized nations is a system that is impartial and that is made up of procedures and rules that are consistent, predictable, and transparent. Our civilian courts and military justice systems are the envy of the world--and for good reason. We have a system that is designed not just to convict those the government suspects are guilty, but to deliver justice. The Supreme Court has just reminded us that, even in the face of extraordinary threats to our security, our traditional values and institutions should be seen not as liabilities, but as assets--tools in the struggle to combat terrorism. These values and institutions--in particular here, the UCMJ and the Geneva Conventions--should again become the lodestar.
   Ms. Newell Bierman. These trials will undoubtedly be some of the most scrutinized trials in the world. It is a chance for the United States to showcase to the world its respect for the rule of law, its principles of fair justice and humane treatment, and to win back the moral high ground. A system based on the UCMJ and MCM that respects the fair trial standards embodied in Common Article 3 is the right way forward.

A126

Mr. Fidell. We completely agree with Dr. Carafano that the war of ideas must not be overlooked. In our view, adhering to our Nation's high standards of the rule of law, fundamental fairness, and respect for the individual are better calculated to make progress in the battle of ideas than creating a third-rate system of justice that will never gain public confidence here, much less anywhere else.

Mr. Mernin. The war of ideas will be won, in part, by demonstrating, without hedging, that American justice and values are not built on words without meaning. Putting in place a system which provides fundamental guarantees of due process and fairness will demonstrate to our enemies, to our allies, and to our friends, that the United States intends to lead the world and remain in the vanguard of respect for the rule of law and human dignity. The U.S. Military Academy, in preparing cadets for their role as the next commanders, requires instruction in military and constitutional law. These young men and women are training to be leaders in this war--a ``Long War on Terror,'' as it is now characterized--and we owe them, and all our troops, support and gratitude. If we take the position that we can whittle away, for the sake of the moment, bits and pieces of our treaty obligations--the ``supreme law of the land''--honored in letter and spirit for 50 years, we send the wrong message to those cadets, our troops, our enemies, our allies, and to the world. We send a message that the parsing of words for the sake of expediency trumps experience, honor, and law. If we slide down this slippery slope, we will be judged at the bottom by those left standing at the top.

Dr. Carafano. I stand by my original testimony. In addition, giving illegal combatants the same protections under the Geneva Conventions as soldiers who abide by the laws of war will only weaken the Conventions by removing an incentive to join. After all, if a nation or non-state actor can receive such protections without abiding by the Convention, why would they ever abide by its rules?

Mr. Katyal. This question, more than any other in the thousands of words I have read since working on this issue for the past 5 years, states the precise problem. To answer it, I will quote from what another brave American, Justice Rutledge, said 60 years ago. In his dissent in the last significant military commission case (Yamashita v. Styer (1946)), Justice Rutledge said:

> ``It is not too early, it is never too early, for the Nation steadfastly to follow its great constitutional traditions, none older or more universally protective against unbridled power than due process of law in the trial and punishment of men, that is, of all men, whether citizens, aliens, alien enemies or enemy belligerents. It can become too late.
> This long-held attachment marks the great divide between our enemies and ourselves. Theirs was a philosophy of universal force. Ours is one of universal law, albeit imperfectly made flesh of our system and so dwelling among us. Every departure weakens the tradition, whether it touches the high or the low, the powerful or the weak, the triumphant or the conquered.''

Gilding over the existing, flawed military commission system, which the Supreme Court has found illegal and that other countries have found unconscionable, would dishonor our country's great constitutional tradition. The right to a fair trial is one of the foundational rights enshrined in our Constitution, one that has weathered every war this country has fought. Strict adherence to that tradition, and to the fundamental principle of rule of law, is what separates us from our enemies, and what makes America the best country in the world. The rule of law should not be another victim in the war on terror.

Mr. Schlueter. I do not agree with Dr. Carafano. The due process protections applicable in Federal, State, and military trials were not established to demonstrate to anyone that our system is better than any other system. To do so, suggests that there is an extant body of law that will appeal to terrorists who have vowed to destroy America

itself. If we are to expand the due process rights available to such terrorists, it should be for reasons other than public relations. I have no doubt that if Congress and the President were to try terrorists by military courts-martial--with all of the rights and protections available to American servicemembers--that domestic and foreign critics would still find fault.

Mr. Silliman. I completely agree with your assessment; and I strongly disagree with Dr. Carafano. We can only win the ``war of ideas'' by proving to the international community that we are, in practice as well as rhetoric, a nation under the rule of law.

31. Senator McCain. Mr. Schlueter, how would your proposed two amendments to the UCMJ be responsive to the Hamdan court's ruling that detainee trials must adhere to the requirements of Common Article 3 of the Geneva Conventions?

Mr. Schlueter. My reading of the Hamdan decision is not that the military commissions must in all circumstances comply with Common Article 3, which apparently speaks in broad terms. My proposal would address the new key features in the court's opinion--the authority of the President to convene commissions and the uniformity requirement in Article 36(b). According to the Court, Article 3 applies under the Supremacy Clause of the Constitution (Article VI). But, as with all treaties, Congress may enact a subsequent statute that would prevail over the treaty provision. Congress can do that by amending the UCMJ to recognize, what if any provisions in Article 3, are applicable to military commissions.

32. Senator McCain. Mr. Schlueter, under your proposal, wouldn't it be possible and maybe probable for the President to promulgate procedures that are virtually identical to those set forth in Military Order No. 1?

Mr. Schlueter. Yes, the President could simply readopt procedures set out in the existing rules. I doubt that will happen, however.

33 Senator McCain  Mr  Schlueter, how would your proposal achieve better the goal of avoiding Supreme Court rejection than proposals to modify the UCMJ to comply with the Hamdan ruling?

Mr. Schlueter. Unlike others, I do not read Hamdan to require that the UCMJ and the MCM must be the baseline for any further legislation or changes. My recommendations are intended to: (1) take a modest approach to reacting to Hamdan; (2) recognize the constitutional role of the President as commander in chief; (3) recognize the traditional and respective roles of Congress and the President in promulgating rules of procedure, as reflected in Article 36; and (4) remove the uniformity requirement in Article 36, which as far as I know, had never really been interpreted to apply to military commissions. If that were true, then the uniformity principle would apply to Provost Courts and any other military tribunal.

The plurality's approach was more modest than that suggested by Justice Kennedy in his concurring opinion. He, and not the plurality and not the dissenters, criticized the President for not applying the full range of protections available to those being tried. Nor did the Court say that only Congress can fix the problem.

The key to responding to Hamdan is not necessarily in amending the UCMJ, but in providing the basic protections to those being tried by military commissions. That can be accomplished just as easily by amending the commission rules themselves.

My minimalist approach would not necessarily provide any immunity against judicial review; but I cannot imagine that a wholesale review and changes to the UCMJ would be any more immune.

[Whereupon, at 1:40 p.m., the committee adjourned.]

CONTINUE TO RECEIVE TESTIMONY ON THE FUTURE OF MILITARY COMMISSIONS IN

# TAB 6

A129

9/11 suspects may face death penalty - latimes

Advertisement

**Los Angeles Times**   CALIFORNIA & LOCAL   ENTERTAINMENT   SPORTS   BUSINESS   TECHNOLOGY   NATION   POLITICS   WORLD   MORE

YOU ARE HERE:  LAT Home → Collections → Indictments

Advertisement

# 9/11 suspects may face death penalty

*The Pentagon brings murder and conspiracy charges against six detainees accused of plotting the attacks.*

**February 12, 2008 | Los Angeles Times Staff Writer**

0   Tweet

MIAMI — The Pentagon announced Monday that it was seeking the death penalty against alleged Sept. 11 mastermind Khalid Shaikh Mohammed and five other men, in a move that will probably ensure that the controversial military commissions at the Guantanamo Bay prison live on into the next presidential administration.

The murder and conspiracy charges against the six men accused of planning the 2001 attacks on the World Trade Center and the Pentagon would be the first capital cases against any of the nearly 800 detainees who have been brought to the U.S. military prison in Cuba.

**FROM THE ARCHIVES**

Guantanamo Bay detainee pleads guilty in 2002 tanker bombing
*February 20, 2014*

New pretrial hearings open for five alleged Sept. 11...
*January 28, 2013*

Guantanamo defendant lashes out at tribunal
*January 28, 2013*

Three 9/11 suspects opt out of pretrial hearing
*October 17, 2012*

Obama administration won't pursue civilian trials for 9/11...
*April 5, 2011*

They also marked a change in strategy for the Office of Military Commissions, which for six years has focused on building cases against about a dozen detainees accused of lesser crimes.

As Bush administration policy in Guantanamo comes under sharper scrutiny in this election year, the White House has pressured the commissions to try and convict so-called high-value detainees like Mohammed. That pressure became so intense last year that the chief prosecutor quit in protest of what he considered political interference.

The charges must first be approved by the commissions' convening authority, former Defense Department Inspector General Susan J. Crawford, but because her office applied pressure to prosecute the high-value detainees, her approval appeared likely.

Air Force Brig. Gen. Thomas Hartmann, legal advisor to Crawford and an advocate of the new strategy of making the most heinous suspects a priority for the commissions, said the alleged Sept. 11 conspirators would have nearly identical rights to defendants tried in courts-martial.

Tribunal rules call for the Guantanamo court to arraign defendants within 30 days of their being served charges and for trial to begin within four months. But Hartmann acknowledged that the timing could be pushed back by legal wrangling.

The charges announced Monday are expected to spur fresh challenges to the commissions' legitimacy and to the admissibility of evidence obtained through such interrogation methods as waterboarding, a simulated drowning technique.

**MORE STORIES ABOUT**

Indictments

Prisoners

Conspiracy

Although the suspects have been in U.S. custody for years, they only become eligible for legal counsel once the charges are approved by Crawford and are served to them at Guantanamo.

http://articles.latimes.com/2008/feb/12/nation/la-na-gitmo12feb12[5/8/2017 11:41:10 AM]

104

9/11 suspects may face death penalty - latimes

News

The Guantanamo detention network of camps and prisons has neither a death row nor an execution chamber, but those facilities are said to be in the works.

"That's all still being put together," said Army Major Robert D. Gifford, spokesman and legal advisor for the commissions.

At least five of the six charged with Sept. 11 roles are being held in isolation at a maximum-security facility at Guantanamo, where three concrete-and-steel prisons and four camps of metal-mesh cells and barracks are arrayed along the rocky shoreline and surrounded by opaque fencing topped with coils of barbed wire.

Also charged along with Mohammed, known among his military jailers as KSM, are: Ramzi Binalshibh, a Yemeni who allegedly provided logistics for the Hamburg terrorist cell; Mohammed Qahtani, known as the 20th hijacker for his alleged thwarted plans to aid fellow Saudis in seizing U.S. aircraft; Ali Abdul Aziz Ali, a nephew of Mohammed who was raised in Kuwait; Mustafa Ahmed Hawsawi, a Saudi who allegedly provided logistic support to KSM and others; and Walid bin Attash, alleged scion of a terrorist family long aligned with Al Qaeda.

Military and civilian legal experts predicted the trials of the six, likely to be conducted jointly, won't begin until at least fall and may start even beyond the November presidential election.

"The fact is that we're going to have a military commission for those the United States believes, and most of the world acknowledges, to be ring leaders of the 9/11 attacks," said Scott Silliman, a Duke University law professor and former military judge advocate. "That should not be delayed simply because we're in an election year."

Silliman conceded there are probably political considerations to the timing of the charges but said he doubted the trial would get underway before the election. Military defense attorneys will make challenges on their clients' behalf and demand access to classified evidence and faraway witnesses, which would probably delay the process, Silliman said.

One of the first defense challenges in the case is likely to be the admissibility of evidence obtained through interrogation methods that the administration approved for Mohammed and others but that human rights groups contend are torture.

The military judge assigned to the trial will make any determinations about admissibility based on provisions of the Detainee Treatment Act of 2005 that, by virtue of an amendment attached by former POW and presidential hopeful Sen. John McCain (R-Ariz.), prohibits the use of "cruel, degrading or inhumane" interrogation practices.

1 | 2 | Next

1 | 2 | Next

🖥 ▢ 0

MORE:

Seizure Led to FloJo's Death

His 104 scores make his case

A131

9/11 suspects may face death penalty - latimes

Restaurant review: South Beverly Grill

Brutal Murder by Teen-Age Girls Adds to Britons' Shock

Comaneci Confirms Suicide Attempt, Magazine Says

---

**Los Angeles Times**   Copyright 2017 Los Angeles Times

Index by Keyword | Index by Date | Privacy Policy | Terms of Service

http://articles.latimes.com/2008/feb/12/nation/la-na-gitmo12feb12[5/8/2017 11:41:10 AM]

A132

# TAB 7

A133



**Case Western Reserve Journal of International Law**

Volume 42 | Issue 1

2009

# Prosecuting Alleged Terrorists by Military Commission: A Prudent Option

Scott L. Silliman

Follow this and additional works at: http://scholarlycommons.law.case.edu/jil

 Part of the International Law Commons

Recommended Citation

Scott L. Silliman *Prosecuting Alleged Terrorists by Military Commission: A Prudent Option* 42 Case W. Res. J. Int'l L. 289 (2009)
Available at: http://scholarlycommons.law.case.edu/jil/vol42/iss1/38

This A ce sb oug  o you o   ee a d ope  access by   e S ude  Jou   a s a  Case Wes e   Rese ve U  ve s y Sc oo o  Law Sc  o a y Co     o s.
I   as bee  accep ed o   c us o   Case Wes e   Rese ve Jou   a o I e a o a Law by a  au o zed ad    s a o o  Case Wes e   Rese ve
U  ve s y Sc oo o  Law Sc  o a y Co     o s.

A134

PROSECUTING ALLEGED TERRORISTS BY MILITARY COMMISSION:
A PRUDENT OPTION

*Scott L. Silliman*[*]

*President Obama has announced that the detention facility at Guantánamo Bay will be closed by January 22, 2010. He has also said that at least some of the detainees facing criminal prosecution will be tried in military commissions. The system of military commissions established by President Bush after the 9/11 attacks, as well as the one which Congress enacted in 2006 following the Supreme Court's Hamdan decision, were widely criticized as being unproductive and not meeting international legal standards. The Congress has, very recently, revised the rules and procedures for military commissions to make them fair, effective and much more like those used for courts martial. This article compares and contrasts trials in revised military commissions with trials in federal district courts. It concludes that a combination of both forums would best serve the President, and that military commissions are still a prudent option for prosecuting some detainees where there are security and admissibility of evidence concerns.*

I. INTRODUCTION

Two months after the horrific terrorist attacks on the World Trade Center and the Pentagon on September 11, 2001, then President George Bush issued a Military Order which authorized the detention and trial by military commission of non U.S. citizens who were members of al Qaeda, who had engaged in international terrorism, or who had knowingly harbored individuals in either category.[1] Some of those captured by our military forces in Afghanistan, or turned over to us by the Northern Alliance, were transferred to the U.S. Navy detention facility at Guantánamo Bay, Cuba, a place far from the battlefield. Guantánamo Bay was chosen, in part, because

---

[*]     A.B. 1965, J.D. 1968, University of North Carolina. After serving for twenty-five years as a uniformed judge advocate in the United States Air Force, Professor Silliman retired in the grade of colonel in 1993 and joined the faculty at Duke University School of Law where he is a Professor of the Practice of Law as well as Executive Director of Duke's Center on Law, Ethics and National Security.

[1]     Military Order, Detention, Treatment, and Trial of Certain Non-Citizens in the War Against Terrorism, 66 Fed. Reg. 57,833 (Nov. 13, 2001) (defining those affected by the military order, as well as the terms of detention and trials).

A135

it was deemed to be outside the jurisdictional reach of the federal courts.[2] The Bush Administration claimed that it had the right under the law of war to detain those at Guantánamo Bay until the cessation of hostilities, whenever that might be. The Bush Administration also claimed to be able to prosecute a detainee by military commission for "violations of the laws of war and all other offenses triable by military commission."[3] However, between November 2001 and the summer of 2006, the U.S. completed no military commission trials, and on June 29, 2006, the Supreme Court ruled in *Hamdan v. Rumsfeld*[4] that the military commission system established by President Bush violated two specific provisions of the Uniform Code of Military Justice (UCMJ), Articles 21[5] and 36(b).[6]

The Court held that Article 21 incorporates provisions of the Geneva Conventions of 1949 as part of the law of war, specifically the clause of Common Article 3 relating to minimal judicial guarantees for prosecutions.[7] Four months after the Court's decision in *Hamdan*, Congress responded by enacting the Military Commissions Act of 2006 (MCA).[8] Among other objectives, the MCA sought to improve the military commission system by correcting many of the deficiencies delineated by the Court in *Hamdan* and by providing military commissions with a firm statutory predicate. From 2006 until January 22, 2009, however, when President Obama directed the

---

[2]   In choosing the facility at Guantánamo Bay, the Bush Administration was obviously relying upon the 1950 Supreme Court opinion in *Johnson v. Eisentrager*, 339 U.S. 763, 775 (1950), which held that enemy aliens, who were captured and held outside our territory, and at no relevant time and in no stage of their captivity had ever been within our territorial jurisdiction, had neither a statutory nor a constitutional right of access to our courts.

[3]   Dep't of Def., Military Commissions Order No. 1, §3(B) (Aug. 31, 2005) (superseding an earlier version of the Order dated Mar. 21, 2002).

[4]   548 U.S. 557, 618 27 (2006) (elaborating on why the Bush Administration violated two provisions of the Uniform Code of Military Justice).

[5]   10 U.S.C. § 821 (2006) (stating that "the provisions of this chapter conferring jurisdiction upon courts martial do not deprive military commissions, provost courts, or other military tribunals of concurrent jurisdiction with respect to offenders and offenses that by statute *or by the law of war* may be tried by military commissions, provost courts, or other military tribunals.") (emphasis added)).

[6]   *Id.* § 836(b) (declaring that the President shall ensure that "[a]ll rules and regulations made under this article shall be uniform insofar as practicable . . . .").

[7]   Under Common Article 3, it is prohibited to have "the passing of sentences and the carrying out of executions without previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples." Geneva Convention Relative to the Treatment of Prisoners of War art. 3(i)(d), Aug. 12, 1949, 6 U.S.T. 3316, 75 U.N.T.S. 135.

[8]   Pub. L. No. 109 366, 120 Stat. 2600 (providing statutory definitions, guidelines, and jurisdictional boundaries for the U.S. military commissions).

suspension of any further military commission proceedings,[9] the U.S. completed only three trials.[10] In the Spring of 2009, the Obama administration made some changes to military commission procedures,[11] and the President has indicated his intent to use military commissions for prosecuting at least some of the detainees.[12] In furtherance of the President's decision, Congress recently amended the MCA to make the military commission system fairer and more effective.[13] Many argue, however, that those detainees for whom there is some evidence of criminality should be tried in the federal district courts rather than in military commissions because of the stigma attached to the hearings already conducted at Guantánamo.[14] Which, then, is the better prosecutorial forum to use?

This article assesses prosecuting the detainees in federal district courts and military commissions. It compares and contrasts each, and argues

---

[9]   Exec. Order No. 13,492, 74 Fed. Reg. 4897, 4899 (Jan. 22, 2009) (halting all Guantánamo proceedings pending in the United States Court of Military Commission Review).

[10]   David Hicks pled guilty, in accordance with a pretrial agreement, to providing material support to terrorism. *See* LAW COUNCIL OF AUSTRALIA, SUMMARY OF THE REPORT OF THE INDEPENDENT OBSERVER FOR THE LAW COUNCIL OF AUSTRALIA: DAVID HICKS V. THE UNITED STATES 4 5 (July 24, 2007), *available at* http://www.lawcouncil.asn.au/shadomx/ apps/fms/fmsdownload.cfm?file_uuid CDFB40A7-1E4F-17FA-D2F7C11559D3CAC7&site Name lca. He was convicted and sentenced to serve nine months of confinement (in Australia), with seven years of further confinement suspended. *Id.* Salim Hamdan, Osama Bin Laden's driver, was acquitted of conspiracy but convicted of providing material support for terrorism. *See* Hamdan v. Rumsfeld, 548 U.S. 557, 570 (2006). He was sentenced to serve sixty-six months of confinement but was credited with sixty-one months already served while awaiting trial. *See* Carol J. Williams, *The Nation: Yemeni Gets 5 1/2 Years in Prison with Credit for Time Already Served, Osama bin Laden's Driver Should Complete His Sentence by January*, L.A. TIMES, Aug. 8, 2008, at A1. Finally, Ali Hamza Ahmad Suliman al Bahlul was convicted of conspiring with al-Qaeda, solicitation to commit murder of protected persons and other specified offenses, and providing material support for terrorism. Press Release, U.S. Dep't of Defense News Release No. 926-08, Detainee Convicted of Terrorism Charge at Military Commission Trial (Nov. 3, 2008), *available at* http://www.defenselink.mil/releases/release.aspx?releaseid 12329 [hereinafter News Release]. He was sentenced to life imprisonment. *Id.*

[11]   *See* Memorandum from Jeh C. Johnson, Gen. Counsel of the Dep't of Def., to Robert Gates, Sec'y of Def., Changes to the Manual for Military Commissions (May 13, 2009) ((1) declaring statements obtained by interrogation methods constituting cruel, inhuman or degrading treatment to be inadmissible in evidence; (2) reversing the burden of proof with regards to the admissibility of hearsay evidence; and (3) granting more flexibility to an accused in the selection of military defense counsel).

[12]   William Glaberson, *Obama to Keep Tribunals; Stance Angers Some Backers*, N.Y. TIMES, May 15, 2009, at A1.

[13]   Military Commissions Act of 2009, Pub. L. No. 111-84, §§ 1801 07, 123 Stat. 2190 (2009).

[14]   *See, e.g.*, The Constitution Project, *Guantánamo Detainees Should be Transferred to U.S. for Prosecution by Federal Courts*, Aug 3, 2009, *available at* http://www.constitutionproject.org/newsdetail.asp?id 402 (last visited Oct 7, 2009).

that recent legislation revising the rules and procedures for military commissions makes that forum a prudent option to be used in combination with the federal district courts.

## II. Assessing the Two Forums

### A.    The Federal District Courts

High profile terrorism cases, such as the trials of Zacarias Moussaoui and José Padilla, have, in the past, been successfully prosecuted in the federal district courts. Additionally, at least one of the detainees, Ahmed Ghailani, has already been moved to New York and charged with offenses in connection to the 1998 bombings of our embassies in Kenya and Tanzania.[15] For other potential cases, there are numerous "terrorism" crimes available for U.S. attorneys to use in criminal prosecutions, most notably those statutes which proscribe providing material support for terrorists and providing material support to a foreign terrorist organization.[16]

However, prosecuting a large number of the Guantánamo Bay detainees in the federal district courts would involve unique challenges. Assuming that some of the potential evidence in many cases would be highly classified, the trial judge would need a Sensitive Compartmented Information Facility (SCIF)[17] when reading the classified documents and for securely storing the evidence when trial is not in session. Additionally, in order to assist the judge during trial, law clerks would need to have the requisite security clearances, a process which often takes months to accomplish. Ensuring court security and guaranteeing the safety of witnesses and jurors would also require significant additional resources. For example, when dealing with very high profile cases such as Khalid Sheikh Mohammed, it is not

---

[15]    Peter Finn, *Guantánamo Bay Detainee Brought to U.S. for Trial*, Wash. Post, June 11, 2009, at A1.

[16]    *See* 18 U.S.C. § 2339(A) (2006) (providing that it is illegal to provide material support to terrorists) and § 2339(B) (providing that it is illegal to provide material support to foreign terrorist organizations). *See also id.* § 2332 (declaring that homicide occurs when someone kills a national of the U.S. abroad); *id.* § 2332(a) (declaring imprisonment for anyone who uses, threatens, or conspires to use a weapon of mass destruction against a U.S. national); *id.* § 2332(b) (declaring that acts of terrorism transcend national boundaries); *id.* § 2339(C) (prohibiting the financing of terrorism); *id.* § 2339(D) (stating that it is illegal to receive military training from foreign terrorist organizations); *id.* §§ 884, 992, 924 (pertaining to explosives offenses); *id.* § 956 (pertaining to conspiracy to murder, kidnap or maim persons, or to damage property overseas); *id.* § 1203 (declaring it is illegal to take hostages).

[17]    *See* Office of the Inspector General, U.S. Dep't of Justice, *Processing Classified Information on Portable Computers in the Department of Justice*, Audit Report 05 32 (July 2005), *available at* http://www.usdoj.gov/oig/reports/plus/a0532/intro.htm ("A SCIF is an accredited area, room, group of rooms, buildings, or installation where Sensitive Compartmented Information may be stored, used, discussed, and electronically processed.").

inconceivable that terrorist cells operating within the U.S. would target the courtroom and prisoner detention facility where he would be kept during trial proceedings.

There are evidentiary challenges as well in using the federal district courts to prosecute the Guantánamo Bay detainees. Statements taken from the detainees during their initial capture might be inadmissible either be cause they were taken under coercive conditions or because no advice of rights was given.[18] An admission made while a weapon is pointed directly at the detainee could hardly be considered free of coercion; and on the bat tlefield, the soldier's mission is to kill or capture the enemy, not to gather evidence for a criminal prosecution.

There may be specific challenges which arise during pretrial dis covery with regard to exculpatory material in the government's possession[19] or written statements made by potential government witnesses.[20] The gov ernment must release this information if the detainee requests it.[21] If such material is classified, as would generally be the case, then, under the Classi fied Information Procedures Act (CIPA), the trial judge may conduct an in camera hearing to determine the use, relevance, or admissibility of the evi dence.[22] In this situation, the determination of relevance may be difficult to make because the trial judge is acting outside the adversarial process and without the benefit of knowing how the detainee intends to proceed with his defense. If the classified material sought by the detainee is deemed relevant by the trial judge, and the government's offered unclassified substitutes or summaries are ruled inadequate, then the prosecution faces the dilemma of either having to produce the material, accept sanctions imposed by the trial judge, or forego prosecuting the detainee.[23]

Although the full scope of a detainee's constitutional protection beyond habeas corpus has not yet been ascertained, if the Sixth Amendment right to a speedy trial applies, prosecuting detainees who have been kept at Guantánamo Bay for five, six or more years may also prove to be a chal

---

[18]    *See* Lego v. Twomey, 404 U.S. 477, 495 (1972) ("Just as we do not convict when there is a reasonable doubt of guilt, we should not permit the prosecution to introduce into evi dence a defendant's confession when there is a reasonable doubt that it was the product of his free and rational choice.").

[19]    *See* Brady v. Maryland, 373 U.S. 83 (1963).

[20]    *See* Jencks v. United States, 353 U.S. 657 (1957).

[21]    *See* 18 U.S.C. § 3500 (2006) (pertaining to demands for production of statements and reports of witnesses).

[22]    18 U.S.C.A. app. 3 § 6(a) (2000).

[23]    ABA Standing Comm. on Law & Nat'l Sec., Post Workshop Report  Trying Terrorists in Article III Courts: Challenges and Lessons Learned, at 13 (July 2009), *available at* http://www.abanet.org/natsecurity/trying_terrorists_artIII_report_final.pdf (last visited Oct. 7, 2009).

A139

lenge. The Supreme Court has held that a delay of over eight years in prose-cuting a drug dealer was clearly sufficient to trigger a speedy trial violation where the government was the cause of the delay.[24]

*B.    Revised Military Commissions*

Although prosecuting the detainees in military commissions using the newly revised rules and procedures might be subject to some of the same challenges facing trials in the federal district courts, military commis-sion prosecutions offer some distinct advantages. A military commission, like the more traditional court-martial, is "portable," meaning that it may be held anywhere,[25] thereby obviating the security risks of holding trials in New York, Washington, or other metropolitan centers in this country. Even after the detention facility at Guantánamo Bay is closed, military commis-sions could readily be convened at any American military installation in the world, regardless of where the alleged offense took place or where the ac-cused is detained. Since the trial would take place within a military facility, the active duty armed forces could provide an extremely high level of secu-rity in a manner which would be virtually impossible in a civilian communi-ty. If a military commission convicted and sentenced a detainee to any pe-riod of confinement, that detainee could serve the sentence at any location under military control.

A military commission is also an extremely efficient trial forum. As in the case of courts-martial, there is seldom any period of lengthy delay in a military commission between a conviction and the decision on sentencing since attorneys for both the government and the detainee must be prepared at the outset to proceed through the findings and sentencing phases of the trial. Also, unless Congress chooses to incorporate the court-martial re-quirement for a formal pretrial investigation[26]—the equivalent of a grand jury—into military commission rules, a criminal charge can be referred to trial by a military commission in a relatively short period of time.

The speedy trial issue arises because many of the detainees have been held at Guantánamo Bay for years without criminal charges being brought against them. The amended MCA specifically makes inapplicable the court-martial speedy trial rule under the UCMJ which provides that an accused should be brought to trial within one hundred and twenty days after

---

[24]    *See* Doggett v. United States, 505 U.S. 647 (1992).

[25]    *See* 10 U.S.C. § 805 (2006) ("[The Uniform Code of Military Justice] applies in all places.").

[26]    *Id.* § 832(a) ("No charge or specification may be referred to a general court martial for trial until a thorough and impartial investigation of all the matters set forth therein has been made.").

the imposition of pretrial restraint.[27] The question of whether any constitutional speedy trial protection extends to the detainees remains unanswered.

Under the revised military commission procedures, the jury panel makes the decision as to guilt or innocence and, upon conviction, determines the sentence.[28] Except when considering a capital charge, the jury panel need only have a minimum of five members,[29] and the panel's composition differs significantly from a federal jury in that it is comprised solely of commissioned officers who are chosen because they meet certain qualifications.[30] It is also highly likely that all members of the panel would hold some level of security clearance, and this level would facilitate consideration of any classified material which might be introduced into evidence. As to appellate review under the new legislation, once the convening authority approves a finding of guilt, the case is referred to a Court of Military Commission Review (CMCR) which is comprised of appellate military judges.[31] What is significant about the scope of review for the CMCR is that it includes determinations of both law and fact,[32] thus permitting the appellate court to set aside a conviction based upon a finding of insufficient evidence

---

[27]    Military Commissions Act of 2009, Pub. L. No. 111-84, § 802, 123 Stat. 2190 (2009) (to be codified at 10 U.S.C. § 948(b)(d)(1)) ("The following provisions of this title shall not apply to trial by military commission under this chapter: (A) Section 810 (Article 10 of the Uniform Code of Military Justice), relating to speedy trial, including any rule of court-martial relating to speedy trial . . . ."). *See* 10 U.S.C. § 810; Manual for Courts-Martial, United States, at II-71, R.C.M. § 707(a) (2008), *available at* http://www.au.af.mil/au/awc/awcgate/law/mcm.pdf (containing Executive Orders, the most current being Exec. Order No. 13,447, 72 Fed. Reg. 56179 (Sep. 28, 2007), through which the President exercises the authority vested in him by Congress in Articles 36 and 56 of the Uniform Code of Military Justice (10 U.S.C. §§ 836, 856) to prescribe rules of procedure for courts-martial and to establish maximum punishments for offenses).

[28]    Military Commissions Act of 2009, Pub. L. No. 111-84, § 949(l)(a), (m)(a), 123 Stat. 2190 (2009). Interestingly, a military commission may convict a detainee, except for death cases, upon a vote of only two-thirds of the panel. *Id.* § 949(m)(a). Sentencing requires only a two-thirds vote for imprisonment up to ten years and a three-fourths vote for sentences which are more than ten years up to life imprisonment, but a unanimous vote is required for a death sentence and the jury panel must be comprised of twelve members. *Id.* § 949(m)(a), (b)(2), (c)(1). This is identical to what is required in courts-martial under the Uniform Code of Military Justice. *See* 10 U.S.C. § 852(a), (b).

[29]    *See* Military Commissions Act of 2009, Pub. L. No. 111-84, §§ 948(m)(a), 949(m)(c), 123 Stat. 2190 (2009).

[30]    *Id.* § 948(i)(a) (b) (stating that "[a]ny commissioned officer of the armed forces on active duty is eligible to serve on a military commission under this chapter" and that "[w]hen convening a military commission . . . the convening authority shall detail as members of the commission such members of the armed forces eligible under subsection (a), as in the opinion of the convening authority, are best qualified for the duty by reason of age, education, training, experience, length of service, and judicial temperament.").

[31]    *Id.* § 950(f)(a), (b).

[32]    *Id.* § 950(d).

to support the jury panel's verdict. The model for this expanded scope of appellate review is the service courts of criminal appeal, the highest appellate courts in each of the armed services for review of courts-martial.[33] Following action by the CMCR, a detainee may petition for further review in the Court of Appeals for the District of Columbia Circuit and then to the Supreme Court.[34]

There is one particular issue with regard to using revised military commissions which remains unresolved. Under the new legislation, "material support for terrorism," a crime codified in 18 U.S.C. 2339(a) and (b), is deemed to be a violation of the law of war—the traditional subject matter jurisdiction of a military commission—and listed among the offenses which may be prosecuted by military commission.[35] Whether material support for terrorism constitutes a recognized violation of the law of war will, in large part, depend upon how the courts interpret the scope of Congress' authority to define violations of the law of war in a statute.[36] If a court rules that the offense is not a violation of the law of war, and is therefore outside the subject matter jurisdiction of military commissions, such offenses could be prosecuted only in the federal district courts. The resolution of this issue may come when the case of Ali Hamza Ahmad Suliman al Bahlul, who along with Salim Hamdan was convicted of material support for terrorism,[37] reaches its final stage of appeal.

### III. CONCLUSION

As mentioned earlier, the Obama Administration has signaled its intention to prosecute alleged terrorists using a combination of the federal district courts and military commissions operating under revised rules of procedure. There will be cases where security reasons or evidence admissibility problems make it more advisable to use military commissions. On the other hand, in the event it is ruled that the crime of material support for terrorism can only be prosecuted in the federal district courts, then the difficulties of using a military forum are obvious. The Administration should not be reticent, though, to use military commissions to prosecute those at Guantánamo Bay whenever possible. Now that Congress has revised the rules and procedures to make them adhere more closely to the protections afforded to

---

[33]   *See* 10 U.S.C. § 866(c).

[34]   Military Commissions Act of 2009, Pub. L. No. 111 84, § 950(g)(a)(e), 123 Stat. 2190 (2009).

[35]   *See id.* §§ 950(p)(d), (t)(25).

[36]   U.S. CONST. art. I, § 8, cl. 10 (stating that Congress has authority "[t]o define and punish Piracies and Felonies committed on the high Seas, *and Offenses against the Law of Nations.*" (emphasis added)).

[37]   *See* News Release, *supra* note 10.

our own service personnel under the UCMJ, there is a greater probability that military commissions will be upheld in the courts and, notwithstanding their early notoriety, accepted by the American people and the global com munity.[38]

---

[38]  *See* Hamdan v. Rumsfeld, 548 U.S. 557, 632 33 (2006) (holding that courts-martial under the UCMJ meet the requirements of Common Article 3 of the Geneva Conventions, whereas the system of military commissions at issue in the case did not). The case noted:

The Government offers only a cursory defense of Hamdan's military commission in light of Common Article 3. As Justice Kennedy explains, that defense fails be-cause "[t]he regular military courts in our system are the courts-martial established by congressional statutes." At a minimum, a military commission "can be 'regular-ly constituted' by the standards of our military justice system only if some practical need explains deviations from court-martial practice."

*Id.* at 785 86 (Kennedy, J., concurring in part) (citations omitted) (alteration in original).

# TAB 8

Death penalty in 9/11 trials may be difficult - Page 2 - latimes

Advertisement

**Los Angeles Times**   CALIFORNIA & LOCAL   ENTERTAINMENT   SPORTS   BUSINESS   TECHNOLOGY   NATION   POLITICS   WORLD   MORE

YOU ARE HERE: LAT Home → Collections → Trials

Advertisement

(Page 2 of 2)

## Death penalty in 9/11 trials may be difficult

*Legal experts say Obama was overly confident when he said that critics of the New York trial would be silenced 'when the death penalty is applied to' suspect Khalid Shaikh Mohammed.*

November 30, 2009 | By David G. Savage

 0

"I suspect KSM is absolutely delighted by this decision," said Brad Berenson, a former White House lawyer in the George W. Bush administration, referring to Mohammed by his initials. "This means a return to the scene of his greatest triumph. And it gives him a megaphone 100 times greater than he would otherwise have."

**FROM THE ARCHIVES**

Death Penalty Facts
*March 12, 2005*

Death Penalty Controversy
*January 28, 1990*

Earlier this year, Mohammed said at a Guantanamo hearing that he wished to plead guilty. But Duke University law professor Scott Silliman said the government should not count on him and his four alleged co-conspirators to plead guilty now.

"I think it's likely KSM will want to use the trial as a forum for himself and to put the government on trial. I will be very surprised if he pleads guilty," said Silliman, a former military lawyer. "We should expect a long, convoluted trial full of difficulties for the government."

Before trial, the five defendants' attorneys are likely to ask for a change of venue and to ask for the charges to be dismissed because the long-held defendants were denied a "speedy trial."

**MORE STORIES ABOUT**

Trials

News

Washington dc

Terrorism

"There also will be a mountain of discovery motions," said Charles "Cully" Stimson, a former Pentagon lawyer in the George W. Bush administration. Defense lawyers will demand to see files and cables that contain evidence involving the alleged 9/11 plotters.

Supporters of Holder's decision say convictions in an open federal court will be a triumph for American justice.

"This trial is going to be fair," said Stephen Saltzburg, a law professor at George Washington University. "It will show that we Americans play by a set of rules. And that the truth comes out in court for all to see."

david.savage@latimes.com

http://articles.latimes.com/2009/nov/30/nation/la-na-terror-trials30-2009nov30/2[5/8/2017 11:47:45 AM]

119

A145

Death penalty in 9/11 trials may be difficult - Page 2 - latimes

Prev | 1 | 2

🖶 [ ] 0

**MORE:**

Woman Gets 26 Years to Life in Plot to Kill Identical Twin

Did Louganis Act Properly? : Diving: Some wonder whether he should have revealed he was HIV-positive during '88 Games.

Toski Admits to Cheating, Quits Tour

Swimmer Victor Davis, 25, Dies of Injuries

Mary Todd Andrews, 86; Actress, Screen Star Dana Andrews' Widow

**Los Angeles Times** Copyright 2017 Los Angeles Times

Index by Keyword | Index by Date | Privacy Policy | Terms of Service

A146

# TAB 9

A147

The World Today - Gitmo detainee acquitted of 284 charges, guilty of one 18/11/2010



## The full story...

# Gitmo detainee acquitted of 284 charges, guilty of one

Lisa Millar reported this story on Thursday, November 18, 2010 12:24:00

**ELEANOR HALL:** The first Guantanamo Bay detainee to be tried in the United States was today cleared of nearly all the charges against him by a New York jury.

Ahmed Khalfan Ghailani faced 285 charges over the 1998 embassy bombings in east Africa that killed more than 200 people.

But the jury found him guilty of just one charge - conspiring to destroy US property.

North America correspondent Lisa Millar spoke to the executive director of the US Center on Law, Ethics and National Security at Duke University, Professor Scott Silliman, about the case.

**SCOTT SILLIMAN:** I was surprised that he was convicted of only one count of the conspiracy charge that had to do with basically destroying US government property, the buildings in the embassy bombing.

It's kind of hard to understand how a jury could conclude that he conspired to bomb the embassy and yet didn't also conspire to kill the victims of the bombing.

But juries in your country and our country come out with strange results so we just have to leave it at that.

I think many people believed that he would be convicted on more counts. But the fact that he was convicted of at least one count means that the trial in the eyes of the prosecutor I think was a success.

**LISA MILLAR:** The prosecution though struck trouble a couple of weeks ago when they had witnesses knocked out didn't they?

**SCOTT SILLIMAN:** That's correct. The judge ruled that the Government's principal witness could not be allowed to testify because

http://www.abc.net.au/worldtoday/content/2010/s3070013.htm[5/8/2017 11:31:23 AM]

122

A148

The World Today - Gitmo detainee acquitted of 284 charges, guilty of one 18/11/2010

his identity and what he would testify to had been discovered by the Government through course of means, through the use of techniques that would not otherwise be permissible.

And so the Government had a partial case going into the trial and many believed that perhaps the jury would either become deadlocked or that he'd be acquitted of all the charges. But that's a risk you take whenever you go into a prosecution of a case like this.

LISA MILLAR: So 285 charges, guilty on only one, but you say that's still a win for the Government and prosecutors.

SCOTT SILLIMAN: Well I think so. Obviously you could look at it and say he wasn't convicted of at least half of the charges. Perhaps the Government should not have charged them all.

But as we've just discussed it was only a couple of weeks ago that the Government lost its major evidence in the case. And at least it went on to trial and got a conviction on one count.

So had that witness been able to testify then perhaps we would have had a difficult, a more different result. We probably would have had more counts upon which he was convicted.

But nonetheless the Government pursued this trial in the Federal Court. As your listeners may know there's a raging debate in this country between the military commission system and trials in the Federal Courts like Ghailani. And at least this indicates that the federal trial option will work albeit with some problems.

LISA MILLAR: So this was seen, as you say, a bit of a testing ground for the Obama administration. Barack Obama would like to see detainees tried in civilian courts where possible.

Does what has happened here in New York support that move?

SCOTT SILLIMAN: Well it does partially. But I think that the Obama administration is also signalled that it also wants to use the military commission system.

We've got the major conspirators in the 9/11 attacks still at Guantanamo Bay - Khalid Sheikh Mohammed and four others - and no decision has been made yet as to whether they will be prosecuted by a military commission or trial in the Federal Courts.

I'm sure the administration was watching this case to see whether in fact you could get a conviction albeit on just one count which means the Federal Courts could be used in appropriate cases.

But I think President Obama is also saying that there will be appropriate cases to be sent to military commissions as well. So I think we are just seeing the start of the trials for the terrorists.

And again if your listeners know Ghailani was not charged with anything with regard to the attacks of 9/11. The charges against him related to the bombings of the embassies in Tanzania and Kenya in 1998.

LISA MILLAR: And of course the big trial that the question mark hangs over is that of Khalid Sheikh Mohammed as you said, the co-conspirator of the 2001 attacks.

What impact do you think this will have on the Government's decision about where they try him?

SCOTT SILLIMAN: I'm not sure it will have that much of an impact. To compare Ghailani to Khalid Sheikh Mohammed, they're two totally different types of cases. And the magnitude of what they did is very different.

So I would suggest that the Obama administration is still carefully trying to look at both available forms and trying to make a good, well reasoned decision as far as which form should be used.

http://www.abc.net.au/worldtoday/content/2010/s3070013.htm[5/8/2017 11:31:23 AM]

123

A149

The World Today - Gitmo detainee acquitted of 284 charges, guilty of one 18/11/2010

ELEANOR HALL: That's Professor Scott Silliman the executive director of the US Center on Law, Ethics and National Security at Duke University. He was speaking to Lisa Millar.



©2010 ABC
PRIVACY POLICY
CONDITIONS OF USE

A150

# TAB 10

Gitmo Trial May Mean Obama Will Sign Off on KSM's Death | TIME.com



**CRIME**

# Gitmo Trial May Mean Obama Will Sign Off on KSM's Death

By Mark Benjamin    April 05, 2011

Attorney General Eric Holder's announcement Monday that Khalid Shaikh Mohammed and four other alleged 9/11 plotters will be tried in military commissions rather than civilian courts means that KSM might face lethal injection at Guantanamo, and the President might have to personally sign off on his death.

| | Email | Print | Share |

Follow @TIMEPolitics

If it is a capital case, Holder's decision draws the President directly into the judicial process. In civilian court, a judge assigns the death penalty according to sentencing guidelines. In a military commission, the President must explicitly approve a death sentence. And the Military Commissions Act of 2009, which governs those cases, gives the President wide latitude to use his own judgment in a capital case.

"That part of the sentence providing for death may not be executed until approved by the President," the law states. "In such a case, the President may commute, remit, or suspend the sentence, or any part thereof, as he sees fit."

That law is silent on the method of execution, but lethal injection is the military's official execution method. And while the Army's death row is at Fort Leavenworth in Kansas, experts in military law suspect KSM's lethal injection would probably be carried out at GTMO. "I'm assuming the same pattern will be followed, except for the location," says Scott Silliman of Duke Law School.

(The military hasn't executed anybody since 1961, though there are seven people on death row at Fort Leavenworth.)

In KSM's case, a panel of 12 commissioned officers would have to vote unanimously to sentence the alleged terrorist to death. The law bars the introduction of evidence obtained by torture, but does allow hearsay under certain, very limited circumstances.

http://swampland.time.com/2011/04/05/gitmo-trial-may-mean-obama-will-sign-off-on-ksms-death/[5/8/2017 11:56:03 AM]

A152

Gitmo Trial May Mean Obama Will Sign Off on KSM's Death | TIME.com

There has been some confusion about whether it might be more difficult to execute KSM via military commission if he pleads guilty to a capital offense, since the law clearly allows a jury to administer the death penalty, but is silent on how to handle a guilty plea in such a case. Silliman predicts the military judge might simply reject the plea, allowing the case to move forward, and conceivably toward the President's desk.



## Most Popular

**FROM SWAMPLAND**

1  Why the U.S. Flag is Red, White and Blue

2  Rick Warren Preaches First Sermon Since His Son's Suicide

3  Does the Military Vote Really Lean Republican?

4  The Party of No: New Details on the GOP Plot to Obstruct Obama

5  Rahm Emanuel's Father Problem

**FROM TIME.COM**

1  Russian Forces Double Along Ukraine Border

2  Gangs of 'Powerfully Built' Women Are Mugging Tourists on the Streets of Hong Kong

3  Putin Phones Obama To Discuss Ukraine, White House Says

## POPULAR AMONG SUBSCRIBERS

**Japan's Booming Sex Niche: Elder Porn**

**Young Kids, Old Bodies**

**Benedict Cumberbatch Talks Secrets, Leaks, and Sherlock**

**Obama's Trauma Team**

## CONNECT WITH TIME

http://swampland.time.com/2011/04/05/gitmo-trial-may-mean-obama-will-sign-off-on-ksms-death/[5/8/2017 11:56:03 AM]

A153

Gitmo Trial May Mean Obama Will Sign Off on KSM's Death | TIME.com

**4**    Colbert Tweet Draws Accusations of Racism and #CancelColbert

**5**    There's A Scientific Reason for Why You Look Weird In Selfies



© 2017 Time Inc. All rights reserved.

128

A154

# TAB 11

Meet the man who would save Guantanamo



| | Join the ABA | Shop ABA | Calendar | Member Directory |

News▾   In-Depth▾   Blawgs▾   About▾

Search      Submit

Home / In-Depth Reporting / Meet the man who would save Guantanamo

FEATURES

# Meet the man who would save Guantanamo

POSTED MAR 01, 2013 11:20 AM CST

BY TERRY CARTER



*Photo of Brig. Gen. Mark Martins by Dave Moser.*

For a moment, U.S. Army Brig. Gen. Mark Martins seems discomfited. That is not his nature. In the words of a reporter covering the revamped military commissions now trying accused terrorists in Guantanamo Bay: "Don't play poker with the man. He has no tells."

But Martins is visibly stung when told reporters gripe that his lengthy, detailed responses to their questions sometimes don't contain the direct answers they seek. He winces, holding a squint as he mulls the criticism, his sinewy 6-foot-3 frame folded erectly onto a small couch by a coffee table at one end of his office in a nondescript commercial area of Northern Virginia. His response at first develops in the fashion that brings the complaint: "You have to give them the context. We're not in the same place we were five years ago. So using the same narratives and storylines when you now have a different statute—Congress has weighed in, we've had the judiciary weigh in."

Martins catches himself in midsentence, then continues in a softer voice that trails off in thought: "So, I probably do. I hope they don't think I'm pedantic. ...."

Transparency has been Martins' mantra, a theme he returns to often since being assigned in September 2011 as chief prosecutor, the sixth in 10 years, for the controversial military commissions in Gitmo.

In their earlier iterations, one chief and several prosecutors have resigned or sought reassignment, some blaming unethical pressures from both military and civilian higher-ups. Martins knows that perception still rules, and part of his job is to proselytize what he sees as a newfound legitimacy for the rehabilitated military commissions, significantly overhauled to carry the burden of justice for those accused in the September

Tweet

in Share  5

submit

http://www.abajournal.com/magazine/article/the_man_who_would_save_guantanamo[5/8/2017 11:58:43 AM]

130

A156

Meet the man who would save Guantanamo



2001 attacks on New York and Washington and the 2000 bombing in Yemen of the U.S.S. Cole.

But legitimacy is as elusive as it is necessary because of the recent history of military commissions. Dusted off after 60 years of desuetude only a month after the 9/11 terrorist attacks, too much of their modern development took place in the dark underbelly of fiat, political intrigue and utter disregard for justice and the rule of law. Even teachers in the law department at the U.S. Military Academy at West Point, Martins' alma mater, say the system had been reverse-engineered to get hasty convictions and the certainty of executions.

Martins acknowledges that those earlier iterations were seriously flawed, and he has been intimately involved in their reformation. Martins served as executive secretary and co-chair for the interagency Detention Policy Task Force, a U.S. Defense Department group that developed the policies later adopted in the Military Commissions Act of 2009. The legislation attempted to address a variety of criticisms, from the principled stands of civil libertarians to the rebuffs from federal district and appellate courts, and even critics avow the sincerity of Martins' efforts.

Jennifer Daskal, a fellow at Georgetown University's Center on Law and National Security, was the senior counter-terrorism counsel at Human Rights Watch when she was hired to work on the task force. Daskal feels that Martins "not only took my views seriously, but actively sought them out and was always incredibly considerate and respectful." Still, she and those of similar mindset represent Martins' most formidable audience: She believes the cases should be tried in Article III courts.

"It's hard to divorce the current military commissions from their history," says Daskal. "The system is hugely improved, certainly since [earlier versions in] 2001 and including 2006. But with public perception domestically and, more important, internationally, there are huge hurdles for him to overcome. With that said, if the goal is to make the prosecution as fair and transparent and as consistent with the rule of law as humanly possible, Mark Martins is probably the best person for the job."

## SCHOLAR SOLDIER

Any appraisal of Martins, 52, begins with a discussion of his bona fides, which rise above even those of the rarest warrior-lawyer.

In 1983 Martins graduated first in his class of 833 at West Point. Commissioned as a second lieutenant in the infantry, he headed to Oxford University as a Rhodes scholar. While others might have spent the break between them in the tow of Fodor's England travel guide, Martins squeezed in 61 daunting days of the elite Army Ranger School.

The Ranger regimen pushes soldiers to their limits psychologically and physically, and the washout rate usually is more than 50 percent. A week or so before beginning classes at Oxford, Martins received the coveted Ranger tab on his sleeve.

He graduated from high school in Rockville, Md., just outside Washington, D.C. His father, a colonel, was chief of neurosurgery at the Walter Reed Army Medical Center. Martins met some surgeons on the staff who were West Point grads and found interest in the academy.

"I was a suburban kid," he says. "Once I got to West Point, now I was orienteering, shooting, mountain climbing, parachuting and doing all of that with buddies," he recalls. "I love this stuff."



Photo of Brig. Gen. Mark Martins by Dave

http://www.abajournal.com/magazine/article/the_man_who_would_save_guantanamo[5/8/2017 11:58:43 AM]

*Meet the man who would save Guantanamo*

He runs at least five miles each day and typically sleeps four or five          *Moser.*
hours a night. Friends say he has been known to self-enforce sleep
deprivation at home on weekends to extend his ability to maintain mental acuity without sleep. "It's like a muscle," he says,
as though that might explain.

The Oxford program is a mix of politics, philosophy and economics, but Martins found himself drawn to studies in
jurisprudence. After graduating with first-class honors, he returned to the infantry but after two years entered the service's
Funded Legal Education Program as an Army captain at Harvard Law. Martins graduated magna cum laude in 1990 and
was on the law review.

To the extent that authoring particular law review notes might reveal one's politics, Martins' writings might illuminate him to
philosophical foes. He criticized the U.S. Supreme Court for its handling of *Teague v. Lane*, which dismissed a habeas
petition by a black man challenging prosecutors' striking of 10 blacks from the jury pool and getting an all-white jury. And
Martins wrote that, in *Evans v. Jeff*, permitting a requirement for waiver of attorney fees in settling civil rights class actions
wrongly removed incentives for lawyers to take such cases.

Martins has straddled a sharp divide in the military, in which there is an "operational army" and an "institutional army." The
former includes the armies, corps, divisions, brigades and battalions that carry out military missions around the world. The
institutional army, part of which is the Judge Advocate General's Corps, provides the necessary infrastructure. As the
Army's webpage puts it: "Without the institutional army, the operational army cannot function. Without the operational
army, the institutional army has no purpose."

Martins is well-seasoned in both. But when asked about his various assignments in the operational army, Martins'
instinctive humility subsides a bit. "Since Harvard Law, I've been able to spend more time in the operational army than a
lot of my brigadier general peers who went into combat arms," Martins says. "That's the way it worked out. I'm pretty
lucky."

In 1998, then-Maj. Martins was the first (and, thus far, the only) JAG lawyer awarded the "White Briefcase" as the top
graduate of the Army Command and General Staff College, a one-year resident graduate school for grooming top
leadership prospects. It's actually a .45-caliber pistol mounted under glass in a small wooden case, and its other recipients
include Gens. Dwight Eisenhower and David Petraeus, Martins' friend and mentor.

As a lieutenant colonel while he was the JAG lawyer advising the Army's 1st Armored Division in Iraq in 2003, Martins was
tapped to command a 60-vehicle convoy going 400 kilometers over nearly 19 hours from Kuwait to Baghdad—a decidedly
dangerous and nonlawyerly mission. Before that, as a major, he was chief of staff providing options in tactical and
strategic decision-making (not as an advising lawyer) to the general leading a peacekeeping mission in Kosovo in 1999.

Since 9/11, Martins has been deployed to Iraq and Afghanistan for about 4½ years, including two years at a time in each.
He was away from his wife, Kate, herself a West Point grad and former Army helicopter pilot, and their children, who were
then in high school. Their son, Nate, graduated from West Point last spring and headed to Ranger School, while daughter
Hannah is in ROTC at Princeton University.

A158

Meet the man who would save Guantanamo



*Brig. Gen. Mark Martins: "Except for yours truly, this is such an impressive legal team. The partnership we've forged between the defense and justice departments serves the American people exceptionally well." Pictured left to right are: Omar Qudrat, Marine Capt. Michael Krouse, Alan Ridenour, Danielle Tarin, Navy Lt. Jaspreet Saini, Brig. Gen. Mark Martins, Air Force Col. Michael O'Sullivan, Courtney Sullivan, Haridimos Thravalos and Mikael Clayton. Photo by Dave Moser.*

## ACCOLADES FROM ABOVE

When Martins commanded a large counterinsurgency operation helping develop local legal systems to lessen Taliban influence in the far reaches of Afghanistan, his boss, Vice Adm. Robert Harward, a Navy SEAL, wrote in his evaluation: "Tremendously fit, infectiously successful, visionary yet practical, caring toward his troops and always leading from the front, this is the first officer I would pick for the hardest commands and the most important fights."

In an evaluation of Martins' earlier work in Iraq, U.S. Air Force Gen. Richard B. Myers quoted Petraeus as saying Martins was "the most outstanding officer with whom I ever have served—bar none."

"He's fiercely competitive, but at the same time he lacks the arrogance that someone with his intelligence, education and background might justifiably display," says Darrel Vandeveld, who studied international law under Martins at the Judge Advocate General school at the University of Virginia in 1994. "At heart, he's a very humble person."

Martins was handpicked to lead the Guantanamo prosecutions by Jeh Johnson, then-general counsel at the U.S. Defense Department, who had seen his work on the Detention Policy Task Force. It was Martins' experience at dealing with detention problems and rule of law efforts in Iraq and Afghanistan that led to that job.

If Martins' personal accomplishments have propelled him through the ranks, many believe his personableness and reputation for trustworthiness give him the best hope for his current, unenviable task. And reluctant critics like Daskal and Vandeveld speak to some of the best examples of that.

Vandeveld, now retired as an Army Reserve lieutenant colonel, resigned as a prosecutor at Gitmo in 2008, upset after finding that discovery had been withheld from the defense in a case he was handling. The defendant, Mohammed Jawad, was a teenager when first brought to Guantanamo. Vandeveld came to believe that Jawad was probably innocent, and that he had been subjected at Gitmo to the "frequent flyer program," in which he was awakened every three hours and moved to different cells for weeks at a time.

Superiors rebuffed Vandeveld's desire to plea-bargain. In 2009, Jawad was released after a successful habeas petition.

Vandeveld's noisy exit included testifying in 2009 against the legislation for reformed military commissions. But last year, after Martins contacted him, Vandeveld wrote an opinion piece on the Lawfare blog reversing his position. He cited a mix of admiration for Martins' professionalism, sufficient fairness built into the revised system and the need to provide long-

A159

Meet the man who would save Guantanamo

delayed justice to the defendants in what, at this point, is "the only legal array we have to end a decade of panicky missteps and failure."

It is difficult to get Martins to toot his own bugle; he's quick to emphasize the team aspect of whatever he's doing. Indeed, while he has argued in court in recent hearings when matters touched on the commissions' legitimacy, the substantive prosecution is being done by others, such as Robert Swann, a retired Army colonel who was chief prosecutor in 2004, and Edward Ryan, who joined the 9/11 prosecution team in 2007 after lengthy experience as a federal prosecutor and more than 100 RICO convictions involving Colombian drug cartels.

While many see the military commissions as intertwined with their complicated history, Martins is driven to legitimizing his prosecutorial task. As the new round of commissions convenes, the ultimate outcome may have a good deal to say about a far broader issue: whether the proper democratic response to terrorism in some instances is found in civilian law enforcement or by military means.

No one wears military uniforms in Martins' office in Northern Virginia. The building resembles others along block after sprawling block of suburban business-park development. There is a guard desk just outside the elevator on his floor in a reception area so plain and bare, it strongly hints at governmental presence. At either end heavy, locked metal doors lead to the prosecution team's offices.

Martins, wearing a dark-blue business suit, emerges to greet a guest rather than sending a staffer. He is known for the personal touch and for charm offensives. There is a clear-domed, rotating light on the hallway ceiling outside his office door that flashes red when there's need to signal "Do not disturb."

But he is clearly disturbed as he thinks out loud about complaints over his handling of news conference questions. After all, he says, reporters have benefited significantly from the changes he helped engineer.

For example, reporters now can watch Gitmo proceedings on live video feed to several U.S. locations if they choose not to travel to the military base in Cuba; even down there, they are somewhat freer to move about than before. (Their view, though, is through Plexiglas, and they complain about the extraordinary, censor-driven delay in audio. A lawyer's gesture occurs a clumsy 40 seconds before the words that accompany it.) Same-day transcripts are usually available online. Documents are put up as soon as possible, though it often takes weeks because various federal agencies must vet them for classified information.

Still, it is the issue of torture, not credentialed press logistics that will ultimately determine the fate of the new commissions.



*David Nevin, Mohammed's Attorney: "My question is, when is it OK to use statements they uttered after being waterboarded? ... Khalid Sheikh Mohammed [was*

It is no secret that a number of defendants were tortured or coercively interrogated by the CIA at "black sites" abroad before being brought to Gitmo in 2005. And under some circumstances evidence obtained by torture, "cruel, inhuman or degrading treatment" or other coercion can be admitted—though Martins insists he will not avail himself of that.

But the trials under way sometimes look like a game: the defense trying to make the proceedings all about torture, and the prosecution trying to keep any utterance of the word out of the courtroom.

Martins has said the prosecution will not use evidence derived from torture, but defense lawyers and others say the government will bootstrap coerced admissions using similar statements taken later by other, noncoercive interrogators. The prosecution has a different perspective: a "clean team" of FBI agents at Guantanamo later spoke with the detainees in relaxed settings. The clean team spent months being friendly and solicitous with the men, building rapport before questioning them. To defense attorneys, this is a distinction without a difference.

"My question is: When is it OK to use statements they uttered after being waterboarded?" says Boise, Idaho, attorney David Nevin, a lawyer for Khalid Sheikh Mohammed, the self-

A160

Meet the man who would save Guantanamo

*waterboarded] 183 times in March 2003. Is it OK a day later, a week, a month, a year? When?" AP Photo/File*

admitted mastermind of 9/11. "It's unclassified, so I'll say this: Khalid Sheikh Mohammed [was waterboarded] 183 times in March 2003. Is it OK a day later, a week, a month, a year? When?"

Finding that bright line in all this will be up to the judge, Army Col. James Pohl, who is handling both the 9/11 and U.S.S. *Cole* trials. He will determine whether the FBI agents, if brought in to testify, picked poisoned fruit from the CIA's tree.

Martins points out that Pohl already has shown independence and resolve in speaking truth to power: He prohibited the Bush administration from razing the notorious Abu Ghraib prison in Iraq on grounds that it was a crime scene; he similarly refused the Obama administration's request for a stay in the Abd al-Rahim al-Nashiri case (the *Cole* bombing) while a task force studying new approaches to Gitmo was under way. Pohl required dismissal without prejudice.

Beyond that, the prosecution has another avenue to present such evidence. On Feb. 29, 2012, Majid Khan, a well-spoken man whose command of English reflects his having grown up in the Baltimore area, entered a plea agreement on conspiracy and murder charges. Now 32, he had been held in detention for nine years—after his 2003 arrest in Pakistan—before being formally charged just a month before his plea. He is expected to testify against Mohammed and others, and will not be sentenced until after their trial. Thus, mention of the fact that he, too, was tortured won't occur until then.



©Andrew Lichtenstein/Corbis

## WHAT STAYS CLASSIFIED

Reporters and defense attorneys alike complain of the overclassification of information, especially when it concerns the treatment of detainees. Courts have ruled it improper to do so solely to avoid embarrassment to the U.S. or to conceal illegal activity. But it is the CIA, not the courts, that determines what is a secret and what is not.



©Maps.com/Corbis

Until Martins pulled back the parameters in early September, any utterance by any of the defendants, even telling their lawyers what they had for lunch, was presumptively classified. For two months in 2010, for example, a note from one defendant to his lawyer remained top secret while the government vetted it. It said professional basketball player LeBron James should apologize to the citizens of Cleveland for having jumped to the Miami Heat. Classified information for the trials now is limited to anything having to do with

http://www.abajournal.com/magazine/article/the_man_who_would_save_guantanamo[5/8/2017 11:58:43 AM]

A161

Meet the man who would save Guantanamo

"sources and methods" of interrogations before the defendants' arrival at Gitmo. Still, critics complain that those interrogations took place eight to 10 years ago, and that the government says coercive practices are no longer permitted. So why the need?

"From where I sit, they've structured the entire environment so that the government can talk about the bad things the defendants did, but the defendants are not allowed to defend themselves in any meaningful way," Nevin says. "The result is a system designed to guarantee convictions and minimize the possibility that anything of substance will come out about torture."

Nevin—founding partner of Nevin, Benjamin, McKay & Bartlett—has a storied history of challenging what he sees as governmental overreach: In 1993 he won acquittal on all charges for one of two men accused of killing a U.S. marshal during a siege and shootout at Ruby Ridge, Idaho. In 2004 he persuaded an Idaho jury to acquit Sami Omar al-Hussayen, a Saudi student accused of recruiting terrorists. Nevin wants to argue, in part, that the conspirators planning the 9/11 attacks sought retaliation against the U.S. for its own actions against their people.

Harvard professor Jack Goldsmith says, "One aim of defense counsel in high-profile cases like these—and this is what they sometimes do in our civilian courts also—is to try to delegitimate the whole system."

A friend and admirer of Martins', Goldsmith resigned as head of the Office of Legal Counsel under the Bush administration, in part over that administration's justifications for mistreatment of detainees. Goldsmith says critics of the military commissions haven't thought through the consequences. "The alternative to military commissions for the people being tried in them is not to set them free," he says. "The alternative is military detention, which puts a lower burden on the state. I think it's self-defeating for critics just across the board to be against the military commissions when they are a legitimate tool, and when they should see the alternatives as worse."

As critical as Nevin is of the prosecutions, he sees Martins as a principled force behind them. "The government [still] hopes to execute them and extinguish the only eyewitnesses to the events, the only ones who have any motivation to tell the truth about what happened," Nevin says. "I find Gen. Martins to be an intelligent and honorable guy. If I had to guess, I'd say he has inherited some limitations in the ways he can go forward that are achieving the effect of the ends I've described."

## HANDPICKED PROSECUTOR

Meanwhile, Martins has been spending a lot of time onstage, often on camera and usually in dress uniform, trying to live the transparency he preaches.

"Gen. Martins has done distinguished work and he's taken what I think is a thankless task, all to his credit," says Eugene R. Fidell, a visiting lecturer at Yale Law School, former Coast Guard JAG and an expert in military law. "But he also has felt impelled to spend a lot of time defending the system. You have to wonder why so much effort has been spent justifying its existence when we already have a fabulous judicial system."

Some see it as double duty. "Gen. Martins and his team are essentially going to have to try two cases in every one case they do because they will be trying to convict a defendant and trying to legitimize their system," says David Raskin, who just a few years ago was himself readying to try Mohammed in federal court in the Southern District of New York. "That's twice as much work."

Raskin is one of many critics who believe the cases should be in



A162

Meet the man who would save Guantanamo

federal court. For him it also is a personal disappointment. After 12 years as an assistant U.S. attorney, the last 4½ of them as chief of that district's terrorism and national security unit, he lost his opportunity to prosecute the worst of all terrorists when President Barack Obama abruptly renewed the military commissions in 2009.

*Martins, in his combat uniform, checks on troop living conditions at a partnered police station in Afghanistan.*

Raskin, who joined the New York City office of London's Clifford Chance to do white-collar criminal defense, believes military commissions require extra effort in matters that Article III courts already handle in stride. Hundreds of terrorism cases have already been prosecuted in our federal courts, a criticism Martins knows all too well.

"We don't seek to displace the federal courts in international terrorism cases," Martins says, "but there is a narrow category of cases where counterterrorism professionals, prosecutors, intelligence and law enforcement officers might determine that the best forum is a military commission."

Criteria include point and circumstances of capture, foreign policy concerns, evidentiary problems, and the nature and gravity of the conduct. If there are violations of the laws of war, more serious matters might be better handled by military commissions if certain other factors come into play, too. One of those, as Martins has put it in some of his speeches, "is the manner in which the case was investigated and evidence gathered, including which entity conducted the investigation" and a particular forum's capability for protecting "specific intelligence sources and methods."

Some critics turn that argument back on itself. "In these cases the government is trying desperately to avoid their own shadow, from abusing detainees," says Stephen I. Vladeck, a law professor at American University and regular contributor to the Lawfare blog. "Not that it changes the terrible crimes the defendants committed. That's the tragic irony."

But Robert Chesney, a professor at the University of Texas law school, believes military commissions have become a proxy in the debate over the U.S. approach to battling terrorism. "The commissions have a profoundly significant symbolic value for both sides," says Chesney, a nonresident senior fellow at the Brookings Institution. "If you step back from the debate, people who want military commissions are that way not so much because they believe them to be better than civilian courts; they want a symbolic statement that this is a military concern, and they are opposed by most on the other side for that same reason. I'm not saying Mark Martins and others have this view. But it drives the narrative."

Martins thinks the context of terrorism is too complicated for Manichean choices: "I don't identify with either side, but we do face serious and adaptive yet entirely surmountable threats from irregular, nonstate groups—an attack can be characterized as both an act of war and a crime. Seeing military and law enforcement responses as mutually exclusive is a false choice. And lawfully gathered, noncoerced evidence in armed conflict should not be subject to identical rules of admissibility in a criminal trial. With that said, there is of course a critical role for law enforcement, and I believe our federal courts should continue to be our primary venue."

For Martins, military commissions aren't just the only game in town—they are the only possible one for now. Since 2009, to thwart Obama's then-stated desire to close down detention and trials at Guantanamo, Congress has issued successive legislation prohibiting the use of any government funds to bring detainees onto U.S. soil from Gitmo.

"I want to push back the notion that military commissions are what you use when you can't prove the case in federal court," Martins says. "It doesn't work that way. This has to be a public trial; it has to exclude coerced evidence and provide counsel rights. I'm going to present cases based on admissible evidence, and that's also not classified. The accused and counsel can litigate admissibility and refer to matters that relate to prior treatment. It is wrong out there to say we are attempting to sidestep relevant matters."

Chesney offers a counterfactual explanation for how things might have worked out better: "If in 2001 we'd had the 2009 Military Commissions Act and Mark Martins in charge of the prosecution, from the get-go there would have been significant focus on the legitimacy of the system, rather than on the more draconian-looking, multiyear process we got. I'm sure some would still be critical, but it would not have become the cause célèbre it continues to be."

A163

Meet the man who would save Guantanamo

The facts on the ground are, of course, very different, and the military commissions remain under siege as they have been for years, even as they proceed.

Martins, meanwhile, adheres to the Army's colloquial maxim, often barked by sergeants, which could apply from firing ranges to mess halls to command positions: "Stay in your lane."

| Previous: | Next: |
|---|---|
| Seeking justice in the killing fields | Daughter pushes back against pushy parents |

## Filed under:

**Constitutional Law | Civil Rights | Trials & Litigation | Military Law | Terrorism | Legal Theory | Features | Guantanamo/Detainees**

## You might also like:

- Draft executive order contemplates reopening CIA prisons, interrogating terrorists outside US
- Fired by feds over critical op-eds, former Gitmo chief prosecutor settles free-speech case for $100K
- Lawyers for admitted Sept. 11 mastermind allege secret order authorized destruction of evidence
- Defense Department wants group to lift ban on psychologists' participation in interrogations
- 14 years after Sept. 11 attacks, families of victims and others await justice



We welcome your comments, but please adhere to our comment policy and the ABA Code of Conduct.

Commenting is not available in this channel entry.



| Most Read | Most Commented |
|---|---|

A164



| UNITED STATES OF AMERICA | ) | IN THE UNITED STATES COURT OF |
|---|---|---|
| | ) | MILITARY COMMISSION REVIEW |
| *Appellant,* | ) | |
| | ) | APPELLANT'S OPPOSITION TO |
| | ) | APPELLEES' MOTION FOR RECUSAL |
| v. | ) | AND/OR DISQUALIFICATION |
| | ) | OF JUDGE SILLIMAN |
| | ) | |
| KHALID SHAIKH MOHAMMAD, | ) | |
| | ) | U.S.C.M.C.R. Case No. 17-002 |
| WALID MUHAMMAD SALIH MUBARAK | ) | |
| BIN 'ATTASH, | ) | Arraigned at Guantanamo Bay, Cuba |
| | ) | on May 5, 2012 |
| RAMZI BINALSHIBH, | ) | |
| | ) | Before a Military Commission |
| ALI ABDUL AZIZ ALI, | ) | convened by Vice Admiral (ret.) |
| | ) | Bruce E. MacDonald, USN |
| and | ) | |
| | ) | Presiding Military Judge |
| MUSTAFA AHMED ADAM AL HAWSAWI | ) | Colonel James L. Pohl, USA |
| | ) | |
| *Appellees.* | ) | DATE: May 15, 2017 |

### TO THE HONORABLE, THE JUDGES OF
### THE UNITED STATES COURT OF MILITARY COMMISSION REVIEW

COMES NOW Appellant United States of America, and pursuant to Rule 21(c)(1) of this Court's Rules of Practice, opposes Appellees' Motion for Recusal and/or Disqualification of Judge Silliman (hereinafter "Motion") filed on May 9, 2017 at 6:00 p.m. This opposition is timely filed.[1]

### STATEMENT OF FACTS

On May 9, 2017, Appellee Mohammad filed a Motion for Recusal and/or Disqualification of Judge Silliman alleging twelve instances of actual or apparent prejudice

---

[1] Pursuant to Rule 21(c) of this Court's Rules of Practice, Appellant's opposition is timely filed when filed within five days of filing of Appellees' motion. By operation of Rule 8(c), the Appellees' Motion is deemed filed on May 10, 2017, because it was filed after 5:00 p.m. on May 9, 2017. The day of filing is not included in the calculation of Appellant's allowable period for filing its opposition. *See* U.S.C.M.C.R. Rule of Practice 8(a). Therefore, this opposition is timely filed.

A165

arising from public statements or writings of Judge Silliman. Mot. at 1–5. Appellees Hawsawi and Bin 'Attash joined this Motion on May 10, 2017 and May 12, 2017, respectively.[2]

## LAW AND ARGUMENT

Appellees moved for recusal or disqualification of Judge Silliman. Appellees allege that prior writings and statements by Judge Silliman demonstrate actual prejudice against Appellee Mohammad and apparent prejudice against Appellee Mohammad and the other Appellees. Mot. at 9. The conduct cited by Appellees fall into three general categories. The first category includes scholarly writings and testimony before Congressional bodies. *See id.* ¶¶ 2, 4–5, 7. The second category includes comments and appearances in the media. *See id.* ¶¶ 6, 8–11. The third category includes statements made during academic conferences or lectures, including statements about the Chief Prosecutor of Military Commissions, Brigadier General (BG) Mark Martins.[3] *See* Mot. ¶¶ 1, 3, 12. It is, of course, Judge Silliman's decision whether to recuse himself or not, but, in the government's view, Appellees' arguments here objectively fail.

The judges of the U.S.C.M.C.R. are subject to rules governing judicial conduct. Rule 25 of the U.S.C.M.C.R. Rule of Practice (Feb. 3, 2016) addresses recusal and states:

> (a) **Grounds**. Judges may recuse themselves under any circumstances considered sufficient to require such action. Judges must disqualify themselves under circumstances set forth in 28 U.S.C. § 455, R.M.C. [Rule for Military Commissions] 902, or in accordance with Cannon 3C, Code of Conduct for United States Judges as adopted by the Judicial Conference of the United

---

[2] *See* Appellee Mustafa Ahmed Adam Al Hawsawi's Notice of Joinder to Appellee Khalid Sheikh Mohammad's Mot. for Recusal and/or Disqualification of Judge Silliman, filed on May 10, 2017; Walid Muhammad Salih Mubarak Bin 'Attash, Notice of Joinder, filed on May 12, 2017. This opposition is filed in response to the Appellees joined in this Motion, but the arguments herein apply to all Appellees; none of Judge Silliman's actions require recusal as to any Appellee in this case.

[3] The only statement that the Appellees rely on to challenge Judge Silliman that was made after Judge Silliman was sworn in as a Judge on the U.S.C.M.C.R. was Judge Silliman's statement about BG Martins.

States . . . .  For purposes of R.M.C. 902, the same disqualification standards which apply to military judges shall also apply to civilian judges appointed under 10 U.S.C. § 950f.

(b) **Procedure**.  A motion to disqualify a judge will be referred to that judge for a final decision.  If an initiating judge is recused or disqualified, that judge will notify the clerk of court, who will arrange for assignment of a substitute judge.

Title 28 U.S.C. § 455 states in relevant part:

(a) Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

(b) He shall also disqualify himself in the following circumstances:

(1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;

Rule for Military Commissions 902 tracks the language of § 455 and states in relevant part:

(a) *In general*.  Except as provided in section (e) of this rule, a military judge shall disqualify himself or herself in any proceeding in which that military judge's impartiality might reasonably be questioned.

(b) *Specific grounds*.  A military judge shall also disqualify himself or herself in the following circumstances:

(1) Where the military judge has a personal bias or prejudice concerning a party or personal knowledge of disputed evidentiary facts concerning the proceeding.

Canon 3C of the Code of Conduct for United States Judges is also very similar and states:

C. Disqualification.

(1) A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances in which:

(a) the judge has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;

The test of impartiality is an objective one; therefore, the standard is that of a reasonable person armed with all of the relevant facts.  *See Liteky v. United States*, 510 U.S. 540, 548 (1994) (requiring an objective evaluation under 28 U.S.C. § 455); *see also Cheney v. United States*, 541 U.S. 913, 924 (2004) (Scalia, J.) (opinion respecting recusal) ("It is well established that the

3

A167

recusal inquiry must be made from the perspective of a reasonable observer who is informed of all the surrounding facts and circumstances.") (internal quotation marks omitted).  Appellees have failed to allege any facts that, when viewed objectively, should result in Judge Silliman's recusal or disqualification.

1. Professor Silliman's Statements to Congress and Academic Writings.

Professor Silliman's comments during Congressional hearings and his writings in academic publications are not objective evidence of actual or apparent prejudice against Appellees.  Judge Silliman took the oath as a judge on the U.S.C.M.C.R. on September 12, 2012.  Mot. at 5; 1 Mot. App., 4.  Prior to his service on the Court he was a Professor of the Practice of Law at Duke University Law School.  1 Mot. App., 4  In his capacity as a law professor, Judge Silliman made various public statements to Congress, legal professionals, law students, and members of the media.  Although the Canons of Judicial Conduct did not apply to Professor Silliman at the time, they can be instructive on the issue of whether his prior comments and writings are current grounds for recusal or disqualification.  Canon 4 of the Code of Conduct for United States Judges states in relevant part:

> A judge may engage in extrajudicial activities, including law-related pursuits and civic, charitable, educational, religious, social, financial, fiduciary, and governmental activities, and may speak, write, lecture, and teach on both law-related and nonlegal subjects.  However, a judge should not participate in extrajudicial activities that detract from the dignity of the judge's office, interfere with the performance of the judge's official duties, reflect adversely on the judge's impartiality, lead to frequent disqualification, or violate the limitations set forth below.
>
> A. Law-related Activities.
>
> (1) Speaking, Writing, and Teaching. A judge may speak, write, lecture, teach, and participate in other activities concerning the law, the legal system, and the administration of justice.
>
> (2) Consultation. A judge may consult with or appear at a public hearing before an executive or legislative body or official:

4

A168

        (a) on matters concerning the law, the legal system, or the administration of justice;

        (b) to the extent that it would generally be perceived that a judge's judicial experience provides special expertise in the area.

All the statements and writings cited by Appellees in paragraphs two,[4] four,[5] five,[6] and seven[7] of their Motion represent what would be permissible judicial conduct under Canon 4 if done by a sitting judge. If they are permissible activities for a sitting judge, then they offer no impediment to his service now and thus would not be grounds for recusal or disqualification.

---

[4] In paragraph 2, Appellees relate:

> On November 28, 2001, then-Professor Silliman testified as a witness before the Senate Committee on the Judiciary regarding facts and law directly at issue in this case and stated: "I maintain that shortly before 9 o'clock in the morning on Tuesday, September 11th, we were not in a state of armed conflict and we did not enter into a state of armed conflict until some time thereafter, certainly on or after the 7th of October."

Mot. at 2.

[5] "4. In a law review article in 2004 addressing military commission jurisdiction post 9/11, then-Prof. Silliman opined specifically on Article 36, UCMJ, which is central to the instant appeal, and also on Article 21, UCMJ." *Id.* at 3.

[6] In paragraph 5, Appellees state:

> On July 19, 2006, then-Professor Silliman testified as a witness before the Senate Committee on Armed Services, again on matters directly relevant to this case, opinion at length on deviations in military commission from the uniformity requirement of Article 36: "All this is easily accomplished in a military commission system under the UCMJ by justifying, via Article 36(b) of the Code, the need to deviate from the MRE procedures."

*Id.* at 3.

[7] Appellees' paragraph 7 states:

> In a law review article published in 2009, then-Prof. Silliman opined on the significant resources required for security to prosecute someone like Mr. Mohammad in the United States due to the risk of targeting by terrorist cells, specifically expressing concern for the safety of the courtroom hearing Mr. Mohammad's case: "For example, when dealing with very high profile cases such as Khalid Sheikh Mohammed, it is not inconceivable that terrorist cells operating within the U.S. would target the courtroom and prisoner detention facility where he would be kept during trial proceedings."

*Id.* at 3–4.

5

A169

2. <u>Professor Silliman's Public Statements</u>.

Judge Silliman's public statements concerning Appellees are not evidence of prejudice, nor do they give rise to an appearance of prejudice. All the media statements cited by Appellees in paragraphs one,[8] six,[9] and eight through eleven,[10] occurred prior to his appointment as a judge. Although these statements taken out of context and devoid of circumstance might make it appear as if Professor Silliman had made a determination of the guilt of the Appellees, when put in their proper context such appearance is no longer reasonable.

The Supreme Court has stated,

---

[8] "1. Then-Professor Silliman chose to publicly address students at Duke University School of Law on September 12, 2001, Judge[sic] Silliman said 'there is a rage in me, and I suspect within you, that needs to be vented... [sic]' in reference to the attacks of September 11, 2001." *Id.* at 2.

[9] "6. On February 12, 2008, Judge [sic] Silliman was quoted in the Los Angeles Times as saying 'The fact is that we're going to have a military commission for those the United States believes, and most of the world acknowledges, to be ring leaders of the 9/11 attacks... [sic]'" *Id.* at 3.

[10] Media statements eight through eleven are:

8. On August 18, 2009, then-Professor Silliman appeared on C-SPAN's Washington Journal with Susan Davis, and asserted that bringing Guantanamo detainees to the United States for trial was a more "dangerous option" in light of the possibility that a "radicalized" group might stage an attack or protest.

9. On 30 November 2009, Judge [sic] Silliman told the Los Angeles Times, "I think it's likely KSM will want to use the trial as a forum for himself and to put the government on trial. I will be very surprised if he pleads guilty... [sic] We should expect a long, convoluted trial full of difficulties for the government."

10. On November 8, 2010, then-Prof. Silliman was quoted in the media stating an opinion on the guilt or innocence of the Appellees in this case: "We've got the major conspirators in the 9/11 attacks still at Guantanamo Bay – Khalid Sheikh Mohammed and four others... [sic]"

11. On April 5, 2011, then-Prof. Silliman was quoted discussing the manner in which Mr. Mohammad "will be" executed. He said, referencing lethal injection executions carried out by the military in the United States, "I'm assuming the same pattern will be followed, except for the location."

*Id.* at 4–5.

6

A170

> Not all unfavorable disposition towards an individual (or his case) is properly described by [the terms 'bias or 'prejudice']. One would not say, for example, that world opinion is biased or prejudiced against Adolf Hitler. The words connote a favorable or unfavorable disposition or opinion that is somehow *wrongful* or *inappropriate*, either because it is undeserved, or because it rests upon knowledge that the subject ought not to possess (for example, a criminal juror who has been biased or prejudiced by receipt of inadmissible evidence concerning the defendant's prior criminal activities), or because it is excessive in degree (for example, a criminal juror who is so inflamed by properly admitted evidence of a defendant's prior criminal activities that he will vote guilty regardless of the facts).

*Liteky*, 510 U.S. at 550 (emphasis in original). It is not reasonable to suggest that then- Professor Silliman's knowledge, general description, and acknowledgment of the events of September 11, 2001, and the reported actors involved represents prejudice for the purpose of 28 U.S.C. § 455. The Appellees have not alleged that then-Professor Silliman's comments regarding Appellee Mohammad were based on personal knowledge that was received through inappropriate means. To the contrary, an objective observer would reasonably conclude that Professor Silliman's comments reflected knowledge gained from readily available reporting on the events and the actors involved. One would be hard-pressed to find an appellate judge in the United States who is unaware of the events of September 11, 2001, and the actors widely reported to be involved. When considering the impact of extra-judicial opinions, the Supreme Court has observed,

> The fact that an opinion held by a judge derives from a source outside judicial proceedings is not a necessary condition for 'bias or prejudice' recusal, since predispositions developed during the course of a trial will sometimes (albeit rarely) suffice. *Nor is it a sufficient condition for 'bias or prejudice' recusal, since some opinions acquired outside the context of judicial proceedings (for example, the judge's view of the law acquired in scholarly reading) will not suffice.*

*Id.* at 554 (emphasis added). It is objectively unreasonable to believe, based on the content of the public statements identified in Appellees' Motion, that Judge Silliman has any more personal knowledge of the events of 9/11 than any other well informed citizen of the United States. As

7

A171

such, this knowledge is not a basis for recusal or disqualification. To the extent that any opinion of Judge Silliman concerning Appellee Mohammad, or any of the other Appellees, could possibly be ascertained by his public statements, those opinions are precisely the type of opinions that do not rise to the level of prejudice. "A motion to recuse, however, is not intended to give litigants a veto power over sitting judges, or a vehicle for obtaining a judge of their choice. We assume the impartiality of a sitting judge and the party seeking disqualification bears the substantial burden of proving otherwise." *White v. NFL*, 585 F.3d 1129, 1139 (8th Cir. 2009) (internal quotation marks and citations omitted). The decision on recusal or disqualification is one the judge must make. However, if Judge Silliman does not recuse himself, Appellees' vague allegations, simple rule recitations, and conclusory statements would be insufficient to compel a different result on appeal.

It is important to note that all of Professor Silliman's statements to the media that Appellees identified occurred before he became a judge on this Court. All of the statements were made in his capacity as a law professor specializing in national security and military law— the very body of law that is concerned with the law of war and the proper role of military commissions—a specialty that has provided him with unique and valuable knowledge and insight regarding the issues under consideration. The statements were not prohibited at the time. The only issue then is whether these statements reflect prejudice that would cause a reasonable person to question Judge Silliman's ability to participate in this appeal impartially. The answer is no. The comments Appellees point to in paragraph eight of the Motion simply reflect the reality of the world today. There is no requirement for a judge to stick his head in the sand and ignore the state of the world around him. "Impartiality is not gullibility. Disinterestedness does not mean child-like innocence." *Liteky*, 510 U.S. at 551.

8

A172

Specifically addressing paragraph 11 of the Motion, Appellees' characterization of Professor Silliman's statement is completely misleading. While the article is about Appellee Mohammad, there is nothing in the language quoted that indicates that Professor Silliman's comments related directly to Appellee Mohammad. *See* 1 Mot. App., Tab 11. The paragraph of the article that quotes Professor Silliman reads as follows,

> That law is silent on the method of execution, but lethal injection is the military's official execution method. And while the Army's death row is at Fort Leavenworth in Kansas, experts in military law suspect [Khalid Shaikh Mohammad]'s lethal injection would probably be carried out at [Guantanamo Bay, Cuba]. "I'm assuming the same pattern will be followed, except for the location," says Scott Silliman of Duke Law School.

Mot. App., 126. First, the paragraph does not state that Appellee Mohammad "will be" executed as the Appellees claim. Mot. ¶ 11. Second, any speculation about whether Appellee Mohammad would be executed, and if so how, is by the author and is not reflected in the quoted statement from Professor Silliman. Third, there is no indication from the article that Professor Silliman was responding to a question posed specifically about Appellee Mohammad. The only reasonable conclusion from the quoted statement is that Professor Silliman assumed that if a military commission death sentence were carried out, it would be carried out in the same manner, but at a different location, as other military death sentences.

3. Professor Silliman's Comments about BG Martins

In paragraph twelve of the Motion,[11] Appellees took Judge Silliman's comments about the Chief Prosecutor out of context, and those comments were not portrayed accurately by

---

[11] In paragraph 5, Appellees state:

> On March 1, 2013, Judge Silliman introduced Brigadier General Mark Martins at the Duke Law School annual conference on Law, Ethics and National Security (LENS). BG Martins is the Chief Prosecutor for Military Commissions. Judge Silliman pointed out approvingly, "One of our colleagues, close colleagues, Bobby Chesney, professor of law at University of Texas, I think said it well. He

9

A173

Appellees. Appellees describe Judge Silliman's comments while introducing BG Martins during an academic conference in March 2013 as "glowing[]." Mot. at 8. Although the Appellees' quotation of Judge Silliman is accurate, it's important to remember that Judge Silliman was paraphrasing a comment made by a colleague. Judge Silliman paraphrased this comment made by Professor Robert Chesney: "[i]f in 2001 we'd had the 2009 Military Commissions Act and Mark Martins in charge of the prosecution, from the get-go there would have been significant focus on the legitimacy of the system, rather than on the more draconian-looking, multiyear process we got. I'm sure some would still be critical, but it would not have become the cause célèbre it continues to be." 1 Mot. App., 137. Judge Silliman prefaced his paraphrase of this comment by saying that Mr. Chesney "said it well" and followed it by stating that the quote was "a very fair statement." *See* 2 Mot. App., Tab 3, at 3:22 and 3:49. If anything, noting the Chief Prosecutor's focus on the system's legitimacy demonstrates Judge Silliman's commitment to fairness, not bias. Further, these statements were made while Judge Silliman was introducing BG Martins prior to a presentation at an academic conference, during which Judge Silliman read BG Martins's credentials and experience from a paper on the podium. *Id.*, Tab 3, at 0:12–4:35. No reasonable person with knowledge of the facts would believe that these statements demonstrate any actual or apparent bias favoring BG Martins or the prosecution in general.

 WHEREFORE, while recognizing that the decision on recusal or disqualification is a decision the challenged judge must make on his own, Appellant opposes Appellees' Motion for

---

said if in 2001, after 9/11, if we had had the 2009 Military Commissions Act, and if we had had General Martins as the chief prosecutor, much of the dialogue back and forth arguing about military commissions probably would have been minimized. And I think that's a very fair statement."

Mot. at 5.

Recusal or Disqualification of Judge Silliman because the matters contained therein would not

lead a reasonable observer to question Judge Silliman's impartiality.

Respectfully submitted,

//s//
_____
MARK S. MARTINS
Brigadier General, U.S. Army
Chief Prosecutor

MICHAEL J. O'SULLIVAN
Appellate Counsel for the United States
Office of the Chief Prosecutor
Office of Military Commissions
1610 Defense Pentagon
Washington, D.C. 20301-1610
michael.j.osullivan14.civ@mail.mil
Tel. (703) 275-9033
Fax (703) 275-9105

A175

**CERTIFICATE OF SERVICE**

I certify that a copy of the foregoing was sent by electronic mail to the Court and Counsel for all five Appellees on May 15, 2017.

//s//
_____

MICHAEL J. O'SULLIVAN
Appellate Counsel for the United States
Office of the Chief Prosecutor
Office of Military Commissions
1610 Defense Pentagon
Washington, D.C. 20301-1610
michael.j.osullivan14.civ@mail.mil
Tel. (703) 275-9033
Fax (703) 275-9105

A176

| | |
|---|---|
| UNITED STATES OF AMERICA | ) IN THE UNITED STATES COURT OF |
| | ) MILITARY COMMISSION REVIEW |
| *Appellant,* | ) |
| | ) **REPLY TO APPELLANT'S OPPOSITION** |
| v. | ) **TO APPELLEES' MOTION FOR** |
| | ) **RECUSAL AND/OR DISQUALIFICATION** |
| KHALID SHAIKH MOHAMMAD, | ) **OF JUDGE SILLIMAN** |
| | ) |
| WALID MUHAMMAD SALIH MUBAREK | ) |
| BIN 'ATTASH, | ) USCMCR Case No. 17-002 |
| | ) |
| RAMZI BINALSHIBH, | )  Arraigned at Guantanamo Bay, Cuba |
| | )     on May 5, 2012 |
| ALI ABDUL-AZIZ ALI, | ) |
|    AKA AMMAR AL BALUCHI, | ) Before a Military Commission |
| | )     convened by Vice Admiral (ret.) |
| And | )     Bruce E. MacDonald, USN |
| | ) |
| MUSTAFA AHMED ADAM AL HAWSAWI | ) Presiding Military Judge |
| | ) Colonel James L. Pohl, USA |
| *Appellees,* | ) |
| | ) DATE: 22 May 2017 |

## TO THE HONORABLE, THE JUDGES OF
## THE UNITED STATES COURT OF MILITARY COMMISSION REVIEW

**I.    THIS PANEL CAN ADDRESS THE MERITS OF APPELLEE'S MOTION**

Appellant's entire argument in response to Mr. Mohammad's motion to disqualify based

on 10 U.S.C. §973(b) is to cite the order of the United States Court of Military Commission

Review (USCMCR) in *United States v. Al-Nashiri*[1] in which this court found that Judges

Mitchell and King did not "occupy a 'civil office' when serving as appellate military judges on

the Court of Military Commissions Review." (Resp. at 2). However, Appellant fails to

acknowledge the language of the Court of Appeals for the Armed Forces in *United States v.*

*Ortiz*, 2017 CAAF LEXIS 288 (C.A.A.F. April 17, 2017) which was decided *after* this Court's

---

[1] NO. 14-001 (USCMCR May 18, 2016).

1

decision in *Al-Nashiri*[2]. Because the decisions of this Court should not conflict with the Court of Appeals for the Armed Forces[3], and because the language of the *Ortiz* decision is in direct conflict with the finding of this Court, review in this Court is appropriate[4].

## II.    UNITED STATES COURT OF MILITARY COMMISSION REVIEW JUDGES HOLD A CIVIL OFFICE AND THEREFORE ARE SUBJECT TO 10 U.S.C. §973(b)

As the Court of Appeals for the Armed Forces noted in *Ortiz*:

> While there is much that is unsettled about this situation, the aim of the statute [10 U.S.C. §973(b)] is clear. The evil sought to be protected against is the unauthorized holding of civil office by officers of the armed forces on active duty, which is thought to threaten "civilian supremacy in the conduct of governmental affairs." S. Rep. No. 98-174, at 232 (1983), as reprinted in 1983 U.S.C.C.A.N. 1081, 1122. Thus, the prohibitions in the statute are aimed at the holding of "civil office" (*here, civil office requiring presidential appointment with Senate advice and consent*) rather than the performance of *assigned* military duty. (Emphasis added) 2017 CAAF LEXIS 288 at p.5.

Judges of the USCMCR are performing a civil function when they serve as the intermediate appellate court on cases arising from the Military Commissions. Any doubt that CMCR judges hold a "civil office" is conclusively settled by the 2009 amendments to the MCA, which

---

[2] Additionally, because all USCMCR judges are now appointed not assigned, their designation no longer would be as 'appellate military judges' but rather as 'additional judges.' 10 U.S.C. §950(b)(3).

[3] Although decisions of the USCMCR in cases arising from the Military Commissions are not reviewed by the Court of Appeals for the Armed Forces (C.A.A.F.), where, as here, the issue raised is virtually identical to a finding of the C.A.A.F., this Court should respect that authority. *See e.g.* this Court's reliance on *United States v. Ali*, 71 M.J 256, 264 (C.A.A.F. 2012) in its Opinion in *Al-Nashiri* (CMCR 14-001, June 9, 2016). See also, United *States v. Ribaudo*, 62 M.J. 286 (2006) (holding prospectively applied "to ensure *consistency among* the service *Courts of Criminal Appeals*,")(emphasis added.)

[4] If the panel determines that the conflict with the language from the *Ortiz* decision is not sufficient for this panel to address the issue, USCMCR Rules of Practice Rule 5 allows referral *en banc* if: "(1) En banc consideration is necessary to secure or maintain uniformity of the court's decisions; or (2) The proceeding involves a question of exceptional importance." Appellee respectfully submits that this issue certainly involves a 'question of exceptional importance' as it will be dispositive of this and all future military commission appeals under the current statutory scheme. *See Ortiz* at p.5-6.

reconstituted that body as an Article I "court of record." 10 U.S.C. § 950f(a); *see also In re*

*Khadr*, 823 F.3d 92, 96 (D.C. Cir. 2016[5]). As in *Freytag v. C.I.R.*, 501 U.S. 868 (1991), "the

clear intent of Congress [was] to transform" the CMCR from an entity wholly within the

Executive Branch "into an Article I legislative court," *id.* at 888, the judges of which hold a

quintessential "civil office." *See, e.g.*, *Winchell* v. *United States*, 28 Ct. Cl. 30, 35 (1892).

Additionally, USCMCR judges are answerable only to the Article III D.C. Circuit, and are

protected from removal except for "good cause" or "military necessity." *See* 10 U.S.C. § 949(b);

*Khadr*, 823 F.3D at 98.  Judges on the USCMCR are Article I judges exercising the judicial

power of the United States and thus are subject to 10 U.S.C. §973(b).

    This Court's order in *Al-Nashiri* asserts that "[D]isposition of violations of the law of war

by military commissions is a classic military function." However, unlike the military

commissions themselves, the USCMCR hears *appeals* as an Article I court of record, *see* 10

U.S.C. § 950f(a), which is not a "classic" military function[6]. *See e.g. Weiss v. United States,* 510

U.S. 163 (1994).  Nor is it "inherently military," because the USCMCR includes civilian judges

and has exercised jurisdiction over domestic, non-military offenses[7]. *See, e.g., Bahlul* v. *United*

---

[5] *In re Khadr* was decided by the D.C. Circuit two days after this court's order in *Al-Nashiri*; accordingly the language from *Khadr* is yet another reason this panel can revisit the issue.

[6] "Although Congress has on numerous occasions during our history revised the procedures governing courts-martial, it has never required tenured judges to preside over courts-martial *or to hear immediate appeals therefrom*…. Congress did not even create the position of military judge until 1968." *Weiss v. United States,* 510 U.S. 163, 179 (1994)(emphasis added). Further, military commissions have only been subject to direct appellate review since 2005. *See Department of Defense Military Commission Instruction No. 9* (October 11, 2005)

[7] This Court's holding also ignores the distinction between the actions that a military officer participates in, and the nature of the entity for which those actions are taken. For example, a military officer might supervise a team that fixes trucks– if those trucks belong to the military, the officer is performing a military function; but if the trucks belong to a nonprofit entity where the officer volunteers on weekends (even supervising the same people), such supervision is not a 'military function.' Accordingly, while a judge presiding over a court-martial would be a 'military function,' presiding over a case in an Article I appellate court is distinctly civil.

3

*States*, 840 F.3d 757 (D.C. Cir. 2016) (en banc) (per curiam), *petition for cert. filed*, No. 16-1307 (U.S. Mar. 28, 2017).

As the Office of Legal Counsel (OLC) explained in 1983, "the provision was intended to bar the appointment of regular military officers to *any* appointive positions in the civil government, irrespective of the importance of the office, the permanence of the appointment, or the likelihood of interference with the officer's military duties." *Off. of Legal Counsel, Applicability of 10 U.S.C. § 973(b) to JAG Officers Assigned to Prosecute Petty Offenses Committed on Military Reservations* 15 (May 17, 1983) [hereinafter "1983 OLC Memo"] (emphasis added).1 This was so because "allowing active duty regular military officers to hold civil office [would be] 'in conflict with the fundamental principle of republican institutions.'" *Id.* at 11 (quoting Cong. Globe, 41st Cong., 2d Sess. App. 3403 (May 12, 1870) (statement of Sen. Sumner)).

Among other things, § 973(b) makes it unlawful for an active-duty military officer to "hold, or exercise the functions of, a civil office in the Government of the United States . . . that requires an appointment by the President by and with the advice and consent of the Senate," except where such service is "otherwise authorized by law." 10 U.S.C. § 973(b)(2)(A)(ii). Thus, as relevant here, the dual-office holding ban applies to all "civil offices" held either by principal Executive Branch officers, *see Myers v. United States*, 272 U.S. 52 (1926), or by inferior officers whose appointment has not properly been vested in some other body. See U.S. CONST. art. II, § 2, cl. 2 (requiring presidential nomination and Senate advice and consent for inferior officers the appointment of whom Congress has not vested "in the President alone, in the courts of law, or in the heads of departments").

As previously noted, the Office of Legal Counsel itself has concluded that a position is a "civil office" so long as it "is one established by statute, and . . . its duties involve the exercise of

4

A180

'some portion of the sovereign power.'" *1983 OLC Memorandum,* Appellee Appendix at Tab 4. The position of "additional judge" on the CMCR is established by statute, *see* 10 U.S.C. § 950f(b)(3); and it exercises "some portion of the sovereign power," *see id.* § 950f(d) (setting out the CMCR's formal authority on appeal).

Judges on the USCMCR are Article I judges exercising the judicial power of the United States. They hold a quintessential "civil office" and therefore military officers are prohibited from serving as USCMCR judges pursuant to 10 U.S.C. §973(b)[8].

## III.   SERVICE BY A MILITARY OFFICER AS AN APPOINTED JUDGE ON THE USCMCR VIOLATES THE COMMANDER-IN-CHIEF CLAUSE OF THE UNITED STATES CONSTITUTION

Appellant's response to Mr. Mohammad's argument that service by a military officer as an appointed judge on the USCMCR violates the Commander-in-Chief Clause asserts that "no court has found this argument persuasive." (App. Br. At 4) However, as the D.C. Circuit found in *Khadr,* a decision issued two days *after* this Court's Order in *Al-Nashiri*, USCMCR judges "may be removed by the President only for cause and not at will." *Khadr*, 823 F.3d at 98.  USCMCR judges "cannot . . . be removed by the President except [for] . . . inefficiency, neglect of duty, or malfeasance in office," *i.e.*, they have "good-cause tenure." *Free Enterprise Fund* v. *Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 487, 493 (2010).  *See also Free Enterprise Fund* v. *Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 487, 493 (2010).  Such a constraint on the

---

[8] Appellant does not address this Court's finding in *Al-Nashiri* that the appointment of a military officer to the USCMCR, even if a civil office, is 'authorized by law,' even though it was addressed in Appellee's Motion to Disqualify. Appellee would further note that if Congress wanted to exempt USCMCR judges from §973(b), it would have done so. *See e.g. Department of Defense Authorization Act*, 1984, § 1002(d), 97 Stat. at 656; *See* S. REP. NO. 98-174, at 258 (1983) (The same section of the statute that amended § 973(b) separately authorized the President to appoint an active-duty military officer to serve as Chairman of the Red River Compact Commission, and provided that his acceptance of such an appointment "shall not terminate or otherwise affect [his] appointment as a military officer.")

President's power over active-duty military officers raises constitutional concerns of the first order. *E.g.*, *Fleming* v. *Page*, 50 U.S. (9 How.) 603, 615(1850). Indeed, it is well settled that it would be unconstitutional for Congress to "insulate [a military] officer from presidential direction or removal." David Barron & Martin Lederman, *The Commander-in-Chief at Its Lowest Ebb: A Constitutional History*, 121 HARV.L.REV.941, 1103–04 (2008). So, if the dual-office holding ban discussed above does *not* prohibit active-duty military officers from serving as USCMCR judges, then the good-cause removal protection provided by 10 U.S.C. §950f(b)(3) would "insulate [a military] officer from presidential direction or removal" in violation of the Commander-in-Chief Clause of the Constitution.

## CONCLUSION

For all the reasons stated above, and those stated in Appellee's Motion to Disqualify, this appeal should be abated until a properly constituted court is convened.

Respectfully submitted,

//s//
DAVID Z. NEVIN
Learned Counsel

//s//
GARY D. SOWARDS
Defense Counsel

//s//
DEREK A. POTEET
Maj, USMC
Defense Counsel

//s//
RITA RADOSTITZ
Defense Counsel

*Counsel for Mr. Mohammad*

6

A182

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing was sent via email to the Clerk of the U.S. Court of

Military Commission Review and all parties of record on the 22nd day of May 2017.

//s//
DAVID Z. NEVIN
Learned Counsel
dnevin@nbmlaw.com

A183

UNCLASSIFIED//FOR PUBLIC RELEASE



**UNITED STATES**
**COURT OF MILITARY COMMISSION REVIEW**

| | | |
|---|---|---|
| United States, | ) | BRIEFING SCHEDULE AND |
|     Appellant | ) | |
| | ) | |
| v. | ) | PANEL DESIGNATION |
| | ) | |
| Khalid Shaikh Mohammad | ) | |
| | ) | |
| Walid Muhammad Salih | ) | |
|     Mubarek Bin 'Attash | ) | |
| | ) | |
| Ramzi Binalshibh | ) | |
| | ) | |
| Ali Abdul Aziz Ali, and | ) | |
| | ) | |
| Mustafa Ahmed Adam al | ) | CMCR Case No. 17-002 |
|     Hawsawi, | ) | |
|     Appellee | ) | April 25, 2017 |

**BEFORE:**

**BURTON, PRESIDING Judge**
**HERRING, SILLIMAN, Judges**

By order of the Deputy Chief Judge Scott L. Silliman, the judges assigned to the case of *United States v. Khalid Shaikh Mohammad et. al.* are as follows:

| | |
|---|---|
| Presiding Judge | Paulette V. Burton |
| Judge | James W. Herring, Jr. |
| Judge | Scott L. Silliman |

Appellee's answer and appellant's reply are due in accordance with CMCR Rule of Practice 15(c)(1) (Feb. 3, 2016).

1

UNCLASSIFIED//FOR PUBLIC RELEASE

A184

UNCLASSIFIED//FOR PUBLIC RELEASE

FOR THE COURT:

Mark Harvey
Clerk of Court, U.S. Court of Military
Commission Review

2

UNCLASSIFIED//FOR PUBLIC RELEASE

A185

USCMCR Judges                                                                   Page 1 of 2



Home     VWAP Login     Search... Go

ABOUT US   CASES   FACILITIES/SERVICES   VICTIM/WITNESS ASSISTANCE   LEGAL RESOURCES   NEWS/MEDIA RESOURCES   CONTACT US

You are here: Home   ABOUT US   USCMCR Judges

ABOUT US
  ORGANIZATION OVERVIEW
    ORGANIZATIONAL CHART
  MILITARY COMMISSIONS
  HISTORY
  USCMCR HISTORY
  **USCMCR JUDGES**
  LEGAL SYSTEM COMPARISON
  FAQS
CASES
FACILITIES/SERVICES
VICTIM/WITNESS ASSISTANCE
LEGAL RESOURCES
NEWS/MEDIA RESOURCES
CONTACT US

### Current Panel Assignments
Judges U.S. Court of Military Commissions Review[1]

**Chief Judge**

Chief Judge Paulette V. Burton

**Deputy Chief Judge**

Scott L. Silliman (Sworn as USCMCR Judge: September 12, 2012; Sworn as Deputy Chief Judge: Mar. 11, 2014)

**Judges**

William B. Pollard, III (Sworn as USCMCR Judge: September 14, 2012)

Colonel James Wilson Herring, Jr., USA (Sworn as USCMCR Judge: September 23, 2015)

Colonel Larss G. Celtnieks, USA (Sworn as USCMCR Judge: September 23, 2015)

Lieutenant Colonel Paulette Vance Burton, USA (Sworn as USCMCR Judge: September 23, 2015)

[1] Judges are appointed to and reassigned from the USCMCR under the 2009 Military Commissions Act, 10 U.S.C. § 950f(b); the 2012 Manual for Military Commissions, Rule for Military Commissions 1201(b); and the 2011 Regulation for Trial by Military Commission, paragraph 25-2. Seniority is based on the date when the Judge was sworn as a USCMCR Judge.

Privacy Statement & Disclaimer | Accessibility/Section 508
4800 Mark Center Drive, Suite 11F09-02 Alexandria, VA 22350-2100

Cases

Page 1 of 2



ABOUT US    CASES    FACILITIES/SERVICES    VICTIM/WITNESS ASSISTANCE    LEGAL RESOURCES    NEWS/MEDIA RESOURCES    CONTACT US

You are here: Home CASES

CMCR

Keyword Search

*Select a case to enable search field.*

**You searched for:**

Remove | Khalid Shaikh Mohammed (17-002)

Refine your search further

**Date range**

FROM

TO

## Khalid Shaikh Mohammed (17-002)

The Office of Military Commissions is committed to the goal of transparency. Please be advised that some posted materials may be redacted in part or in whole through a review conducted by the DoD Security Classification/Declassification Review Team and any relevant non-DoD federal departments or agencies to prevent the release of classified and/or protected information in accordance with Chapters 17 and 19, Regulation for Trial by Military Commission.

Sort by                                                                    (Showing 5 of 5 results)

| File Description | File Date ▼ | Source ▲ | |
|---|---|---|---|
| Prosecution Reply to Defense Merits Brief | 05/15/2017 | Prosecution | |
| Prosecution Opposes All Defense Motions | 05/15/2017 | Prosecution | |
| Court Dockets Case | 04/25/2017 | Court | |
| Government files Merits Brief | 04/24/2017 | Prosecution | |
| Government files Notice of Appeal of dismissal of Charges III and V | 04/12/2017 | Prosecution | |

Show All

Number of results per page: 10 ▾

Page: 1 of 1

Previous Next

Office of Military Commissions > ABOUT US > USCMCR History                    Page 1 of 2



Home        VWAP Login        Search... [Go]

ABOUT US    CASES    FACILITIES/SERVICES    VICTIM/WITNESS ASSISTANCE    LEGAL RESOURCES    NEWS/MEDIA RESOURCES    CONTACT US

**You are here:** Home    ABOUT US    USCMCR History

## U.S. Court of Military Commissions Review (USCMCR) History

ABOUT US
ORGANIZATION OVERVIEW
    ORGANIZATIONAL CHART
MILITARY COMMISSIONS
HISTORY
USCMCR HISTORY
USCMCR JUDGES
LEGAL SYSTEM COMPARISON
FAQS
CASES
FACILITIES/SERVICES
VICTIM/WITNESS ASSISTANCE
LEGAL RESOURCES
NEWS/MEDIA RESOURCES
CONTACT US

After the terrorist attacks on the United States on September 11, 2001, Congress adopted a joint resolution authorizing the President to use all necessary and appropriate force against the nations, organizations or persons that planned, authorized, committed or aided the terrorist attacks. On November 13, 2001, the President issued an order governing the detention, treatment and trial of certain non-citizens in the war against terrorism. The order provided for trial by military commission of any noncitizen for whom there was "reason to believe" that the person was a member of al Qaeda or had engaged or participated in terrorist activities aimed at or harmful to the United States.

The Secretary of Defense published Military Commission Order (MCO) No. 1 on March 21, 2002, and revised it on August 31, 2005, to implement the President's order. MCO No. 1 provided for a Review Panel, appointed by the Secretary of Defense and consisting of three military officers, who could be civilians commissioned pursuant to Title 10, Section 603 of the United States Code. The Review Panel would review each conviction and send the case to the Secretary of Defense with a recommendation for disposition or return the case to the Appointing Authority if it found that a material error of law had occurred.

On September 21, 2004, the Secretary of Defense appointed four civilians with a view toward commissioning them as temporary major generals in the U.S. Army when ordered to active duty as members of the Review Panel. He appointed former Attorney General of the United States (Carter Administration) Griffin Bell as Chief Judge, former Secretary of Transportation (Ford Administration) William Coleman as Appellate Judge, Chief Justice of the Rhode Island Supreme Court Frank Williams as Appellate Judge, and former Congressman and Attorney General for the State of Pennsylvania Pete Blester as Appellate Judge.

On November 8, 2004, before any cases came before the Review Panel, a District Court granted a habeas petition, and stayed the military commission trial of Salim Ahmed Hamdan. Hamdan v. Rumsfeld, 344 F. Supp. 2d 152 (D.C. 2004). On December 10, 2004, the Appointing Authority stopped all military commissions pending resolution of the habeas issues in the federal courts. On July 15, 2005, a D.C. Circuit panel unanimously reversed the District Court and dissolved the stay imposed on Hamdan's military commission. Hamdan v. Rumsfeld, 415 F.3d 33 (D.C. Cir. 2005). Shortly thereafter, the Supreme Court granted certiorari, and military commission trials were again halted.

On June 29, 2006, the Supreme Court ruled in Hamdan v. Rumsfeld, 548 U.S. 557, 635 (2006), that the military commission scheme violated the Uniform Code of Military Justice (UCMJ) and the Geneva Conventions, and that the Appellant was entitled to the protections of Common Article 3 of the Geneva Conventions. In response, Congress passed the Military Commissions Act (MCA) of 2006.

In October 2006, the President signed into law the 2006 Military Commissions Act, which created the Court of Military Commission Review, composed of military appellate judges or civilians with "comparable qualifications." The Court was authorized to sit as a whole or in panels of three. Its appellate jurisdiction was limited to matters of law. Fifteen military appellate judges and four civilians of "comparable qualifications" were appointed to the Court by the Secretary of Defense. The Court heard and issued decisions on interlocutory issues in four cases.

In September 2007, the Court made three important decisions. In United States v. Khadr, 07-001 (Sept. 19, 2007), the Court decided that the Government appeal was timely and the Deputy Secretary of Defense had authority under 10 U.S.C. § 113 to approve the Court's rules of practice and it clarified the authority of the Deputy Chief Judge. In United States v. Khadr, 07-001 (Sept. 24, 2007), the Court held that the military commission could determine that it had personal jurisdiction over Khadr in accordance with long-standing practice in military courts-martial. The military commission could itself decide whether Khadr was an unlawful enemy combatant under the 2006 MCA. In a separate order dated September 24, 2007, the Court ruled the Deputy Secretary of Defense had authority to create the position of Deputy Chief Judge, and the Deputy Chief Judge could assign the judges to Khadr's panel. In Khadr v. United States, 529 F.3d 1112 (D.C. Cir. 2008), the D.C. Circuit declined to review the decision of the Court of Military Commission Review.

Two writs filed with the Court were summarily denied: Al Odah, CMCR No. 08-001 (March 21, 2008); and Mohammed, CMCR No. 08-002 (June 3, 2008). The writ in Jawad, CMCR No. 08-004 (July 31, 2009) was denied after oral argument on January 13, 2009.

In October 2008, the Court dismissed the government's appeal in United States v. Khadr, 753 F. Supp. 2d 1153 (CMCR 2008) because it was not filed in a timely fashion in accordance with Section 950d of the 2006 MCA.

On June 24, 2011, the Court affirmed the finding and sentence of Salim Ahmed Hamdan and decided three issues: (1) Congress had the power to define the offense of providing material support to terrorism as a violation of the international law of war under Article I of the U.S. Constitution; (2) Hamdan's conviction for that offense is not the result of an ex post facto prosecution prohibited by both the U.S. Constitution and international law; and (3) the 2006 Military Commissions Act does not violate the Constitution by making aliens, but not citizens, subject to trial by military commission. On

A188

October 16, 2012, the U.S. Court of Appeals for the District of Columbia Circuit reversed Hamdan's conviction for material support to terrorism in Hamdan v. United States, 696 F.3d 1238 (D.C. Cir. 2012), in holding the Military Commissions Act did not authorize retroactive prosecution for conduct that was committed before the Act's enactment and was not prohibited by U.S. law at the time the conduct occurred. The International law of war did not proscribe material support for terrorism as a war crime at the time that Hamdan was providing such support to al Qaeda and because material support for terrorism was not a pre-existing war crime, Hamdan's conviction for material support for terrorism could not stand.

On September 9, 2011, the Court affirmed the findings and sentence of Ali Hamza Ahmad Suliman al Bahlul and decided six issues: (1) his convictions for conspiracy, providing material support to terrorism, and solicitation constitute war crimes triable by military commission; (2) the offense of providing material support for terrorism did not violate the Ex Post Facto Clause of the U.S. Constitution; (3) al Bahlul's communications did not constitute political speech protected by the First Amendment of the U.S. Constitution; (4) the 2006 Military Commissions Act is not an unconstitutional Bill of Attainder; (5) his prosecution does not violate the Constitution's Equal Protection Clause by making aliens, but not citizens, subject to trial by military commission; and (6) al Bahlul's sentence of life imprisonment is not inappropriately severe and disproportionate to the sentences of closely-related defendants. On April 23, 2013, the U.S. Court of Appeals for the District of Columbia Circuit vacated a previously-issued panel decision and ordered an en banc review of al Bahlul's case. On July 14, 2014, the U.S. Court of Appeals for the District of Columbia Circuit: (1) "reject[ed] Bahlul's ex post facto challenge to his conspiracy conviction" Slip Opinion at 53; (2) held prosecution of Bahlul for providing material support to terrorism and solicitation was "a plain ex post facto violation—again, assuming without deciding that the protection of the Ex Post Facto Clause extends to Bahlul," id. at 49-50, 52; (3) vacated Bahlul's convictions of providing material support to terrorism and solicitation, id. at 53; (4) remanded four issues to the panel that first heard Bahlul's case, id. at 53; and (5) "after panel consideration, [of the four issues] remand[ed] to the CMCR to determine the effect, if any, of the two vacaturs on sentencing," id. at 53. The July 14, 2014 Judgment and Remand are attached. On June 12, 2014, a three judge panel of the U.S. Court of Appeals for the District of Columbia Circuit set aside Al Bahlul's conviction of conspiracy to violate the international law of war, declaring the conspiracy offense in the Military Commissions Act to be unconstitutional because conspiring to commit war crimes does not violate the international law of war.

On March 27, 2013, the Court dismissed the American Civil Liberties Union (ACLU) and ACLU Foundation requests for a writ of mandamus seeking release of documents by the military commission. On March 27, 2013, the Court dismissed various media requests for a writ of mandamus seeking release of documents by the military commission.

On April 24, 2014, the Court denied Al Qosi's requests for new trial and extraordinary writs because appointed defense counsel did not have Al Qosi's permission to file the request for new trial and the extraordinary writs. Appointed defense counsel acted without an established attorney-client relationship with Al Qosi, and her actions on Al Qosi's behalf are a nullity. The requests to intervene by Al Hawsawi and Al Shibh were also denied. On May 1, 2015, the U.S. Court of Appeals for the District of Columbia Circuit dismissed Al Qosi's Appeal for lack of jurisdiction.

The Court's oral arguments in four cases have been held at the United States Court of Appeals for the Federal Circuit in Washington, D.C.

The 2009 Military Commissions Act (MCA) modified the CMCR, renaming it the United States Court of Military Commission Review, and expanding the scope of the Court's jurisdiction beyond the former CMCR, to include factual sufficiency of the evidence, making the scope of review the same as the Service Courts of Criminal Appeals created in the Uniform Code of Military Justice. The 2009 MCA was amended in 2011 and 2013. The Secretary of Defense appoints judges from the Service Courts of Criminal Appeals to the United States Court of Military Commission Review. The 2009 MCA granted the President authority to appoint civilian judges, with the advice and consent of the Senate. Here is the list of judges currently serving on the USCMCR.

The 2009 MCA's protections of the independence of appellate judges is similar to the protections of appellate judges assigned to the Service Courts of Criminal Appeals under the Uniform Code of Military Justice, except judges assigned to the United States Court of Military Commission Review have statutory tenure. As such, the 2009 MCA is more protective of the independence of appellate judges than the Uniform Code of Military Justice.
The Rules of Practice for the United States Court of Military Commission Review were primarily derived from the Rules of Practice used by the Service Courts of Criminal Appeals for the review of courts-martial cases involving military personnel.

Privacy Statement & Disclaimer | Accessibility/Section 508
4800 Mark Center Drive, Suite 11F09-02 Alexandria, VA 22350-2100

A189